# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SIMON CAMPBELL and PENNSYLVANIANS FOR UNION REFORM, | : | |
| | : | |
| *Plaintiffs*, | : | No. 2:18-CV-892-JD |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA SCHOOL BOARDS ASSOCIATION, MICHAEL FACCINETTO, DAVID HUTCHINSON, OTTO W. VOIT III, KATHY SWOPE, LAWRENCE FEINBERG, ERIC WOLFGANG, DANIEL O'KEEFE, DARRYL SCHAFER, THOMAS KEREK, and LYNN FOLTZ, | : | |
| | : | |
| *Defendants*. | : | |

## <u>PROPOSED ORDER</u>

AND NOW, this ____ day of _____, 2018, upon consideration of the Plaintiffs' Motion for Entry of a Permanent Injunction (the "Motion") and the opposition of the Defendants, it is hereby ORDERED and DECREED that the Motion is DENIED.

IT IS SO ORDERED.

_____
The Hon. Jan E. DuBois

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SIMON CAMPBELL and PENNSYLVANIANS FOR UNION REFORM, | : | |
| *Plaintiffs*, | : | No. 2:18-CV-892-JD |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA SCHOOL BOARDS ASSOCIATION, MICHAEL FACCINETTO, DAVID HUTCHINSON, OTTO W. VOIT III, KATHY SWOPE, LAWRENCE FEINBERG, ERIC WOLFGANG, DANIEL O'KEEFE, DARRYL SCHAFER, THOMAS KEREK, and LYNN FOLTZ, | : | |
| *Defendants*. | : | |

## DEFENDANTS' INJUNCTION HEARING BRIEF

Michael I. Levin, Esq. (PA 21232)
David W. Brown, Esq. (PA 201553)
LEVIN LEGAL GROUP, P.C.
1301 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006
Phone: (215) 938-6378
mlevin@levinlegalgroup.com
dbrown@levinlegalgroup.com

*Attorneys for Defendants*

Defendants Pennsylvania School Boards Association ("PSBA"), Michael Faccinetto, David Hutchinson, Otto W. Voit III, Kathy Swope, Lawrence Feinberg, Eric Wolfgang, Daniel O'Keefe, Darryl Schafer, Thomas Kerek, and Lynn Foltz (the "Individual Defendants"), through their counsel, the Levin Legal Group, P.C., hereby submit this Defendants' Injunction Hearing Brief (the "Hearing Brief").

## PROCEDURAL HISTORY

On February 28, 2018, the Plaintiffs Simon Campbell and his nonprofit corporation, Pennsylvanians for Union Reform (hereinafter referred to together or individually as "Campbell") filed the Complaint in this matter, asserting causes of action against PSBA and the Individual Defendants in their individual capacities for alleged violations of the First Amendment pursuant to 42 U.S.C. § 1983, alleging that the Defendants "acted under color of state law."  Then on April 20, 2018, Plaintiffs filed a Motion for Entry of a Permanent Injunction (the "Injunction Motion").  Defendants filed a response to the Injunction Motion on May 4, 2018.

On April 27, 2018, Defendants filed a Motion to Dismiss the Complaint and/or Strike Impertinent and Scandalous Language (the "Motion to Dismiss"). Plaintiffs filed a Response to the Motion to Dismiss on May 10, 2018, and Defendants filed a Reply Brief on May 29, 2018.  This Court issued a Decision and Order on June 29, 2018, denying the Motion to Dismiss.

1

On June 29, 2018, Defendants filed a Motion for Summary Judgment. Plaintiffs Response in Opposition is due on or before July 13, 2018.

## FACTS

PSBA is a voluntary membership association whose membership includes nearly all of the 500 public school districts and 29 Intermediate Units in the Commonwealth, along with numerous vocational-technical schools and community colleges.  Membership by these entities confers individual membership rights on the members of the governing boards of the entities.   Originating in 1895 as the Pennsylvania State School Directors Association, PSBA became a not-for-profit corporation in 1962.  PSBA's mission is to render assistance to public school districts and represent the general public interest in the field of public education. Although most of its member entities are political subdivisions or governmental entities, PSBA is, and has always been, a private association.  PSBA is governed by a board of directors, each of whom is also a member of a school board for one of PSBA's member school districts.  However, and importantly, when acting on behalf of PSBA, the board members are acting in their private capacity, and not as part of their duties as school board members.  Importantly, they are acting for and on behalf of PSBA, not as a representative of any school board on which they may serve.  By law and practice, the Individual Defendants owe their fiduciary duties strictly to the

PSBA and not to the government entities on which they may also serve.[1]

Plaintiff Simon Campbell ("Campbell") is a Bucks County resident and a naturalized U.S. citizen originally from the United Kingdom.  An outspoken critic of teachers' unions, Campbell won a four-year term on the Pennsbury School District ("Pennsbury") Board of School Directors in 2009.  He quickly became well-known among Pennsylvania's education community for filing extensive and numerous requests under Pennsylvania's Right to Know Law, 65 P.S. § 67.101 *et seq.* ("RTKL"), which was significantly amended in 2009.  Campbell filed hundreds or thousands of requests seeking, *inter alia*, information regarding teacher salaries and benefits statewide, as well as information relating to fees paid to the Pennsylvania State Education Association ("PSEA"), the statewide teachers' union.

In 2013, Campbell lost his seat on the Pennsbury School Board.  Around that

---

[1]     Pennsylvania's Nonprofit Corporation Law provides: "(a) Directors. – A director of a nonprofit corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and diligence, as a person of ordinary prudence would use under similar circumstances." 15 Pa. C.S.A. § 5712.  PSBA's Board receives training annually that they represent PSBA when serving on the PSBA board and not the districts on which they may separately serve.

same time, Campbell founded Pennsylvanians for Union Reform ("PFUR"), a 501(c)(4) civic league that "seeks to eliminate compulsory unionism in Pennsylvania while promoting transparency and efficiency in government for taxpayers."  *See* Pennsylvanians For Union Reform, *available at* www.paunionreform.org (accessed July 7, 2018).  Campbell and PFUR have filed thousands of voluminous RTKL requests with Pennsylvania public school districts and other government entities. Campbell also filed hundreds of appeals of local agencies' RTKL decisions with Pennsylvania's Office of Open Records ("OOR").  Campbell has appealed several OOR decisions to Pennsylvania courts of common pleas and the Commonwealth Court.[2]

Campbell has earned widespread condemnation for his tactics of intimidation, his demeaning attitude toward any agencies that question him, and RTKL requests that seem intended merely to harass.  In March 2017, Campbell sent identical RTKL

---

[2]      *See, e.g.*, *Butler Area Sch. Dist. v. PFUR*, 172 A.3d 1173 (Pa. Commw. 2017); *State Employees Ret. Sys. v. Campbell*, No. 871 C.D. 2016. 2017 Pa. Commw. LEXIS 436 (Pa. Commw. Mar. 3, 2017); *Dep't of Human Servs. v. PFUR*, No. 1108 C.D. 2015, 2017 Pa. Commw. LEXIS 22 (Pa. Commw. Feb. 8, 2017); *PFUR v. Centre County DA's Office*, No. 1623 C.D. 2015, 2016 Pa. Commw. LEXIS 245 (Pa. Commw. Jun. 1, 2016); *PFUR v. Pa. Dep't of State*, No. 1852 C.D. 2015, 2016 Pa. Commw. LEXIS 23 (Pa. Commw. May 23, 2016); *Commonwealth v. PFUR*, 105 A.3d 61 (Pa. Commw. 2014); *Office of the Budget v. Campbell*, 25 A.3d 1318 (Pa. Commw. 2011).

requests to most, if not all (approximately 600) public school agencies in Pennsylvania, requesting six categories of information.  He also provided an online link to a 16-minute video instructing the school agencies how to respond to his requests.  Campbell's video included misstatements about the RTKL designed to have school districts provide information that is exempt from disclosure.[3]  Campbell also threatened to sue districts that did not comply with his requests.

As one of its services, PSBA provides guidance on legal issues facing public school entities.  This includes providing guidance with respect to the RTKL.  In providing this service to its members, on March 28, 2017, PSBA attorney Emily Leader ("Leader") sent an e-mail to PSBA members offering guidance on how to respond to Campbell's request, including identifying information to which Campbell was seemingly entitled under RTKL, as well as information which members were not required to provide.  On April 14, 2017, PSBA attorney Stuart Knade ("Knade") sent an e-mail to PSBA members offering additional suggestions on responding to Campbell's requests.  Knade urged members to comply with the RTKL, but also

---

[3]     For example, Campbell alleged that e-mail addresses not appearing on school districts' web sites are public records if they appear in other agency records.  In reality, those e-mail addresses are exempt from disclosure under 65 P.S. § 67.708(b)(6).

5

informed members that they are prohibited from releasing certain information protected by the RTKL and the Pennsylvania Constitution.  Knade also provided analysis on whether members could require RTKL requesters to review records at members' offices rather than mailing or e-mailing records.

At some point, Campbell began to maintain at least two web pages on PFUR's web site (www.paunionreform.org) defaming PSBA – "PSBA Horror" and "PSBA Investigation."  Under the PSBA Horror link, Campbell posted copies of the RTKL guidance e-mails from Leader and Knade, as well as a picture of PSBA Executive Director Nathan Mains along with text – as if Mains were speaking – stating, "Taxpayers, thanks for the $226,000 and the public pension!  Now **** off, and drive to the school district if you want public records.  And don't forget your check book."  Mains never made any such statement.

On May 8, 2017, Campbell submitted another identical RTKL request to approximately 600 PSBA members.  The 17-page request included not only demands for 27 categories of documents, but also Campbell's own extensive analysis of RTKL provisions and other legal issues, such as attorney-client privilege, rules of professional conduct for attorneys, and school solicitors' conflicts of

interests.[4]  In the request, Campbell wrote, "I call upon elected school officials to terminate the taxpayers forced relationship with PSBA.  Revoke PSBA membership. . . .  Stop making taxpayers fund the salaries and PSERS pensions of a private corporation's employees."[5]  The 27 requests for information that Campbell sent to public school entities required those entities to spend the resources and taxpayer dollars that fund those entities focused not on their records, but on information and records concerning PSBA, including several requests for "extracted computerized information" regarding payments made to PSBA.  Campbell's request included a link to a 33-minute video, ostensibly to aid school districts and their solicitors in responding to his requests.  The duplicative requests also noted that Campbell was attempting to "place the matched name and addresses [of all Pennsylvania school employees] on the internet for citizens so inclined to generate a mailing list to

---

[4]     The request includes a half-page footnote in which Campbell criticizes the Pennsylvania Supreme Court's ruling in *Penn. State Educ. Assoc. v. Commonwealth*, 148 A.3d 142 (Pa. 2016) ("PSEA III") as "nonsensical," and brags that he possesses the home addresses of three state Supreme Court justices.

[5]     The Right to Know Law has the limited purpose of providing a mechanism for citizens to obtain public records.  It was never intended and is not designed as a mechanism for citizens to petition government for a redress of grievances or as an open forum or limited open forum.  However, Campbell abuses the RTKL's purpose and processes.  Whatever request for records he may make is only for the purpose of giving him a megaphone for his invective.

7

respectfully send political lobbying mail to the homes of school employees."

Campbell has shown a penchant for personally attacking anyone who challenges him or his view of the world.  One day after Leader sent the RTKL guidance to PSBA members, Campbell sent an e-mail to other school officials accusing Leader, a licensed attorney, of being "an unregistered lobbyist from a private corporation out there seemingly engaged in the unauthorized practice of law."  *See* Exh. D-110 [e-mail from Simon Campbell to Sidney Clark (Mar. 29, 2017)].  Meanwhile, after receiving a letter from PSBA's outside general counsel, Michael Levin, following the submission of the May 2017 RTKL request,[6] Campbell posted a second, half-hour-long video on his web site including one segment mocking PSBA's counsel's letter.

On July 17, 2017, PSBA filed a lawsuit in the Cumberland County Court of Common Pleas against Campbell (the "State Tort Action") for defamation, tortious interference with contract and abuse of process.  Compl., ¶ 8.  More than seven months later, on February 28, 2018, Campbell filed the Complaint in this action,

_____

[6]     The undersigned Michael Levin has represented PSBA since November 1975. He became General Counsel to PSBA when his mentor and predecessor as General Counsel, William Fearen, retired in 1988.

alleging that the State Tort Action was an effort to retaliate against Campbell for allegedly exercising his First Amendment rights to make RTKL requests.  It is perhaps more than a little ironic that Campbell, who asserts that his First Amendment Rights have been violated by PSBA because he has been sued, asks the court to interfere with PSBA's First Amendment right to petition the courts for redress and for PSBA's right to access the courts.  By his motion, Campbell seeks:

> . . . entry of a permanent injunction enjoining Defendant, Pennsylvania School Boards Association, from prosecuting the retaliatory SLAPP Suit pending in the Cumberland County Pennsylvania Court of Common Pleas, styled Pennsylvania School Board [sic] Association v. Campbell, et al., Docket No. 2017 07303, and further directing PSBA and the currently-serving Governing Board Defendants to take all actions necessary to discontinue the SLAPP Suit with prejudice forthwith.

Motion for Permanent Injunction, p. 1.

## ARGUMENT

## I.    Legal Standards

### A.    Standard to Obtain A Permanent Injunction

According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between

the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.  *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006) (*citing Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982); *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)).

An injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course.  *See, e.g.*, *Weinberger*, 456 U.S. at 305.  If a less drastic remedy is sufficient to redress the movant's injury, no recourse to the additional and extraordinary relief of an injunction is warranted.  *See ibid.*; *see also Winter v. Nat'l Resources Defense Council, Inc.*, 555 U.S. 7 (2008).

The requirements for a permanent injunction "require certainty on the merits." *Brennan Petroleum Prods. Co., Inc. v. Pasco Petroleum Co., Inc.*, 373 F. Supp. 1312, 1316 (D. Ariz. 1974).  Accordingly, a permanent injunction is normally issued "only after a full trial on the merits." *Chappell & Co. v. Frankel*, 367 F.2d 197, 203 (2d Cir. 1966).

## B.      Standard to Prove a Claim for First Amendment Retaliation

A plaintiff bringing a claim for violation of constitutional rights under 42 U.S.C. § 1983 must show a "violation of a right secured by the Constitution and laws of the United States." *West v. Atkins*, 487 U.S. 42, 48 (1988).  Second, the plaintiff

must "show that the alleged deprivation was committed by a person acting under color of state law." *Id.*

To plead a First Amendment retaliation claim properly pursuant to 42 U.S.C. § 1983, a plaintiff must allege "(1) that [the plaintiff] engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007); *see also Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). Whether the plaintiff engaged in protected activity is a question of law; whether there a was a causal connection between the activity and the retaliatory action is a question of fact. *Curinga v. City of Clairton*, 357 F.3d 305, 310 (3d Cir. 2004).

## II.   Campbell is Unlikely to Succeed on the Merits of His Claims

### A.   Campbell's Actions Are Not Protected By The First Amendment

Campbell claims fail for several reasons, with the first being that the Campbell's actions simply are not protected by the First Amendment. Campbell allege that the First Amendment's Petition Clause protects: 1) their requests under Pennsylvania's Right to Know Law ("RTKL") (Compl., ¶¶ 3, 28); 2) their harassment of local school districts to have them leave PSBA (*Id.*, ¶ 38); and 3) their

defamatory comments about PSBA (*Id.*, ¶ 28).  As described below, they are incorrect on all counts.

### 1.   Campbell's RTKL Requests are Not Protected by the First Amendment

In the Memorandum of Law supporting the Injunction Motion, Campbell baldly alleged – without citation – that "[a] RTKL request is a petition for government action."  Inj. Mot., p. 15.  In doing so, he implied that the Campbell's RTKL requests are protected under the First Amendment's Petition Clause.  U.S. Const. Amend. I ("Congress shall make no law . . . abridging the freedom . . . to petition the Government for a redress of grievances.")  However, the Petition Clause offers no such protection for RTKL requests.  *See, e.g.*, *Harper v. EEOC*, No. 15-2629-STA, 2015 WL 7272246 at *3 (Nov. 17, 2015) (denying a request to add First Amendment claim based on Freedom of Information Act request).  So although Campbell has a statutory right to request documents under RTKL, that right is not protected by the First Amendment's Petition Clause as Campbell implies.[7]

---

[7]     The U.S. Supreme Court has held that a prisoner's attempt to frivolously file suit under the Freedom of Information Act was an abuse of process warranting that the woman be barred from future *in forma pauperis* filings.  *In re Gaydos*, 519 U.S. 59 (1996).

Meanwhile, in contrast, PSBA's right to make a non-frivolous court filing is indeed protected by the Petition Clause.  The U.S. Supreme Court's precedents confirm that the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes. "[T]he right of access to courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-97 (1984); *see also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002); *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 (1983); *Calif. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972).  Therefore, it is clearly the Defendants' rights and not Campbell's rights that must be protected.

## 2.    Campbell's Lobbying Against PSBA Membership Is Not Protected by the First Amendment

Campbell claims that his lobbying of school districts to formally end their association with PSBA cannot form the basis of a tortious interference with contract claim because there can be no claim for tortious interference when petitioning a governmental body to change its policy.  Inj. Mot., p. 16.  Defendants agree that this would be the case if Plaintiffs were merely "lobbying" as they allege.  However, the Plaintiffs engaged in a pattern of conduct, intimidation and threats to achieve the stated purpose of forcing public school districts to abandon their membership with PSBA.  Although Campbell may have a right to lawfully petition school districts to

adjust their policies with regard to PSBA membership, Campbell does not have a First Amendment-protected right to threaten taxpayer-funded school districts into complying with his wishes. For example, Campbell informed PSBA members that he would not make a harassing RTKL appeal to OOR if they "granted" his RTKL requests for PSBA documents but were unable to obtain them.

In *Rouse Phila. Inc. v. Ad Hoc '78*, 417 A.2d 1248 (Pa. Super. 1979), former Philadelphia politician and activist Milton Street appealed a contempt of court ruling against him. Street had been cited for contempt after leading a protest of Center City Philadelphia businesses in violation of a restraining order issued following previous unlawful, Street-led protests. Street and the protesters demanded that the businesses pay "reparations" to minority groups to stop the protests. Pennsylvania's Superior Court found that the protest had been conducted for purposes "contrary to state law" including extortion and tortious interference with business relations, and therefore was not protected by the First Amendment. *Id.* at 1256. As in *Rouse*, Campbell abandoned his First Amendment protections by violating state law on defamation and abuse of process. In *Al Hamilton Contracting Co. v. Cowder*, 644 A.2d 188 (1994), the Superior Court held that although "malicious intentions" are not grounds for an abuse of process claim, using process for an "illegitimate aim such as extortion, blackmail, or to coerce or compel the plaintiff to take some collateral action" are grounds for abuse of process. *Id.* at 192. Similarly, Campbell's improper

14

threats to school districts eviscerated any right Campbell had to petition the districts to change their policies vis-à-vis PSBA membership. Accordingly, the Campbell "lobbying" bears no First Amendment protections.

Furthermore, the soapbox that Campbell is using to express his venom is not intended or designed as a forum or limited open forum under Free Speech analysis. Not every procedure or process created by government is a place where petitioning activities or speech activities can take place. The RTKL is not a park; it is not a public sidewalk; it is not a forum for speech. In one of the Supreme Court's seminal cases on the First Amendment, the Court made clear that a person's First Amendment rights do not exist with equal force everywhere. In *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37 (1983), the Court said:

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." In these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.
>
> A second category consists of public property which the state has opened for use by the public as a place for expressive activity. The

15

Constitution forbids a state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest.

Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. As we have stated on several occasions, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."

*Id.* at 45-47 (internal citations omitted).

The RTKL is a law that is designed for one purpose – to enable citizens to obtain public records from government agencies in Pennsylvania. There are precise procedures enacted in the RTKL. If a citizen wants a public record, he or she must make a request using the form developed by the State or the local agency for the request.[8]  There is no place on the forms for "expressive conduct" or "petitioning

---

[8]      The RTKL provides that "[t]he Office of Open Records shall develop a uniform form which shall be accepted by all Commonwealth and local agencies in addition to any form used by the agency to file a request under this act. The uniform

conduct," except for the information necessary to make the request and have it processed.  Each agency is required to appoint a "open-records officer."[9]  The open-records officer is required to process and respond to the request.  *See* 65 P.S. § 67.502.  Depending upon what is requested, a request can be time-consuming and costly to the agency.  Carefully designing the process to achieve the goal of open government in a responsible manner while protecting the proper interests of government (significantly broad categories of records are not public and not subject to disclosure), nowhere is there any intent by the General Assembly to create a forum for speech or petitioning activity in general.  However, that is what Campbell asserts he has the right to do through the RTKL.  Although his abuses are significant, perhaps most abusive is his effort to steer people to his website by including a link in his RTKL request to ask public employees – *i.e.*, the open-records officers – to listen to Campbell's view of the world during their work day while they are supposed to be doing the people's business.

---

form shall be published in the Pennsylvania Bulletin and on the Office of Open Record's Internet website."  65 P.S. § 67.505.

[9]      An agency shall designate an official or employee to act as the open-records officer.  65 P.S. § 67.502.

17

### 3.    Campbell's Defamatory Statements Are Not Protected by the First Amendment

Campbell further alleged that his defamatory statements about PSBA and its executive director, Nathan Mains, are protected by the First Amendment as either "statements of opinion and/or parody."  Inj. Mot., p. 18.  However, a review of Campbell's statements about Mains and PSBA shows that protections for opinion or parody do not apply.

As noted above, Campbell posted a photo on PFUR's web site showing Mains purportedly saying, "Taxpayers, thanks for the $226,000 and the public pension!  Now **** off, and drive to the school district if you want public records.  And don't forget your check book."  Mains never made any such statement.  Another defamatory image on the web site showed Mains allegedly saying, "Hey school children, **** the Constitution!  **** the bill of rights!"

There is no separate constitutional privilege for opinion.  *See Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21 (1990) ("We are not persuaded that, in addition to these protections, an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment.").  Instead opinion is subject to the same First Amendment analysis as other speech.  Campbell next claims that as long as a publication is "recognizable to the average reader as a joke," it is protected parody.  Inj. Mot., p. 19.  However, because PSBA

and Mains are not household names, the average reader would not be able to determine if Campbell's online posts were intended to be parodies.

In *Martin v. Municipal Publications*, Philadelphia Magazine published a photograph of a man, Joseph Martin, in a Mummer's costume, with the caption "A New Year's tribute here to all the ostriches who gave their tails to make the world free for closet transvestites from South Philly to get themselves stinking drunk. Have a nice year." *Martin*, 510 F. Supp. 255, 257 (E.D. Pa. 1981). Martin sued for defamation. The magazine claimed that because the photograph was published in a section of the magazine featuring light humor, satire and parody, that no individual would have taken it as defamatory. The court disagreed, writing, "The problem with this argument is that people who were not familiar with the magazine and the nature of the 'FLASH' section may have seen this publication of Mr. Martin's photograph." *Id.* at 258 (denying defendant's motion for summary judgment). Similarly, in this case, many of the people who viewed Campbell's defamatory web sites would have been unfamiliar with PSBA and Mains, and would have viewed the published statements as actual statements and/or positions of PSBA and Mains.

Campbell attempts to support his position by citing *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988) in which the noted televangelist and public figure Rev. Jerry Falwell unsuccessfully sued Hustler for defamation after the magazine printed a satirical article presented as an interview with Falwell. However, neither PSBA

19

nor Mains is a public figure for the purposes of First Amendment.  In a defamation action, a private individual need only prove negligence on the part of the defendant to prevail, as opposed to a public figure who must establish actual malice by the defendant.  *See, e.g.*, *Joseph v. Scranton Times L.P.*, 959 A.2d 322, 339, 342 (Pa. Super. 2008).  However, in this case, it is possible – if not likely – that the Defendants would be able to meet the actual malice standard of *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964).

In *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990), the U.S. Supreme Court held that

> The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being – a concept at the root of any decent system of ordered liberty. . . . . The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.

*Rosenblatt v. Baer*, 383 U.S. 75, 92-93 (1966).  By filing the State Tort Action, PSBA has simply sought to protect its reputation while it still has an opportunity to do so.  Accordingly, Campbell's defamatory statements bear no First Amendment protection.

### B.      Campbell's Claims Are Barred by the *Noerr-Pennington* Doctrine

Plaintiffs cannot maintain their claims because Defendants are shielded by the *Noerr-Pennington* doctrine.  The doctrine protects citizens from being penalized for exercising their First Amendment right to petition government, including filing lawsuits.  First recognized in the antitrust context by the Supreme Court in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961) ("*Noerr*"), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965) ("*Pennington*"), and further developed by the Supreme Court in *City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365 (1991) ("*Omni*"), the *Noerr-Pennington* doctrine has been extended to protect citizens in a variety of contexts; for example, *see Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49 (1993) (*Noerr-Pennington* doctrine applied to copyright infringement action); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982) (*Noerr-Pennington* doctrine immunizes citizens from liability for exercising right to boycott); *Video Int'l Prod., Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075 (5th Cir.1988), *cert. denied* 490 U.S. 1047 (1989) (*Noerr-Pennington* protects defendant from liability for claim of conspiracy with city in violation of civil rights under § 1983); *Gorman Towers, Inc. v. Bogoslavsky*, 626 F.2d 607 (8th

Cir.1980) (private citizens immune from liability in § 1983 claim regarding zoning dispute).

Like other courts, the Third Circuit has also applied the *Noerr* doctrine outside of the antitrust context to protect citizens from liability for exercising their rights to petition. *See, e.g.*, *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155 (3d Cir.1988) (applying *Noerr-Pennington* doctrine to immunize defendants in conspiracy action, on basis that defendants were exercising First Amendment rights when alerting authorities to fact that nursing home was failing to comply with applicable regulations).

Pennsylvania federal courts have consistently applied the *Noerr-Pennington* doctrine to support Commonwealth citizens' right to petition government by filing lawsuits. In *Bartley v. Taylor*, a "shock jock" reporter at a sports radio station criticized the job performance of the athletic director at Lock Haven University. *See Bartley*, 25 F. Supp. 3d 521 (M.D. Pa. 2014). The athletic director responded by taking several actions, including filing a defamation lawsuit in the Clinton County Court of Common Pleas. The radio station's manager then filed a First Amendment retaliation lawsuit against the athletic director in federal court. The court dismissed the radio station manager's case on summary judgment, based in part on the *Noerr-Pennington* doctrine.

When Bartley's speech becomes allegedly defamatory, it would be illogical for this Court to say to a public employee – you may sue the speaker for defamation and slander to try to protect your name and reputation, but then the speaker may sue you simply because you sued him. If this Court were to hold that a "non-sham" civil lawsuit against a reporter, who may fairly be characterized as a "shock-jock," had a chilling effect on the shock-jock's speech and therefore is retaliatory, then there would be no judicial check on this speaker's speech and the speaker could tumble down the slippy slope of accusatory prattle into actionable defamation . . . . Here, Taylor had reason to believe she needed to access the courts to protect her good name and reputation. Her case, although not ultimately prevailing, certainly does not rise to the level of retaliation under the First Amendment. Bartley was not threatened with intimidation or sanctions or the loss of public benefits. Taylor was merely appealing to the courts to protect herself. To characterize this as retaliation raises this claim to an absurd level which garners no support with this Court.

*Id.* at 537-38.

In this case, PSBA filed the State Tort Action in good faith to protect its reputation, just as the athletic director did in *Bartley*. PSBA retained an excellent law firm skilled in the prosecution of such lawsuits – Bochetto & Lentz. The filing of the lawsuit in state court constituted a constitutionally protected right. *See BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 525 (2002) ("[T]he right of access to the courts is . . . but one aspect of the right of petition."). Meanwhile, Campbell filed a federal lawsuit for First Amendment retaliation, just as the radio station did. Accordingly, based on the same analysis in *Bartley*, this Court should dismiss the current litigation against PSBA and the Individual Defendants under the *Noerr-Pennington* doctrine because the Defendants must be allowed to protect themselves, especially in a case

23

such as this where Campbell long ago tumbled down the "slippy slope" into actionable defamation.

In *Barnes Foundation v. Twp. of Lower Merion*, 927 F. Supp. 874 (E.D. Pa. 1996, the Barnes Foundation, which operated an art museum in Lower Merion, filed an action under §§ 1983 and 1985, alleging that the township and neighbors of the foundation had enforced police, fire and zoning ordinances in a discriminatory manner and had filed a retaliatory state court lawsuit against the foundation. The court dismissed all claims against the neighbors, holding that the *Noerr-Pennington* doctrine protected the neighbors' government-petitioning activity. Judge Brody further held that it was irrelevant that the neighbors' petitioning may have been motivated by racism, because under the *Noerr-Pennington* doctrine "it does not matter what factors fuel the citizen's desire to petition government. As long as there is petitioning activity, the motivation behind the activity is unimportant." *Id.* at 877 (*citing Noerr*, 365 U.S. at 139 ("The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so"); *Pennington*, 381 U.S. at 670 ("*Noerr* shields . . . a concerted effort to influence public officials regardless of intent of purpose"); *Omni*, 499 U.S. at 380 ("That a private party's political motives are selfish is irrelevant")). Therefore, even though Campbell in this case incorrectly alleges an improper motive (a conclusory

allegation that need not be assumed to be true) on the part of PSBA in bringing the State Tort Action – supposedly as retaliation against the Plaintiffs for their government-petitioning activities (Compl., ¶ 44) – that does not preclude application of the *Noerr-Pennington* doctrine to dismiss the Campbell's claims.[10]

### 1.    PSBA's State Tort Action is not a sham lawsuit

The only restriction placed on *Noerr-Pennington* immunity is that the petitioners must make a genuine effort to influence legislation or procure favorable government action, rather than simply using the petitioning process as a means of interference or harassment (known as the "sham exception").  See *Omni*, 499 U.S. at 380 (defining "sham" petitioning as a situation in which "persons use the governmental process – as opposed to the outcome of that process – " as a "weapon"); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 n.4 (1988) ("private action that is not genuinely aimed at procuring favorable government action is a mere sham that cannot be deemed a valid effort to influence government action").  The sham exception is inapplicable here to the claim

---

[10]    It is very important to distinguish an alleged improper motivation for government petitioning activity, as alleged by Plaintiffs, from petitioning activity that is defamatory and/or intended merely to harass rather than legitimately seeking relief, as evidenced by the Plaintiffs' actions.

25

Plaintiffs assert against PSBA.  As the Supreme Court has explained, when "there is no dispute over the predicate facts of the underlying legal proceeding, a court may decide probable cause [and thus *Noerr–Pennington* applicability] as a matter of law."  *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 63 (1993) [hereinafter "*PRE*"].  The U.S. Supreme Court in *PRE* set forth a two-part definition of sham litigation.

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits.  If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr* . . . Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon."

*Id.* at 60.

A suit is objectively baseless if the litigant did not have probable cause to institute legal proceedings.  *Id.* at 62 ("[t]he existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham

litigation"). Probable cause "requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." *Id.* at 62-63.[11]

## 2.    The State Court Action Is Not Objectively Baseless

Under *PRE*, the party alleging that the litigation is not protected by *Noerr–Pennington* bears the burden of demonstrating that the challenged conduct was a sham, and "[i]f an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and a claim premised on the sham exception must fail." *Id.* at 60. As will be shown, Plaintiffs are unable to show that any of PSBA's claims in the underlying action was a sham.

---

[11]    In this Court's decision on the Defendants' Motion to Dismiss, the Court held that "whether the state suit has an objective basis hinges on defendants' ability to establish in that suit that plaintiffs' petitioning was a sham or that their free expression was actionable defamation." Decision, p. 10 (citations omitted). Defendants respectfully submit that such a test would be the Defendants' burden against a *Noerr-Pennington* challenge by Plaintiffs in the underlying case. In contrast, to establish an objective basis, Defendants in this case must merely show that their claims in the underlying case are not a sham. Furthermore, even if it is determined that there is no objective basis for the Defendants' claims, Plaintiffs must also show that there is no subjective basis for the Defendants' claims. *PRE, supra,* at 60-61.

### a. Abuse of process

In the state court action Amended Complaint,[12] PSBA alleges that Simon Campbell and Pennsylvanians for Union Reform ("PFUR") abused process by issuing identical Right to Know Law ("RTKL") requests to 600 education agencies, most of whom are PSBA members.  Compl., Exh. 9, ¶¶ 91-93.  Plaintiffs have previously contended that Defendants are unable to show that RTKL requests are "legal process" or that the RTKL process can be abused, citing *Parks Miller v. Catorna*, No. 4:15-CV-1754, 2016 WL 2752633, *10 (M.D. Pa. May 11, 2016) (noting that plaintiff had produced no support that a Pennsylvania court had deemed an RTKL request to be legal process).[13]  However, Pennsylvania courts have defined

---

[12]     A copy of the Amended Complaint in the state court action is attached to the Plaintiffs' Complaint in this litigation as Exhibit 9.

[13]     The court in *Parks Miller* rejected the plaintiff's abuse of process claim for several reasons, including 1) the plaintiff did not raise the claim in the complaint; 2) the plaintiff did not allege in the complaint that the defendant had used the RTKL to obtain information about her; 3) plaintiff only made a vague mention of abuse of process in opposing the motion to dismiss, and did not connect it to the RTKL request; 4) plaintiff's counsel stated at oral argument that the plaintiff was not making an RTKL claim; and 5) the court held that there were no factual allegations supporting the claim.  Importantly, on appeal, the Third Circuit stated that the plaintiff's abuse of process claim failed "because Parks Miller did not plead that legal process was used against her primarily to accomplish a purpose for which it was not designed," not because RTKL requests cannot be legal process. *Park Miller v. County of Centre*, 702 F. App'x 69, 74 n.7 (3d Cir. 2017).

"process" broadly, holding that it "encompasses the entire range of procedures incident to the litigation process." *Rosen v. Am. Bank of Rolla*, 627 A.2d 190, 192 (Pa. Super. 1993). As Plaintiffs are well aware, Pennsylvania's RTKL provides that a requestor may file a petition for review with a Court of Common Pleas or the Commonwealth Court if a requestor is not satisfied with the decision of the appeals officer. 65 P.S. §§ 67.1301-1302. Therefore, a RTKL request is properly deemed a procedure incident to the litigation process under *Rosen*.

As for Plaintiffs' claim that RTKL requests cannot be abused, PSBA details in the Amended Complaint the way in which the Plaintiffs abused the RTKL. "To establish a claim for abuse of process, it must be shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff." *Shiner v. Moriarty*, 706 A.2d 1228, 1236 (Pa. Super. 1998). In the Amended Complaint, PSBA alleged that Campbell and PFUR made the 600 RTKL requests in May 2017 "for the sole and improper purpose of harassing and intimidating the PSBA, and to interfere with their contractual relationships with its members, knowing that such Right to Know Law Requests would likely cause the PSBA to become inundated with hundreds upon hundreds of requests and inquiries from their membership throughout the Commonwealth." Compl, Exh. 9, ¶ 93.

In the Complaint in this action, Plaintiffs do not state whether or not they intended to harass and/or intimidate PSBA via the May 2017 RTKL requests. Instead they merely allege that their actions were protected by the First Amendment. *See, e.g.*, Compl., ¶¶ 39, 43.   Accordingly there is no factual dispute regarding the state court claim for defamation, but rather only a dispute as to the legal implications of those facts.   Therefore, this Court may determine whether the abuse of process claim is objectively baseless.   And such analysis clearly shows that Defendants had a reasonable belief that their abuse of process claim might be successful, and therefore the claim is not baseless.

### b.  Defamation

Defendants next claim in the Amended Complaint that the Plaintiffs here have defamed PSBA.   Plaintiffs have previously alleged that this claim is a sham because the allegedly defamatory statements made by Plaintiffs are satire.   However, any claim that the offensive material is satire is unavailing.   Because PSBA and its CEO Nathan Mains are not household names, the average reader would not be able to determine if Campbell's online posts were intended to be parodies.   In *Hustler Magazine v. Falwell*, 485 U.S. 46 (1988), the Supreme Court held that televangelist Jerry Falwell could not maintain a libel claim against a men's magazine for printing an article satirically alleging a romantic liaison between Falwell and his mother.   The

court ruled that the article was so outrageous that no reader would believe that the acts portrayed had actually occurred.

However, in this case, because PSBA and Mains are not household names, the average reader would not be able to determine if Campbell's online posts were intended to be parodies. In *Martin v. Municipal Publications*, Philadelphia Magazine published a photograph of a man, Joseph Martin, in a Mummer's costume, with the caption "A New Year's tribute here to all the ostriches who gave their tails to make the world free for closet transvestites from South Philly to get themselves stinking drunk.  Have a nice year."  Martin, 510 F. Supp. 255, 257 (E.D. Pa. 1981). Martin sued for defamation.  The magazine claimed that because the photograph was published in a section of the magazine featuring light humor, satire and parody, that no individual would have taken it as defamatory.  The court disagreed, writing, "The problem with this argument is that people who were not familiar with the magazine and the nature of the 'FLASH' section may have seen this publication of Mr. Martin's photograph."   *Id.* at 258 (denying defendant's motion for summary judgment).

Similarly, in this case, many people who viewed Campbell's defamatory web sites, which included the photo illustrations found in the Amended Complaint – Compl., Exh. 9, ¶¶ 19, 42 –  would have been unfamiliar with PSBA and CEO Nathan Mains, and would have viewed the published statements as actual statements

and/or positions of PSBA and Mains.   Meanwhile, in addition to the alleged "parodies" of Mains and PSBA, PSBA's Amended Complaint includes additional allegations in support of its defamation claim that are clearly not satirical.   *See* Compl., Exh. 9, ¶¶ 30-31 (describing the Plaintiffs' web site post falsely alleging that PSBA employees receive free state-issued license plates); ¶¶ 33-36 (accusing PSBA staff attorney Emily Leader of "the unauthorized practice of law").

### c.  Tortious interference

PSBA's final tort claim against the Plaintiffs alleges tortious interference with contract based on the Plaintiffs' efforts to lobby school districts to drop their membership in PSBA.  Compl., Exh. 9, ¶¶ 82-89.  Plaintiffs claim this is objectively baseless because there can be no claim for tortious interference when the interference consists of petitioning a governmental body to alter its official policy, essentially making their own *Noerr-Pennington* argument with regard to their petitioning activity.  If so, the Plaintiffs are subject to the same *Noerr-Pennington* sham exception.

Any such *Noerr-Pennington* defense by the Plaintffs must fail because their petitioning of PSBA members was a sham intended to harm PSBA and not to exercise Plaintiffs' First Amendment rights.  *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972) ("First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the

legislature has the power to control."); *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961) ("[I]mmunity does not apply when efforts to influence governmental action are a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor.").

Plaintiffs' intention to harm PSBA is described in Campbell's RTKL requests and e-mails to all Pennsylvania school districts on May 8-9, 2017.  Compl., Exh. 9, Exh. H, p. 7 ("Stop making local taxpayers fund the salaries and PSERS pensions of a private corporation's employees.  Fire PSBA – do it for the taxpayers."); Compl., Exh. 6 ("I will be lobbying the full school board, even more than I already am, to fire this self-serving monopoly whose private employees should not be getting PSERS pensions.")  Campbell also threatened any districts that would not comply with his RTKL demand for documents.  *See id.* ("It is worth remembering that a denial – any denial – is going to create a legal dispute.  .  .  .  Should [the school district] and I get into a legal dispute I will retain one of the best Right to Know and First Amendment lawyers in Pennsylvania.")

Plaintiffs do not refute that they intended to harm PSBA.  Instead the Complaint merely alleges that Plaintiffs' "statements and activities" constituted "First-Amendment-privileged political speech, government-petitioning, and associational activities."  Comp., ¶ 43.  Due to the improper goal of the Plaintiffs'

May 2017 communications to harm PSBA, Plaintiffs are unable to invoke *Noerr-Pennington* doctrine, and therefore Defendants' tortious interference claim is not objectively baseless.

### d. As long as some portion of PSBA's claims have a proper basis, immunity is appropriate

Even if this Court were to find that some portion of Defendants' state court claims are objectively baseless, the *Noerr-Pennington* doctrine is still available to Defendants as long as at least one of the claims has merit.  Courts have routinely held that as long as some of the claims in a complaint have a proper basis, the lawsuit is not a sham for Noerr-Pennington purposes.  *Univ. of Penn.*, *supra*, 940 F. Supp. 2d at 246-47.

In *Dentsply Int'l, Inc. v. New Tech. Co.*, No. 96-272 MMS, 1996 WL 756766 (D. Del. 1996), the court held that "litigation will not be considered a 'sham' so long as at least one claim in the lawsuit has objective merit." *Id.* at *2.  Dentsply relied on the language in *PRE* that in order to be a sham, the "lawsuit must be objectively baseless," *PRE*, 508 U.S. at 60, and it cited *Eden Hannon & Co. v. Sumitomo Trust & Banking Co.*, 914 F.2d 556 (4th Cir. 1990), where the Fourth Circuit found that a suit where the plaintiff succeeded on one of four claims was "hardly a sham." *Id.* at 565.  This court has found *Dentsply*'s reasoning convincing, particularly in light of the "very narrow scope" of the sham exception.  *Univ. of Penn.*, *supra*, 940 F. Supp.

34

2d at 246-47 (*citing VIM, Inc. v. Somerset Hotel Ass'n*, 19 F. Supp. 2d 422, 426 (W.D. Pa. 1998)).

Accordingly, if this Court finds even one of PSBA's claims to have merit, the analysis is complete, and the *Noerr-Pennington* doctrine applies.

### e.   State Tort Action Cannot Be Deemed Subjectively To Constitute A Use of Process Against The Plaintiffs

A party alleging sham litigation must meet both the objective and subjective prongs of the *PRE* test. *PRE*, 508 U.S. at 63.   Only if challenged litigation is objectively meritless may a court move to the second part of the test. *Id.*   Therefore, in this case, the Court need not address the second part of the test as PSBA's state court claims are not objectively baseless. *Univ. of Penn.*, *supra*, 940 F. Supp. 2d at 243 (granting motion to dismiss on *Noerr-Pennington* grounds without addressing subjective portion of sham test).

However, to the extent that the Court deems any portion of the state court action to be baseless, under this second part of the Supreme Court's definition of sham, the Court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor," *Noerr*, *supra*, 365 U.S., at 144, through the "use [of] the governmental *process* – as opposed to the *outcome* of that process – as an anticompetitive weapon," *Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 380 (1991) (emphasis in original).   Yet the

35

Plaintiffs' own Complaint makes clear that PSBA's lawsuit was not baseless. Exhibit 12 to the Complaint is a press release from Mains and PSBA stating, "PSBA is not suing Mr. Campbell and his organization in order to stifle the ability for citizens to file Right-to-Know requests. Our governing board unanimously approved filing this lawsuit because of Mr. Campbell's conduct, which we believe is unlawful and unjustified." Again, Plaintiffs' own averments only support the Defendants' argument that the state court action was filed for legitimate purposes.[14]

Furthermore, Defendants have testified that PSBA filed the underlying lawsuit to try to end Plaintiffs' misuse of the Right to Know Law to harm PSBA and to stop Plaintiffs' defamation of PSBA and its personnel. *See, e.g.*, Exh. D-88 [Voit Dep., 32:6-17] (explaining purposes for filing the State Tort Action).

## C. PSBA And Its Board Members Are Not State Actors Acting Under 'Color of Law'

To file a suit alleging a violation of the First Amendment, a plaintiff must

---

[14] All of the reported cases reviewed by Defendants' counsel that address sham litigation discuss the second part of *PRE* sham litigation test as addressing whether the party accused of sham litigation used legal process to harm a business competitor. In this Complaint, Plaintiffs specifically admit that they are not business competitors of PSBA. Compl., ¶ 29 ("Neither Campbell nor PFUR are competitors of PSBA, other than in the marketplace of ideas.") Plaintiffs do not cite any cases that the subjective prong of the sham litigation test can be met by alleging any other type of improper motivation for using legal process.

comply with Section 1983 of the Civil Rights Act of 1871.  Section 1983 provides:

> Every person who, ***under color of any statute, ordinance, regulation,***
> ***custom, or usage,*** of any State or Territory or the District of Columbia,
> subjects, or causes to be subjected, any citizen of the United States or
> other person within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or
> other proper proceeding for redress, except that in any action brought
> against a judicial officer for an act or omission taken in such officer's
> judicial capacity, injunctive relief shall not be granted unless a
> declaratory decree was violated or declaratory relief was unavailable.
> For the purposes of this section, any Act of Congress applicable
> exclusively to the District of Columbia shall be considered to be a
> statute of the District of Columbia.

42 U.S.C. § 1983 (emphasis added).

PSBA is a private, nonprofit corporation organized in Pennsylvania.  Exh. D-81 [Knade Aff., ¶ 15].  It was not created by the state.  It is a voluntary membership association composed of public school entities and the members of the board of directors of those public school entities.  PSBA has no oversight responsibilities or powers with regard to public schools.  PSBA has no power or authority to take action for public schools.  Although eligibility to be a director or officer of PSBA is generally based on the individual's status as a public school director, when serving on the PSBA governing board the individual is not acting in the scope of his or her duties as a public school director.  On the contrary, the decision for any individual to run for PSBA service is a private decision.  Service on the PSBA governing board is private conduct outside of service to the school district.  When PSBA governing

37

board members serve PSBA, they are not representing their school districts, and they owe their fiduciary duties to PSBA under law and in fact.  School districts do not "sponsor" PSBA Governing Board members, and school districts do not authorize their board members to engage in service with PSBA on the Governing Board. When acting at meetings of the PSBA governing board, members are addressing PSBA business operations, not the operations of school districts.  PSBA Governing Board members perform their PSBA service on their private time and not as part of their duties to their school districts.  Under these facts, the Defendants submit that it is clear that PSBA and its Governing Board members are not state actors and are not subject to Section 1983 liability.

### 1.   Acting "under color of law" requires "state action"

The phrase "under color of law" has been interpreted to mean that the defendant in a lawsuit filed under Section 1983 must not be acting as a private entity or individual.  The Supreme Court has said:

> To state a claim for relief in an action brought under §1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.  Like the state-action requirement of the Fourteenth Amendment, the under-color-of-state-law element of § 1983 excludes from its reach "'merely private conduct, no matter how discriminatory or wrongful,'" *Blum v. Yaretsky*, 457 U.S. 991, 1002, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982) (*quoting Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).  Describing these

concepts in different language, the Supreme Court said in another case:

> "Careful adherence to the 'state action' requirement preserves an area of individual freedom by limiting the reach of federal law" and avoids the imposition of responsibility on a State for conduct it could not control.  *Lugar* [*v. Edmondson Oil Co.*, 457 U.S. 922 (1982)] at 936-37, 102 S.Ct. at 2753-2754.  When Congress enacted § 1983 as the statutory remedy for violations of the Constitution, it specified that the conduct at issue must have occurred "under color of" state law; thus, liability attaches only to those wrongdoers "who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it." *Monroe v. Pape*, 365 U.S. 167 , 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961).  As we stated in *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941):  "Misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law."

*Nat'l Collegiate Athletic Ass'n v. Tarkanian,* 488 U.S. 179, 191 (1988).

In *Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n,* 531 U.S. 288 (2001), the U.S. Supreme Court considered the factors to determine whether a private entity, such as PSBA, might be considered to be a state actor for First Amendment analysis purposes.  Introducing its analysis, the court said the following in *Brentwood*:

> Our cases try to plot a line between state action subject to Fourteenth Amendment scrutiny and private conduct (however exceptionable) that is not.  The judicial obligation is not only to preserv[e] an area of individual freedom by limiting the reach of federal law and avoi[d] the imposition of responsibility on a State for conduct it could not control, but also to assure that constitutional standards are invoked when it can be said that the State is responsible for the specific conduct of which the plaintiff complains.  If the Fourteenth Amendment is not to be displaced, therefore, its ambit cannot be a simple line between States

and people operating outside formally governmental organizations, and the deed of an ostensibly private organization or individual is to be treated sometimes as if a State had caused it to be performed. Thus, we say that ***state action may be found if, <u>though only if</u>, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself.***

*Brentwood*, 531 U.S. at 295 (citations and quotations omitted) (emphasis added).

The court concluded in *Brentwood* that the Tennessee Secondary School Athletic Association ("TSSAA") engaged in "state action" when it enforced a rule against a private school exerting "undue influence" in recruiting athletes by writing to incoming students and their parents about spring football practice. The TSSAA placed Brentwood's athletic program on probation for four years, declared its basketball team ineligible to compete in playoffs for two years, and imposed a $3,000 fine. The court concluded that the TSSAA was a state actor when it took these actions against Brentwood under what it called "entwinement" between the state and the association. While the Supreme Court found that TSSAA was a "state actor," the court ruled more importantly that TSSAA had taken "state action." The court stated that "[t]he issue is whether a statewide association incorporated to regulate interscholastic athletic competition among public and private secondary schools may be regarded as engaging in state action ***when it enforces a rule*** against a member school." *Brentwood,* 531 U.S. at 290 (emphasis added).

There is no indication by the Supreme Court that it would have come to the

same conclusion that there was state action if the TSSAA had filed a lawsuit as opposed to issuing binding regulations on its members.  Indeed, the tenor of the Court's decision is such that it was addressing the nature of the action taken and being challenged.  At bar, PSBA was not imposing any rules upon any party and was not regulating any part of the public school system when it filed the State Tort Action against Campbell.

"We hold that the association's regulatory activity may and should be treated as state action owing to the pervasive entwinement of state school officials in the structure of the association, there being no offsetting reason to see the association's acts in any other way." *Id.* at 291.  The Supreme Court expressly stated that the rules it was announcing were "to assure that constitutional standards are invoked '***when it can be said that the State is responsible for the specific conduct of which the plaintiff complains***.'" *Id.* at 295.

In deciding the Motion to Dismiss in this case, the Court held that the Defendants were state actors for purposes of Plaintiffs' First Amendment claims. Memorandum, pp. 7-8.  However, the Court's analysis was based, as required on a Motion to Dismiss, on the facts as presented by Plaintiffs in the Complaint. The Court did not have the benefit, as it does now, of the myriad of facts that illustrate that PSBA is quite different than TSSAA.   There are numerous material and significant factual differences between this case and *Brentwood*.

41

A few of the facts in *Brentwood* appear to be key in the Supreme Court's finding that the TSSAA was a state actor when it adopted the rule complained of in that decision.  Some key facts seem to be that when serving on the TSSAA board, the individuals were representing their employers and acting on behalf of their employers; that state representatives had historically been on the board; and that the board members were on the time clock as part of their duties for their government employers.  When undertaking its analysis, the Supreme Court in *Brentwood* said:

> Although the findings and prior opinions in this case include no express conclusion of law that public school officials act within the scope of their duties when they represent their institutions, no other view would be rational, the official nature of their involvement being shown in any number of ways.

*Id. at* 299.

At bar, however, the PSBA Governing Board members are not representing their school districts.  Exh. D-70 [Freund Decl., ¶ 23]; Exh. D-71 [Russell Aff., ¶ 27]; Exh. D-73 [Gentzel Aff., ¶ 9(x)]; Exh. D-74 [Faccinetto Decl., ¶ 7]; Exh. D-75 [King Decl., ¶ 12-15]; Exh. D-81 [Knade Aff., ¶ 38].  As was stated by PSBA Governing Board President Michael Faccinetto in his Declaration, "It is my understanding that when serving on the PSBA Governing Board that I have fiduciary duties to the PSBA only and that I am not representing the School District on the board."  Exh. D-74 [Faccinetto Decl., ¶ 7]

Another key concept in *Brentwood* that is not present at bar was expressed by

42

the Supreme Court as follows:

> The mechanism is an organization overwhelmingly composed of public
> school officials who select representatives (all of them public officials
> at the time in question here), who in turn adopt and enforce the rules
> that make the system work. Thus, by giving these jobs to the
> Association, the 290 public schools of Tennessee belonging to it can
> sensibly be seen as exercising their own authority to meet their own
> responsibilities.

*Id. at* 299.   These are not the facts in this case.   No public school district has

delegated to the PSBA the power to do anything to regulate or enforce any rules

applicable to the public school system.  Exh. D-81 [Knade Aff., ¶ 121]; Exh. D-71

[Russell Aff., ¶ 41-42].

Designees from the Tennessee State Board of Education actually sat on

TSSAA's board of directors as nonvoting members.  *Brentwood* at 301.  No state

agency in Pennsylvania has ever sat on the PSBA board or been involved in PSBA

governance.  *See generally* D-81 [Knade Aff.]; Exh. D-71 [Russell Aff.]; Exh. D-73

[Gentzel Aff.].  In *Brentwood*, school administrators not only served on the board of

TSSAA and "do not merely control but overwhelmingly perform all but the purely

ministerial acts by which the Association exists and functions in practical terms."

*Brentwood* at 299.  PSBA has its own administration and staff, and therefore, unlike

TSSAA, does not have its government entity members conduct its business.  Exh.

D-81 [Knade Aff., ¶ 111]

Most importantly, the major difference between *Brentwood* and this case is

that the entanglement in *Brentwood* resulted in the TSSAA having authority to conduct regulatory enforcement action against member schools, thereby providing "entwinement down" as well as "entwinement up from the member public schools." *Brentwood*, at 302. In this case, PSBA did not exert any power or authority over its member school district such as the state action that TSSAA exerted over its member schools.[15] PSBA offers services to its members that members can choose to accept or decline. Exh. D-81 [Knade Aff., ¶¶ 128-135]. PSBA has no authority to require its members to take action, and it certainly has no regulatory authority as the TSSAA did in *Brentwood*. Brentwood, 531 U.S. at 293 (noting that TSSAA placed Brentwood's athletics on probation and imposed a fine).

Because the Plaintiffs' case is built upon *Brentwood*, Defendants are providing the following chart of facts showing the significant differences between the *Brentwood* facts as discussed by the Supreme Court and the facts in this case pertaining to PSBA:

---

[15] Not only did PSBA not exert any state action over the Plaintiffs, PSBA does not exert any authority over its member entities, but merely provides services that members can utilize if they choose to, and as they see fit. Exh. D-81 [Knade Aff., ¶¶ 53-54, 117-118, 121, 133]

| Facts | Brentwood | PSBA |
|---|---|---|
| Most school districts in state were in association | Yes | Yes |
| Board members acted in "official capacity" at Association | Yes | No |
| Drew Officers/Directors from School Districts | Yes | Yes |
| Regulates district activity in lieu of state regulation | Yes | No |
| Board members were acting within the scope of their duties for school districts or private schools in which they served or were employed | Yes | No |
| School district officials do not only merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions | Yes | No |
| State board members sit *ex officio* on Board | Yes | No |
| Association board members are members of state retirement system | Yes | No for Governing Board members;[16] yes for PSBA employees |
| Collected dues from school districts | Yes | Yes |
| District money collected directly and kept by Association | Yes [17] | No |
| Government regulation of entity | Yes | No |

---

[16]    Members of the PSBA Governing Board are not in the Public School Employees Retirement System ("PSERS").  The employees of the PSBA are currently in PSERS.

[17]    School district gate receipts kept by Association.

| Facts | Brentwood | PSBA |
|---|---|---|
| School districts delegated to Association power to act on their behalf | Yes | No |
| State actor acts in accordance with rules of association | Yes | No |
| The Association has enforcement powers over members | Yes | No |
| The Association was created by state or other governmental entities | Yes | No |

It is submitted that the facts in this case, particularly the facts of most importance to the Supreme Court in *Brentwood*, are so different from the facts in that case that the *Brentwood* decision does not command the result that PSBA is a state actor.

The *Brentwood* court also noted that "[e]ven facts that suffice to show public action (or, standing alone, would require such a finding) may be outweighed in the name of some value at odds with finding public accountability in the circumstances." *Brentwood*, at 303. The Court cited *Polk County v. Dodson*, 454 U.S., 312 (1981), in which a defense lawyer's actions were deemed private even though she was employed by the county and was acting within the scope of her duty as a public defender because a public defender does not act on behalf of the state, but rather is the state's adversary. *Polk County*, at 323, n.13; *Brentwood*, at 303-04 ("The state-action doctrine does not convert opponents into virtual agents.") In this case, PSBA

was not acting on behalf of the Commonwealth of Pennsylvania or any public school entity in filing the underlying lawsuit against the Plaintiffs, but was rather acting on its own behalf.

In an action under § 1983, the plaintiff must establish that the conduct in question deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States and that the conduct complained of was committed by a person acting "under color of state law," meaning that the individuals acted in an official capacity and in a manner authorized by state law. *See Koerner v. The Garden Dist. Assoc.*, No. 00-2206, 2002 WL 31886728, *4 (E.D. La. Dec. 23, 2002).

In *Koerner*, the Plaintiff alleged that the New Orleans Garden District Association ("GDA") and the Garden District Security District ("GDSD") violated his constitutional rights by encouraging city officials to act against him for violating zoning laws. Koerner alleged that the GDSD was a state actor because it was created pursuant to Louisiana state law. The court held that Koerner was unable to show that the state exercised coercive power over either the GDA or the GDSD or provided significant "encouragement" that their actions must be deemed actions of the state. *Id.* at *7. As such, there was no "entwinement" as found in *Brentwood*.

Recognizing the fundamental importance of the act complained of in the analysis whether there was state action, the court in *Logiodice v. Trustees of Maine*

47

*Cent. Inst.*, said:

> A closely divided Supreme Court [in *Brentwood*] applied the state action label to the association. The opinion stressed two points: that the membership of the association was comprised overwhelmingly (84 percent) of "public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling" and that in substance the association (replacing previous state school board regulation) set binding athletic standards for state schools, including the recruiting standards at issue in the case.

*Logiodice*, 296 F.3d 22, 28 (1st Cir. 2002); *see also Am. Mfrs.*, 526 U.S. at 51 (holding that the issue is not whether a party is a state actor, but whether a party's specific conduct constituted state action).

## 2. Courts have declined to extend the *Brentwood* analysis

Courts have shown a general unwillingness to expand the holding in *Brentwood* beyond its facts or the specific issue decided by the Court. *See, e.g.*, *Benn v. Universal Health Sys., Inc.,* 371 F.3d 165, 173 (3d Cir. 2004); *Breighner v. Michigan High Sch. Athletic Ass'n, Inc.*, 683 N.W.2d 639, 645 (Mich. 2004).[18] In

---

[18]    In *Breighner*, the court ruled that the payment of fees in return for services does not constitute public funding. The court said: "In this vein, we agree with the reasoning of the Court of Appeals in *State Defender Union*, *supra* at 432-433, 584 N.W.2d 359, that an otherwise private organization is not "funded by or through state or local authority" merely because public monies paid in exchange for goods provided or services rendered comprise a certain percentage of the organization's revenue. Earned fees are simply not a grant, subsidy, or funding in any reasonable,

*Osler ex rel. Osler v. Huron Valley Ambulance Inc.*, 671 F. Supp. 2d 938 (E.D. Mich. 2009), the court said:

> *Brentwood Academy* provides no support for the plaintiff's state action argument, for it is readily distinguishable. HVA is not a state-wide organization that consists predominantly of public entities or public employees acting in their official capacities. It does not derive its authority to act from any power conferred by the state or county government. ***It does not set rules of practice***; instead it is governed by the regulations and protocols promulgated by the oversight boards. The presence of some of HVA's officers and employees on the Washtenaw-Livingston Medical Control Authority Board does not convert HVA into a state actor. "***Rather than looking to the number of public officials who serve on the governing board of a private institution . . . the proper focus concerns whether the State has exercised 'coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'***" *Crowder v. Conlan*, 740 F.2d 447, 452 (6th Cir.1984) (*citing Blum*, 457 U.S. at 1004, 102 S.Ct. 2777). HVA's conduct arises solely from its private contract to provide ambulance services to its customer, which in this case happens to be a public body. Based on the undisputed facts in the record, the Court cannot conclude that the state or local government affirmatively authorized, encouraged, or facilitated HVA's private conduct or otherwise clothed HVA with the authority of state law.

*Id.* at 945 (emphasis added).

Noting that labeling "state action" to acts by a private entity should be the exception and should be limited, the Fourth Circuit said:

-------------------

common-sense construction of those synonymous words. *Breighner*, 683 N.W.2d at 646.

> Nevertheless, there are infrequently arising circumstances under which the actions of an ostensibly private party will be deemed to satisfy the color-of-law requirement.  We recently summarized when that sort of attribution was appropriate, with a concomitant observation of why it was the exception rather than the rule:  "Under the state-action or color-of-law doctrine, we 'insist' as a prerequisite to liability 'that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.'  By doing so, we maintain the Bill of Rights as a shield that protects private citizens from the excesses of government, rather than a sword that they may use to impose liability upon one another."

*Philips v. Pitt Cty. Mem'l Hosp*., 572 F.3d 176, 181 (4th Cir. 2009) (*quoting Holly*

*v. Scott*, 434 F.3d 287, 292 (4th Cir. 2006)).

### 3.   The Third Circuit's Analysis of the Pervasive Entwinement Theory Is Controlling

In *Cureton v. NCAA*, 198 F.3d 107 (3d Cir. 1999), the Third Circuit was

required to decide whether the National Collegiate Athletic Association, which

oversees most intercollegiate college sports in the United States, was a recipient of

federal funds and therefore subject to Title VI.  In doing so, the court looked to the

U.S. Supreme Court's decision in *NCAA v. Tarkanian*, *supra*, in which the court held

that the NCAA does not have "controlling authority" over its members since

members could choose to renounce their NCAA membership, and so the NCAA is

not a state actor.

> The Court reasoned that the UNLV "delegated no power to the NCAA to take specific action against any university employee.  The commitment by UNLV to adhere to NCAA enforcement procedures was enforceable only by sanctions that the NCAA might impose on UNLV itself."  The Court explained that the UNLV had the option to

50

retain [basketball coach Jerry] Tarkanian and risk sanctions, perhaps even expulsion, or to withdraw voluntarily from the NCAA.

*Cureton*, 198 F.3d at 117 (citations omitted).  The Third Circuit then went on to decide that the NCAA was not a recipient of federal funds and subject to Title VI because it lacked control over the federal funds since member schools could choose to renounce their NCAA membership.

Following the Supreme Court's decision in *Brentwood*, the Third Circuit was asked to decide whether the NCAA was subject to Title IX in *Smith v. Nat'l Collegiate Athletic Ass'n*, 266 F.3d 152 (3d Cir. 2001).  The plaintiff alleged that Brentwood's "pervasive entwinement" analysis suggested a less restrictive standard for state actor and Title IX liability than the "controlling authority" analysis in *Tarkanian*.  The Third Circuit disagreed, holding that state control must be shown.[19]

_____

[19]    Other courts have also held that government-funded entities are not state actors if their actions are not controlled by the state.  In both *Dowe v. Total Action Against Poverty*, 145 F.3d 653 (4th Cir. 1998) *and Nail v. Community Action Agency of Calhoun County*, 805 F.2d 1500 (11th Cir. 1986) (per curiam), the Fourth and Eleventh Circuit Courts of Appeals were confronted with nearly identical claims in which a terminated employee of a Head Start Program, which was the recipient of both federal and state funding, sued under § 1983.  *Dowe*, 145 F.3d at 658; *Nail*, 805 F.2d at 1501.  In each case, the courts concluded that because the personnel decision was not controlled by state regulations or involvement, the Head Start program could not be found to be a state actor.  *Dowe*, 145 F.3d at 659-60; Nail, 805 F.2d at 1501-02;  *see also Moglia v. Sullivan Co. Head Start*, 988 F.Supp. 366, 367 (S.D.N.Y.1997) (holding that county Head Start program was not acting under color

Smith also contends that *Brentwood* suggests that a less restrictive standard than "controlling authority" governs Title IX liability. Specifically, she argues that the NCAA was "pervasively entwined" in the operations of its members and thus is subject to Title IX. We disagree.  The Supreme Court in *Brentwood* stated: "We have treated a nominally private entity as a state actor when it is 'entwined with governmental policies' or when government is 'entwined in [its] management or control.'"   Similar to "pervasive entwinement," "controlling authority" exists when a public entity receiving federal dollars has ***delegated control to a private actor*** or is "entwined in its management or control."   Although the "public entwinement" theory differs from the "controlling authority" theory in that it focuses on whether a public entity controls or manages a private entity, ***its requirement of control is no less rigorous.*** Thus, we do not think the standards substantially differ.

*Smith*, 266 F.3d at 160.  The Third Circuit then held that because NCAA member schools could choose to renounce their membership despite how "unpalatable" that

---

of law in discharging plaintiff); *Joseph v. Ulster County Cmty. Action Comm., Inc.*, 475 F. Supp. 944, 947-48 (S.D.N.Y. 1979) (finding county community action commission, which supervised the local Head Start program, was not a state actor). Similarly, in *Morse v. North Coast Opportunities, Inc.*, 118 F.3d 1338 (9th Cir.1997), the Ninth Circuit Court of Appeals held that a Head Start parents' council's approval of an employee's termination was not fairly attributable to the federal government.  *See id*. at 1342-43. Although acknowledging that the federal government both funded and regulated the Head Start program, the Ninth Circuit Court of Appeals held that governmental funding and extensive regulation, without more, were insufficient to establish that the private agency's actions were fairly attributable to the federal government.  *See id.* at 1343.  In this case, PSBA is not a government-created entity and its operations are not outlined in government regulations.  Therefore, it is even less of a state actor than the Head Start programs mentioned above.

choice might be, the pervasive entwinement theory was not met.

In this case, Plaintiffs concede that PSBA's member schools have the choice to renounce their PSBA membership, and Campbell has openly encouraged school districts to drop their membership from PSBA. Compl., Exh. 9, Exh. H, p. 7 ("Stop making local taxpayers fund the salaries and PSERS pensions of a private corporation's employees. Fire PSBA – do it for the taxpayers."); Compl., Exh. 6 ("I will be lobbying the full school board, even more than I already am, to fire this self-serving monopoly whose private employees should not be getting PSERS pensions.") Moreover, PSBA lacks any control whatsoever over its members, as all services are provided at members' requests, and any guidance offered is purely suggestive. PSBA members are free to ignore PSBA's suggested guidance and frequently do. Accordingly, under the Third Circuit's analysis in *Cureton* and *Smith*, the Plaintiffs' pervasive entwinement theory fails.

### 4. Evidence Shows PSBA and Its Board Are Not State Actors

As noted above, there are several factual differences between the case at bar and the Brentwood "pervasive entwinement" case. PSBA and its governing board are private actors not engaging in state action and not controlled by any governmental element. The Defendants have adduced evidence establishing that PSBA is a private actor engaged in private conduct that is not within the reach of Section 1983. Among the facts that the Defendants have established are:

53

- PSBA is a nonprofit corporation, incorporated in the Commonwealth of Pennsylvania.  Exh. D-81 [Knade Aff., ¶ 15]; Exh. D-71 [Russell Aff., ¶ 6].

- PSBA was not created by any public school entity or by the General Assembly, any State Agency or any state or local government entity.  Exh. D-81 [Knade, ¶¶ 15, 17]; Exh. D-71 [Russell Aff., ¶ 7]; Exh. D-73 [Gentzel Aff., ¶ 9(b), (c)].

- No government entity took any action to incorporate the PSBA. No state agency took any action to incorporate the PSBA.  Exh. D-71 [Russell Aff., ¶¶ 10-12]; Exh. D-81 [Knade Aff., ¶¶ 18-21]; Exh. D-73 [Gentzel Aff., ¶ 9(e)-(g)].

- No public school entity took any action to authorize PSBA's State Tort Action against Campbell and PFUR.  Exh. D-81 [Knade Aff., ¶ 27]; Exh. D-73 [Gentzel Aff., ¶ 9(m)].

- No public school entity ever takes any action to direct the vote of Governing Board members of the PSBA. Exh. D-81 [Knade Aff., ¶ 28]; Exh. D-73 [Gentzel Aff., ¶ 9(d)].

- No Public School Entity has the power or authority to direct action by the PSBA that has any legal binding effect on PSBA. Exh. D-81 [Knade Aff., ¶ 29].

- PSBA does not regulate any part of the public school system.  Exh. D-81 [Knade Aff., ¶ 30; Exh. D-73 [Gentzel Aff., ¶ 9(p)].

- PSBA does not adopt or enforce rules with which Public School Entities must comply.  Exh. D-81 [Knade Aff., ¶ 32].

- PSBA has never adopted or enforced rules with which public school entities must comply, except membership rules under the Bylaws.  Exh. D-81 [Knade Aff., ¶ 33].

- PSBA has no power or authority to regulate any academic, extracurricular or other program or activity of any public school entity.  Exh. D-81 [Knade Aff., ¶ 34].

54

- No public school entity has ever assigned any of its revenues to PSBA. Exh. D-81 [Knade Aff., ¶ 35].

- PSBA has never collected Public School Revenues for, or on behalf of, public school entities.  Exh. D-81 [Knade Aff., ¶ 36].

- The PSBA Governing Board is not subject to the vote of any Public School Entity when it is acting as the Governing Board of PSBA.  Exh. D-81 [Knade Aff., ¶ 37].

- When serving on the PSBA Governing Board, board members are not representing the school boards on which they serve.  Exh. D-81 [Knade Aff., ¶ 38].

- No state official has ever been a member of the governing board of the PSBA, voting or otherwise.  Exh. D-81 [Knade Aff., ¶ 39].

- No state official has ever had any voting rights on any of the constituent parts of the PSBA.  Exh. D-81 [Knade Aff., ¶ 40].

- No State Agency has any power or authority over PSBA, except to the extent that any private, nonprofit corporation is subject to applicable law. Exh. D-81 [Knade Aff., ¶ 40].

- The Pennsylvania Department of Education ("PDE") has no power or authority over PSBA.  Exh. D-81 [Knade Aff., ¶ 42].

- PDE has never taken any action to control the operations or activities of the PSBA. Exh. D-81 [Knade Aff., ¶ 43]; Exh. D-73 [Gentzel Aff., ¶ 9(bb); Exh. D-71 [Russell Aff., ¶ 32].

- The State Board of Education has no power or authority over the PSBA. Exh. D-81 [Knade Aff., ¶ 44]; Exh. D-73 [Gentzel Aff., ¶ 9(dd)].

- The State Board of Education has never taken any action to control the operations or activities of the PSBA.  Exh. D-81 [Knade Aff., ¶ 45].

- The Secretary of Education of the Commonwealth of Pennsylvania has no power or authority over the PSBA.  Exh. D-81 [Knade Aff., ¶ 46]; Exh. D-73 [Gentzel Aff., ¶ 9(ff)]; Exh. D-71 [Russell Aff., ¶ 35].

- The Secretary of Education has never taken any action to control the operations or activities of the PSBA.  Exh. D-81 [Knade Aff., ¶ 47]; Exh. D-73 [Gentzel Aff., ¶ 9(gg)]; Exh. D-71 [Russell Aff., ¶36].

- None of the actions complained of by Campbell in this action have been reviewed or approved by any state agency or state official.  Exh. D-81 [Knade Aff., ¶ 48].

- No school director, even if a member of PSBA, has any duty toward PSBA by being a member of PSBA. Exh. D-81 [Knade Aff., ¶ 49]; Exh. D-73 [Gentzel Aff., ¶ 9(hh)].

- No school director, even if a member of PSBA, is required to attend any PSBA function or activity.  Exh. D-81 [Knade Aff., ¶ 50]; Exh. D-73 [Gentzel Aff., ¶ 9(ii)]; Exh. D-71 [Russell Aff., ¶ 38].

- No school director, even if a member of PSBA, is required to engage in any vote related to PSBA.  Exh. D-81 [Knade Aff., ¶ 51]; Exh. D-73 [Gentzel Aff., ¶ 9(jj)]; Exh. D-71 [Russell Aff., ¶ 39].

- No school director, even if a member of PSBA, is required to take advantage of any of the services of PSBA.  Exh. D-81 [Knade Aff., ¶ 52]; Exh. D-73 [Gentzel Aff., ¶ 9(kk)]; Exh. D-71 [Russell Aff., ¶ 40].

- PSBA has no power or authority over public school students.  Exh. D-81 [Knade Aff., ¶ 53]; Exh. D-73 [Gentzel Aff., ¶ 9(kk)]; Exh. D-71 [Russell Aff., ¶ 41].

- PSBA has never exercised any power or authority over public school students.  Exh. D-81 [Knade Aff., ¶ 54]; Exh. D-73 [Gentzel Aff., ¶ 9(ll)]; Exh. D-71 [Russell Aff., ¶42].

- Public school students cannot obtain any scholastic credit or meet any graduation requirements by participating in any PSBA activities.  Exh. D-

81 [Knade Aff., ¶ 55]; Exh. D-73 [Gentzel Aff., ¶ 9(mm)]; Exh. D-71 [Russell Aff., ¶ 43].

■ School boards of public school districts that are members of PSBA vote for members of the PSBA Governing Board.  Exh. D-81 [Knade Aff., ¶ 56].

■ No school board has dictated or compelled any decision of the PSBA Governing Board.  Exh. D-81 [Knade Aff., ¶ 58].

■ None of the actions taken by the PSBA Governing Board have been subject to the approval of any state agency or public school entity.  Exh. D-81 [Knade Aff., ¶ 59].

■ Members of the PSBA Governing Board have fiduciary duties to the PSBA.  Exh. D-81 [Knade Aff., ¶ 65]; Exh. D-70 [Freund Decl., ¶ 9]; Exh. D-75 [King Decl., ¶ 7].

■ The fiduciary duties that PSBA Governing Board members have are owed to PSBA and not to the public school entities on which they serve.  Exh. D-81 [Knade Aff., ¶ 66]; Exh. D-70 [Freund Decl., ¶ 9]; Exh. D-75 [King Decl., ¶ 7].

■ For years, the PSBA Governing Board has received training that in their capacity as members of the Governing Board: (a) they represent PSBA and not their public school entities on which they serve; and (b) they owe fiduciary duties to the PSBA.  Exh. D-81 [Knade Aff., ¶ 74]; Exh. D-73 [Gentzel Aff., ¶ 9(zz)].

■ During the Governing Board Training, Levin emphasizes and stresses that when acting as PSBA Governing Board, members:
   a. are not acting in their role as school directors for the Public School Entity(ies) on which they serve;
   b. are not acting in a representative role for any constituency;
   c. are not representing board members; and
   d. have a duty to PSBA, and PSBA alone, in accordance with exercising their fiduciary duties.

Exh. D-81 [Knade Aff., ¶ 78(a)-(d)]; Exh. D-73 [Gentzel Aff., ¶ 9(eee)].

57

The evidence further establishes that PSBA does not perform any government function for any public school entity.  Instead, if a public school entity wants to implement anything recommended by the PSBA, the entity must take action to approve and implement the action.  For example, if a public school entity wants to adopt a policy recommended by the PSBA, it must vote to approve the policy at a public meeting.  PSBA has no power or authority to adopt a policy, rule or regulation for, or on behalf of, a public school entity.

The evidence also establishes that no public school entity or any other government entity did anything to authorize any Individual Defendant to run for office or Governing Board member of PSBA.  No public school entity or other government entity did anything to authorize any of the votes taken by the Individual Defendants at PSBA Governing Board meetings.

Meanwhile still more evidence establishes that the following laws that generally apply to state and/or local governmental entities do not apply to PSBA:  1) The Public Official and Employee Ethics Act, 65 Pa. C.S.A. § 1101, et seq.; 2) the Sunshine Act, 65 Pa. C.S.A. § 701, *et seq.*; and 3) the Public Employe Relations Act, 43 P.S. § 1101.101, *et seq.*  Exh. D-73 [Gentzel Aff., ¶ 9(sss)].

Even the Plaintiffs have at times acknowledged that PSBA is a private actor. Campbell sent an e-mail to Terry Mutchler, former head of the Office of Open

Records ("OOR"), in which Campbell made a number of statements that PSBA was a private corporation or entity.  *See* Exh. D-34 [e-mail from Campbell to Mutchler]. When arguing that PSBA is not entitled to an opinion from the OOR, Campbell said: "With reference to the attached, please know that the Pennsylvania School Boards Association (PSBA) is neither an agency nor a requester as defined under Act 3. PSBA is a private organization not a government agency."  *See id.*; Exh. D-81 [Knade Aff., ¶ 122].  Referring to PSBA and the Pennsylvania State Education Association ("PSEA"), Campbell said, "I ask the first question because I am concerned about private third parties being allowed to secretly influence OOR advisory opinions."  *See* Exh. D-34, p. 2.  Again referring to PSBA and PSEA, and arguing that they have no right to advisory opinions from OOR, Campbell asserted, "I am deeply troubled that two private organizations who have no lawful right to have an advisory opinion issued to them, may be seeking to violate the privacy rights of individual requesters."  *Id.*

      In deciding the Defendants' Motion to Dismiss, on this issue, the Court said:

> Although PSBA is a private entity, its membership is composed entirely of public schools represented by their school board officials.   As in *Brentwood*, those schools vote for the members of the PSBA's Governing Board. each of whom must also serve as an elected school board official. Furthermore, the PSBA, at the direction of its board, provides key services to its public school members, including legal advice, lobbying of the state legislature, and the filing of the state suit at issue in this case. Taking the allegations of the Verified Complaint

as true the Court concludes pursuant to *Brentwood* that defendants are state actors.

Decision *at* 7-8.

Naturally, the foregoing was based on Campbell's allegations in the Complaint and was made without reference to all of the record facts brought to bear in the Motion for Summary Judgment. However, it is important to comment on the foregoing facts relied upon by the Court. The PSBA Governing Board does not direct PSBA staff and does not direct PSBA staff to provide services to PSBA's members. On the contrary, like most well-run corporations with good governance, the PSBA Governing Board deals with the broad issues of PSBA operations and leaves the day-to-day operations of the PSBA staff to the staff. *See* Exh. D-36 [by-laws]. Two years of minutes of PSBA Governing Board meetings have been provided [Exhs. D-3 through D-22] and it is fair to say that they do not support the Plaintiffs' allegation that "PSBA, at the direction of its board, provides key services to its public school members . . .." Further, with respect to legal services, PSBA currently has a staff of three in-house lawyers. These attorneys provide legal information to PSBA members upon request and are not providing legal advice or legal representation of PSBA members unless an individual member specifically retains PSBA in an attorney-client relationship, which is rare and has been rare for years. Exh. D-85 [Knade 30(b)(6) Dep., 131:3-23]. With respect to lobbying, PSBA

60

lobbies for itself and not for individual school districts.  Indeed, it is common that individual school districts disagree with PSBA's position on issues.  Never does PSBA lobby for a particular school district, but rather PSBA's legislative priorities are developed in consultation with a committee made up of school board directors in order to be reflective of the broad makeup of districts across the Commonwealth. Exh. D-86 [Mains 30(b)(6) Dep., 46:8-47:12].  Finally, the filing of the State Tort Action was not a service provided to or for school districts.  It was for the purpose of protecting the interests of PSBA as an entity.  *See, e.g.*, Exh. D-88 [Voit Dep., 32:6-17].

In light of the foregoing, Defendants respectfully submit that this Court should find that PSBA is not a state actor and was not involved in state action when it filed the State Tort Action.

> ### a.  Even If Individual Defendants Are Deemed to Be State Actors, They Are Protected by Qualified Immunity

### C. The Individual Defendants Are Shielded by Qualified Immunity

Although PSBA and the Individual Defendants assert that the Individual Defendants were acting as private citizens when serving as governing board members and voting to approve the State Tort Action against Campbell, to the extent that the Individual Defendants are deemed to be state actors, they are shielded from liability by the doctrine of qualified immunity.

The purpose of qualified immunity is to protect government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see Reichle v. Howards*, 566 U.S. 658, 664 (2012).

To be clearly established, a right must be sufficiently clear "that every 'reasonable official would [have understood] that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (*quoting Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* This "clearly established" standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can "'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Anderson*, *supra*, at 639 (*quoting Davis v. Scherer*, 468 U.S. 183, 195 (1984)). The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Groh v. Ramirez*, 540 U.S. 551, 567 (2004).

In analyzing the motion to dismiss, this Court held that the Plaintiffs had properly alleged that courts have clearly established that the First Amendment

precludes government officials from filing suits premised on a citizen's petitioning the government.  Decision, p. 11.  The Court then stated that Plaintiffs alleged in the Complaint that PSBA board members had voted to file the state court action "in response to plaintiffs' petitioning of the government by filing the RTKL requests and lobbying school district to sever ties with PSBA."  *Id.* at 12.  Therefore, taking the Plaintiffs' allegations as true, the Court held that the Complaint alleges a violation of a clearly established constitutional right.

However, the evidence adduced in discovery did not show that PSBA filed the state court action in response to plaintiffs' filing the RTKL requests and lobbying school district to sever ties with PSBA.  Instead, Defendants testified that the state court action was brought to defend PSBA from Plaintiffs' defamatory attacks and attempts at tortious interference.  PSBA board member Kathy Swope testified that Plaintiffs' Right to Know Law requests were never presented to PSBA's governing board as a basis for suing Plaintiffs.  *See, e.g.*, Exh. 87 [Swope Dep., p. 28:18-21].

Accordingly, there is no clearly established standard that filing a state lawsuit for defamation, tortious interference with contract, and/or abuse of process constitutes a retaliatory violation of the lawsuit defendant's First Amendment rights.  As noted above, the filing of the lawsuit in state court constituted a constitutionally protected right.  *See BE & K Constr. Co.*, *supra*, 536 U.S. at 525 ("[T]he right of access to the courts is . . . but one aspect of the right of petition.").  Therefore, it was

63

not clear to the individual Defendants at the time that they approved the filing of the State Tort Action that doing so might be a violation of the Plaintiffs' First Amendment rights.   In fact, it is not clear today that such actions violate the Plaintiffs' First Amendment rights.

In the Court's decision rejecting the Defendants' claim of qualified immunity, the Court said: "The Court agrees with plaintiffs that these cases are sufficient to clearly establish that state officials may sue a citizen based on the citizen's petitioning of the government." *Slip opin. at* 11.   The Court made this statement based on the allegations of the Complaint and did not have the record facts that have now been presented by the Defendants in this Motion for Summary Judgment. Simply stated, the Defendants contend: (1) this it is not and was not clearly establish that the Defendants were "state actors" or engaged in a "state action" when filing the State Tort Action; and (2) that it was clearly established that Campbell's conduct about which PSBA complained in its State Tort Action is protected by the First Amendment even if PSBA is deemed to be a state actor.   If either of these elements of Campbell's claims were not "clearly established," the individual defendants have qualified immunity and must be dismissed from the case.

Significantly, qualified immunity is intended to be an immunity from suit, rather than simply a defense to liability, which means that its protection is effectively lost if a defendant is required to go to trial.   *See Saucier v. Katz*, 533 U.S. 194, 200-

01 (2001).  The Supreme Court has made clear that the "driving force" behind

creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial

claims' against government officials [will] be resolved prior to discovery."

*Anderson*, *supra*, 483 U.S. at 640, n.2 (1987).

### D.  The State Tort Action Does Not Deter a Person of Ordinary Firmness From Exercising Constitutional Rights

Campbell alleges, as he must, that he has been deterred from exercising his

First Amendment rights in light of the filing of the State Tort Action, and that they

have "ceased various First Amendment-protected activities."  Inj. Mot., p. 25.  Yet

this claim is belied by the fact that Campbell continued to churn out RTKL requests

months after the State Court Action was initiated.  PSBA is aware the Campbell

served several RTKL requests on several public school districts at least as late as

November 30, 2017, more than four months after the suit was filed.  Therefore, it is

clear that Campbell's First Amendment rights were not chilled by the filing of the

State Tort Action.  *See Constantine v. Rectors & Visitors of George Mason Univ.*,

411 F.3d 474, 500 (4th Cir. 2005) ("[P]laintiff's actual response to the retaliatory

conduct provides some evidence of the tendency of that conduct to chill First

Amendment activity . . . .")

Campbell goes on to allege that even if he was not deterred from exercising

their First Amendment rights – as he clearly was not – the State Tort Action would

"deter a person of ordinary firmness from exercising their rights."  The only case cited on this point by Campbell from a court within the Third Circuit is *College Sav. Bank v. Fla. Prepd. Educ. Expense Bd.*, 919 F. Supp. 756 (D.N.J. 1996).  In that case, the court held that allowing *government* to sue for defamation would chill speech.  *Id.* at 760.  However, as analyzed above, PSBA is not a government entity, and therefore *College Savings Bank* is inapplicable here.

### E.   Campbell Has Not Suffered Irreparable Harm

The irreparable harm requirement for a permanent injunction is met if a plaintiff demonstrates a significant risk that he or she will experience harm that cannot adequately be compensated after the fact by monetary damages.  *See Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102-03 (3d Cir. 1988).  This is not an easy burden.  *See, e.g.*, *Morton v. Beyer*, 822 F.2d 364, 371-72 (3d Cir. 1987).

Campbell alleges that he has irreparably harmed due to an alleged deprivation of their First Amendment rights.  Plf. Mem., p. 26.  To support this position, Campbell cites cases such as *Abu-Jamal v. Price*, 154 F.3d 128, 130 (3d Cir. 1998). In that case, noted cop killer Mumia Abu-Jamal attempted to conduct business as a journalist while in prison.  This was forbidden by prison rules, and prison officials searched Abu-Jamal's mail to prevent him from sending out works of journalism. The Third Circuit held that this deprivation of Abu-Jamal's First Amendment rights

constituted irreparable harm.  However, the difference between the case at bar and the cases cited by Campbell is that Campbell has not been prevented from exercising their First Amendment rights.  Prisoners such as Abu-Jamal have no recourse for communicating with the outside world if the state prevents such communication. Here Campbell has been free to continue with their filing of RTKL requests – and they have.  PSBA has no authority to interfere with Campbell's communications, nor have they.  Furthermore, to the extent that there has been any interference, they could be adequately compensated by monetary damages after trial, if necessary.

### F.    Injunctive Relief Would Result in Greater Harm to Defendants

As noted previously, a party seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *See, e.g.*, *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004). Campbell devotes only one paragraph to arguing that the balance of hardships in this litigation favors their position.  Campbell claims that Defendants would not be prejudiced in any way by the imposition of an injunction, and that Campbell has been chilled in their exercise of otherwise-privileged First Amendment speech.  Plf. Mem., p. 28.  Yet Campbell has continued to serve RTKL requests on Pennsylvania

public school districts, so there would appear to be no harm to Campbell if an injunction is not permitted.

Meanwhile, if the injunction is granted, PSBA will have its access to the courts impermissibly restricted, and potentially be left with no forum for its tort claims against Campbell.

### G.    The Public Interest Does Not Favor Injunctive Relief

In seeking an injunction, Campbell must also prove that the public interest favors preliminary relief. *Kos Pharms., Inc.*, 369 F.3d at 708. Campbell claims that the public interest is in their favor since "in the absence of legitimate, countervailing concerns, the public interest clearly favors the protections of constitutional rights." Plf. Mem., p. 28 (*quoting Council of Alternative Political Parties v. Hooks*, 121 F.3d 876-883-84 (3d Cir. 1977). Yet there are competing constitutional interests at play here – Campbell alleged Petition Clause-protected right to make RTKL requests and the Defendants' Petition Clause-protected right to petition the Commonwealth's courts for a redress of grievances. So at the very least this factor is neutral. However, a closer look reveals that what Campbell truly seeks is a First Amendment-protected right to defame PSBA, its employees, and others who disagree with his strong-arm tactics. Such methods are not protected by the First Amendment and are not in the public interest. Accordingly, this factor weighs in favor of Defendants.

**CONCLUSION**

For all the reasons stated above, the Defendants respectfully request that this

Court deny the Injunction Motion.


Respectfully submitted,


Date:  July 9, 2018                              */s/ David W. Brown*
                                                 Michael I. Levin (PA 21232)
                                                 David W. Brown (PA 201553)
                                                 LEVIN LEGAL GROUP, P.C.
                                                 1301 Masons Mill Business Park
                                                 1800 Byberry Road
                                                 Huntingdon Valley, PA 19006
                                                 Phone:  (215) 938-6378
                                                 mlevin@levinlegalgroup.com
                                                 dbrown@levinlegalgroup.com

                                                 *Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 9th day of July, 2018, I electronically transmitted the foregoing Defendants' Injunction Hearing Brief and the accompanying Proposed Findings of Fact and Conclusions of Law and Witness List to be filed to the Clerk's Office using the Court's Electronic Case Filing system ("ECF") for filing and transmittal of a Notice of Electronic Case Filing to all counsel via the ECF, in accordance with Fed. R. Civ. P. 5(b) and E.D. Pa. L.R. 5.1.2.


*/s/ David W. Brown*
David W. Brown