1

```
 1      I N  T H E  U N I T E D  S T A T E S  D I S T R I C T  C O U R T
        F O R  T H E  E A S T E R N  D I S T R I C T  O F  P E N N S Y L V A N I A
 2
                          - - -
 3
        SIMON CAMPBELL, et al.,  :
 4          P l a i n t i f f s  :
                                 :  CIVIL ACTION
 5          vs.                  :  NO.
                                 :  18-CV-892-JD
 6      PENNSYLVANIA SCHOOL      :
        BOARDS ASSOCIATION,      :
 7      et al.,                  :
            D e f e n d a n t s .  :
 8
                          - - -
 9
                   Tuesday, May 22, 2018
10
                          - - -
11
12              Videotaped deposition of KATHY
13      ANN SWOPE, taken pursuant to Notice at the
14      Law Offices of Gordon & Rees Scully
15      Mansukhani, LLP, 2005 Market Street, Suite
16      2900, Philadelphia, Pennsylvania 19103,
17      beginning at 9:08 a.m., before Brigitte A.
18      Strain, a Federally Certified Registered
19      Professional Reporter and a Notary Public in
20      and for the Commonwealth of Pennsylvania.
21                        - - -
22
23          VERITEXT LEGAL SOLUTIONS
             MID-ATLANTIC REGION
24       1801 Market Street - Suite 1800
        Philadelphia, Pennsylvania  19103
```

2

```
 1      A P P E A R A N C E S :
 2
 3      GORDON & REES SCULLY MANSUKHANI, LLP
        BY:  JACOB C. COHN, ESQUIRE
        BY:  ERIC C. ROSENBERG, ESQUIRE
 4      One Commerce Square
        Suite 2900
 5      2005 Market Street
        Philadelphia, Pennsylvania 19103
 6      215.717.4004
        JCohn@grsm.com
 7      ERosenberg@grsm.com
        Representing the Plaintiffs
 8
 9      LEVIN LEGAL GROUP, P.C.
        BY:  DAVID BROWN, ESQUIRE
10      1301 Masons Mill Business Park
        1800 Byberry Road
11      Huntingdon Valley, Pennsylvania 19006
        215.938.6378
12      DBrown@levinlegalgroup.com
        Representing the Defendants
13
14      ALSO PRESENT:
15          Benjamin Neate, Video
            Technician
16
            Simon Campbell
17
18
19
20
21
22
23
24
```

3

```
 1                  I N D E X
 2                   - - -
 3      Testimony of:  KATHY ANN SWOPE
 4      By Mr. Cohn.....................10
 5                   - - -
 6            E X H I B I T S
 7                   - - -
 8      EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED
 9      P-64  10.13.17 e-mail from Mr.
             Campbell to Mr. Fairchild
10           Subject:  PSBA lawsuit
             Attorney letters        71
11
        P-85  10.12.17 letter to Mr.Heim,
12           responding to his 7.19 letter  74
13      P-94  12.2.17 Minutes          206
14      P-98  2016 PSBA bylaws         146
15      P-106  Complaint               113
16      P-110  Motion For Leave to Provide
             Alternative Service Pursuant
17           To Pa. Civ. R. 430(a)     66
18      P-113  10.12.17 Letter to Heim
             From Cohn                 72
19
        P-114  12.8.17 Letter to Cohn
20           From Levin                213
21      P-211  Preliminary Objections  177
22
23
24
```

4

```
 1      EXHIBITS (continued)
 2      EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED
 3      P-214  Email forwarding letter to
 4           Mr. Poirier              254
 5      P-222  Email, Campbell to Fairchild 137
 6      P-225  Notice of Deposition     13
 7      P-226  Bio of Kathy Swope       14
 8      P-227  Email from Mr. Fairchild to
 9           Kathy Swope              46
10      P-228  7.30.17, e-mail from Campbell
             To Fairchild             57
11      P-229  9.17.17 e-mail from Mr.
             Campbell to Mr.Fairchild.
12           Subject:  RTKL Lewisburg
             Area School District.    60
13
        P-230  September 22nd e-mail from
14           Mr. Campbell to Mr.Fairchild.
             Subject:  Correcting PSBA's
15           Guidance                 69
16      P-231  10.13.17 e-mail from Mr.
             Campbell to Mr.Fairchild.
17           Headed, Subject:  PSBA lawsuit
             attorney letters         70
18      P-232  10.14.17 e-mail from
19           Mr. Campbell.  Subject:
             Verifying your individual
20           Actions re PSBA SLAPP, to
             Governing board members.    80
21
22
23
24
```

7

EXHIBITS (continued):

EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED

P-233  10.17.17 e-mail from
       Mr. Campbell to Mr.
       Fairchild.  Subject:
       PSBA's Amazing
       Self Destruction        85

P-234  October 2, 2017 e-mail
       From Mr. Campbell to
       Mr. Fairchild.  Subject:
       Dirty PSBA e-mail sparks
       New Campbell attorney
       Demands                 109

P-235  10.17.17, Letter from Cohn
       To Heim                 120

P-236  Letter from Heim to Cohn    128

P-237  11.4.17 e-mail from Mr.
       Campbell to Mr. Fairchild.
       Subject:  Bailing out on
       PSBA (ACLU are coming)   155

P-238  11.12.17 Email from Campbell
       To Fairchild            175

P-239  Brief in Support of the
       Preliminary Objections
       To the Amended Complaint   179

P-240  11.27.17 e-mail from Mr.
       Campbell to Mr. Fairchild,
       Re:  Forwarding, encouraging
       You to reconsider
       Your SLAPP suit.        179

DEPOSITION SUPPORT INDEX

DIRECTION TO WITNESS NOT TO ANSWER

Page   Line

31    17

43    21

48     6

53    16

56     2

63     2

64    13

101    11

116    10

132     5

133     1

196    21

211    10

212    10

230    23

260     4

263    12

6

EXHIBITS (continued):

EXHIBIT NUMBER   DESCRIPTION   PAGE MARKED

P-241  Brief in Support of
       Preliminary Objections    186

P-242  Email from Campbell       201

P-243  12.5.17 e-mail from Mr.
       Campbell to Mr. Fairchild
       Subject:  SLAPPer, PSBA's
       Latest RTKL chaos.       203

P-245  12.19.17 e-mail from Cohn
       To Heim, cc Levin         224

P-246  5.13.18 Email from Cohn
       To Solicitors             246

PREVIOUSLY MARKED EXHIBITS REFERRED TO:

61
70
88
105
107
112
55

8

VIDEO TECHNICIAN:  Good

Morning.  We're now going on the

record at 9:08 a.m. on May 29th,

2018.

    Please note that the

microphones are sensitive and may

pick up whispering, private

conversations and cellular

interference.  Please turn off all

cell phones or place them away from

microphones as they could interfere

with the deposition audio.

    This is media unit number one

of the video recorded deposition of

Kathy Swope in the matter of Simon

Campbell, et al.  versus Pennsylvania

School Boards Associates, et al.,

which is filed in the United States

District Court for the Eastern

District of Pennsylvania, Case Number

218-CV-892-JD.

    This deposition is being held

at Gordon & Rees, located at 2005

Market Street, One Commerce Square,

9

1  Philadelphia, Pennsylvania.
2          My name is Benjamin Neate from
3  the firm Veritext, and I'm the
4  videographer.  The court reporter is
5  Brigitte Strain from the firm
6  Veritext.
7          I'm not authorized to
8  administer an oath.  I'm not related
9  to any party in this action, nor am I
10 financially interested in the
11 outcome.
12         Counsel and all present in the
13 room will now state their appearances
14 and affiliations for the record.
15         MR. COHN:  For the Plaintiff,
16 Jacob Cohn of Gordon & Rees.
17         Eric.
18         MR. ERIC ROSENBERG:  Hi.  Eric
19 Rosenberg from the firm Gordon & Rees
20 for the Plaintiff.
21         MR. BROWN:  David Brown from
22 Levin Legal Group for all Defendants.
23         VIDEO TECHNICIAN:  Will the
24 court reporter please swear in the

10

20:57:09 1  witness.
2                  - - -
3          KATHY ANN KOON SWOPE, having
4  first been duly sworn, was
5  examined and testified as follows:
6                  - - -
7          EXAMINATION
8                  - - -
9  BY MR. COHN:
10         Q.    All right.  Good morning, Ms.
11 Swope.
12         MR. COHN:  Court reporter,
13 please note that Mr. Campbell is
14 present and Mr. Ilan Rosenberg may be
15 present for parts of this.
16 BY MR. COHN:
17         Q.    And, Ms. Swope, I am placing
18 here a bunch of exhibits that we have
19 previously marked that we may be using
20 again.
21         Would you please state your
22 full name and address for the record,
23 please?
24

11

1          A.    **Certainly.  Kathy Ann Koon**
2  **Swope, 48 Oak Wood Drive, Winfield,**
3  **Pennsylvania.**
4          Q.    Do you reside in Winfield?
5          A.    **That is correct.**
6          Q.    And you serve as a school
7  board director in Lewisburg?
8          A.    **That is correct.**
9          Q.    Have you ever participated in
10 a deposition before?
11         A.    **Yes, I have.**
12         Q.    Okay.  So I could skip over
13 the standard instructions, but I'll give you
14 a couple anyway.  One of which is, if you or
15 counsel interjects an objection, unless he
16 instructs you not to answer or unless I
17 choose to rephrase the question, or withdraw
18 the question in response to his objection,
19 please answer it as best you can.  Okay?
20         A.    **Certainly.**
21         Q.    And if you don't understand
22 something that I'm asking, please feel free
23 to ask for clarification.  And When we are
24 engaged in our colloquy, please wait for me

12

1  to finish a question, and I will try hard,
2  and I'm bad at it, to wait for you to finish
3  an answer so that we're not talking all over
4  each other.  It makes a very bad record.
5  And you need to keep your responses verbal
6  rather than nonverbal or physical.  Is that
7  okay?
8          A.    **Certainly.**
9          Q.    Okay.  Where are you
10 registered to vote?
11         A.    **Union County, Pennsylvania.**
12         Q.    You don't reside there?
13         A.    **Yes, I do reside there.**
14         Q.    And you also reside in
15 Wynnewood?
16         A.    **I'm sorry?**
17         Q.    You also reside in Wynnewood?
18         A.    **No, Winfield is the town.**
19         Q.    Oh, Winfield is in -- I
20 thought you said -- I thought you were
21 referring to Philadelphia.
22         A.    **No.  No, no, no, no.**
23 **Winfield, Pennsylvania is the name of the**
24 **town that I live in.**

13

1    Q.    All right.  That makes it --
2    A.    **And that is in Union County.**
3    Q.    That's part of the Lewisburg
4  School District?
5    A.    **Yes.**
6              - - -
7         (Whereupon the document was
8      marked, for identification purposes,
9      as Exhibit Number P-225.)
10             - - -
11 BY MR. COHN:
12   Q.    Okay.  So let's take a -- This
13 is Exhibit P-225.  Have you seen your
14 deposition notice?  That's what that is.
15   A.    **Yes, I have.**
16   Q.    And you're here in response to
17 that; correct?
18   A.    **Pardon?**
19   Q.    You're here pursuant to the
20 deposition notice; correct?
21   A.    **That is correct.**
22             - - -
23         (Whereupon the document was
24      marked, for identification purposes,

14

1      as Exhibit Number P-226.)
2              - - -
3  BY MR. COHN:
4    Q.    All right.  Let's take a look
5  at P-226, which I think will help us go
6  through your background.  It's a little bio
7  about you.
8    A.    **Uh-huh.**
9    Q.    Is this something that you
10 prepared for the PSBA to put up on their Web
11 site?
12   A.    **That is correct.**
13   Q.    Okay.  So it is correct?
14   A.    **Yes.**
15   Q.    Okay.  So you went to
16 Susquehanna University?
17   A.    **Yes.**
18   Q.    And you got a teaching degree?
19   A.    **Yes.**
20   Q.    And have you been a teacher?
21   A.    **No.**
22   Q.    What have you done -- when did
23 you graduate with your teaching degree?
24   A.    **2010.**

15

1    Q.    Have you gone to college
2  before that?
3    A.    **Yes.**
4    Q.    Do you have another degree?
5    A.    **No.**
6    Q.    Okay.  When did you first
7  become a school board member?
8    A.    **June of 1999.**
9    Q.    And you have served
10 continuously on Lewisburg School Board since
11 then; correct?
12   A.    **That is correct.**
13   Q.    And you've been the president
14 since when?
15   A.    **This is my 11th year.**
16   Q.    Okay.  Your solicitor is
17 currently Mr. Fanelli; is that correct?
18   A.    **That is correct.**
19   Q.    So tell me how you first came
20 to be involved with positions within PSBA?
21   A.    **Ah.**
22   Q.    If you don't mind, I'll make
23 this easier for you.
24   A.    **Yes, it's a lot of time ago,**

16

1  **so I have to go back.**
2    Q.    Trace for me --
3    A.    **Sure.**
4    Q.    -- your involvement in the
5  PSBA and the positions you held?
6    A.    **Sure.  My earliest position,**
7  **probably -- I don't remember the exact date**
8  **it began or even what year, but I began as a**
9  **county coordinator for PSBA.  And then I**
10 **went on to become the assistant --**
11 **assistant regional director.  Then I became**
12 **the regional director for section -- Region**
13 **6.  Then, I -- I ran for Eastern At-Large.**
14 **And then I ran for president-elect.  And**
15 **then I served as president-elect in 2015.  I**
16 **was president in 2016.  And I am immediate**
17 **past president for 2017 and 2018 because the**
18 **circumstances are such that there was not**
19 **another immediate past president.**
20   Q.    So but for the fact that the
21 president resigned prematurely last year,
22 you would be off the Board this year?
23   A.    **That is correct.**
24   Q.    Okay.  What was the first year

17

1  you were on the board -- which of these
2  positions resulted in your being on the
3  board?
4       A.   **Regional director.**
5       Q.   Okay.  And that was 2008?
6       A.   **Yes, that would be 2008.**
7       Q.   And you have continuously
8  served on the board since 2008?  Were you on
9  the board --
10      A.   **No, it's been 2007, I think.**
11 **Yes, 2007, because this is my -- this is my**
12 **11th year.  So that would have been 200 -- I**
13 **guess 2007.**
14      Q.   Your 11th consecutive year on
15 the board?
16      A.   **Correct.**
17      Q.   Are you the longest tenured --
18      A.   **Yes.**
19      Q.   -- governing board director?
20      A.   **Yes, I am.**
21      Q.   Okay.  I see you hold some
22 other positions related to education.  You
23 are -- What is the LASD?
24      A.   **That is Lewisburg Area School**

18

1  **District.**
2       Q.   Okay.  And then -- Let me see
3  if I could read the small -- or if it's on
4  here.  There's some liquid asset fund that
5  you were involved in?
6       A.   **Yes.**
7       Q.   What is that?
8       A.   **That's -- the Pennsylvania**
9  **School District Liquid Asset Fund is a**
10 **vehicle by which school districts can invest**
11 **money, and I serve on the Board of**
12 **Directors.**
13      Q.   Okay.  And do you serve on
14 that Board of Directors because of any
15 particular position you hold with the school
16 district or with the PSBA?
17      A.   **Yeah.  You must be a school**
18 **director to serve on that board.**
19      Q.   Okay.  Well, Nathan Mains
20 still serves on it, doesn't he?
21      A.   **Yes.  Affiliated PSBA and**
22 **Pennsylvania -- what's it called -- PASBO,**
23 **Pennsylvania Association of School Business**
24 **Officials jointly operate PSDLAF.**

19

1       Q.   PDLAF, right?
2       A.   **No.**
3       Q.   What?
4       A.   **P-S-D-L-A-F.**
5       Q.   Okay.  That's the School
6  District Liquid Asset Fund?
7       A.   **Correct.**
8       Q.   And is that a paying position,
9  being the trustee?
10      A.   **No.**
11      Q.   Are you on any other boards of
12 any other education-related entities?
13      A.   **Yes.**
14      Q.   What is that?  What are they?
15      A.   **I serve on the board of the**
16 **Pennsylvania Public Education Foundation.**
17      Q.   Is that something that you
18 need to be a school director or a PSBA
19 director to serve as?
20      A.   **No.**
21      Q.   I also understand that you are
22 a director of C.M. Regent Insurance Company?
23      A.   **Yes, I am.**
24      Q.   Is that a paying position?

20

1       A.   **Yes, it is.**
2       Q.   How much does that pay?
3       A.   **That -- All of the independent**
4  **directors -- I'm trying to think what the**
5  **last number was.  I think it is 38,000.**
6       Q.   Per year?
7       A.   **Yes.**
8       Q.   Plus expenses to attend
9  meetings?
10      A.   **I don't put in for expenses,**
11 **but I could.**
12      Q.   How long have you served on
13 the board of that company?
14      A.   **Since June of 2016.**
15      Q.   And that was when the company
16 was purchased by Church Mutual and its name
17 was changed?
18      A.   **Yes.**
19      Q.   Did you serve under the board
20 of the predecessor company before it was
21 acquired?
22      A.   **Yes, I did.**
23      Q.   From what period of time?
24      A.   **2015 to June of 2016.**

**21**

1    Q.    Was there, or is there, any
2  requirement that you be a PSBA board member
3  to serve in that position?
4    A.    **Which position?**
5    Q.    The director of the C.M.
6  Regent, or the company that was C.M. Regent
7  before it changed its name.
8    A.    **Before it changed its name.**
9  **School Boards Insurance Company, at that**
10  **time, yes, I had to be a member of the**
11  **governing board at that point.**
12    Q.    And that's no longer --
13    A.    **As far as C.M. Regent, no, I**
14  **had no -- I have no requirements, that I**
15  **know of.**
16    Q.    As a member of the governing
17  board, are you familiar with the bylaws of
18  PSBA?
19    A.    **Yes, I am.**
20    Q.    As a member of the governing
21  board, do you understand the function of the
22  government board?
23    A.    **I do.**
24    Q.    Do you understand that one of

**22**

1  the functions of the governing board is to
2  oversee the people that run the day-to-day
3  operations of PSBA?
4    A.    **Yes.**
5    Q.    And you're the president of
6  the school board, your home school board;
7  correct?
8    A.    **That is correct.**
9    Q.    As the president of the home
10  school board, how much time, on an average
11  week, do you spend in -- in school business?
12    A.    **Just for my local school**
13  **district?**
14    Q.    Yes.
15    A.    **Probably about 15 hours a**
16  **week.**
17    Q.    How much time do you spend on
18  PSBA business on an average week?
19    A.    **Maybe about four.**
20    Q.    And when -- strike that.
21        As the president of the school
22  board, is it fair to say that you are the
23  most involved school board member on a
24  day-to-day basis with school district

**23**

1  business?
2    A.    **Yes.**
3    Q.    Are you somebody that has the
4  most day-to-day contact with the
5  superintendent?
6    A.    **Yes.**
7    Q.    If important things are
8  circulated on an e-mail within the school
9  district, would you be one of the typical
10  copy readers?
11    A.    **Copy readers?  Please clarify.**
12    Q.    A cc.?
13    A.    **No, not in school district**
14  **business.  If it goes out to staff or**
15  **something, no, because that wouldn't be a**
16  **governance function.**
17    Q.    Okay.  Have you ever met Mr.
18  Campbell before?
19    A.    **No.**
20    Q.    When was the first time you
21  heard of Simon Campbell?
22    A.    **Last spring.**
23    Q.    In what context did you hear
24  about Simon Campbell?

**24**

1    A.    **The Right-to-Know request**
2  **received by my school district.**
3    Q.    Let's talk about Right-to-Know
4  Law requests received by your school
5  district in the spring of last year.  There
6  was one that was sent in March, which is not
7  the one that PSBA sued Mr. Campbell about.
8  Are you familiar with that one?
9    A.    **Probably.  I couldn't tell you**
10  **exactly what it was about, but I was aware**
11  **that, as of last spring at some point, that**
12  **we began -- that we received something,**
13  **so...**
14    Q.    Did you have any conversations
15  within the school district about Mr.
16  Campbell's Right-to-Know Law request or
17  requests in the spring of last year?
18    A.    **Yes, I recall having a**
19  **conversation with our business manager.**
20    Q.    Is that Mr. Fairchild?
21    A.    **Yes.**
22    Q.    And he's also the
23  Right-to-Know Law officer?
24    A.    **That's correct.**

25

1    Q.    When, to the best of your
2  recollection, did you have that conversation
3  with him?
4    A.    **I don't recall.**
5    Q.    Was it before or after you
6  became aware that PSBA was considering suing
7  Mr. Campbell?
8    A.    **No, before.**
9    Q.    What was your conversation
10  with Mr. Fairchild?
11    A.    **Just that we had received this**
12  **request and I had suggested that, you know,**
13  **that because he had said something about the**
14  **request to me, I said, you know, make sure**
15  **you run it by our solicitor.  That was it.**
16    Q.    Who at that time was Mr.
17  Fanelli?
18    A.    **Yes.**
19    Q.    Your prior solicitor was
20  replaced when, in 2016?
21    A.    **No. No, no, no, no.  I don't**
22  **recall exactly.  It's several years ago.**
23    Q.    I remember reading something
24  about his being replaced, that he was -- he

26

1  was replaced by Mr. Fanelli; correct?
2    A.    **Yes.**
3    Q.    Who was the prior solicitor?
4    A.    **Carl Beard.**
5    Q.    From the Beard Law Group?
6    A.    **That is correct.**
7    Q.    When -- Let me get a time
8  frame here.  It's my understanding from
9  prior testimony that the vote of the
10  governing board of PSBA to authorize a
11  lawsuit against Mr. Campbell and PFUR, for
12  Pennsylvanians For Union Reform, was taken
13  at a meeting in June in Washington D.C.  Is
14  that consistent with your recollection?
15    A.    **That is correct.**
16    Q.    Prior to that point in time,
17  other than your discussion with Mr.
18  Fairchild, did you have any other
19  discussions with anybody about Mr. Campbell
20  or PFUR?
21    A.    **Not that I recall.**
22    Q.    Okay.  So the first time you
23  remember having a discussion of Mr.
24  Campbell in the context of PSBA was at this

27

1  June meeting in Washington D.C.; correct?
2    A.    **No, I had another**
3  **conversation.**
4    Q.    With whom?
5    A.    **Nathan Mains.**
6    Q.    And that was prior to this
7  meeting?
8    A.    **Yes.**
9    Q.    And What was that
10  conversation?
11    A.    **He wanted my thoughts on how**
12  **best to present this to the board.**
13    Q.    What did he tell you he wanted
14  to present to the board?
15    A.    **The consideration of pursuing**
16  **a lawsuit.**
17    Q.    Why did he tell you that he
18  wanted to consider pursuing a lawsuit by
19  PSBA against PFUR and Mr. Campbell?
20    A.    **I don't recall.**
21    Q.    What basis did he give you for
22  pursuing a lawsuit against PFUR and Mr.
23  Campbell?
24    A.    **Because of the -- how --**

28

1    **Because of the many things that had been**
2    **done that were hurting our image and our**
3    **reputation.**
4    Q.    Which were what?
5    A.    **The videos that were being**
6    **sent out, the Internet Web site.  Those**
7    **items.**
8    Q.    Did he tell you that he wanted
9  to sue Mr. Campbell and PFUR because of the
10  statewide Right-to-Know Law requests that he
11  had been serving?
12    A.    **No.**
13    Q.    Did he say that he wanted to
14  sue because of information that was being
15  sought through those requests that involved
16  financial information of PSBA?
17    A.    **No.**
18    Q.    Were either of those two bases
19  for suing Mr. Campbell presented to the
20  board?
21    A.    **Not that I recall.**
22    Q.    So Mr. Mains said he wanted to
23  have PSBA sue the plaintiffs here because of
24  their online videos and online Web sites;

29

1  correct?
2     **A.     No, because of damaging the**
3  **reputation of PSBA.**
4     Q.     By the online videos and the
5  online Web sites; correct?
6     **A.     Correct.**
7     Q.     And by the e-mails that Mr.
8  Campbell and PFUR were sending to PSBA
9  members; correct?
10    **A.     Yes.**
11    Q.     He wanted to sue them as
12 well -- tell me if I'm wrong -- because,
13 among other things, those e-mails urge the
14 members to quit PSBA; is that correct?
15    **A.     That is correct.**
16    Q.     Okay.  Did he tell you
17 anything about Ms. Leader's assertion that
18 Mr. Campbell had hacked into her private
19 e-mails?
20    **A.     I do know about that, but I'm**
21 **not sure when I became aware of it.**
22    Q.     Do you know that that has now
23 been debunked and that contention has been
24 abandoned?

30

1     **A.     Yes.**
2     Q.     Do you know what --
3     **A.     Let me clarify that.  I know**
4  **that's what's been presented as there was an**
5  **explanation presented, but I don't know that**
6  **it's been debunked.**
7     MR. BROWN:  I will -- just to
8       advise you not to discuss anything
9       that was discussed by counsel or told
10      to you by counsel.
11      THE WITNESS:  Oh, I thought
12      you would jump in if that --
13      MR. BROWN:  Yes.
14      THE WITNESS:  Good.  Okay.
15      You're jumping in.  Good.
16 BY MR. COHN:
17    Q.     When was the first time you
18 ever heard about the law firm of Bochetto &
19 Lentz?
20    **A.     I do not recall.**
21    Q.     Were you told that Bochetto &
22 Lentz was being retained to prosecute the
23 lawsuit against my clients?
24    **A.     To be honest -- trying to**

31

1  **think.  I don't know that I ever knew the**
2  **exact name of the law firm.  I knew that we**
3  **were pursuing the lawsuit.**
4     Q.     Were you told that the law
5  firm that had been hired had a reputation
6  that they cultivated for being nasty
7  litigators?
8       MR. BROWN:  Objection to form.
9  BY MR. COHN:
10    Q.     You can answer.
11      MR. BROWN:  You can answer, if
12      you know.
13      THE WITNESS:  No.
14 BY MR. COHN:
15    Q.     What were you told by Mr.
16 Mains was the goal of suing Mr. Campbell?
17      MR. BROWN:  Again, I instruct
18      you not to discuss it if it was
19      discussed in the presence of counsel.
20      MR. COHN:  Well, I don't think
21      that's appropriate.  The presence of
22      counsel does not make everything
23      automatically privileged.  If you're
24      asking for advice or you're seeking

32

1       advice or you're getting advice,
2       that's one thing, but you cannot
3       insulate an entire meeting, where
4       other things are being discussed and
5       facts are being transmitted, by
6       having a lawyer hiding in the corner.
7       MR. BROWN:  If the discussion
8       was prompted from counsel, then the
9       instruction stands.
10 BY MR. COHN:
11    Q.     Well, let's -- I'm going to
12 retract my question.  It's my understanding
13 that Mister -- strike that.  There was a --
14 My understanding is, there was no lawyer
15 physically present at the June meeting in
16 Washington D.C.  Is that consistent with
17 your recollection?
18    **A.     That is correct.**
19    Q.     And there was a lawyer on the
20 telephone available to consult with.  Is
21 that your understanding?
22    **A.     He was not just available to**
23 **consult with, but that provided guidance.**
24    Q.     Okay.  So he was there to

33

1  provide legal advice and to answer questions
2  about legal advice; correct?
3        A.      **Correct.**
4        Q.      And that was Mr. Levin?
5        A.      **That is correct.**
6        Q.      Was anybody else on the phone?
7        A.      **One of the board members, I**
8  **believe, might have been.**
9        Q.      Okay.  But no other lawyer was
10 on the phone; correct?
11       A.      **Not that I -- Well -- I don't**
12 **recall.**
13       Q.      You know who Mr. Heim is,
14 David Heim?
15       A.      **Yes, I do.**
16       Q.      Do you know whether or not he
17 was on the telephone?
18       A.      **He may have been.  I don't**
19 **recall.**
20       Q.      Now, did anybody explain --
21 strike that.  Your outside general counsel
22 is Michael Levin; correct?
23       A.      **That is correct.**
24       Q.      And Mr. Levin typically

34

1  prosecutes lawsuits that are -- where the
2  PSBA is involved in a party; correct -- is
3  involved as a party; correct?
4               MR. BROWN:  Objection.
5  BY MR. COHN:
6        Q.      You can answer.
7               MR. BROWN:  Go ahead, you can
8         answer, if you know.
9               THE WITNESS:  I wouldn't know.
10 BY MR. COHN:
11       Q.      Okay.  Well, you are aware of
12 lawsuits that have been brought in the name
13 of PSBA while you've been on the governing
14 board; is that correct?
15       A.      **Yes.**
16       Q.      Are you aware of any instance
17 when a lawsuit was brought in the name of
18 PSBA where Mr. Levin was not PSBA's counsel
19 in court?
20       A.      **I don't know.**
21       Q.      Who would know the answer to
22 that?  Is it Mr. Levin?
23       A.      **I don't know, actually, if he**
24 **would even know if there were lawsuits that**

35

1  **he didn't -- didn't pursue.**
2        Q.      Are you talking about the
3  lawsuit in 2016, when PSBA sued Governor
4  Wolf about school funding?
5        A.      **Yes.**
6        Q.      That was Mr. Levin; correct?
7        A.      **I don't know.**
8        Q.      Did anybody -- did you have
9  any conversations with anybody, other than
10 asking counsel for legal advice or getting
11 legal advice from counsel, as to why
12 Bochetto & Lentz was hired?
13       A.      **I do not.  I do not have any**
14 **information about that.**
15       Q.      Nobody ever told you about
16 their nasty reputation?
17              MR. BROWN:  Objection.
18              THE WITNESS:  No.
19 BY MR. COHN:
20       Q.      Okay.  What did -- Are you
21 aware that you've sued Mr. Campbell here
22 seeking punitive damages?
23       A.      **Yes.**
24       Q.      Do you want to take away his

36

1  college money for his children?
2               MR. BROWN:  Objection.
3               THE WITNESS:  I don't know how
4         respond to that.
5  BY MR. COHN:
6        Q.      Was it PSBA's serious
7  intention to pursue a claim for punitive
8  damages against Mr. Campbell?
9        A.      **I'm sorry, but could you**
10 **clarify what you mean by serious.**
11       Q.      Is PSBA serious about pursuing
12 a claim for punitive damages against Mr.
13 Campbell?
14       A.      **Yes.**
15       Q.      Is it still serious about
16 pursuing a claim against Mr. Campbell for
17 punitive damages?
18       A.      **I can't speak on behalf of**
19 **PSBA.**
20       Q.      Since the lawsuit was
21 authorized in June, have there been any
22 other votes taken by the governing board
23 with respect to the prosecution or
24 maintenance of the lawsuit against my

37

```
1   clients?
2       A.      We did a straw poll.
3       Q.      And When was that straw poll
4   taken?
5       A.      December.
6       Q.      And how is a straw poll
7   different from an ordinary vote on the
8   governing board?
9       A.      Straw poll is -- was done by
10  e-mail.
11          MR. BROWN:  Was this an e-mail
12      directed by counsel.
13          THE WITNESS:  I don't know.
14      It might have been.
15          MR. COHN:  Whether or not it's
16      directed by counsel, it's an action
17      of the governing board.  The actions
18      of the governing board are not
19      privileged.
20          THE WITNESS:  It wasn't an
21      action.
22          MR. BROWN:  No, if it's done
23      at the direction of counsel, it would
24      be work product.
```

38

```
1   BY MR. COHN:
2       Q.      Who asked you to take a vote;
3   Mr. Mains?
4       A.      I don't recall.
5       Q.      What was the vote?  Was it
6   unanimous to continue the lawsuit?
7       A.      I don't recall.  But some of
8   the answers I think went directly to
9   somebody else.  I'm not sure they shared
10  all of it with everybody.
11      Q.      What conversations did you
12  have at your school district about the
13  lawsuit after it was authorized?
14      A.      None.  We were instructed not
15  to.
16      Q.      Did anybody at the school
17  district share any opinions with you about
18  the lawsuit?
19      A.      Some comments, I think, were
20  made.
21      Q.      By Mr. Fairchild?
22      A.      Yes.
23      Q.      Did he tell you that he was
24  happy about the lawsuit?
```

39

```
1       A.      No.  He didn't comment
2   regarding his happiness or lack of.
3       Q.      What comments did he make
4   about the lawsuit?
5       A.      I'm trying to remember.  I
6   believe I recall -- I believe he did say
7   that -- something to the effect that --
8   empathetic the fact that -- that I was named
9   in it.
10      Q.      You're saying, after Mr.
11  Campbell and PFUR filed this lawsuit, he
12  made statements to you?
13      A.      Yes.
14      Q.      Well, it didn't come as a
15  surprise that you were personally named, did
16  it?
17      A.      Yes.
18      Q.      You weren't warned?
19      A.      By whom?
20      Q.      By Mr. Campbell, by Mr.
21  Campbell's counsel?
22      A.      No, I was -- I don't recall
23  being warned.
24      Q.      Let's set a time frame here.
```

40

```
1   The lawsuit was filed in July, on July 17th;
2   correct?
3       A.      I know it was July.  I don't
4   know the exact date.
5       Q.      And the Amended Complaint was
6   filed in December.  Are you familiar with
7   this timeline?
8       A.      Yes.
9       Q.      And this lawsuit, the federal
10  lawsuit, was filed on February 28th of this
11  year.  Are you familiar with that?
12      A.      Yes.
13      Q.      Okay.  Between July and
14  February, were you provided by anybody at
15  PSBA with any of the correspondence between
16  counsel for my clients and counsel for the
17  PSBA?
18      A.      Yes.
19      Q.      Can you tell me what you were
20  provided?  Were you provided with a copy of
21  the ACLU letter?
22      A.      Yes.
23      Q.      Were you provided with copies
24  of my letters?
```

41

1    A.    Yes.

2    Q.    Were you provided with copies

3  of my correspondence with Mr. Levin when he

4  made the settlement proposal in December?

5    A.    Yes.

6    Q.    Were you provided with my

7  response?

8    A.    Yes.

9    Q.    Did you read them?

10   A.    Yes.

11   Q.    Let's go through some things.

12  First of all, do you remember the blast

13  e-mail that Mr. Mains sent out in July

14  announcing the lawsuit?

15   A.    Yes.

16   Q.    And you read that at the time?

17   A.    I believe I did.

18   Q.    Did that e-mail accurately

19  summarize the lawsuit and its purpose?

20   A.    I don't recall.

21   Q.    Do you want to take a look at

22  it now?

23   A.    Okay.

24        (Discussion held off the

42

1        record.)

2  BY MR. COHN:

3    Q.    I'm going to show you what we

4  previously marked as Exhibit 61.

5        (Discussion held off the

6        record.)

7  BY MR. COHN:

8    Q.    Well, here, this is an

9  identical copy of P-61.  Why don't you take

10  a moment and why don't you read that?

11        (Discussion held off the

12        record.)

13        THE WITNESS:  (Witness

14        reviewing document.)

15  BY MR. COHN:

16   Q.    Does that refresh your

17  recollection as to the contents of that

18  e-mail?

19   A.    Yes, it does.

20   Q.    Thank you.

21   A.    There's been a lot of

22  correspondence.

23   Q.    So you see the second

24  paragraph there?

43

1    A.    Yes, sir.

2    Q.    It discusses Mr. Main's May 7

3  -- I'm sorry, Mr. Campbell's May 7th, 2017

4  Right-to-Know Law request?

5    A.    Yes.

6    Q.    You weren't told, when you

7  voted to authorize a lawsuit, that you were

8  suing -- you were authorizing a lawsuit

9  against Mr. Campbell and PFUR for making

10  Right-to-Know Law requests; correct?

11   A.    I didn't say that that was not

12  something that was said.  I don't recall.

13   Q.    Okay.  Does looking at the

14  second paragraph of the May -- of the July

15  17 blast e-mail refresh you recollection any

16  further as to what was discussed with Mr.

17  Mains in May, or discussed with the

18  governing board in June about the reasons

19  for the lawsuit?

20   A.    The reasons for the lawsuit --

21        MR. BROWN:  Again, I instruct

22        you not to answer if these were

23        discussions made to you by the

24        counsel.

44

1        THE WITNESS:  They were.

2        That's what I was -- my recollection

3        is that that portion of the

4        discussion was with counsel.

5  BY MR. COHN:

6    Q.    Okay.  Well, looking at

7  paragraph two, the second paragraph of the

8  July 17 e-mail --

9    A.    Uh-huh.

10   Q.    -- does this accurately

11  reflect the reasons for the lawsuit against

12  my clients?

13   A.    I think that it does not.

14   Q.    In what way?

15   A.    Well, because, first, I think

16  that the -- the other piece was, that's not

17  specified here, is the reputation damage

18  that was being done and the defamation of

19  PSBA.

20   Q.    Okay.  That would be the

21  paragraph after that --

22   A.    Yes, that's why I said, it

23  wouldn't be just that second --

24   Q.    All right.  So the second and

45

1 third paragraphs. So does that accurately
2 reflect the reasons why PSBA was suing my
3 clients?
4     **A.**    **I believe so.**
5     **Q.**    Does that accurately reflect
6 your understanding of what you were
7 approving the lawsuit to be when you voted
8 to approve it in June?
9     **A.**    **Yes.**
10     **Q.**    Okay. Now, Mr. Campbell sent
11 a lot of e-mails to you and to your school
12 district afterward. Do you remember that?
13     **A.**    **I recall receiving one e-mail**
14 **from Mr. Campbell.**
15     **Q.**    Okay. Well, we'll go through
16 that.
17         When e-mails were received by
18 Mr. Fairchild from Mr. Campbell asking that
19 they be forwarded to the school board, did
20 Mr. Fairchild typically, to your
21 understanding, forward those e-mails to the
22 school board?
23         MR. BROWN: I'm just going to
24     object as to how she would know that.

46

1     But go ahead, you can answer if you
2     can.
3         THE WITNESS: Yes. I was
4     going to say -- I'm trying to think
5     if I really know that for a fact, and
6     I don't want to give you false
7     information. So I'm trying to think
8     about that. I don't -- I really
9     don't know.
10 BY MR. COHN:
11     **Q.**    Well, let's start with an
12 e-mail that we will mark as P-227, please.
13         MR. COHN: Is this 227 we're
14     up to?
15         MR. ERIC ROSENBERG: Uh-huh.
16         MR. COHN: Thank you.
17         - - -
18     (Whereupon the document was
19     marked, for identification purposes,
20     as Exhibit Number P-227.)
21         - - -
22 BY MR. COHN:
23     **Q.**    Please take your time and
24 review that.

47

1     **A.**    **(Complying with request.)**
2     **Q.**    Do you recognize this e-mail?
3     **A.**    **Yes, I do.**
4     **Q.**    Is this an e-mail that you saw
5 around the time it was sent?
6     **A.**    **Yes.**
7     **Q.**    Do you remember whether you
8 received that from Mr. Fairchild?
9     **A.**    **I don't know if it was sent**
10 **directly to me or if I received it from Mr.**
11 **Campbell, or whether Mr. Fairchild sent it,**
12 **but I do recall seeing this e-mail.**
13     **Q.**    Did you forward it to anybody?
14     **A.**    **I don't recall.**
15     **Q.**    Did you read any of the
16 material cited? Did you read the Brentwood
17 Academy case that he cited?
18     **A.**    **I have.**
19     **Q.**    Did you read it then?
20     **A.**    **I don't recall when I read it.**
21 **I don't know of -- I wouldn't think it was**
22 **then.**
23     **Q.**    Did you read the Butler Area
24 School District resolution?

48

1     **A.**    **Yes.**
2     **Q.**    Do you remember having any
3 conversations with anybody at PSBA about
4 this resolution?
5     **A.**    **About the resolution?**
6         MR. BROWN: Again, I would
7     instruct you not to answer if your
8     discussions were with counsel for
9     PSBA.
10         THE WITNESS: Actually, I
11     don't recall discussing it with
12     anyone other than -- I mean, outside
13     of my own district.
14 BY MR. COHN:
15     **Q.**    You discussed it within your
16 district?
17     **A.**    **I discussed it within my**
18 **district, yes.**
19     **Q.**    At what point in time?
20     **A.**    **Shortly after it was received.**
21     **Q.**    All right. So after receiving
22 the July 27th, 2017 e-mail, you took it upon
23 yourself to read the Brentwood case?
24     **A.**    **I don't know when I read the**

1 Brentwood case, but I think it was actually
2 at a different point in time.
3      Q.    All right.  So what -- with
4 whom within the Lewisburg School District
5 did you discuss this e-mail, or the content
6 of this e-mail?
7      A.    Mr. Fairchild.
8      Q.    What was your conversation
9 with him?
10      A.    I said, my recollection on
11 this was that he should check with our
12 solicitor because that -- as to whether we
13 need to do this, forward it.
14      Q.    Okay.  Do you remember an
15 e-mail from Mr. Mains to the governing board
16 about the Butler Area School District
17 resolution?
18      A.    No, I'm sorry, I do not.
19      Q.    70.  Let me get Exhibit P-70.
20 This has previously been marked.  I want you
21 to take a look at that e-mail.
22           I know you're not a party to
23 the --
24      A.    No, I have not seen the first

1 two pages.
2      Q.    -- beginning, the first couple
3 of e-mails.  That's an e-mail chain between
4 Mr. Mains and Ms. Foltz, but do you see the
5 July 27th e-mail from Mr. Mains?
6      A.    Yes.
7      Q.    Is that an e-mail you recall
8 receiving?
9      A.    Yes.
10      Q.    By the way, do you remember
11 Mr. Hutchinson voicing concerns about
12 proceeding with the lawsuit?
13      A.    No, I do not.
14      Q.    So you see the e-mail about
15 Mr. Campbell and the Right-to-Know Law
16 request and the friends on the board at
17 Butler.  You see that paragraph, right?  In
18 the e-mail from Mr. Mains?
19      A.    In here?  This page.
20      Q.    Yes.
21      A.    Because you're on a different
22 page, I think.
23      Q.    No, no.  Right here
24 (indicating).

1      A.    Oh, here.  Okay.  Yes.  It
2 looked different, so I -- Yes.
3      Q.    And you could see, he's
4 e-mailing about substantially the same
5 e-mail that Mr. Fairchild forwarded to you.
6 Correct?
7      A.    Correct.
8      Q.    Now, did you have any
9 conversations with anybody at PSBA, or
10 within PSBA following the receipt of Mr.
11 Mains' e-mail?
12      A.    Not that I recall.
13      Q.    If you look to the first
14 e-mail, I know it wasn't sent to you, but
15 you see Mr. Mains writing to Ms. Foltz:
16           Were you trying to release a
17 bit more info, such as when Simon hacked a
18 private secure drive and stole family videos
19 to intimidate Emily, but are hesitant to try
20 this case in public.  We will amend the
21 lawsuit for each thing.  And he's saying,
22 he says that is defamation of PSBA.
23           Do you see that?
24      A.    I do.

1      Q.    Did you have any conversations
2 with Nathan Mains about releasing more
3 information?
4      A.    No, I did not.
5      Q.    Did you have any conversations
6 with anybody at PSBA about releasing more
7 information?
8      A.    No, I did not.
9      Q.    Did you have any conversations
10 with anybody at PSBA about amending the
11 Complaint prior to December?
12      A.    Not that I recall.
13      Q.    Give me those back, please.
14      A.    (Complying with request.)
15      Q.    Has the -- Has PSBA's lawsuit
16 ever been on the agenda at a meeting of the
17 Lewisburg Area School District?
18      A.    No.
19      Q.    Has it ever been the topic of
20 discussion at any executive sessions of the
21 Lewisburg School District?
22      A.    No.  That wouldn't be an
23 appropriate executive session item.
24      Q.    Are you aware that Mr.

53

1  Campbell and PFUR have communicated their
2  intention to amend this Complaint to sue
3  Lewisburg Area School District for ratifying
4  your conduct?
5        **A.    Excuse me.  Could you clarify?**
6        Q.    Read that question back,
7  please.  I think I like the way I phrased
8  it.
9              (Whereupon, the court reporter
10             read back the pertinent testimony. )
11             THE WITNESS:  No.
12 BY MR. COHN:
13       Q.    Mr. Fanelli has not shared my
14 e-mail with you?
15       **A.    Not that I --**
16             MR. BROWN:  Objection.  Don't
17      answer discussions with Mr. Fanelli.
18             THE WITNESS:  Yes, I wouldn't
19      be able to answer.
20             Thank you.  I'm bad at that.
21 BY MR. COHN:
22       Q.    Do you know whether or not
23 notice has been given to C.M. Regent
24 Insurance Company of the claim that Mr.

54

1  Campbell and PFUR are asserting against your
2  school district for ratifying your actions
3  on the PSBA governing board?
4        **A.    I have no --**
5        MR. BROWN:  Objection, but you
6        can answer if you know.
7        THE WITNESS:  I have no
8        awareness.
9  BY MR. COHN:
10       Q.    Are you aware of the
11 spoliation letter that's been sent to Mr.
12 Poirier?
13       **A.    No, I'm not.**
14       Q.    Did you -- Did you personally
15 approve the Levin Law Firm to defend you
16 personally in this lawsuit?
17       **A.    Yes.**
18       Q.    You were consulted about that?
19       **A.    Yes.**
20       Q.    Were you consulted about the
21 involvement of Mr. Heim in this lawsuit?
22       **A.    Yes.**
23       Q.    Were you informed that he was
24 going to be copied on communications

55

1  concerning settlement of the claims against
2  you personally?
3              MR. BROWN:  Again, I'm going
4        to object to any discussions that you
5        had with Mike Levin or David Heim
6        about any of these issues.
7              THE WITNESS:  That's right.  I
8        have to be careful about that.
9  BY MR. COHN:
10       Q.    Are you aware that you refused
11 a consent to permit an insurance company to
12 pay money to settle a lawsuit against you?
13             MR. BROWN:  Objection.
14 BY MR. COHN:
15       Q.    You can answer.
16       **A.    Could you clarify your**
17 **question, or repeat it?**
18       Q.    Sure.  Did you know that on
19 March 27th Mike Levin communicated to me
20 your absolute refusal to permit any
21 insurance company to pay money to settle my
22 client's claims against you personally?
23       **A.    I don't know that I issued an**
24 **absolute refusal of any kind, but I -- I --**

56

1  **there's --**
2              MR. BROWN:  Again, I'm going
3        to instruct you not to answer --
4              THE WITNESS:  Yeah.
5              MR. BROWN:  -- or discuss
6        anything that you discussed with
7        Mike.
8              THE WITNESS:  Yes.  I keep --
9  BY MR. COHN:
10       Q.    Is it your position that you
11 refused to consent to permit an insurance
12 company to pay money to my clients in order
13 to get you out of this lawsuit?
14       **A.    Me personally?**
15       Q.    Yeah, you personally.
16       **A.    I -- I -- I would say yes,**
17 **that there was -- that I -- I did do that.**
18       Q.    Okay.  Is that still your
19 position --
20       **A.    Yes, it is.**
21       Q.    -- that you refuse to allow
22 anybody, to the extent you can, to pay money
23 to get you personally out of this lawsuit?
24             MR. BROWN:  Objection, but go

1    ahead.  You can answer.

2         THE WITNESS:  Yes.

3         MR. COHN:  Okay.  228.  27 was

4    the last here.  I need P-228, please.

5         - - -

6         (Whereupon the document was

7         marked, for identification purposes,

8         as Exhibit Number P-228. )

9         - - -

10   BY MR. COHN:

11   Q.    P-228, do you recognize that?

12   A.    **No, I do not.**

13   Q.    As far as you know, you've

14   never seen this?

15   A.    **That is correct.**

16   Q.    Does Mr. Fairchild have any

17   instructions as to how he is to treat

18   e-mails that are sent to him that are

19   requested that they be sent on to other

20   people?

21   A.    **Not -- not that I'm aware of.**

22   Q.    Just to be clear, Mr.

23   Fairchild is, what?  He's the business

24   manager?

1    A.    **He is the -- I think his title**

2    **is the -- the administrator of -- I can't**

3    **remember, but, yes, he serves as our**

4    **business manager.**

5    Q.    What are his job functions?

6    A.    **I really don't know, I'm**

7    **sorry.  I can give you what my impression --**

8    **my impression of his functions.**

9    Q.    Well, certainly --

10   A.    **He operates the business**

11   **portion of the district.**

12   Q.    Does he answer directly to the

13   superintendent?

14   A.    **Yes.**

15   Q.    Who is the superintendent?

16   A.    **Steve Skalka.**

17   Q.    And how long has he been the

18   superintendent?

19   A.    **Since June.**

20   Q.    Who was the predecessor

21   superintendent?

22   A.    **Mark DiRocco.**

23   Q.    How long was he the

24   superintendent?

1    A.    **He was superintendent for 14**

2    **or 15 years.**

3    Q.    I'm sorry, Steve's last name

4    again?

5    A.    **Skalka, S-K-A-L-K-A.**

6    Q.    Okay.  Was he the assistant

7    superintendent before that?

8    A.    **No.**

9    Q.    This was an outside search for

10   a new superintendent?

11   A.    **That is correct.**

12   Q.    Who is the assistant

13   superintendent?  Is there one?

14   A.    **Yes.**

15   Q.    And who is that?

16   A.    **Cathy Moser.**

17   Q.    And has Ms. Moser been the

18   assistant superintendent throughout the

19   relevant time here?

20   A.    **Yes.**

21   Q.    Going back to how far, do you

22   know?

23   A.    **She was acting superintendent**

24   **while -- during our search period.**

1    Q.    And how long was she the

2    acting superintendent?

3    A.    **From mid December of 2016**

4    **through June, this -- of 2017.  About six**

5    **months.**

6         - - -

7         (Whereupon the document was

8         marked, for identification purposes,

9         as Exhibit Number P-229. )

10        - - -

11        MR. COHN:  What are we up to,

12   229?

13   BY MR. COHN:

14   Q.    Moving to 229, P-229.  Let's

15   set that to the side.  I'm done with that

16   for now.  If you've never seen it, it's not

17   fair for me to question you too much about

18   it.

19   A.    **Pardon me?**

20   Q.    I said, if you've never seen

21   it, I don't have too many questions for you

22   about it.

23        The next document is Exhibit

24   P-229, which is a September 17th, 2017

61

1  e-mail from Mr. Campbell to Mr. Fairchild.
2  Subject:  RTKL Lewisburg Area School
3  District.
4           And my first question, after
5  you've had a chance to review this, is
6  whether or not you've seen this e-mail
7  before.
8       A.    **I have seen this e-mail**
9  **before.  I did not read it.**
10      Q.    Was this forwarded to you by
11 Mr. Fairchild?
12      A.    **Yes.**
13      Q.    By the way, this is Mr.
14 Fairchild's correct e-mail address on here,
15 is it not?
16      A.    **That is correct.**
17      Q.    So we can assume that
18 something that was sent to him was at least
19 received by him; correct?
20      A.    **Unless the computer screws up.**
21 **We have computer problems at times.**
22      Q.    All right.  So you got this.
23 You didn't read this.
24      A.    **I scanned the pieces of it.**

62

1       Q.    You sent it on to the PSBA?
2       A.    **I may have.**
3       Q.    Did you speak to anybody about
4  it?
5       A.    **No, not that I recall.**
6       Q.    Were you aware that -- if you
7  look at the paragraph below the Petition For
8  Redress of Grievances heading, do you see
9  that?
10      A.    **Yes.**
11      Q.    There's a reference, it says,
12 the latest legal news is that on 9.12.17
13 PSBA asked that the Cumberland County
14 Courthouse to -- asked the Cumberland County
15 Courthouse to agree that they can publicize
16 their SLAPP, Strategic Litigation Against
17 Public Participation, suit in the newspaper.
18 Do you see that?
19      A.    **I do see that.**
20      Q.    Were you familiar at all with
21 the efforts to serve Mr. Campbell with the
22 Complaint?
23      A.    **I do have some recollection of**
24 **that.**

63

1       Q.    Who told you about it?
2            MR. BROWN:  I'm instructing
3       you not to answer if --
4            THE WITNESS:  I was going to
5       say, I believe that was Mike.
6  BY MR. COHN:
7       Q.    Okay, tell me something.  How
8  many conversations did you have with Mike
9  Levin concerning this lawsuit?  Without
10 telling me what they were, how many did you
11 have between July and December of 2017?
12      A.    **I can't recall exactly, but**
13 **there were several.**
14      Q.    Typically you and he alone?
15      A.    **Not in -- In some cases.**
16      Q.    Did he call you or you'd call
17 him?
18      A.    **I'd call him.**
19      Q.    Because you had questions
20 about the lawsuit?
21      A.    **Uh-huh.**
22      Q.    Okay.  Did you -- what did --
23 what -- so you had an understanding that
24 there was a petition filed in the state

64

1  court to have newspaper publication of the
2  service -- service of the Complaint upon Mr.
3  Campbell and PFUR; correct?
4            MR. BROWN:  Objection.  But
5       you can answer, if you understood the
6       question.
7            THE WITNESS:  Well, I was
8       going to try -- I was trying to stop
9       and think because I believe that that
10      was information I did receive from
11      Mike as part of an update as to what
12      was going on, so... Yeah.
13           MR. BROWN:  Same instruction.
14 BY MR. COHN:
15      Q.    Did -- Did you know that Mr.
16 Heim falsely asserted in that petition that
17 Mr. Campbell was evading service?
18           MR. BROWN:  Objection.
19 BY MR. COHN:
20      Q.    You can answer that.
21           MR. BROWN:  That's if you
22      understand the question.
23           THE WITNESS:  I -- I would
24      have no knowledge of that.

BY MR. COHN:

Q.      Did you ever see the petition that was filed?

A.      **I don't know.  I'm not sure what it looks like, but for reference --**

Q.      Did you ever click on any of the links to any -- of any of the e-mails that Mr. Campbell sent to you or sent to Mr. Fairchild?

A.      **A few.**

Q.      We'll get to that in the appropriate time.

Did you know that Emily Leader was -- knew in July that Mr. Campbell was going to Europe to visit his family in August, and that was why he was out of the country?

A.      **I would have no knowledge of what Emily knew.**

Q.      So here, for example, on this one you see there's a link there to publicize their strategic SLAPP suit, where it says, PSBA asked the Cumberland County courthouse to agree that they can publicize

their SLAPP suit.  Do you see that?

A.      **I do.**

Q.      Okay.  Did you click on that link?

A.      **No.**

Q.      That would have taken you to the actual filing.

MR. COHN:  Let's mark Exhibit P-110.

- - -

(Whereupon the document was marked, for identification purposes, as Exhibit Number P-110. )

- - -

BY MR. COHN:

Q.      Exhibit P-110 is the as filed Motion For Leave to Provide Alternate -- Alternative Service Pursuant to PA.Civ.R. 430(a) that was filed on September 12 of 2017 by PSBA.

A.      **You want me to read this, I assume?**

Q.      The question is, have you ever seen this before?

A.      **No, I have not.**

Q.      Then I have no questions for you about it.

Have I covered all the boards that you serve on?

MR. BROWN:  Objection, but go ahead, you can answer, if you understand.

THE WITNESS:  I don't know.

BY MR. COHN:

Q.      School Board, PSBA, Liquid Asset Fund, Board of C.M. Regent.  Are there any other boards you serve on?

A.      **Let me think a moment.**

**Yeah, I told you the Pennsylvania Public Education Foundation.**

Q.      Right.

A.      **I also serve on the Board of Directors for the PSBA Insurance Trust.**

Q.      Is that a remunerative position?

A.      **No.**

Q.      And the Insurance Trust is the -- is the collective insurance buying entity

that buys insurance on behalf of a lot of the school boards; is that right?

A.      **No.**

Q.      No?

A.      **No, we have -- That's not correct.**

Q.      So tell me what the Insurance Trust is.

A.      **We have -- It's the remaining pieces that were not purchased by C.M. Regent.  So it's like student accident insurance and that kind of thing.**

Q.      Okay.  Well, your school district gets insurance and one piece of it is issued by C.M. Regent, and another piece of it comes with a Memorandum of Insurance for the Insurance Trust.  Are you familiar with that?

A.      **The -- Yes.**

Q.      Okay.  Is that the same Insurance Trust where -- that you serve on the Board of?

A.      **Yes.**

Q.      So there is -- Something

1  having to do with -- with -- getting
2  insurance for a collection of school
3  districts, is one of the functions that your
4  -- your Insurance Trust engages in still; is
5  that correct?
6      **A.     I don't know.  I'm not very**
7  **familiar with that aspect of what you're**
8  **talking about.  Like I said, we have**
9  **insurance that we provide and sell to**
10 **insurance -- to school districts.**
11         MR. COHN:  P-230.
12         - - -
13         (Whereupon the document was
14     marked, for identification purposes,
15     as Exhibit Number P--230. )
16         - - -
17         (Discussion held off the
18     record. )
19 BY MR. COHN:
20     Q.     This is Exhibit P-230,
21 September 22nd e-mail from Mr. Campbell to
22 Mr. Fairchild.  Subject:  Correcting PSBA's
23 Guidance.
24         And the first question I have

1  is whether or not this is an e-mail that you
2  have seen.
3      **A.     I'm not sure if I've ever seen**
4  **this or not, to be honest.**
5      Q.     Do you know whether or not Mr.
6  Fairchild was ever given any instruction
7  within your school district as to how to
8  handle e-mails that were received from Mr.
9  Campbell or from PFUR?
10         MR. BROWN:  Objection.  But
11     you can answer, if you know.
12         THE WITNESS:  Just that he
13     should check with his -- our
14     solicitor on anything he has a
15     question about with any e-mail.
16 BY MR. COHN:
17     Q.     As far as you know though,
18 there were no standing instructions as to
19 how he was to handle Mr. Campbell's e-mails?
20     **A.     Oh, no.  No.**
21         MR. COHN:  231.
22         - - -
23         (Whereupon the document was
24     marked, for identification purposes,

1  as Exhibit Number P-231.)
2      - - -
3  BY MR. COHN:
4      Q.     This is a Friday, October 13,
5  2017 e-mail from Mr. Campbell to Mr.
6  Fairchild.  And it's headed, Subject:  PSBA
7  lawsuit attorney letters.
8          Is this an e-mail you've seen
9  before?
10     **A.     Not that I recall.**
11     Q.     It references a number of
12 things.  This is October 13th.  Let's look
13 at some of the things that he attached links
14 to.
15         - - -
16         (Whereupon the document was
17     marked, for identification purposes,
18     as Exhibit Number P-64.)
19         - - -
20 BY MR. COHN:
21     Q.     So this is Exhibit P-64, Mr.
22 Heim's July 19th letter to Mr. Campbell and
23 Pennsylvanians For Reunion Reform.
24         (Discussion held off the

1      record.)
2  BY MR. COHN:
3      Q.     Is this a letter that you've
4  seen?
5      **A.     I cannot recall.  I may have.**
6      Q.     Okay.  Looking at it doesn't
7  refresh your recollection as to whether or
8  not you've seen this before?
9      **A.     No, it does not.**
10     Q.     Okay.
11     **A.     Because I may have received it**
12 **and not read it, so that's why I'm unsure.**
13     Q.     Okay.
14         (Discussion held off the
15     record.)
16         - - -
17         (Whereupon the document was
18     marked, for identification purposes,
19     as Exhibit Number P-113.)
20         - - -
21 BY MR. COHN:
22     Q.     P-113.  This is my October 12,
23 2017 letter to Mr. Heim, responding to his
24 July 19 letter that we just looked at to Mr.

73

1  Campbell.
2          Do you remember seeing that
3  e-mail?
4      A.    **I do not recall seeing --**
5      Q.    You never saw this letter?
6      A.    **No, I didn't say -- I don't**
7  **recall if I've seen it.**
8      Q.    Do you remember hearing
9  anything about the content of this letter?
10         MR. BROWN:  And I'll instruct
11         you not to discuss what you may have
12         been advised by Mr. Heim or Mr.
13         Levin.
14         THE WITNESS:  I'm sorry.
15         Could you repeat the question?
16  BY MR. COHN:
17     Q.    Do you remember hearing
18  anything about the content of this letter?
19     A.    **Not that I recall.**
20     Q.    Did anybody let you know that
21  this letter advised Mr. Heim that a lawsuit
22  against you was being contemplated?
23         MR. BROWN:  Same instruction,
24         don't answer what was discussed with

74

1         the counsel.
2         THE WITNESS:  I don't recall
3         that.
4  BY MR. COHN:
5      Q.    Do you see the last page?  It
6  says, "Also, please let the 10 government
7  official PSBA directors know that Simon
8  contemplates suing them in their personal
9  capacities on the assumption that each of
10  them voted in favor of filing the SLAPP
11  suit."  Do you see that?
12     A.    **I do.**
13     Q.    When is the first time you
14  became aware that Simon Campbell and PFUR
15  were thinking about suing you?
16     A.    **Suing us --**
17     Q.    Suing you.
18     A.    **Oh, suing me personally?**
19     Q.    Yes.
20     A.    **I don't recall because I don't**
21  **-- I don't think -- there's so much**
22  **information in all of this stuff that -- and**
23  **so many different kinds of threats and**
24  **things, that it's hard to distinguish when I**

75

1  **learned of each one.**
2      Q.    We'll keep on going through
3  this chronologically.  Then maybe it will
4  help you out.
5      A.    **Thank you.**
6      Q.    By the way, do you remember
7  your district receiving a letter from Mr.
8  Campbell's counsel -- personal counsel in
9  the Cumberland County case?
10     A.    **No, I do not.**
11     Q.    Do you know whether or not
12  your district has ever instituted a
13  litigation hold with respect to information
14  concerning Mr. Campbell, or the interactions
15  between the District and the PSBA?
16     A.    **Yes, I do recall something**
17  **about that.**
18     Q.    When do you --
19         MR. BROWN:  I'll instruct you
20         not to discuss any conversations you
21         may have had with your solicitor.
22         THE WITNESS:  Right.  That's
23         right.  That might have been from
24         that.  I don't know for sure.

76

1  BY MR. COHN:
2      Q.    When do you remember hearing
3  about a litigation hold for the District?
4      A.    **I don't recall.**
5          (Discussion held off the
6          record.)
7                  -  -  -
8          (Whereupon the document was
9          marked, for identification purposes,
10         as Exhibit Number P-85.)
11                 -  -  -
12  BY MR. COHN:
13     Q.    P-85 is a letter from the
14  Nauman Smith Law Firm, dated October 16,
15  2017, signed by Joshua D. Bonn, B-O-N-N.
16     A.    **I remember the information**
17  **about this from our solicitor, now that I**
18  **see it.**
19     Q.    So you remember hearing about
20  this letter?
21     A.    **No, I just remember**
22  **information about this topic from our**
23  **solicitor.**
24         MR. BROWN:  Again, I'll

77

1    instruct you not to discuss what
2    conversations you had with your
3    solicitor.
4          THE WITNESS:  Okay.
5    BY MR. COHN:
6    Q.    Do you remember -- does seeing
7    this date of October 16 refresh your
8    recollection as to the time period in which
9    you would have had that kind of discussion
10   with your solicitor?
11   A.    No.  To be honest, my father
12   was having a heart surgery during this time
13   and I wasn't fully engaged in this type of
14   activity.
15   Q.    Do you know whether the
16   Lewisburg Area School District instituted a
17   litigation hold in October, 2017?
18   A.    I don't know exactly when in
19   October, but I know that there was a
20   litigation hold instituted.
21   Q.    That was last fall, not this
22   spring?
23   A.    (No response.)
24   Q.    That was last fall, Not this

78

1    spring?
2    A.    As far as I can recall.
3    Q.    Do you know whether the
4    District has an established litigation hold
5    protocol?
6    A.    Yes.
7    Q.    Is it in writing?
8    A.    Yes.
9    Q.    Okay.  Do you know -- Are you
10   familiar with its -- with its provisions?
11   A.    I have familiarity with it.
12   Q.    Can you tell me what your
13   understanding is of those protocols?
14   A.    When --
15         MR. BROWN:  Objection, but you
16   can answer, if you know.
17         THE WITNESS:  Yeah.  My
18   recollection, we have a policy on
19   this.  And that it's outlined in the
20   policy that if a litigation hold is
21   requested, that notice be sent out to
22   all persons who might have
23   information regarding that topic.
24   BY MR. COHN:

79

1    Q.    Do you know whether or not
2    there are any instructions given to the IT
3    Department?
4          I take it that Lewisburg has
5    an IT department?
6    A.    We have a person.
7    Q.    Does the litigation hold
8    protocol include giving instructions to that
9    person?
10   A.    I don't recall if it
11   specifically does.
12   Q.    Okay.  Then I guess we can
13   make a Right-To-Know Law request of it for
14   the protocol.
15   A.    It's right online, you don't
16   even have to.
17   Q.    Okay.  Thank you.
18   A.    Certainly.
19   Q.    Were you involved in any
20   deliberations within PSBA about whether or
21   not to provide the information that was
22   requested in the plaintiff's statewide
23   Right-to-Know Law request of May of 2017?
24   A.    Repeat the question.

80

1    Q.    You know that the lawsuit, the
2    underlying lawsuit here sues Mr. Campbell
3    and PFUR --
4    A.    Right.
5    Q.    For making a request in May of
6    2017; right?
7    A.    Correct.
8    Q.    And you know that in
9    particular the lawsuit sues PFUR and Mr.
10   Campbell for asking for information through
11   the districts that is financial information
12   of PSBA.  You know that; correct?
13   A.    I am familiar with that.
14   Q.    Were you party to any
15   discussion within PSBA about whether to
16   provide the requested information to the
17   school districts to provide to Mr. Campbell?
18   A.    No.
19         (Discussion held off the
20         record.)
21              - - -
22         (Whereupon the document was
23         marked, for identification purposes,
24         as Exhibit Number P-232.)

81

1         - - -
2  BY MR. COHN:
3       Q.     P-232 is an October 14, 2017
4  e-mail from Mr. Campbell.  Subject:
5  Verifying your individual actions re PSBA
6  SLAPP.  And it's to the governing board
7  members.
8             (Discussion held off the
9        record.)
10  BY MR. COHN:
11       Q.     That was P-232.
12             And, Ms. Swope, we'll take a
13  break in 10 minutes, if that works for you,
14  while they change the media.
15       A.     **That will be perfect, thank**
16  **you.**
17       Q.     This is an October 14th e-mail
18  that notices -- that shows that it was sent
19  to you.  Was this received by you?
20       A.     **Let me continue to read and**
21  **see if I can recall.**
22             **(Reading document.)**
23             **Yes, it was.**
24       Q.     Do you remember receiving it

82

1  and reading it?
2       A.     **I do.**
3       Q.     Did you forward it on to the
4  PSBA?
5       A.     **I may have.**
6       Q.     You see that Mr. Campbell is
7  writing to you in your capacity as a
8  Lewisburg Area School District Director.
9  You see that?
10       A.     **Yes.**
11       Q.     And he writes, "It is my
12  presumption that all of you as individual
13  government officers, the people who
14  constitute 10 of PSBA's 11 board directors,
15  conspired to approve the lawsuit that PSBA
16  filed against me on July 17, 2017 in the
17  Cumberland County Court of Common Pleas.  If
18  this presumption for any of you is
19  incorrect, promptly respond in writing to
20  that effect, explicitly condemning PSBA'S
21  litigious action."  You see that?
22       A.     **I do.**
23       Q.     And you did not respond to
24  that, did you?

83

1       A.     **Well, it would not be**
2  **appropriate to respond during a lawsuit.**
3       Q.     And attached to that is my
4  letter of October 12th, 2017.  Do you see
5  that?
6       A.     **That's the same letter that is**
7  **over here, is it?**
8       Q.     It is.
9       A.     **Okay.**
10       Q.     It is.  Is the -- You don't
11  remember clicking on any link or reading
12  anything on this, do you?
13       A.     **No.**
14       Q.     Okay.  And you didn't respond
15  -- Strike that.
16             Did you discuss this e-mail
17  with anybody at PSBA?
18             MR. BROWN:  Same instruction,
19        not to discuss what you discussed
20        with counsel.
21             THE WITNESS:  Yeah, not that I
22        can recall.
23  BY MR. COHN:
24       Q.     Did you send this to your

84

1  school board solicitor?
2       A.     **I would not have, no.**
3       Q.     Even though it was written to
4  you as -- as a school board member?
5             MR. BROWN:  Objection.  But
6        you can answer if you understand the
7        question.
8             THE WITNESS:  It didn't
9        involve my school district.
10  BY MR. COHN:
11       Q.     That's what you determined by
12  yourself, right?
13       A.     **That is correct.**
14       Q.     You determined that without
15  seeking the solicitor's input.  Correct?
16             MR. BROWN:  Objection to any
17        extent that you discussed it with
18        counsel.
19             MR. COHN:  She said she
20        didn't.
21             THE WITNESS:  That I can
22        recall.
23  BY MR. COHN:
24       Q.     Okay.  Is this the kind of

85

1   thing, when -- when you get a letter --
2   Strike that. All right.
3           By the way, with respect to my
4   letter to Mr. Heim, was it your testimony
5   you don't remember whether or not you ever
6   saw that?
7       A.      **Yes, I don't recall seeing**
8   **that.**
9               - - -
10              (Whereupon the document was
11          marked, for identification purposes,
12          as Exhibit Number P-233.)
13              - - -
14  BY MR. COHN:
15      Q.      P-233 is an October 17, 2017
16  e-mail from Mr. Campbell to Mr. Fairchild.
17  Subject: PSBA's Amazing Self Destruction.
18              Again, my question to you is
19  whether or not you've seen it, P-233.
20              VIDEO TECHNICIAN: There's
21          about five minutes left.
22              THE WITNESS: I recall seeing
23          this, but again, I didn't read the
24          whole thing at that time. There's

86

1           parts of this I don't remember.
2   BY MR. COHN:
3       Q.      Have you ever read it before
4   today?
5       A.      **I read parts of it. In its**
6   **entirety, no, not till today.**
7       Q.      Did Mr. Fairchild forward this
8   to you around the time that he received it?
9       A.      **I believe he did.**
10      Q.      So you scanned it and didn't
11  read it thoroughly at that time?
12      A.      **That is correct.**
13      Q.      That's the only time you've
14  seen it until today?
15      A.      **No, I probably -- I think I**
16  **probably forwarded it -- saw it when I**
17  **forwarded it to -- We were asked to provide**
18  **everything.**
19      Q.      Okay. What did you do to
20  prepare for your deposition today?
21      A.      **In terms of?**
22      Q.      Preparing. I know you drove
23  here. Did you do anything other than drive
24  here? Did you review any documents? Did

87

1   you meet with anybody?
2       A.      **We had met with counsel.**
3       Q.      Who's "we"?
4       A.      **Not we. I.**
5       Q.      When was that?
6               THE WITNESS: Do I have to
7           discuss that?
8               MR. BROWN: You can tell him
9           when we met.
10              THE WITNESS: Yes. We -- we
11          talked by phone, David and I,
12          yesterday. And Mike Levin and I
13          talked a couple of weeks ago.
14              MR. BROWN: Don't discuss the
15          content, just when.
16              THE WITNESS: Yeah.
17  BY MR. COHN:
18      Q.      Did you review any documents
19  to prepare for this deposition?
20      A.      **No, I did not. I was not**
21  **asked to do that.**
22      Q.      Okay. If you turn to the
23  second page of this e-mail, you see there's
24  a sentence that starts, "Bullies are

88

1   bullies?"
2       A.      **I see it, yes.**
3       Q.      He writes, "No more playing
4   games. Lewisburg Area SD is not neutral for
5   as long as it is silent about the
6   misappropriation of membership dues to file
7   a SLAPP. It is time for Lewisburg Area
8   School District to belatedly pass the
9   resolution. I request a copy be sent to me
10  and PSBA, please. Everyone also needs to be
11  on the phone telling CEO Nathan Mains to
12  withdraw his SLAPP and issue a public
13  apology to me." Do you see that?
14      A.      **I do.**
15      Q.      Do you remember seeing that at
16  the time?
17      A.      **Yes.**
18      Q.      Did you have any discussion
19  within the Lewisburg School District about
20  Mr. Campbell's request that a resolution be
21  passed condemning the lawsuit?
22      A.      **No.**
23      Q.      Did you have any discussion
24  with anybody within Lewisburg Area School

1 District about condemning the lawsuit?
2 **A.     I did not.**
3 **Q.**     Where did the money come from
4 to pay the lawyers that were pursuing the
5 lawsuit?
6           MR. BROWN:  Objection.
7 BY MR. COHN:
8 **Q.**     From PSBA's funds?
9 **A.     I'm sorry, you lost me a**
10 **little bit there.**
11 **Q.**     PSBA was --
12 **A.     We were talking about the**
13 **District and you're changing gears.  Okay.**
14 **Q.**     I'm changing gears to PSBA,
15 because he's writing that he doesn't like
16 the idea that PSBA -- that the district
17 money is being used by PSBA to pay for the
18 lawsuit.
19 **A.     Okay.  Where does PSBA's money**
20 **come from?**
21 **A.     There are several sources.**
22 **Q.**     And the vast majority of it
23 comes from the school districts; correct?
24           MR. BROWN:  Objection, but you

1        can answer, if you know.
2           THE WITNESS:  It comes -- we
3        also have non-dues revenue as well.
4 BY MR. COHN:
5 **Q.**     Is that kept in a segregated
6 account?
7 **A.     I don't know how the**
8 **accounting is kept.**
9 **Q.**     Is there any basis for Mr.
10 Mains to say that segregated money from
11 non-school district sources is what's being
12 used to pay for the lawsuit?
13 **A.     I can't say what Nathan should**
14 **say or not say.  I don't know.**
15 **Q.**     Just before this e-mail on
16 October 16th was the second blast e-mail
17 that Mr. Mains sent out to the PSBA members
18 about this lawsuit.  Do you remember that?
19           MR. BROWN:  Objection to the
20        form, but go ahead.
21           THE WITNESS:  No, I would not
22        have known that if you had not told
23        me.
24 BY MR. COHN:

1 **Q.**     Okay.  Well, you know what,
2 let's take a break, we could change the
3 media and then we'll take a look at Mr.
4 Mains' October 16th last e-mail that had the
5 link to the underlying Complaint.
6           VIDEO TECHNICIAN:  The time is
7        now 10:31 a.m.
8           We are off the video record.
9        This ends media unit number one.
10           (Whereupon there was a recess
11        in the proceedings.)
12           VIDEO TECHNICIAN:  The time is
13        now 10:45 a.m.  We're back on the
14        video record.  This begins media unit
15        number two.
16           THE WITNESS:  Before we get
17        started, I have to correct something
18        on the record.
19 BY MR. COHN:
20 **Q.**     Okay.
21 **A.     You asked about all the boards**
22 **I serve on.  I also serve on the Board of**
23 **the Green Dragon Foundation.**
24 **Q.**     Which is what?

1 **A.     That is our school district**
2 **foundation that provides -- supports the**
3 **districts by fundraising for different**
4 **things in the district.**
5 **Q.**     I take it that's a volunteer
6 position?
7 **A.     Yes, it is.**
8 **Q.**     Green Dragons, is that the
9 mascot?
10 **A.     It is indeed.**
11 **Q.**     It's better than a Hilltopper.
12 Westmont Hilltoppers, that's where I'm from.
13 **A.     They could have done better.**
14 **Q.**     That's where I'm from,
15 although I did notice that they were one of
16 the founding school districts of the liquid
17 asset fund.
18 **A.     There you go.**
19 **Q.**     I'm placing before you Exhibit
20 P-88, which was previously marked.  This is
21 Mr. Mains' blast e-mail of October 16th.  I
22 ask you to take a moment to review it.  And
23 my first question to you will be whether or
24 not you have seen this before.

93

1      A.      Yes, I have.

2      Q.      And did you see it before it

3  was sent?

4      A.      No.

5      Q.      Were you involved in any

6  discussion about whether this should be sent

7  and what it should say?

8      A.      No, I was not.

9      Q.      So you became aware of it

10  after it was sent?

11      A.      Right.

12      Q.      You'll see in here, this is

13  the one where he -- where Mr. Mains includes

14  a link to an unfiled version of the

15  underlying Complaint.  Do --

16      A.      Yes.

17      Q.      -- you see that?

18              Were you aware that he was

19  doing that?

20      A.      Not in advance.

21      Q.      Did you have any discussions

22  with anybody about this e-mail?

23      A.      Not that I can recall.

24      Q.      Any discussions with anybody

94

1  about the wisdom, or lack of wisdom of

2  disseminating a copy of the Complaint?

3      A.      No.

4      Q.      Are you aware of when the

5  lawsuit was actually served on Mr. Campbell?

6      A.      I knew there was repeated

7  attempts and there was a delay in -- but I

8  don't remember how long.

9      Q.      Was there any discussion -- I

10  will represent to you that Mr. Campbell

11  received mail copies of the Complaint on

12  October 20th.  The lawsuit was filed on July

13  17th.  Was there any discussion, with that

14  time frame in mind, within PSBA of whether

15  or not to actually follow through with

16  serving the Complaint?

17              MR. BROWN:  Again, I'll

18      instruct you not to answer what was

19      discussed by counsel, Heim or Levin.

20              THE WITNESS:  There -- there

21      -- Not that I can recall.

22  BY MR. COHN:

23      Q.      So there was no discussion at

24  all, whether or not it was with counsel, as

95

1  -- that you can recall, regarding whether or

2  not to serve the lawsuit after it was filed

3  and before it was actually served?

4      A.      I'm sorry, could you -- I

5  didn't understand your question.

6      Q.      I'm just clarifying.  You have

7  no recollection of there being any

8  discussion within PSBA of the -- of whether

9  or not to carry forward with serving the

10  lawsuit before it was actually served.

11      A.      You mean in the time period

12  where it was -- the suit was filed, but the

13  service had not occurred.

14      Q.      All right.  Let me back it up.

15      A.      Sorry.

16      Q.      So, the suit was filed, the

17  sheriff was sent out.  The sheriff couldn't

18  find Simon because he was in England and

19  Europe, and they returned no service.

20  You're aware of those facts?

21      A.      Yes.

22      Q.      And then there was -- there

23  was an attempt to serve Mr. Campbell by

24  other means than sending the sheriff to his

96

1  house.

2      A.      Correct.

3      Q.      Were there -- and am I correct

4  that you're not aware of any discussions in

5  -- from the time period that began after

6  sheriff service was -- was unsuccessful and

7  before he was actually served with whether

8  or not to cease efforts to serve Mr.

9  Campbell?

10      A.      Definitely not.  There were no

11  -- no such that I was part of.

12      Q.      And no discussion about

13  dismissing the lawsuit prior to its being

14  served?

15      A.      Not that I can recall.

16      Q.      And going back to 233, I read

17  to you that Mr. Mains was -- I'm sorry, Mr.

18  Campbell was trying to get everybody to tell

19  Mr. Mains to withdraw his SLAPP and issue a

20  public apology.  You are not --

21      A.      Everybody was trying to tell

22  him to do that?

23      Q.      No, my point is --

24      A.      That's not correct.

97

1    Q.    No.  Let me read this then to
2  you again, so we're all on the same page.
3         This is what Mr. Campbell
4  wrote the day after Mr. Mains' blast e-mail.
5    A.    **Is that this one?**
6    Q.    Yes.  You can pull that back
7  out in front of you.
8    A.    **Thank you.**
9    Q.    And when you get to right here
10 (indicating) --
11   A.    **Yep.**
12   Q.    -- he says, "I request a copy
13 be sent to me in PSBA, please."  And the
14 next sentence, everyone needs -- also needs
15 to be on the phone telling CEO Nathan Mains
16 to withdraw his SLAPP and issue a public
17 apology to me.
18        And do you see that's what --
19 What --
20   A.    **I do see it says that, yep.**
21   Q.    And you're saying there was no
22 discussion around that time frame, of which
23 you are aware, of PSBA's doing so; correct?
24   A.    **Doing?**

98

1    Q.    Pulling back the lawsuit and
2  --
3    A.    **No.**
4    Q.    -- apologizing to Mr.
5  Campbell?
6    A.    **There was no discussion to do**
7  **that.**
8    Q.    Are you aware that at that
9  point in time this lawsuit could have been
10 settled before withdrawing the claim and
11 making an apology?
12        MR. BROWN:  Objection, but you
13     can answer, if you know.
14        THE WITNESS:  If I did know
15     that, it would have been through
16     counsel.  So I don't think I should
17     answer.
18 BY MR. COHN:
19   Q.    PSBA was not interested in
20 pulling back the lawsuit at that time;
21 correct?
22        MR. BROWN:  Objection.
23        THE WITNESS:  I cannot speak
24     for PSBA, I can only speak for

99

1  myself.  I was not interested in
2  withdrawing.
3  BY MR. COHN:
4    Q.    And you're not interested
5  today, are you?
6    A.    **I am not.**
7    Q.    Okay.  It's going to take a
8  federal court to issue an injunction before
9  you'll appreciate that this lawsuit needs to
10 be dismissed; correct?
11        MR. BROWN:  Objection.  You
12     can answer.
13        THE WITNESS:  Repeat the
14     question.  I want to make sure I
15     understood it.
16 BY MR. COHN:
17   Q.    I'm just making it clear that
18 you have no current intention, if the issue
19 -- Strike that.
20        January 2018, January 1, you
21 have a new governing board with three
22 members leaving the board and three members
23 joining the board; correct?
24   A.    **Correct.**

100

1    Q.    And you guys refer to that as
2  the 2018 governing board?
3    A.    **That is correct.**
4    Q.    Last year was the 2017
5  governing board?
6    A.    **Correct.**
7    Q.    And seven of the ten
8  individual defendants in this lawsuit are
9  carryovers from the 2017 governing board;
10 correct?
11   A.    **That is correct.**
12   Q.    And then who are the three new
13 ones?
14   A.    **The new ones would be -- Take**
15 **a moment here.**
16   Q.    Is Mr. Kerek a new one?
17   A.    **Yes, Mr. Kerek.**
18        **Names are always the things**
19 **that get away from me.**
20        **Our new treasurer -- blanking**
21 **on his name.  And then somebody else was new**
22 **as well.**
23   Q.    Stacy Thompson, right?
24   A.    **Yes.**

101

1    Q.      Why did Stacy Thompson resign?
2    A.      **I don't -- I don't know**
3    **Stacy's reason.  She gave us a letter that**
4    **she had a lot of things going on in her life**
5    **that were very difficult.  She lost her**
6    **husband recently.**
7    Q.      In 2018, has there been any
8    consideration by the governing board of
9    discontinuing the state court lawsuit?
10    A.      **In 2018.**
11    MR. BROWN:  Instruct you not
12    to answer --
13    THE WITNESS:  I'm thinking --
14    I think that the only conversation we
15    had, that Mike was with us in
16    discussing it in executive session
17    with our solicitor.
18    BY MR. COHN:
19    Q.      I don't understand.  The
20    governing board has a solicitor separate and
21    apart from --
22    A.      **Mike Levin was with us.**
23    Q.      -- Mike Levin?
24    A.      **No, he was with us.**

102

1    Q.      Okay.  And when did that
2    meeting take place?
3    A.      **I believe that would have been**
4    **in January.  And then we had -- I guess that**
5    **was -- I don't know if we had another board**
6    **meeting after -- yeah, we did have another**
7    **board meeting after that.  I don't remember**
8    **when the last one was.**
9    Q.      Was it before or after the
10    federal lawsuit was commenced on February
11    28th?
12    A.      **It was -- That would have been**
13    **after the last one, I believe.**
14    Q.      You're saying that there has
15    been no governing board meeting since
16    February -- since before February 28th of
17    2018?
18    A.      **No, I didn't say that.  I said**
19    **that there has been -- Our next meeting is**
20    **in June and we -- and there was one, and I**
21    **couldn't remember.  I think it was in April.**
22    Q.      Okay.  Was the subject of the
23    federal lawsuit on the agenda?
24    A.      **It was not on the agenda, as**

103

1    far as I can recall.
2    Q.      Was it discussed?
3    THE WITNESS:  Since it was
4    with our solicitor, am I allowed to
5    answer that?
6    MR. BROWN:  He's asking, was
7    the subject discussed.
8    BY MR. COHN:
9    Q.      I'm asking you about the
10    subject.  Was the subject of the federal
11    court lawsuit discussed?
12    A.      **Yes, I believe so.**
13    Q.      Was the subject of the state
14    court lawsuit discussed?
15    A.      **I believe it was all discussed**
16    **as one content.**
17    Q.      Were they discussed in an
18    executive session with the presence of
19    counsel?
20    A.      **That is correct.**
21    Q.      With the physical presence of
22    counsel?
23    A.      **Yes, sir.**
24    Q.      Where did the -- Where did

104

1    this meeting take place?
2    A.      **PSBA headquarters.**
3    Q.      Where did the January meeting
4    take place?
5    A.      **It was not at PSBA**
6    **headquarters, I don't think.  We were in**
7    **Hershey -- Hershey, because it was part of**
8    **the -- something else.  Yeah.**
9    Q.      At the April meeting, did
10    anybody -- Strike that, are your governing
11    board meetings run according to a protocol?
12    A.      **When you say -- you mean like**
13    **Robert's Rules?**
14    Q.      Yes, exactly what I mean.
15    A.      **Yes.**
16    Q.      Do you use Robert's Rules of
17    Order as the guide to the way that these
18    meetings are conducted?
19    A.      **I'm not sure what -- what is**
20    **our governing document as to which --**
21    **whether it's Robert's or something else, but**
22    **it's that -- it's parliamentary procedure.**
23    Q.      Any governing board director
24    can make a motion at a governing board

105

1  meeting; correct?
2      A.   Yes.
3      Q.   Any governing board director
4  could have made a motion to discontinue the
5  state court lawsuit at either of the two
6  2018 team meetings; correct?
7      A.   At either of the --
8      Q.   At either of the two -- There
9  were two 2018 team governing board meetings
10  that you just testified to.
11      A.   Yes.
12      Q.   Am I correct that any one
13  governing board member could have made a
14  motion pursuant to the procedures of the
15  governing board to discontinue the state
16  court lawsuit?
17      A.   Yes.
18      Q.   Did any member of the
19  governing board make a motion to discontinue
20  the lawsuit?
21      A.   No.
22      Q.   Was the -- was a motion to
23  discontinue the lawsuit otherwise presented
24  to the governing board?

106

1          MR. BROWN:  I object.
2          THE WITNESS:  Yeah, if it was
3      that would --
4          MR. BROWN:  I advise --
5          THE WITNESS:  -- have been
6      part of a discussion with counsel.
7  BY MR. COHN:
8      Q.   I'm not asking for advice.
9  I'm asking for an official action.  Was an
10  official motion placed by anybody to take a
11  vote as to whether or not to discontinue the
12  state court lawsuit?
13      A.   I think I need to ask my
14  attorney a question.
15          MR. BROWN:  That's still
16      covered by attorney/client privilege.
17  BY MR. COHN:
18      Q.   Was a vote taken as to whether
19  or not to discontinue the state court
20  lawsuit?
21      A.   At the meeting, I answered
22  that there was not, in the -- in the formal
23  meeting.
24      Q.   Was there in any meeting a

107

1  vote taken to discontinue the lawsuit?
2      A.   No.
3      Q.   And you've never asked to
4  discontinue the lawsuit; correct?
5      A.   No.  That is correct.
6      Q.   And it's your intention never
7  to bring a motion to discontinue the
8  lawsuit; correct?
9          MR. BROWN:  Objection.  Go
10      ahead.
11          THE WITNESS:  I was going to
12      say that, you used the word
13      discontinue.  That doesn't mean, you
14      know, that if some time in the future
15      a settlement was agreeable on both
16      parties, that I would object to that.
17      I'm not going to -- just a
18      Motion to Dismiss.
19  BY MR. COHN:
20      Q.   Okay.  You understand that a
21  central focus of this lawsuit is to get a
22  federal judge to compel you to cause PSBA to
23  discontinue the lawsuit; correct?
24      A.   Yes, I am correct.  I mean,

108

1  that is correct.  I do understand that.
2      Q.   Okay.  And you still don't
3  understand that the existence of this
4  lawsuit is endangering your home school
5  district, do you?
6          MR. BROWN:  Objection.  I
7      don't think that's a proper question.
8  BY MR. COHN:
9      Q.   Well, you can answer it.
10          MR. BROWN:  If you think you
11      understand his question, you can
12      answer it.
13          THE WITNESS:  So -- Could you
14      repeat the question, please?  I'm
15      sorry.
16  BY MR. COHN:
17      Q.   Are you aware of Mr.
18  Campbell's intention, after the injunction
19  is issued, assuming that it is issued, to
20  amend his Complaint to add new parties?
21      A.   I -- I think I saw that in one
22  of his documents that you've showed.
23      Q.   Well, I don't think you've
24  seen anything about amending this -- that

109

1   Complaint that didn't exist yet.  You know
2   what, we'll get to it.
3       **A.      No, I thought there was a**
4   **reference to -- or you made a reference**
5   **verbally to our individual districts.**
6       Q.      There was.  There was.  And
7   we'll get to that.  I'll show you a document
8   that you may or may not have seen when we
9   get to it.  Okay?
10      **A.      Okay.**
11      Q.      Moving along with P-233?
12          MR. ERIC ROSENBERG:  234.
13          - - -
14          (Whereupon the document was
15      marked, for identification purposes,
16      as Exhibit Number P-234.)
17          - - -
18          MR. COHN:  P-234, David.
19          MR. BROWN:  Thank you.
20          THE WITNESS:  What happens
21      when we run out of alphabet letters?
22          MR. COHN:  Well, the Ps are
23      always, and I don't think we're going
24      to run out of any other numbers.

110

1           (Discussion held off the
2       record.)
3   BY MR. COHN:
4       Q.      Again, this is a Saturday,
5   October 2, 2017 e-mail from Mr. Campbell to
6   Mr. Fairchild.  Subject:  Dirty PSBA e-mail
7   sparks new Campbell attorney demands.
8           Again, my question is, did you
9   ever see this e-mail before?
10      **A.      I have seen this.**
11      Q.      Did you see it at or around
12  the time that it was sent?
13      **A.      Yes.**
14      Q.      Did you review it thoroughly?
15      **A.      I'm sorry.  Could you repeat**
16  **the question?**
17      Q.      Did you review this e-mail
18  thoroughly when you received it?
19      **A.      No, I did not.**
20      Q.      Did you click on the e-mail
21  link to the letter that I had sent to Mr.
22  Heim?
23      **A.      No, I don't believe I clicked**
24  **on any of the links.**

111

1       Q.      Have you ever seen my letter
2   to Mr. Heim?
3       **A.      Is that the one you showed me**
4   **earlier here?**
5       Q.      No.  It's the one that -- this
6   is P-113.
7       **A.      Okay.**
8       Q.      Let me give you P-113, Ms.
9   Swope.  It's marked P-113, which is my
10  October 12, 2017 letter.
11          MR. COHN:  No, this is the
12      wrong letter.  Stop.  Hold on.  I
13      need the October 17 letter, or
14      October 16.
15          (Discussion held off the
16      record.)
17          - - -
18  BY MR. COHN:
19      Q.      All right.  Well, we will get
20  back to it.
21          Was there any discussion
22  within PSBA about the reaction to Mr. Mains
23  having sent a link to the copy of the
24  underlying Complaint to 4500 people?

112

1           MR. BROWN:  Objection, but you
2       can answer, if you can.
3           THE WITNESS:  No, not that I'm
4       aware of.
5   BY MR. COHN:
6       Q.      Have you ever seen the
7   underlying Complaint?
8       **A.      Yes.**
9       Q.      When's the first time you
10  looked at it?
11      **A.      I don't recall exactly when,**
12  **but at some point I read the Complaint.**
13      Q.      Well, in what context?
14          Well, let me back up.  Your
15  lawyers have admitted for you that you
16  didn't see the Complaint before it was
17  filed.  Do you agree with this?
18      **A.      That's correct.**
19      Q.      How long after the original
20  Complaint was filed did you first review it?
21      **A.      I don't know, because**
22  **sometimes when I receive an e-mail -- I get**
23  **over a hundred e-mails a day.  So to back**
24  **up, sometimes -- I sometimes don't get**

113

1   **caught up for a couple of days, or even a**
2   **week or two.**
3       Q.      Was there something that
4   triggered your filing -- I'm sorry, your
5   reading of the Complaint?
6       A.      **Not that I can recall.**
7       Q.      Why don't we mark this then?
8       MR. COHN:  This is Exhibit
9   P-106.  Eric, make me a sticker,
10  please.
11                      - - -
12      (Whereupon the document was
13      marked, for identification purposes,
14      as Exhibit Number 106.)
15                      - - -
16      THE WITNESS:  My recollection,
17      it would have been about the time not
18      long after I received a copy because
19      I would have been anxious to read
20      that.
21  BY MR. COHN:
22      Q.      This is the initial Complaint.
23      A.      **Uh-huh.**
24      Q.      So your under -- your belief

114

1   is that you would have reviewed this
2   Complaint some time --
3       A.      **When it first became available**
4   **to me, within a few -- within a week or two.**
5       Q.      So July of 2017, within a week
6   or two of its having been filed, it would
7   have been sent to you and you would have
8   read it.  That's your testimony?
9       A.      **That's my belief, yes.**
10      Q.      Okay.  Did you read it
11  thoroughly?
12      A.      **Yes.**
13      Q.      Was it consistent with what
14  you thought you had authorized to be filed?
15      A.      **Yes.**
16      Q.      Were you aware that it accused
17  Mr. Campbell of committing crimes?
18      MR. BROWN:  Objection.
19      Please --
20      THE WITNESS:  I don't think I
21      would have that kind of an awareness,
22      not knowing the law.
23  BY MR. COHN:
24      Q.      Well, okay.  Let's -- let's

115

1   turn then to paragraph --
2       A.      **Give me a page first.**
3       Q.      Sure.  Page seven.
4       A.      **Uh-huh.**
5       Q.      You See paragraph 25,
6   "Campbell has even gone so far as to
7   personally target PSBA staff members by
8   mentioning them by name in his videos he
9   posts online."
10      A.      **Uh-huh.**
11      Q.      Did I read that correctly?
12      A.      **Yes, you did.**
13      Q.      Paragraph 26.  "In one bizarre
14  instance Campbell apparently searched for
15  and captured a personal family video of a
16  PSBA staff member, which included young
17  children."  Do you see that?
18      A.      **I do.**
19      Q.      You read all this at the time;
20  right?
21      A.      **I did.**
22      Q.      Okay.  Paragraph 27.
23  "Campbell then included hyperlinks to the
24  video in an e-mail on which he was copying

116

1   the PSBA staff member whose family was
2   depicted on the video."  You see that?
3       A.      **I do.**
4       Q.      Did you ever talk to Emily
5   Leader about this?
6       A.      **No, I did not.**
7       Q.      What did you hear from anybody
8   about this situation?
9       A.      **I heard --**
10      MR. BROWN:  Again, I'll
11      instruct you not to answer what you
12      were told about this issue by
13      counsel.
14      THE WITNESS:  Okay.  Let me
15      thank you for reminding me because I
16      have to think about that in trying to
17      distinguish -- I believe that -- that
18      I had heard -- I'm trying to think
19      where I even had heard that.  No, I
20      think that was in the -- that was in
21      the discussion with counsel.
22  BY MR. COHN:
23      Q.      Okay.
24      A.      **So, yeah.  No.  I'm sorry.**

1    Q.    All right.  So paragraph 28.

2    A.    **Uh-huh.  This was clearly done**
3  **to intimidate the PSBA staff member.  And**
4  **when combined with the rest of Campbell's**
5  **conduct, such conduct -- the conduct**
6  **constitutes a violation of Pennsylvania's**
7  **harassment and stalking statutes, pursuant**
8  **to 18 PA CSA Section 2709, 18 PA CSA Section**
9  **2709.1a.**

10    A.    **Uh-huh.**

11    Q.    And you read that at the time;
12  right?

13    A.    **Yes.**

14    Q.    And you understood that he was
15  been accused of engaging in criminal conduct
16  from this, didn't you?

17    A.    **No, I did not know it was a**
18  **criminal -- that harassment was a criminal**
19  **crime.**

20    Q.    You didn't know that
21  harassment and stalking are crimes in
22  Pennsylvania?

23    A.    **I didn't know it was --**
24  **whether it was criminal or a misdemeanor or**

1  **whatever, yes, sir.**

2    Q.    Well, just for your future
3  reference, any time you see an 18 in front
4  of the PA CSA, that's the a Criminal Code of
5  Pennsylvania.

6    A.    **Oh.**

7    Q.    And Mr. Heim went out of his
8  way to put this in there.  Can you tell
9  me --

10    MR. BROWN:  Objection.

11  BY MR. COHN:

12    Q.    -- what this has at all to do
13  with the causes of action that are being
14  asserted against Mr. Campbell in this
15  lawsuit?

16    A.    **I don't think I'm the best one**
17  **to answer that question.**

18    Q.    Okay.  You've read this and
19  you understand what you authorized a lawsuit
20  against.

21    A.    **Yes.**

22    Q.    Can you explain to me what
23  relevance you understood this to have to the
24  lawsuit and the causes of action for which

1  PSBA was suing Mr. Campbell?

2    MR. BROWN:  Objection.

3    THE WITNESS:  It would be
4  conjectural on my part, and I
5  wouldn't want to do that in this
6  case.

7  BY MR. COHN:

8    Q.    Could it be because PSBA
9  intentionally hired extra nasty counsel?

10    MR. BROWN:  Objection.

11    THE WITNESS:  No, I don't
12  think that's correct.

13  BY MR. COHN:

14    Q.    Did you ever do any research
15  into Mr. Bochetto's law firm?

16    A.    **No, sir.**

17    Q.    Okay.  So you're not aware of
18  the legal decisions that talk about his --
19  their potentially unethical conduct, are
20  you?

21    MR. BROWN:  Objection.

22  BY MR. COHN:

23    Q.    Well, we could put it in the
24  record.  If you've never heard of it, I

1  don't need to mark the case.

2    MR. COHN:  You know it's a
3  Third Circuit decision.  I'm sure
4  you're aware of it.

5    All right.  What are we up to,
6  P-235.  We're back in time here for a
7  minute.  Actually, we go forward in
8  time here for a minute.

9    - - -

10    (Whereupon the document was
11  marked, for identification purposes,
12  as Exhibit Number P-235.)

13    - - -

14  BY MR. COHN:

15    Q.    P-235 is my letter to David
16  Heim, dated October 17, 2017.

17    (Discussion held off the
18  record.)

19    MR. COHN:  By the way,
20  Counsel, is this still a live link?
21  It was as of Friday.

22    MR. BROWN:  I'm not sure.  I
23  know there were efforts being made to
24  make it not live.  As of this moment,

121

1    I can't say for certain.
2    BY MR. COHN:
3    Q.    Have you ever seen this letter
4    before?
5    A.    **No, but it could be in --**
6    **There's a cache of documents that was**
7    **accessible that I did not access.**
8    Q.    Including this letter that you
9    could have clicked through from the -- Mr.
10   Campbell's October 17 e-mail?
11   A.    **Correct.  I would assume it's**
12   **in there.  I have no idea.**
13   Q.    You are aware that because of
14   this letter PSBA made -- put its insurance
15   companies on notice of a claim by Mr.
16   Campbell?
17   A.    **I know that -- that we put**
18   **them on notice.  I don't know the impetus**
19   **for that.**
20   Q.    Were you involved in any
21   discussions with anybody about whether or
22   not to disable the link in Mr. Mains'
23   October 16 blast e-mail to the draft
24   Complaint?

122

1    A.    **No, I have not been involved**
2    **in any conversations regarding that.**
3    Q.    Are you aware that there is a
4    -- that if you click on Mr. Mains' -- the
5    link in Mr. Mains' October 16, 2017 e-mail,
6    you were led to an exact, but unfiled copy
7    of the Complaint that we're reviewing right
8    now?  Are you aware of that?
9    A.    **Your letter indicates that,**
10   **so I am.  Other than that, I would not have**
11   **been aware.**
12   Q.    Do you approve of Mr. Mains
13   sending a link to a copy of the Complaint
14   accusing Mr. Campbell of being a criminal to
15   4500 individuals?
16          MR. BROWN:  Objection.
17   BY MR. COHN:
18   Q.    You can answer.
19   A.    **I actually don't see it the**
20   **way that you see it.  We are very big about**
21   **transparency.  So I see it as being**
22   **transparent to our membership.**
23   Q.    Okay.  Did you review any of
24   the exhibits to this Complaint when you

123

1    received it?
2    A.    **I believe I did.**
3    Q.    Did you review the exhibits
4    prior to this being filed?
5    A.    **No.  Some of the -- wait, let**
6    **me clarify that.**
7    **A number of the things that**
8    **were listed I may have seen.  I don't know**
9    **offhand which ones or how many.**
10   Q.    Turning to paragraph 19 of the
11   Complaint.
12   A.    **Page six?**
13   Q.    Page five.
14          Do you see the image of Mr.
15   Mains?  It's not a very good reproduction,
16   but do you see that?
17   A.    **Yes, I do.**
18   Q.    Did you ever visit
19   PAUnionReform.org's Web site prior to the
20   filing of this lawsuit?
21   A.    **Yes.**
22   Q.    And did you review the
23   PSBAhorror page?
24   A.    **Some things on it, yes.**

124

1    Q.    Did you review the Mains
2    photograph with the word bubble?
3    A.    **Yes, there was -- It didn't**
4    **look like this, the one I recall seeing**
5    **though.**
6    Q.    Okay.  But it was in the
7    context of other content on that page.
8    Correct?
9    A.    **Correct.**
10   Q.    Do you remember what the
11   content of that page was?
12   A.    **I remember that across the top**
13   **there were a number of different links to**
14   **different things to do with PSBA,**
15   **PSBAhorrors, and all that kind of stuff.**
16   **I remember that this had a --**
17   **like the -- it had like F'ing.**
18   Q.    It had symbols that were not a
19   word.  Correct?
20   A.    **No, it inferred fucking.**
21   Q.    That's what you inferred from
22   it.  Correct?
23   A.    **I think anybody would infer**
24   **that, yes, but certainly did.**

125

1      Q.      Okay.  And that's a word that
2  you in American English inferred.  Correct?
3      A.      **Yes.**
4      Q.      When did you first become
5  aware that Mr. Campbell was British?
6      A.      **I think an early e-mail that**
7  **he sent, I clicked on a -- I think it was**
8  **the first video he sent out.  I clicked to**
9  **see what you would put in a video that has**
10 **to do with the Right-to-Know.**
11     Q.      Is it fair to say that the
12 content of PSBAhorror and PS -- and you also
13 visited the PSBA Investigation --
14 Investigate PSBA Web page of Union Reform?
15     A.      **I don't specifically recall**
16 **that, or what was on there.  I may have.**
17     Q.      Do you remember the content of
18 what you reviewed as being generally
19 critical of PSBA?
20     A.      **Yes.**
21     Q.      And generally critical of PSBA
22 employees' receipt of public pension?
23     A.      **Yes.**
24     Q.      And generally being critical

126

1  of PSBA's guidance to school districts as to
2  how to respond to Mr. Campbell's
3  Right-to-Know Law requests?
4      A.      **I don't recall seeing that.  I**
5  **recall seeing a really, really disgusting**
6  **video that was very inappropriate to do with**
7  **wanking.**
8      Q.      Do you have an understanding
9  of the various definitions and usages of the
10 word wanker and wanking in British English?
11     A.      **I certainly -- from that**
12 **video, they made pretty clear references to**
13 **semen and such, I think I got the idea.**
14     Q.      Okay.  That's the secret
15 wanker meeting video that he posted after
16 the lawsuit was filed?
17     A.      **Yes.**
18     Q.      That was a comedy sketch?
19     A.      **Yes, but it was portrayed as**
20 **us.  And I clicked on it and I said, how did**
21 **they get a video of us.**
22     Q.      And nobody could obviously
23 believe that that would be you; correct?
24     A.      **No.  I said, wait a minute,**

127

1  **this isn't us, but I don't know if anybody**
2  **else who knew that wasn't us.**
3      Q.      It's a parody.  You know what
4  a parody is; correct?
5      A.      **I do know what a parody is.**
6      Q.      Okay.  You know you're suing
7  him over parodies, right?
8              MR. BROWN:  Objection.
9  BY MR. COHN:
10     Q.      You can answer it.
11     A.      **I know that -- that the way**
12 **the PSBA was portrayed was part of our**
13 **concerns.**
14     Q.      Okay.  In parodies?
15             MR. BROWN:  Objection.
16             THE WITNESS:  I won't call it
17      that because I don't agree.
18 BY MR. COHN:
19     Q.      Prior to the filing of this
20 lawsuit, of the underlying lawsuit, did you
21 bear personal animus towards Mr. Campbell?
22     A.      **No.**
23     Q.      Do you currently bear personal
24 animus towards Mr. Campbell?

128

1      A.      **No, I do not.  I don't even**
2  **know Mr. Campbell.**
3      Q.      But you sued him for punitive
4  damages; right?
5              MR. BROWN:  Objection.
6              THE WITNESS:  The -- I
7      participated and agreed to the
8      lawsuit, yes.
9  BY MR. COHN:
10     Q.      All right.  Let's take a look
11 at Mr. Heim's response to me, to my October
12 17 letter, which is P-235.
13             MR. COHN:  Are we at P-236?
14      Is that this letter?
15             - - -
16             (Whereupon the document was
17      marked, for identification purposes,
18      as Exhibit Number P-236.)
19             - - -
20 BY MR. COHN:
21     Q.      P-236 is Mr. Heim's letter
22 back to me.
23     A.      **Uh-huh.**
24     Q.      My first question to you will

129

1  be if you have ever seen this letter before.
2  **A.  I believe I have.**
3  **Q.**  In what context have you
4  reviewed this letter?
5  **A.  I believe it was that we've**
6  **been -- we, as in the defendants, have been**
7  **kept up-to-date with the correspondence.**
8  **And I think it was sent to me in that sense.**
9  **Q.**  Back in November?
10  **A.  Yes.**
11  **Q.**  See the last paragraph, Mr.
12  Heim writes, "Finally, threats of civil
13  rights claims based on state action
14  accomplished nothing and have no plausible
15  basis in law or fact.  Neither the nature of
16  voluntary membership at PSBA, a private
17  corporation, nor the nature of the services
18  PSBA members have the option of purchasing
19  could possibly support the assertion that
20  PSBA is a state actor legally capable of
21  violating federal constitutional rights."
22  Do you see that?
23  **A.  I do.**
24  **Q.**  Now, as part of your being

130

1  kept up-to-date on what's going on in this
2  lawsuit, have you been sent the briefs that
3  have been filed before Judge Dubois?
4  **A.  Could you be specific as to**
5  **what they reference?**
6  **Q.**  Let's talk about the two
7  Motions that are currently pending before
8  Judge Dubois.  There is a motion to dismiss
9  the lawsuit, to which there is an opposition
10  brief.  Have you been provided with those?
11  **A.  Yes, I've seen both.**
12  **Q.**  Have you read those?
13  **A.  Yes, I have.**
14  **Q.**  There is a Motion for the
15  entry of a permanent injunction.  There is
16  an opposition.  And there is a reply brief
17  to that.  Have you been given those?
18  **A.  I believe so.**
19  **Q.**  Have you read those?
20  **A.  Yes.**
21  **Q.**  And you still consent to Mr.
22  Heim's involvement behind the scene of the
23  defense of the federal court action?
24  MR. BROWN:  Objection.

131

1  THE WITNESS:  I'm not sure
2  what you mean.
3  BY MR. COHN:
4  **Q.**  Are you aware of the extent to
5  which Mr. Heim has been writing the briefs
6  that are being filed on your behalf?
7  MR. BROWN:  Objection.
8  THE WITNESS:  I would have no
9  awareness of that.
10  BY MR. COHN:
11  **Q.**  Have you been consulted,
12  without going into any -- any detail with
13  respect to the positions that are being
14  taken on your behalf in the federal court
15  action?
16  **A.  Positions regard -- Could you**
17  **clarify what you mean?**
18  **Q.**  Legal positions, arguments.
19  Are you being consulted -- have you been
20  consulted, prior to the filing of any of
21  these briefs, as to the positions that are
22  being taken in this lawsuit on your behalf?
23  MR. BROWN:  I'm going to
24  object.  This is getting into

132

1  attorney/client privilege, what was
2  discussed with her.
3  MR. COHN:  I'm asking whether
4  --
5  MR. BROWN:  So I'm going to
6  instruct her not to answer.
7  MR. COHN:  I'm asking -- I'm
8  asking you temporally, because it's
9  obvious to me that she wasn't
10  consulted because that's why you're
11  taking positions in the lawsuit that
12  are exposing her to punitive damages.
13  And I just want to know whether,
14  before you took those positions in
15  the lawsuit, in the papers that you
16  filed, whether or not -- without
17  getting into anything, whether or not
18  she has been consulted whatsoever as
19  to whether -- with respect to
20  positions that are being taken on her
21  behalf in advance of their being
22  taken.
23  MR. BROWN:  No, I still think
24  this is -- this is getting into

1  attorney/client privilege. I'm
2  instructing her not to answer.
3        MR. COHN: All right. You're
4  on the record; I'm on the record.
5        MR. BROWN: Okay.
6  BY MR. COHN:
7        Q.    So, interestingly, this letter
8  is filed -- sent on November 2nd of 2017.
9  You see that?
10       **A.    I do.**
11       Q.    That's about two weeks after
12 the PSBA received a letter from the ACLU;
13 correct?
14       **A.    I don't know the date of the**
15 **letter from the ACLU, but I have seen that.**
16       Q.    Have you, in your experience
17 as a school board director, or as a director
18 of PSBA, come to know anything about the
19 ACLU?
20       **A.    Yes.**
21       Q.    What do you understand that
22 they do?
23       **A.    I think it would be boring for**
24 **me to sit and go through everything I know**

1  **about that.**
2        Q.    Do you understand them to
3  pursue the defense of people's
4  constitutional rights and fundamental
5  liberties?
6        **A.    I know that that is what they**
7  **try to do.**
8        Q.    Okay. Do you know them to be
9  a serious organization?
10       MR. BROWN: Objection.
11 BY MR. COHN:
12       Q.    You can answer.
13       **A.    In my personal opinion, or**
14 **whose opinion?**
15       Q.    Your opinion.
16       **A.    Serious, I guess the**
17 **definition. How do you define serious?**
18       Q.    If they give you something and
19 they purport to tell you what the
20 constitutional law is, is it something that
21 you would look at seriously if it's coming
22 from the ACLU?
23       **A.    No differently than any other**
24 **legal matter, legal source.**

1        Q.    Okay, you don't think the
2  ACLU, in particular, knows what they're
3  talking about when it comes to the First
4  Amendment?
5        MR. BROWN: Objection.
6        THE WITNESS: I don't think
7        that's what I said. If that's what
8        you took, I didn't mean that. I said
9        --
10 BY MR. COHN:
11       Q.    Would you agree with me that
12 the first -- that the ACLU, in particular,
13 knows what they're talking about when it
14 comes to the First Amendment, as opposed to
15 other general lawyers involved in the
16 practice of law?
17       **A.    Well, there's constitutional**
18 **lawyers. I think that they would be on**
19 **equal footing, in my personal opinion, with**
20 **the ACLU.**
21       Q.    Are you aware that Mr. Heim
22 holds himself out as having expertise in
23 constitutional law?
24       **A.    No, I'm not.**

1        Q.    Have you ever looked at his
2  Web site?
3        **A.    No.**
4        Q.    Ever looked at his bio?
5        **A.    No.**
6        Q.    That's been previously marked.
7  This is Exhibit 112, which has been
8  previously marked. Let's take it out of
9  your file here. I take it you've seen this
10 letter before; correct?
11       **A.    Yes.**
12       Q.    It was provided to you around
13 the time that it was received by Mr. Heim;
14 is that correct?
15       **A.    I don't recall exactly when.**
16       Q.    How did it come to your
17 attention?
18       **A.    I don't recall if it was an**
19 **e-mail or something at the board meeting or**
20 **something -- I don't recall, I'm sorry.**
21       Q.    Did you, when you received
22 this, have any discussions with Mr. Mains
23 about it outside of the board meeting?
24       **A.    I think he told me that the**

137

1  letter was received.
2      Q.      Did you know about it
3  before --
4      A.      I don't know because I believe
5  Mr. Campbell sent something to the school
6  districts that also reference that, but I
7  don't remember the timeline.
8      Q.      Well, let's go back to our
9  handy-dandy timeline here.
10                  - - -
11         (Whereupon the document was
12         marked, for identification purposes,
13         as Exhibit Number P-222.)
14                  - - -
15         MR. COHN:  This is 222, P-222,
16         which I don't think has previously
17         been marked.
18         MR. BROWN:  Thank you.
19         (Discussion held off the
20         record.)
21  BY MR. COHN:
22     Q.      P-222, ma'am, is an e-mail
23  from Mr. Campbell to Mr. Fairchild.
24     A.      Uh-huh.

138

1      Q.      Subject:  ACLU arrives with a
2  message for PSBA, forwarded from Mr.
3  Fairchild to you, forwarded from you to Mr.
4  Mains --
5      A.      Uh-huh.
6      Q.      -- and forwarded from Mr.
7  Mains to Mr. Levin, Mr. Heim, Mr. Dade, Ms.
8  Leader, Ms. Fitz-Patrick.
9      A.      Okay.
10     Q.      Does this refresh your
11  recollection as to the first time you saw
12  the ACLU letter?
13     A.      Yes, sir.  It would have been
14  here.
15     Q.      You would have clicked on Mr.
16  Campbell's link and looked at the letter?
17     A.      Correct.
18     Q.      And you recall doing that now?
19  This refreshes your recollection?
20     A.      I don't remember specifically,
21  but that's my -- to the best of my
22  knowledge.
23     Q.      Okay.  And did you read this
24  e-mail from Mr. Campbell carefully?

139

1      A.      I can't say that I read it
2  carefully.  I read it.
3      Q.      Did you read the part where it
4  says, "Neutrality does not work"?
5      A.      I'd have to refresh my memory
6  to see.
7         (Reviewing document.)
8         Yes, I do remember that.
9  BY MR. COHN:
10     Q.      Did you have any discussion
11  within the school district about whether or
12  not Lewisburg should take a position with
13  respect to the lawsuit, and with respect to
14  the resolution that Mr. Campbell was asking
15  be passed?
16         MR. BROWN:  And again, I'll
17         instruct you not to discuss what you
18         discussed with counsel for the school
19         district.
20         THE WITNESS:  Yeah, that would
21         have been discussed with our
22         solicitor.
23  BY MR. COHN:
24     Q.      Well, let's back up.  Did you

140

1  have conversations with your solicitor about
2  that issue?
3      A.      I did not directly have a
4  conversation with my solicitor.  But I -- I
5  would share the information that I think was
6  on a -- possibly on an e-mail.
7      Q.      Are you saying you forwarded
8  information to Mr. Fanelli?
9      A.      No.  I said that -- I did not
10  say that.
11     Q.      I don't understand your answer
12  then.  Let's take this a step at a time.
13  Was there ever any discussion at any meeting
14  of any school board directors of Lewisburg
15  Area School District --
16     A.      No, there was not.
17     Q.      Let me finish -- let me finish
18  the question.
19     A.      Correct.  Sorry.
20     Q.      I've got to finish the
21  question or I don't --
22     A.      Right.  That's my mistake.
23     Q.      -- have a record of my
24  question.

141

1      A.     I understand.  I apologize.
2      Q.     -- concerning whether or not
3  Lewisburg Area School District should take a
4  public position with respect to the lawsuit
5  by PSBA against Mr. Campbell and PFUR?
6      A.     No, there was not.
7      Q.     Was there ever any discussion
8  between you and the superintendent, or any
9  of the other staff of PSBA, outside of the
10  hearing or participation of Mr. Fanelli,
11  about whether or not Lewisburg should take a
12  position with regard to the lawsuit?
13      A.     I believe that -- I'm trying
14  to remember the exact -- who was there.  So
15  give me a second to just conjure that up.
16             No, I think there was an
17  e-mail with Mr. Fanelli that I was copied
18  on.
19      Q.     An e-mail from Mr. Fairchild,
20  or --
21      A.     Yes.
22      Q.     -- to Mr. Fanelli?
23      A.     Correct.
24      Q.     Transmitting this e-mail and

142

1  perhaps having some additional words in
2  there that you're not going to tell me
3  about; correct?
4      A.     Correct.
5      Q.     Okay.
6             THE WITNESS:  Was I allowed to
7      say that?  Okay.
8             MR. BROWN:  That's fine.
9             THE WITNESS:  All right.
10  BY MR. COHN:
11      Q.     And other than that, you're
12  unaware of any discussion or consultation
13  with Mr. Fanelli by anybody associated with
14  Lewisburg about Mr. Campbell's demand that
15  Lewisburg pass a resolution?
16      A.     I'm not aware.  It doesn't
17  mean it didn't occur.
18      Q.     And you're not aware of any
19  discussion within the Lewisburg School
20  District about whether or not you should
21  continue to authorize the school -- the
22  lawsuit as a governing board director;
23  correct?
24      A.     My -- my --

143

1             MR. BROWN:  This is --
2             THE WITNESS:  Sorry.
3             MR. BROWN:  Once again, just
4      you can't discuss what was discussed
5      with Mr. Fanelli.
6             THE WITNESS:  Correct.
7             MR. BROWN:  Otherwise, go
8      ahead.
9             THE WITNESS:  Yes.  So, could
10      you restate your question?  I'm
11      sorry.
12  BY MR. COHN:
13      Q.     Well, aside from any
14  conversations with Mr. Fanelli, or involving
15  Mr. Fanelli, has there ever been any
16  discussion at the school district, your home
17  school district, about whether you, as a
18  governing board director, should continue to
19  approve of the continuation of the lawsuit
20  against Mr. Campbell and PFUR?
21      A.     No, there has not been.
22      Q.     And there has been no
23  discussion, am I correct, within the
24  Lewisburg School District as to whether or

144

1  not Lewisburg School District should
2  terminate its membership in the PSBA in
3  order to remove you as a director of PSBA;
4  correct?
5      A.     That is correct.
6      Q.     Am I correct that you have no
7  current intention of raising either of those
8  issues with the Lewisburg School District in
9  your capacity as the president of the school
10  board; is that correct?
11             MR. BROWN:  Objection.  You
12      can answer.
13             THE WITNESS:  Okay.  My role
14      on the PSBA Board has nothing to do
15      with my role on my local board.
16  BY MR. COHN:
17      Q.     That's your position, or
18  that's what you've been taught by Mr. Levin
19  and his training?
20             MR. BROWN:  Objection.
21  BY MR. COHN:
22      Q.     Or is that both?
23      A.     No, that's my own opinion.
24  I'm the one that raised that issue

1   initially.

2       **Q.**    Okay.  So I just want to be

3   clear here.  You are familiar with the

4   bylaws?

5       **A.**    **I am.**

6       **Q.**    The PSBA bylaws.  And you are

7   not a member of PSBA.  You are a derivative

8   member of PSBA; correct?

9       **A.**    **That's correct.**

10      **Q.**    And you are only a derivative

11   member because the school district of which

12   you are the President of the Board elects to

13   be a member of the school -- of the PSBA;

14   correct?

15      **A.**    **That is correct.**

16      **Q.**    Okay.  And at any point in

17   time they could cause your removal from the

18   governing board of PSBA by terminating their

19   membership in PSBA; correct?

20      **A.**    **That is incorrect.**

21      **Q.**    That is incorrect.  What is

22   your basis for saying that?

23      **A.**    **The bylaws.**

24      **Q.**    Well, let's get the bylaws

1   out, as we did with Mr. Knade.  And you can

2   show me where in the bylaws there is an

3   exception to your disappearing from the

4   governing board upon the resignation of your

5   home district as a member.

6         You show me where, as the

7   immediate past president, you can still be

8   on the board if your home district is not a

9   member.  This is P-98.  So let's take a look

10   at this.

11             - - -

12       (Whereupon the document was

13       marked, for identification purposes,

14       as Exhibit Number P-98.)

15             - - -

16       MR. BROWN:  I've got it.

17   Thank you.

18   BY MR. COHN:

19      **Q.**    Let's take a look at the

20   governing board.  Let's take a look at

21   Section 4.

22      **A.**    **I would take you to page**

23   **number 6, section 3 --**

24      **Q.**    Right.

1      **A.**    **Number A --**

2      **Q.**    Right.

3      **A.**    **Whereas it says that -- I'll**

4   **pick up in the middle of the sentence.**

5      **Q.**    Well, I don't think it's

6   correct to start in the middle.

7      **A.**    **All right.  I shall begin at**

8   **the beginning.**

9          **"Any individual member under**

10   **Article 1, Section 2, Subsections A and B is**

11   **eligible to hold an office or other elected**

12   **position in the association so long as**

13   **membership status continues, provided,**

14   **however, that a person who was a member when**

15   **elected president, who stood to assume the**

16   **presidency by virtue of having been elected**

17   **president-elect in accordance with this**

18   **article, and has served as president-elect,**

19   **shall be entitled to serve the full term of**

20   **president regardless of the fact that such**

21   **person may cease to be a member of the board**

22   **of the entity from which the individual**

23   **membership derived."  And then that has**

24   **continued on to the immediate past president**

1   **as well.**

2      **Q.**    Okay.  And I see where your

3   status as a derivative member of a voting

4   member ceasing does not cause your removal.

5   But I'm asking that Mr. Knade, as the

6   30(b)(6) designee of PSBA, could not show me

7   where in the bylaws it provides that even if

8   your member entity from which you previously

9   derive that status resigns, you get to stay

10   on the board.

11         Can you show me where that

12   provides it?  I read this as being precisely

13   the opposite, and Mr. Knade could not show

14   me where I was wrong.

15      **A.**    **I'm sorry.  Oh, you mean if**

16   **the -- I'm sorry, I don't think I understand**

17   **your question.**

18      **Q.**    As I understand what you just

19   read, the fact that you may no longer be the

20   -- you resigned from the Lewisburg School

21   board, but you could still continue to be

22   the immediate past president.  That's what I

23   understand what you just read to me.  Okay.

24   And I understand that.  But what I don't

149

1  understand is how, when the membership
2  member, the entity voting member, resigns
3  you can still be the -- on the board as a
4  past president, when, even though you've
5  left the board of Lewisburg, Lewisburg has
6  ceased to be a member.
7      A.    **I believe that those of us who**
8  **are past presidents are members of the Past**
9  **President Honor Society, or whatever.  So**
10 **it's listed under that, I believe.  I could**
11 **try to find that for you.  It's just special**
12 **because of that.**
13     Q.    I understand.  But when we
14 look at 4A, "A vacancy shall occur on the
15 governing board when (2) the entity
16 represented by the members ceases to be a
17 member of the association."  I understand
18 how you can have derivative status, and then
19 not be a derivative member because you
20 ceased to be a director.  But what I don't
21 understand, or what I don't see in these
22 bylaws is how, if Lewisburg chooses to quit,
23 you do not evaporate from the governing
24 board because there's no longer an entity

150

1  member from -- with which you have or had
2  any association.
3      A.    **Well, it goes to the same item**
4  **because if I was no longer a member of my**
5  **board, I would still be on there.**
6      Q.    Yes.
7      A.    **So, since I don't represent**
8  **Lewisburg on there, it doesn't matter.**
9      Q.    So that's -- you think you
10 have an exception that applies only to you
11 and to none of the other voting governing
12 board members if they're -- Let me back up
13 here.
14         So anybody that's not a past
15 president, you agree if their school board
16 quits, they vanish from the governing board
17 as a matter of course?
18     A.    **No.  I think once you're**
19 **elected president-elect, you go through the**
20 **three seats, regardless.  That was my**
21 **understanding.**
22     Q.    Even if your entity member
23 quits?
24     A.    **That has been my**

151

1  **understanding.**
2      Q.    All right.  Well, I don't want
3  to argue with you because I already have
4  contrary testi -- contrary binding testimony
5  from your organization.
6      A.    **My understanding is what I'm**
7  **giving you.**
8      Q.    Okay.  And my understanding,
9  and the understanding testified to by the
10 PSBA is that if your home district quits, it
11 takes you off of the governing board.
12         Now, with that understanding,
13 would that be -- now that you know that that
14 is the concession that PSBA has already
15 made, have you had any discussions with --
16 you've had no discussions with the board,
17 with your school board about the potential
18 implications of your continued service on
19 the governing board, right?
20     A.    **No.**
21     Q.    Then if the school board can
22 vote you out of existence as a director of
23 the governing board by quitting its
24 membership, you're still -- it is still your

152

1  position that in no circumstance can the
2  school board have any responsibility for
3  anything that you do as a governing board
4  member; correct?
5      A.    **That is correct.**
6      Q.    So if you decided that you
7  wanted to vote, along with a bunch of other
8  people, to reconstitute the PSBA as a white
9  supremacist organization and to discriminate
10 against black people, then you could do that
11 without any -- without any repercussions to
12 your home school district; correct?  That's
13 your testimony?
14         MR. BROWN:  Objection.
15         THE WITNESS:  I'm not going to
16         comment on things that are crazy.
17 BY MR. COHN:
18     Q.    Is violating people's
19 constitutional rights crazy?
20     A.    **I don't believe we've done**
21 **that.**
22     Q.    And if you're wrong, is
23 violating somebody's constitutional rights
24 what you would consider to be crazy?

153

1      A.      That would be conjecture on my
2  part.
3              MR. BROWN:  Objection.
4  BY MR. COHN:
5      Q.      But you think it's absolutely
6  obvious that being a white supremacist
7  organization and banning black people would
8  be unconstitutional; right?
9      A.      Certainly.
10      Q.      Okay.  And if you did
11  something like that, it wouldn't surprise
12  you if there were repercussions, legal
13  repercussions, for your home board, would
14  it?
15              MR. BROWN:  Objection.  Go
16          ahead, you can answer.
17              THE WITNESS:  I -- I'm not
18          sure that there would be legal
19          repercussions.  I don't know enough
20          about the law to ascertain that.
21  BY MR. COHN:
22      Q.      Are you familiar with the
23  concept of ratifying somebody's actions?
24      A.      Yes.

154

1      Q.      Have you ever discussed with
2  anybody within the Lewisburg School District
3  whether or not they might have consequences
4  for ratifying your action as a school board
5  -- I'm sorry, as a PSBA director?
6              MR. BROWN:  Again, I'll
7          instruct you not to answer what
8          discussions you might have had with
9          the solicitor.
10              THE WITNESS:  Yeah.  That's
11          what I was going to say, I can't
12          answer that.
13  BY MR. COHN:
14      Q.      At what point in time did you
15  ever have any consultation with your school
16  solicitor regarding that subject matter?
17      A.      I didn't say that I did.
18      Q.      Well, have you not -- There's
19  no privilege in not having a conversation.
20  If you have not had that conversation on
21  that subject matter with your school
22  solicitor, will you please confirm that you
23  haven't?
24      A.      Similar subject matter, that

155

1  would certainly lead me to believe that what
2  he discussed with me regarding what you're
3  saying is that --
4              MR. BROWN:  Don't discuss what
5          he might have told you.
6              THE WITNESS:  Oh, thank you.
7          Sorry.
8  BY MR. COHN:
9      Q.      At what point in time did you
10  have a similar discussion with Mr. Fanelli,
11  this year?
12      A.      I don't recall exactly.  It
13  was some time in the last -- probably --
14  probably in the last six months.
15      Q.      How about in the last three
16  weeks?
17      A.      No, sir.
18              MR. COHN:  What are we up to
19          here?
20              (Discussion held off the
21          record.)
22                  - - -
23              (Whereupon the document was
24          marked, for identification purposes,

156

1          as Exhibit Number P-237.)
2                  - - -
3  BY MR. COHN:
4      Q.      Again, have you ever seen this
5  e-mail before?  November 4, 2017 e-mail from
6  Mr. Campbell to Mr. Fairchild.  Subject:
7  Bailing out on PSBA (ACLU are coming)?
8      A.      Yes, I believe I have.
9      Q.      Another one that you scanned
10  and did not read, or something that you
11  actually read thoroughly?
12      A.      No, I just scanned it.
13      Q.      Now, you see on the second
14  page there's a reference to paragraph 48 of
15  the July 17, '17 SLAPP suit.  Then he
16  quotes.  He said, accordingly, it was
17  clearly Campbell's intent and purpose to
18  cause PSBA's 600 plus member entities
19  considerable cost and inconvenience in
20  responding to the requests, including
21  requesting separately the exact -- same
22  exact financial record and legal agreements
23  from PSBA, just for the sole purpose of
24  harassing PSBA and its members, while

157

1   perverting the process under the
2   Right-to-Know Law.  You see that?
3        A.     Yes.
4        Q.     And that's something that you
5   read in the Complaint as well; right?
6        A.     Correct.
7        Q.     And that's one of the bases
8   for which you approved PSBA's lawsuit
9   against my clients; correct?  Yes?
10       A.     I'm -- I'm rereading it to
11  make sure that I'm speaking correctly.
12             Yes.
13       Q.     So PSBA -- part of the reason
14  PSBA sued my clients was because Mr.
15  Campbell's and PFUR's requests to your
16  school district members were inconveniencing
17  the school districts and causing them
18  expense and disruption; correct?
19             MR. BROWN:  Objection.  Go
20        ahead.  You can answer, if you can.
21             THE WITNESS:  Yes.
22  BY MR. COHN:
23       Q.     Did you hear from any of
24  PSBA's members telling you that they

158

1   approved of the lawsuit?
2        A.     That they what?
3        Q.     That they approved of the
4   lawsuit against my clients?
5        A.     There were some verbal
6   comments to that effect, yes.
7        Q.     Who told you they approved?
8        A.     I don't remember exactly.  I
9   just remember a number of people just being
10  glad that we -- saying, you know, glad
11  you're pursuing that.
12       Q.     And that reinforced your
13  belief that you had done the right thing in
14  authorizing the lawsuit against my clients;
15  correct?
16       A.     That is correct.
17       Q.     And around what time were you
18  told that people were pleased that you were
19  -- that the PSBA was suing my clients?
20       A.     At the leadership conference.
21       Q.     That was in Hershey in -- in
22  October --
23       A.     Yes, sir.
24       Q.     -- of 2017?

159

1        A.     Yes, sir.
2        Q.     Approximately how many people
3   came up to you and gave you positive verbal
4   reinforcement?
5        A.     I do not recall exactly.
6        Q.     More than 10?
7        A.     No, probably in that zone.
8        Q.     You didn't click on any of the
9   links in this e-mail?
10       A.     I didn't say I didn't click on
11  any.  I would have to look and see if I
12  recall.  Let me just check here.
13             I believe I clicked on the
14  financial -- PSBA financial statements.
15  That was all I remember.
16       Q.     Okay.  Then you see, on the
17  last page of the e-mail, it's signed, Simon
18  Campbell.  Do you see it says, "We will all
19  get along fine."  It's right there.  That
20  paragraph there.
21       A.     Uh-huh.
22       Q.     "We will all get along fine
23  just as soon as the state actor SLAPP suit
24  is withdrawn, my legal fees are refunded and

160

1   Nathan Mains issues a public apology."
2        A.     I see that.
3        Q.     And do you remember reading
4   that at the time?
5        A.     Yes.
6        Q.     So you were aware that this
7   law -- the underlying lawsuit could have
8   been resolved for its dismissal, an apology
9   for Mr. Mains, and paying Mr. Campbell's
10  legal fees up to that point in time?
11       A.     Absolutely.
12             MR. BROWN:  Objection.  Go
13        ahead.
14             THE WITNESS:  Yes, I do
15        recall.
16  BY MR. COHN:
17       Q.     And that's Saturday, November
18  4th.
19             Now, attached to that is
20  another blast e-mail --
21       A.     I'm sorry for interrupting
22  you, but I wanted to clarify.  I would not
23  have seen it on that date.
24       Q.     Okay.  It probably would have

161

1  been sent to you the following Monday by Mr.
2  Fairchild, that would stand to reckon?
3      A.    **Within those days when he**
4  **returned, yeah.**
5      Q.    Okay.  And then attached to
6  this e-mail is a third blast e-mail from Mr.
7  Mains, dated November 2nd.  Take a moment
8  and read that e-mail.
9      A.    **(Complying with request.)**
10     **I've read it.**
11     Q.    Have you seen that e-mail
12 before?
13     A.    **Yes, I have.**
14     Q.    Did you discuss it with
15 anybody at PSBA before it was sent out?
16     A.    **No, sir.**
17     Q.    Did you discuss with Mr. Mains
18 why he sent this e-mail?
19     A.    **No, I did not.**
20     Q.    Did you have any discussion
21 with anybody within PSBA about this e-mail?
22     A.    **Not that I can recall.**
23     Q.    So it came to you as part of
24 the blast e-mail when you read it?

162

1      A.    **Yes.**
2      Q.    Do you have any idea why Mr.
3  Mains would have to -- would feel a need to
4  reassure PSBA's entity members that they
5  wouldn't be retaliated against by PSBA if
6  they passed the resolution objecting to the
7  lawsuit?
8      A.    **I didn't see that.**
9            MR. BROWN:  Objection.  But go
10     ahead, you can answer.
11           THE WITNESS:  I didn't see
12     where it said retaliation.
13 BY MR. COHN:
14     Q.    Well, why would he write,
15 "There is no need for concern about
16 adversely affecting your entity's
17 relationship with PSBA or the ways PSBA will
18 continue to support your dedication and hard
19 work serving the educational needs of our
20 Commonwealth school children," if there were
21 not some reason for PSBA member boards to be
22 concerned about retaliation?
23           MR. BROWN:  Objection.  Go
24     ahead, you can answer.

163

1            THE WITNESS:  I don't
2  interpret it that way.  I don't think
3  that's what was intended by the
4  letter, at least in my view.
5            My understanding is that --
6  that Nathan was reassuring any boards
7  that if -- because I believe, in Mr.
8  Campbell's e-mail, there was
9  something about, you know, I'll leave
10 you alone if you'll do this.  It was
11 sort of a blackmail kind of thing.
12           And -- so in doing so, I think
13 Nathan was saying, go ahead and do
14 that if you feel that would be best
15 for your district.
16 BY MR. COHN:
17     Q.    So you consider petitioning
18 governments to be blackmail.  Is that what I
19 understand you to have just said?
20           MR. BROWN:  Objection.
21           THE WITNESS:  No, I did not
22     say that.
23 BY MR. COHN:
24     Q.    So did you ever have any dis

164

1  -- Do you have any idea how many school
2  districts have passed resolutions calling
3  for the discontinuation of the lawsuit?
4      A.    **Not exactly.**
5      Q.    Do you have some idea of how
6  many?
7      A.    **A handful.**
8      Q.    A handful?  Do you consider 40
9  a handful?  Would it surprise you to know
10 that 40, about seven and a half percent of
11 your membership passed, at school -- at
12 public school board meetings a resolution
13 calling for the discontinuation of the
14 lawsuit?
15     A.    **Yeah.  The -- I think that**
16 **because Nathan gave them the go ahead that**
17 **it was okay.**
18     Q.    Do you know how many had
19 actually passed those resolutions prior to
20 November 2nd?
21     A.    **A handful.**
22     Q.    You think that these people
23 needed Nathan's go ahead?  That's very
24 interesting.  Why would you say that?

165

```
1        MR. BROWN:  Objection.
2        THE WITNESS:  My thoughts.
3  BY MR. COHN:
4     Q.    What other coordination has
5  there been between the school boards and
6  PSBA about the lawsuit?
7        MR. BROWN:  Objection.
8  BY MR. COHN:
9     Q.    You can answer.
10    A.    I don't know what you mean by
11 coordination.  Could you clarify?
12    Q.    Well, you just said that
13 Nathan Mains gave the go ahead.  Doesn't
14 each individual school district have an
15 obligation to the students and voters of the
16 school district to act in the way -- in a
17 manner that's in the best interest of that
18 school district?
19    A.    Absolutely.
20    Q.    Did you ever have a
21 conversation with the solicitors for any of
22 the school districts that passed the
23 resolution?
24    A.    No, I did not.
```

166

```
1     Q.    You seem to be questioning
2  their bona fides in calling for its
3  discontinuation.  Why don't you think that
4  some of them concluded that the lawsuit was
5  unfounded and unconstitutional?
6        MR. BROWN:  Objection, but you
7        can answer.
8        THE WITNESS:  Because some of
9        what I heard was that that wasn't
10       sincere.  They were letting us know
11       that it wasn't sincere, but they
12       were trying to appease Mr. Campbell.
13 BY MR. COHN:
14    Q.    Who told you that?
15    A.    I had several board members
16 tell me that from different boards.  I don't
17 remember exactly.
18    Q.    Which ones?
19    A.    I don't recall.
20    Q.    Clarion?
21    A.    No.
22    Q.    Butler?
23    A.    No, not them.
24    Q.    Mars?
```

167

```
1     A.    Mars.
2     Q.    Mars Area School District?
3     A.    I don't remember exactly which
4  ones.
5     Q.    Butler Vo-Tech?
6     A.    You can name all 40.  I'm not
7  going to--
8
9     Q.    Somerset?  We'll get the list.
10 We'll go through that after lunch, okay?
11 And you can tell me who told you that they
12 were being insincere.
13    A.    Actually, I can't answer that
14 because it was based on a conversation with
15 counsel.
16    Q.    So lawyers told you that they
17 had heard --
18    A.    I didn't say that.
19    Q.    I don't understand.  Explain
20 to me how -- how what you just told me is
21 based upon a conversation with counsel?
22    A.    I'm saying that I had a
23 conversation with our counsel in which some
24 information to that effect was shared with
```

168

```
1  me.
2     Q.    So you're now retracting your
3  prior testimony as untrue, that people came
4  up to you and told you this themselves?
5        MR. BROWN:  Objection.
6        THE WITNESS:  No, I think I
7        said I heard that people had said
8        that.
9  BY MR. COHN:
10    Q.    And you also said people came
11 up to you and told you.  Then I asked you
12 who.  And now you're telling me that you
13 heard this through a lawyer.  So --
14    A.    Isn't that a person?
15    Q.    Yes, but that's a person, not
16 people, and it's inconsistent with your
17 prior testimony.
18       MR. BROWN:  Objection.  I
19       don't believe it's inconsistent.
20 BY MR. COHN:
21    Q.    Who was the lawyer?
22       THE WITNESS:  Do I need to
23       answer?
24       MR. BROWN:  You can tell him
```

1    who the lawyer wants.
2         THE WITNESS:  Mr. Fanelli.
3    BY MR. COHN:
4         Q.    And where did you -- Where
5    were you when you were speaking with Mr.
6    Fanelli?
7         A.    **I don't recall.**
8         Q.    What legal advice were you
9    asking him for at the time?
10        MR. BROWN:  Objection.  She
11        does not have to tell you what legal
12        advice she was asking for.
13   BY MR. COHN:
14        Q.    Were you asking him for legal
15   advice, or were you having a conversation
16   with him?
17        A.    **A conversation that included**
18   **my understanding of the legal situation.**
19        Q.    Which legal situation?  The
20   legal situation with the PSBA?
21        MR. BROWN:  I object.  She's
22        covered that this is a discussion
23        that involved --
24        MR. COHN:  No, no, no.

1         MR. BROWN:  Yes.
2         MR. COHN:  If I have a
3    conversation with you about the
4    Mueller investigation, it sure as
5    heck is not privileged.  If she has a
6    conversation with Mr. Fanelli, who
7    has no representation on the PSBA,
8    there is no attorney/client
9    privilege, if she's speaking with him
10   as a PSBA person.
11        And if she's speaking with him
12   as a Lewisburg person, then it has
13   nothing to do with the -- you know,
14   that representation.
15        If it has to do with her PSBA,
16   there's a waiver.  Okay?  And there's
17   no attorney/client privilege because
18   that's a guy, he's not a lawyer.
19   BY MR. COHN:
20        Q.    Now, let's make the foundation
21   here.  When did you speak to Mr. Fanelli
22   about the conversation that we are talking
23   about right now?
24        A.    **I don't recall.**

1         Q.    Where was this conversation
2    held?
3         A.    **I don't recall.**
4         Q.    Was it in person, was it on
5    the telephone?
6         A.    **I don't recall.  I'm sorry.**
7         Q.    Okay.
8         A.    **I just remember my impressions**
9    **of what he had said.**
10        Q.    Okay.  And were you
11   together -- Was this at the PSBA conference?
12        A.    **I don't recall.**
13        Q.    Did you see him at the PSBA
14   conference?
15        A.    **I don't recall if I saw him**
16   **there or not.**
17        Q.    How often do you see Mr.
18   Fanelli?
19        A.    **Fairly often because sometimes**
20   **he's on FaceTime, that kind of thing.**
21        Q.    On FaceTime for what?  Just to
22   talk with him?
23        A.    **No.  For school, our school**
24   **district interactions.**

1         Q.    Okay.  Mr. Fanelli was sharing
2    with you -- you're aware that some of Mr.
3    Fanelli's own school boards passed
4    resolutions; right?
5         MR. BROWN:  Objection.  Go
6         ahead.
7         THE WITNESS:  Yeah, I can't
8         discuss that.
9    BY MR. COHN:
10        Q.    You're aware, are you not,
11   that some of his own school boards, that he
12   is also school solicitor for, passed the
13   resolution that Mr. Campbell was lobbying
14   for; correct?
15        A.    **I don't know that.**
16        Q.    Did Mr. Fanelli tell you about
17   the deliberations within his own school
18   boards for which he -- for -- the school
19   boards that passed the resolution?
20        A.    **No.**
21        Q.    Are you sure?
22        A.    **Yes.**
23        Q.    If I put him under oath, he's
24   going to tell me that too?

173

1    **A.    Yes.**
2           MR. BROWN:  Objection.
3           THE WITNESS:  I'm sorry.
4    BY MR. COHN:
5        **Q.**    Where else would he know about
6    these things?  And what does this have to do
7    with any legal advice to you?
8           MR. BROWN:  Objection.  How
9           should she know what Mr. Fanelli
10          knows?
11   BY MR. COHN:
12       **Q.**    What legal advice were you
13   seeking from him when he told you about the
14   other school districts?
15          MR. BROWN:  Objection.  She
16          doesn't have to discuss what legal
17          advice she was seeking.
18   BY MR. COHN:
19       **Q.**    What was the subject matter of
20   your discussion with him when he chose to
21   raise that with you?
22       **A.    I'm trying to think how I can**
23   **answer without revealing my conversations**
24   **with him.  I don't think I can.**

174

1        **Q.**    You were speaking with him as
2    a PSBA director about this issue; correct?
3        **A.    No, I was not.**
4        **Q.**    But you say that the school
5    district never considered these issues;
6    correct?
7        **A.    The school board never**
8    **considered those issues, no.**
9        **Q.**    Well, who within the school
10   district did?
11       **A.    I'm sorry.  I don't understand**
12   **your question.**
13       **Q.**    Are you saying that you, as a
14   school district director, with your school
15   district director hat on, considered with
16   Mr. Fanelli Mr. Campbell's request that the
17   school district pass a resolution condemning
18   the lawsuit?
19       **A.    I didn't say I considered it.**
20       **Q.**    So nobody, as far as you know
21   on the -- in the school district, on the
22   board or in the -- in the management of the
23   school district, if you will, considered passing the
24   administration, considered passing the

175

1    resolution condemning the lawsuit; correct?
2        **A.    When you use the word**
3    **"considered," what do you mean.**
4        **Q.**    Discussed whether or not to
5    pass a resolution?
6        **A.    Then the answer would be --**
7           MR. BROWN:  And again, I'll
8           instruct --
9           THE WITNESS:  I don't know how
10          to answer.
11          MR. BROWN:  -- you not to
12          answer if there were discussions with
13          Mr. Fanelli about possibly the filing
14          resolution.
15          THE WITNESS:  That's what-- I
16          can't answer then.
17          (Discussion held off the
18          record.)
19                   - - -
20          (Whereupon the document was
21          marked, for identification purposes,
22          as Exhibit Number 238.)
23                   - - -
24   BY MR. COHN:

176

1        **Q.**    Have you seen this e-mail
2    before, Ms. Swope?
3        **A.    I believe I have.**
4        **Q.**    Did you click on any of the
5    links on this e-mail?
6        **A.    I don't -- I don't recall**
7    **clicking on any of them, but I may have.**
8        **Q.**    Well, have you seen the
9    preliminary objections brief that was filed
10   in response to the original Complaint?
11       **A.    If you could show me, I can**
12   **tell you if I've seen it.  I don't know**
13   **things by title very well.**
14       **Q.**    Sure.  We'll get back to that
15   in a second.  Let's just go through here.
16       **A.    Sure.  So looking at the links**
17   **here on the second page, the October 16th**
18   **blast e-mail.  We've looked at that, right.**
19       **A.    Uh-huh.**
20       **Q.**    And we've looked at the
21   October 17 e-mail that I sent to Mr. Heim,
22   the letter that Mr. Campbell refers to.  We
23   looked at that already, right?
24       **A.    Uh-huh.**

177

1    Q.    And we looked at the 11 -- the
2  November 2nd letter back from Mr. Heim,
3  claiming a common interest privilege with
4  the school districts.  You see that?
5    **A.    Yes, I do.**
6    Q.    And let's take a look at the
7  Preliminary Objections, which are P-211.
8                  - - -
9         (Whereupon the document was
10        marked, for identification purposes,
11        as Exhibit Number P-211.)
12                 - - -
13  BY MR. COHN:
14    Q.    These are the Preliminary
15  Objections to the underlying Complaint that
16  were filed in Cumberland County with the
17  Prothonotary on November 9th, 2017.
18    I'm not asking you to read
19  this all right now, but my question is:  Did
20  you -- have you seen this before, first of
21  all?
22    **A.    I believe so.**
23    Q.    Did you get a copy of it
24  around the time that it was filed?

178

1    **A.    I don't recall, if I saw it,**
2  **when I saw it.**
3    Q.    Did you read it when you
4  received it?
5    **A.    I don't remember reading this**
6  **in its entirety.**
7    Q.    Was this something that you
8  would have been provided with prior to the
9  straw vote that was taken in December to
10  continue the lawsuit?
11    **A.    I don't recall specifically if**
12  **I saw this before that or not.**
13    Q.    And, by the way, I have to
14  retract.  This is not the brief that was
15  attached.  These are the Preliminary
16  Objections.  We'll get the brief for you to
17  look at too.
18    Did you actually read the
19  brief that was provided?
20    **A.    If you'd show it to me, I**
21  **don't -- There's so many documents.  I don't**
22  **-- I can't -- I don't know them by title, as**
23  **you do.**
24    Q.    All right.  You can put that

179

1  away.
2         MR. COHN:  Let's go off the
3  record.
4         VIDEO TECHNICIAN:  The time is
5  now 12:03 p.m.  We're off the video
6  record.
7         (Whereupon there was a recess
8  in the proceeding.)
9         VIDEO TECHNICIAN:  The time is
10  now 1:03 p.m.  We're back on the
11  video record.  This begins media unit
12  number three.
13         MR. COHN:  P-239, which we'll
14  probably get around to, is the Brief
15  in Support of the Preliminary
16  Objections to the Amended Complaint,
17  for the record.
18                  - - -
19         (Whereupon the document was
20        marked, for identification purposes,
21        as Exhibit Number P-240.)
22                 - - -
23  BY MR. COHN:
24    Q.    P-240 is a November 27, 2017

180

1  e-mail from Mr. Campbell to Mr. Fairchild,
2  Re:  Forwarding, encouraging you to
3  reconsider your SLAPP suit.  And it is a
4  cover e-mail to Lewisburg from Mr. Campbell,
5  forwarding a Sunday, November 26, 2017
6  e-mail to the governing board directors of
7  PSBA.
8         And my first question to you,
9  did you receive the forwarded e-mail?
10    **A.    Yes, I believe I did.**
11    Q.    My second question to you is,
12  did you receive a copy of the e-mail that
13  was forwarded to Mr. Fairchild, who then, in
14  turn, sent that to you?
15    **A.    Yes, I believe I did.**
16    Q.    And did you review Mr.
17  Campbell's e-mails?
18    **A.    As I look at this again, I**
19  **think I probably scanned -- my recollection**
20  **is, I scanned the first one.  The second one**
21  **-- I'm sorry, that I read the first one,**
22  **scanned the second one.  I said that**
23  **backwards, didn't I?**
24    Q.    Uh-huh.  So, let's look at Mr.

181

1    Campbell's e-mails to the governing board.
2         A.    **Okay.**
3         Q.    By the way, did you discuss
4    this e-mail with any of your co-governing
5    board members outside of a formal meeting?
6         A.    **No.**
7         Q.    In the last year, did you have
8    many conversations with anybody on the
9    governing board outside of formal meetings?
10        A.    **No, not a lot.**
11        Q.    When you would, who would you
12   typically speak with?
13        A.    **Well, it depends.  My vice**
14   **president, to just give him advice on, you**
15   **know, things he needed to know and as he --**
16   **he does his role because it's his first**
17   **year.  He just started in December in that**
18   **role.**
19        Q.    Just to be clear, so Mr.
20   Faccinetto, or Faccinetto, I guess it's
21   pronounced --
22        A.    **No, no, no.  That would be**
23   **Jordan Fetzer.  You're talking about my**
24   **local board, weren't you?**

182

1         Q.    No, no, no, no.
2         A.    **I'm sorry.**
3         Q.    The governing board.
4         A.    **Then I retract my answer, that**
5    **was not correct.  I thought you were talking**
6    **about my local board.**
7         Q.    I apologize, I'll try to be
8    more specific.  You do have those two hats.
9         A.    **So would you ask your question**
10   **again, please?  I'm so sorry.**
11        Q.    Yes.  Did you, outside of
12   meetings of the PSBA governing board, have
13   occasion to speak to any of your
14   co-governing board members?
15        A.    **Rarely.  In fact, I think I --**
16   **I think that, if any, it would be Mike --**
17   **Mike Faccinetto, because I'm the past**
18   **president.  He would consult with me,**
19   **sometimes on, you know, the best practices,**
20   **that kind of stuff.**
21        Q.    Governance issues?
22        A.    **Governance issues, yes.**
23        Q.    Mr. Gentzel -- you know Mr.
24   Gentzel, don't you?

183

1         A.    **I do.**
2         Q.    He used to be the head of PSBA
3    before Mr. Mains, right?
4         A.    **That is correct.**
5         Q.    And now he's at NSBA?
6         A.    **Yes.**
7         Q.    Did you have any conversations
8    with him about this lawsuit?
9         A.    **No.**
10        Q.    All right.  So, this is -- Mr.
11   Campbell is focusing on the e-mail that's to
12   the 10 governing board voting members and
13   also to the non-voting member, right?  Or
14   not?  Is he there?
15        A.    **It looks like it says, "Dear**
16   **Ten."**
17        Q.    There were 11 in attendance.
18        A.    **Yeah.**
19        Q.    So he would be the 11th.  The
20   11th is Carl, what's his last name?  Knox?
21        A.    **I don't remember.**
22              MR. CAMPBELL:  Moore.
23              MR. COHN:  Mall?
24              MR. CAMPBELL:  Moore.

184

1              MR. COHN:  Mawl?
2              MR. CAMPBELL:  Moore,
3    M-O-O-R-E.
4              MR. COHN:  I can't understand
5    your British --
6              THE WITNESS:  Is that his last
7    name?
8              MR. COHN:  Carl Moore.
9              THE WITNESS:  Oh, Moore.  I
10   thought you said Mall.
11             MR. COHN:  Exactly.
12             THE WITNESS:  Oh, You did too?
13   Okay, I feel better.
14             THE WITNESS:  Yes, Carl Moore
15   --
16             MR. COHN:  Exactly.
17             THE WITNESS:  That's correct.
18   BY MR. COHN:
19        Q.    Exactly.  All right.  So he
20   was a non-voting advisory member of the
21   governing board?
22        A.    **Yes, he's -- he is --**
23   **participates fully, except for voting.**
24        Q.    He's like Puerto Rico.  He

185

1   gets a voice, but not a vote?
2      A.     Correct.
3      Q.     Okay.  All right.  So he sends
4   -- he writes to you in your individual
5   capacity and in your capacity as elected
6   government officials, again, asking that the
7   SLAPP suit be withdrawn before a federal
8   lawsuit is actually filed.  Do you see that?
9      A.     Yes.
10     Q.     Did you not take seriously the
11  Plaintiff's intention to file this lawsuit
12  at that time?
13     A.     No, I took it seriously.
14     Q.     It says, you may be PSBA board
15  directors, but you never cease acting under
16  color of state law when making governing
17  decisions as PSBA directors, because you are
18  only PSBA directors as a derivative of being
19  elected public officials in the Commonwealth
20  of Pennsylvania. ` Did you read that at the
21  time?
22     A.     Yes.
23     Q.     Did you contemplate that at
24  the time?

186

1      A.     I did.
2      Q.     Did you seek legal advice
3   about that issue at the time?
4      A.     No.
5      Q.     And he attaches, again, the
6   letter from the ACLU, which we've discussed
7   and you've previously read; correct?
8      A.     Correct.
9      Q.     Again, he attached the
10  preliminary objections that, at some point
11  in time, we may look at today.
12         (Discussion held off the
13         record.)
14             - - -
15         (Whereupon the document was
16         marked, for identification purposes,
17         as Exhibit Number P-241.)
18             - - -
19  BY MR. COHN:
20     Q.     P-241 is the brief in support
21  of the preliminary objections that were
22  filed in November, that miraculously is now
23  printed on both sides of the paper, so we
24  spared half a tree.  And this is going --

187

1   I'm sorry to jump around in time, but this
2   is going back --
3      A.     It's all right.  I'll do my
4   best to keep up with you.
5      Q.     Now, my question to you is:
6   Do you recognize this as the brief in
7   support of the defendant's preliminary
8   objections to PSBA's initial Complaint?
9      A.     Yes.
10     Q.     And this was given to you at
11  some point in time?
12     A.     Correct.
13     Q.     Do you remember at what point
14  in time?
15     A.     No, I'm sorry.  I do not.
16     Q.     As you read the November 26th
17  e-mail that we're talking about right now,
18  which is Exhibit P-240, there is a link to
19  that brief.  Do you remember whether or not
20  you did or did not click on that link
21  because you had already or had not already
22  seen the brief?
23     A.     It might have been that is
24  where I saw it, but I don't know for sure.

188

1   I may have already seen it.
2      Q.     And did you read the brief?
3      A.     Yes.  I -- I will tell you
4   that I scanned the brief.  I did not read it
5   word for word.
6         No, this one is the -- Hold
7   on, hold on, hold on.
8      Q.     This is the November brief.
9      A.     Yes, this one I read word for
10  word.  I'm sorry.
11     Q.     Who did you discuss this brief
12  with, other than Mr. Levin?
13         MR. BROWN:  Or Mr. Heim.
14         THE WITNESS:  Right.  I didn't
15  -- at that -- at this point in time,
16  I think that I -- I think I had a
17  discussion with Nathan just
18  acknowledging the brief and may
19  have -- as I recall, I think I said
20  something -- may have said something
21  about, you know, that I didn't
22  interpret these things the same way
23  that they were interpreted in the
24  brief.

189

1  BY MR. COHN:
2      Q.    Did Mr. Mains ever express to
3  you a personal animus towards Mr. Campbell?
4      A.    **I wouldn't say personal**
5  **animus, no.**
6      Q.    How did Mr. Mains refer to Mr.
7  Campbell when he spoke of him?
8      A.    **Probably frustration, with**
9  **some frustration.**
10     Q.    All right.  So, you read this
11  word for word once when you got it?  That's
12  your testimony?
13     A.    **Yes, sir.**
14     Q.    And this was something that
15  you considered in your future deliberations
16  as to whether or not to discontinue the
17  lawsuit; correct?
18     A.    **That would be correct.**
19     Q.    So, going back to Mr.
20  Campbell's e-mail, which is P-240 --
21     A.    **Yes.**
22     Q.    By the way, have you ever met
23  Mr. Heim?
24     A.    **I don't know.  I don't think**

190

1  **so.**
2      Q.    You ever spoken with him?
3      A.    **Yes.**
4      Q.    You ever spoken with him prior
5  to the commencement of this lawsuit that
6  you're sitting here in?
7      A.    **No.**
8      Q.    I'm talking about the federal
9  lawsuit.
10     A.    **The whole Campbell issue is**
11  **what you're talking about?**
12     Q.    No, I'm trying to draw a
13  distinction between any conversations you
14  may have involved -- that involved Mr. Heim
15  subsequent to February 28th of 2018, and any
16  you may have had that involved him prior to
17  that point in time.
18     A.    **Oh, before the --**
19     Q.    Before the federal lawsuit.
20  There's a lawsuit where PSBA has sued my
21  clients, and then there's this lawsuit --
22     A.    **Right.**
23     Q.    -- where we have sued PSBA and
24  all of the governing board directors, save

191

1  for Mr. Moore?
2      A.    **Correct.  Before this was**
3  **actually filed, I don't recall if he was on**
4  **the phone when we were having our**
5  **discussions in June or not.**
6      Q.    Okay.  Now, go to the next
7  page of that e-mail.  You see the little
8  heading, "More PSBA Retaliation Equals More
9  Liability"?
10     A.    **Yes, I see that.**
11     Q.    It says, "One of my attorneys,
12  Jack Cohn, has cautioned PSBA's retained
13  SLAPP lawyer, David Heim, that everything
14  state actor PSBA says or does in retaliation
15  for my protected constitutional speech is
16  actionable in federal court."  And you read
17  that at the time; right?
18     A.    **Yes.**
19     Q.    And you factored that into
20  your consideration of whether or not to
21  continue the lawsuit?
22     A.    **Yes.**
23     Q.    And did you happen to click on
24  the link in that paragraph about, ACLU's

192

1  past work in this area led to the city of
2  Greensburg paying a $98,000 settlement after
3  that state actor got sued in federal court
4  for First Amendment retaliation following an
5  ill-conceived State Court lawsuit it had
6  initiated?
7      A.    **No, I did not.**
8      Q.    But, to be clear, from July
9  through to the beginning of December, Mr.
10  Campbell was very clear in communicating
11  with you about what would happen if PSBA did
12  not discontinue this lawsuit; correct?
13     A.    **Yes.**
14     Q.    And he was very clear in
15  giving several options for PSBA to
16  discontinue the lawsuit without having to be
17  sued in this lawsuit; correct?
18          MR. BROWN:  Objection, but you
19     can answer.
20          THE WITNESS:  No, I can't
21     answer because I don't know.  When
22     you say several, I'm not sure what
23     you're referring to.
24  BY MR. COHN:

193

1     **Q.**    He wrote and he said, drop the
2  lawsuit and give me an apology, in October.
3  You remember, we looked at that e-mail;
4  right?
5     **A.**    **Yes.  It included money, too,**
6  **I believe.**
7     **Q.**    Then there was another -- We
8  can go back and look at them.
9     **A.**    **No, I trust you.**
10     **Q.**    But the first one was, drop
11  the lawsuit and apologize.
12     **A.**    **Okay.**
13     **Q.**    And then the second one was,
14  drop the lawsuit and apologize, and pay me
15  my legal fees so far.
16     **A.**    **Uh-huh.**
17     **Q.**    And you were aware of that;
18  correct?
19     **A.**    **Yes.**
20     **Q.**    And you considered that in
21  deciding to continue to support the lawsuit;
22  correct?
23     **A.**    **Correct.**
24     **Q.**    And there were letters from me

194

1  to your counsel; correct?
2     **A.**    **Correct.**
3     **Q.**    And there were letters from
4  the ACLU to your counsel; correct?
5     **A.**    **Correct.**
6     **Q.**    And all of this was considered
7  by you in deciding to continue the lawsuit;
8  correct?
9     **A.**    **That is correct.**
10     **Q.**    And below here, below the --
11  two bullets down, it says, "PSBA as state
12  actor."
13     **A.**    **Uh-huh.**
14     **Q.**    And again, Mr. Campbell warns
15  you that PSBA is a state actor; correct?
16     **A.**    **He --**
17     MR. BROWN:  Objection.  You
18    can answer.
19     THE WITNESS:  He -- he makes
20    that claim, but I don't agree with
21    that, so...
22  BY MR. COHN:
23     **Q.**    And he said -- Then he
24  references you to, "Attorney Heim's opinion

195

1  reflects a lack of familiarity with case
2  law."  You see that in the --
3     **A.**    **Yes, I do.**
4     **Q.**    -- first full paragraph?
5     **A.**    **I do.**
6     **Q.**    And did you click on that
7  link?
8     **A.**    **No.**
9     **Q.**    The link would have taken you
10  to the November 2nd letter that we went over
11  earlier, where Mr. Heim just said, "There's
12  no basis for any conclusion that PSBA is a
13  state actor.  You remember looking at that?
14     **A.**    **Yes, I do.**
15     **Q.**    Okay.  Did you ever see
16  anything where there was any basis provided
17  to you for any -- any claim that PSBA was
18  not a state actor, other than the position
19  that Mr. Levin transmitted to me in
20  December?
21     MR. BROWN:  And I'll instruct
22    you not to answer with regard to any
23    discussions you had with Mike or
24    David Heim or another attorney.

196

1     THE WITNESS:  Right.  Could
2    you ask the question again, please?
3  BY MR. COHN:
4     **Q.**    No, we'll get there.  We'll
5  get to it in due -- I withdraw that
6  question, but we'll get to it when we get to
7  -- to Mr. Levin's e-mail to me.
8     And you saw that -- you see,
9  he walks you through a First Amendment
10  retaliation in this -- let -- in this
11  e-mail.  You see that?
12     **A.**    **Yes.**
13     **Q.**    And you read all of that?
14     **A.**    **Yes.  Not the click links, but**
15  **I read the e-mail.**
16     **Q.**    Okay.
17     **A.**    **Again, this is the one I**
18  **scanned.  I had testified earlier that I**
19  **scanned this.**
20     **Q.**    And again, towards the end, he
21  talks about the accusation in the Complaint
22  that he committed two criminal acts.  Do you
23  see that at the bottom of the following
24  page, number three?

197

1    A.      Following page.  Yes, I see
2  that.
3    Q.      Did you do any investigation
4  or inquiry as to the basis for PSBA to
5  accuse Mr. Campbell of being a criminal?
6          MR. BROWN:  I encourage you
7          not to answer as far as your
8          discussions with counsel on that
9          topic.
10         THE WITNESS:  Yes, I can't
11         answer you because that was included
12         in their discussion.
13 BY MR. COHN:
14   Q.      Do you think it's a serious
15 thing to accuse somebody of being a
16 criminal?
17         MR. BROWN:  Objection to the
18         form, but you can answer.
19         THE WITNESS:  Okay.
20         To -- to accuse someone of
21         being a criminal, I think that that
22         would be serious.
23 BY MR. COHN:
24   Q.      You agree with me that it's

198

1  wrong to falsely accuse somebody of being a
2  criminal; correct?
3    A.      It's always wrong to falsely
4  accuse.
5    Q.      Okay.
6    A.      But -- go ahead.
7    Q.      And if somebody knows that
8  there's been a false accusation that that
9  person has made, you think it would be
10 important for that person to correct that
11 false accusation; correct?
12   A.      If there is information that
13 an accusation is false, and they believe
14 that to be accurate, then yes, it should be
15 corrected.
16   Q.      And you think somebody, before
17 they make such an accusation, should take
18 care to investigate whether or not there's
19 truth to that accusation; correct?
20   A.      I think the -- I think that if
21 you have evidence to suggest that there is
22 -- that accusations are made based on the
23 evidence that is before the individual.
24   Q.      Did you ever see the e-mail

199

1  that Mr. Campbell bcc'd Ms. Leader on, that
2  is the supposed basis for the charge that
3  he's a criminal stalker?
4    A.      No.
5    Q.      Do you know that that was also
6  copied to Mr. Mains?
7    A.      No.
8    Q.      Do you know whether or not Mr.
9  Mains did any investigation of the alleged
10 stalker e-mail?
11   A.      I would --
12         MR. BROWN:  Objection.
13         THE WITNESS:  -- have no way
14         to know.
15 BY MR. COHN:
16   Q.      Is it fair to say that this
17 e-mail to the 10 governing board directors
18 of November 26, Exhibit P-240, was the road
19 map of the lawsuit that was filed against
20 you and the other nine directors at PSBA in
21 federal court?
22         MR. BROWN:  Objection to the
23         form.
24         THE WITNESS:  Yeah, I was

200

1          going to say, I have no -- no way to
2          determine whether something is a road
3          map.  I don't know.
4  BY MR. COHN:
5    Q.      Did you read the Complaint
6  that was filed against you?
7    A.      Yes.
8    Q.      Did you read all of it, or you
9  just scanned it?
10   A.      No, that one I read.
11   Q.      Comparing that to this e-mail,
12 do you see similarities?
13   A.      Yes, I see repetition of the
14 allegations.
15   Q.      Do you see he pretty much sued
16 you for exactly what he told you he was
17 going to sue you for; didn't he?
18   A.      Yes.
19   Q.      So November 30th, 2017, I have
20 an e-mail that we're going to mark as
21 Exhibit P --
22         MR. COHN:  P-242, right?
23         (Discussion held off the
24         record.)

1        - - -

2        (Whereupon the document was

3        marked, for identification purposes,

4        as Exhibit Number P-242.)

5        - - -

6        MR. COHN:  The last one was

7    P-241.  This is P-242.  Here's one

8    for you, here's one for me.  You can

9    take this one for now.

10   BY MR. COHN:

11      **Q.**    By the way, at lunch, did you

12  have lunch with your counsel?

13      **A.**   **I did.**

14      **Q.**    Did you discuss the subject

15  matter of this testimony, your testimony

16  here today?

17      **A.**   **No, more my -- Not the subject**

18  **matter, but my demeanor.**

19      MR. BROWN:  Don't discuss what

20  we discussed.

21      THE WITNESS:  Oh, I don't have

22  to discuss -- I always do that.

23  BY MR. COHN:

24      **Q.**    Just to be clear, it is

1  inappropriate to discuss somebody's

2  testimony, other than having -- things

3  having to do with privilege while that

4  witness is under cross-examination, either

5  at trial or during a deposition.

6      MR. BROWN:  I'm aware.

7  BY MR. COHN:

8      **Q.**    All right.  So, here's another

9  e-mail from Mr. Campbell.  And he's sending

10  another Right-to-Know Law request.  Do you

11  see that?

12      **A.**   **Yes, I do.**

13      **Q.**    And do you see what he's

14  asking for?

15      **A.**   **Yes.**

16      **Q.**    Do you know whether or not

17  your school district provided this

18  information?

19      **A.**   **Yes, we did.**

20      **Q.**    In fact, you gave notice to

21  PSBA that this was being provided; correct?

22      **A.**   **That's correct.**

23      **Q.**    And you would have -- and this

24  would have been given to anybody; correct?

1  Anybody that would have asked for this.

2      **A.**   **That would have asked for**

3  **what?  I'm sorry.**

4      **Q.**    For -- for the Nathan Mains

5  October 16 blast e-mail with the live link.

6      **A.**   **If it -- If it was requested**

7  **under Right-to-Know, yes.**

8      - - -

9        (Whereupon the document was

10        marked, for identification purposes,

11        as Exhibit Number P-243.)

12      - - -

13  BY MR. COHN:

14      **Q.**    All right.  243 is a December

15  5, 2017 e-mail from Mr. Campbell to Mr.

16  Fairchild.  Subject:  SLAPPer --

17      MR. COHN:  And, for the

18      record, Brigitte, SLAPP is S-L-A-P-P,

19      all caps, and then a small E-R.

20  BY MR. COHN:

21      **Q.**    PSBA's latest RTKL chaos.

22      And again, my question is,

23  first, whether or not you have seen this

24  e-mail before.

1      **A.**   **Let me read it a moment,**

2  **please.**

3      **(Reading document.)**

4      **Yes, I did see this.**

5      **Q.**    How did it come to you?  Did

6  Mr. Fairchild forward that to you?

7      **A.**   **Yes.**

8      **Q.**    And again, Mr. Campbell is

9  warning that there is a federal lawsuit

10  coming; correct?

11      **A.**   **Correct.**

12      **Q.**    And at this point he is

13  pointing out that PSBA has claimed a common

14  interest privilege with its PSBA school

15  district members; correct?

16      **A.**   **Correct.**

17      **Q.**    Did you ever discuss this

18  issue with Mr. Mains?

19      **A.**   **No.**

20      **Q.**    Do we have an understanding of

21  what a common interest is?

22      **A.**   **Not really.**

23      **Q.**    Did you ever read Mr. -- I'm

24  sorry.  Did you ever click and view the one,

205

1 two, three video?

2     A.    **Can you tell me more about**

3 **what it was -- what it looked like once I**

4 **clicked?**

5     Q.    Sure.  It was a video where

6 Mr. Campbell, as he's wont to do, appears in

7 a video that he makes of himself explaining

8 how the federal lawsuit is going to work,

9 and explaining the elements that he's going

10 to have to make out, and explaining what

11 First Amendment retaliation is.

12     A.    **No, I did not click on that.**

13     Q.    All right.  By the way, I also

14 see he put a link here to the secret wanker

15 meeting page that you said you did view

16 previously; correct?

17     A.    **That is correct.**

18     Q.    Now, is that the video --

19     A.    **I didn't see the whole thing,**

20 **I saw just a part of it.**

21     Q.    Okay.  Is that video one of

22 the things that the Amended Complaint sues

23 Mr. Campbell over?

24     A.    **I don't recall.**

206

1     Q.    Well, that brings us to

2 December 2nd.  Let's mark as P-244 what is

3 represented to us as the minutes of the

4 December 2nd governing board meeting.

5            (Discussion held off the

6       record.)

7            MR. COHN:  We retract P-244.

8            (Discussion held off the

9       record.)

10            - - -

11            (Whereupon the document was

12       marked, for identification purposes,

13       as Exhibit Number P-94.)

14       - - -

15 BY MR. COHN:

16     Q.    Just so you have it in front

17 of you, that's P-94.

18     A.    **Okay.**

19     Q.    And it's still P-94.

20            (Discussion held off the

21       record.)

22 BY MR. COHN:

23     Q.    Do you review the board

24 minutes after a meeting when they come out?

207

1     A.    **Yes.**

2     Q.    Do you recognize this to be

3 the board minutes from the December meeting?

4     A.    **Yes, I do.**

5     Q.    And we decided this was P --

6     A.    **94.**

7     Q.    -- 94.  Now, whenever you guys

8 discuss lawsuit stuff --

9     A.    **Yes.**

10     Q.    Whenever you discuss lawsuit

11 stuff, you do it in an executive session;

12 correct?

13     A.    **That is correct.**

14     Q.    And you do not make minutes of

15 that; correct?

16     A.    **That is correct.**

17     Q.    There's a -- there is a minute

18 made of the fact that there was an executive

19 session; correct?

20     A.    **Correct.**

21     Q.    By the way, there's a

22 reference here, we went over a little bit of

23 it with Mr. Knade about Mr. Mains letting

24 his lobbying registration lapse.  Do you

208

1 remember that?

2     A.    **Yes.**

3     Q.    Do you remember the period of

4 time for which he was an unregistered

5 lobbyist?

6            MR. BROWN:  Objection to the

7       form.

8            THE WITNESS:  I was going to

9       say --

10            MR. COHN:  Basis?

11            MR. BROWN:  I don't know that

12       it's been established that he was an

13       unregistered lobbyist.

14            THE WITNESS:  Yes.  That

15       wasn't -- that's what I was going to

16       say is, that wasn't my understanding.

17 BY MR. COHN:

18     Q.    Okay.  Well, let me ask you a

19 question.  If you get pulled over for not

20 having your registration current and they

21 tow your car away, it's because you have an

22 unregistered vehicle; correct?

23     A.    **I don't know, that never**

24 **happened to me, but...**

209

1      **Q.**      Do you understand there to be
2   a distinction between an unregistered
3   lobbyist in the eyes of the law, who's never
4   signed up to be a lobbyist, as opposed to a
5   lobbyist who once was a lobbyist and then
6   did not maintain the renewal of his lobbying
7   status?
8      **A.      I would say, yes, because my**
9   **understanding is, there was a small gap in**
10  **the time and it was not -- to me, that's not**
11  **the same as never registering.**
12     **Q.**      Do you have any idea what --
13  how long that gap was?
14     **A.      I -- I don't recall.  It was**
15  **shared with me, and I remember my impression**
16  **being, it was a small gap of time.**
17     **Q.**      All right.  So there was an
18  executive session here, in item number three
19  on the first page.
20     **A.      Yes.**
21     **Q.**      A legal issue update.
22     **A.      Correct.**
23     **Q.**      Am I safe in assuming that
24  what occurred there was, a -- among other

210

1   things, a discussion of the lawsuit against
2   my clients?
3             MR. BROWN:  Objection.
4             THE WITNESS:  Am I allowed to
5          --
6   BY MR. COHN:
7      **Q.**      That the subject matter -- was
8   that the subject matter of -- of the
9   executive session?
10     **A.      There were several subject**
11  **matters.**
12     **Q.**      Was that one of them?
13            THE WITNESS:  Am I allowed to
14         answer that?
15            MR. BROWN:  You can answer
16         that, what the subject was, just not
17         what the discussion was.
18            THE WITNESS:  Yes.
19  BY MR. COHN:
20     **Q.**      And, we'll get to it shortly,
21  but on December 8th Mr. Levin sent me a
22  letter that contained a bunch of legal
23  assertions, and made a settlement proposal,
24  which we'll get -- but you remember that was

211

1   transmitted; correct?
2      **A.      I do.**
3      **Q.**      Was that settlement -- Between
4   December 2nd, the board meeting of December
5   2nd, and the transmittal of the settlement
6   letter on December 8th, was there any
7   further deliberation concerning the lawsuit
8   against my clients, within the governing
9   board or with counsel?
10            MR. BROWN:  I would instruct
11         her not to answer what was discussed
12         with counsel.
13            THE WITNESS:  Thank you.
14            MR. COHN:  I'm not asking what
15         was discussed.  I want to know, as --
16         whether the -- I want to know --
17         Let's do it this way.
18  BY MR. COHN:
19     **Q.**      Was the decision to transmit
20  the settlement letter of December 8th made
21  at the executive session of December 2nd?
22            MR. BROWN:  I'm going to
23         instruct her not to answer that.  It
24         still covers the discussions with

212

1   counsel.
2            THE WITNESS:  That's why I was
3         struggling, yeah.
4   BY MR. COHN:
5      **Q.**      Was the December 8th
6   settlement proposal authorized by the
7   governing board?
8      **A.      How do I say this?  The**
9   **governing board -- Clarify what you mean by**
10  **authorized.**
11     **Q.**      Did Mr. Levin have authority
12  to transmit the settlement demand of
13  December 8th to me?
14     **A.      Yes.**
15     **Q.**      Did he have -- Was that
16  authority something that was specifically
17  given to him in December by the governing
18  board?
19     **A.      I'm not -- I'm not sure how to**
20  **answer your question because when you say,**
21  **"specifically given to him", could you**
22  **clarify what you mean?**
23     **Q.**      Well, let's mark this.
24            MR. COHN:  Have we marked this

213

1  before, 114?
2        MR. ERIC ROSENBERG:  I don't
3  believe so.
4              - - -
5        (Whereupon the document was
6        marked, for identification purposes,
7        as Exhibit Number P-114.)
8              - - -
9  BY MR. COHN:
10       Q.     All right.  We're going to
11  mark P-114.
12       (Discussion held off the
13       record.)
14  BY MR. COHN:
15       Q.     Are you familiar with this
16  letter?
17       A.     **Yes.**
18       Q.     Did you see this letter, or a
19  draft of this letter, before it was sent to
20  me?
21       A.     **No.**
22       Q.     Were you provided with this
23  letter at or around the time that it was
24  sent to me?

214

1        A.     **Yes.**
2        Q.     If you will turn to the fourth
3  page.
4        A.     **(Complying with request.)**
5        Q.     There is a settlement
6  framework that is proposed that has 12
7  points.
8        A.     **Uh-huh.**
9        Q.     Do you see that?
10       A.     **I do.**
11       Q.     Did you understand, before
12  this letter was transmitted, that this
13  proposal was going to be made to me?
14       THE WITNESS:  Can I answer
15       that?
16       MR. BROWN:  You can answer if
17       it doesn't depend on what was told to
18       you by counsel.
19       THE WITNESS:  That's what I'm
20       saying.  It was discussed with
21       counsel, so --
22  BY MR. COHN:
23       Q.     Well, was this letter -- were
24  these 11 points, 12 points, unauthorized by

215

1  PSBA?  Did Mike Levin send these to me
2  unauthorized?
3        A.     **No.**
4        Q.     Was this authorized at the
5  level of the governing board?
6        A.     **I'm --**
7        Q.     It was or it wasn't.  I'm not
8  asking you what you told your lawyer or what
9  your lawyer told you.
10       A.     **I know.  I'm -- I'm trying to**
11  **understand, again, the use of the word,**
12  **"authorize" when you say this.**
13       Q.     I was talking about the
14  framework that is being proposed.
15       And let's just be clear here.
16       A.     **Yeah.**
17       Q.     The first several pages of
18  this letter are devoted to -- largely to Mr.
19  Levin's attempt to convince me that PSBA's
20  lawsuit had merit, and to convince me that
21  the position that PSBA was a state actor was
22  not meritorious; correct?
23       A.     **Correct.**
24       MR. BROWN:  I object to the

216

1        characterization.
2  BY MR. COHN:
3        Q.     Is that -- is he telling me
4  anything other than the position that you
5  understood?  I mean, he wasn't giving me a
6  legal position that's different from the
7  legal position that -- that you were
8  understanding, was it?
9        A.     **Right, but here's -- here's --**
10  **if I share with you what -- what --**
11       MR. BROWN:  To the extent --
12       THE WITNESS:  Yeah.
13       MR. BROWN:  -- that your
14       understanding is what was told to you
15       by counsel, you do not have to answer
16       the questions.
17       THE WITNESS:  Okay.  Then I
18       will say to you that I, as a board
19       member, was aware that -- generally.
20  BY MR. COHN:
21       Q.     And to -- to the extent that
22  you had an understanding of the law, this
23  letter is consistent with what you
24  understood the law to be; correct?

217

1  A.  What do you mean?
2  Specifically which law?
3  Q.  The law of defamation, the law
4  of First Amendment, the law of Civil Rights,
5  the law of State Action.
6  A.  Yeah, I don't --
7  MR. BROWN:  I'll object just
8  to the extent that she's not an
9  attorney, but --
10  THE WITNESS:  I was going to
11  say, I don't have good knowledge.
12  MR. BROWN:  -- but you can
13  answer the question.
14  THE WITNESS:  I'm sorry.
15  I did it again.  Sorry,
16  Brigitte.
17  THE WITNESS:  I don't have
18  enough knowledge to make -- make that
19  assertion.
20  BY MR. COHN:
21  Q.  All right.  Well, let's --
22  let's look at this here.
23  A.  Okay.
24  Q.  Point number seven is a

218

1  requirement that Mr. Campbell has to take
2  down contents from his -- from Web sites;
3  correct?  That's one of your demands?
4  A.  That's what we're asking.
5  Q.  Is that still one of your
6  demands, PSBA's demands to resolve this?
7  A.  I can't speak for PSBA.
8  Q.  Is that still a demand that
9  you would be insisting upon, if your voice
10  were to be carried today with PSBA?
11  A.  I -- I believe that the
12  go-forward regarding the image of PSBA would
13  have to be a discussion in the settlement.
14  Q.  So the PSBA parody on Mr.
15  Campbell, or PFUR's Web sites is something
16  that you're still suing over?
17  MR. BROWN:  Objection.
18  Attorney/client privilege.
19  BY MR. COHN:
20  Q.  That PSBA is still suing over,
21  right?
22  A.  I can't speak for PSBA.
23  Q.  Who does speak for PSBA?
24  A.  Collectively, as a governing

219

1  board.  And I think that, individually, I
2  don't have that authority.
3  Q.  All right.  Now, number eight.
4  "Mr. Campbell would not engage in defaming
5  PSBA, its directors, its employees or its
6  attorneys in the future."
7  A.  Uh-huh.
8  Q.  That's a demand of PSBA of my
9  clients; correct?
10  A.  That's what we would be at --
11  that's what we're asking, yes.
12  Q.  And who's -- who's the one
13  that was supposed to decide what's
14  defamation?
15  A.  My expectation was that the
16  attorneys would work that out.
17  Q.  Do you understand the concept
18  of prior restraint?
19  A.  No, I do not.
20  Q.  It says, "Mr. Campbell would
21  not use the Right to Know Act for improper
22  purposes in the future."  That's a demand;
23  correct?
24  A.  Sounds like something that

220

1  would be considered a demand, yes.
2  Q.  And that's a demand that PSBA
3  is making for the benefit of its school
4  district members; correct?
5  A.  Correct.
6  Q.  So, you say -- Number 10, PSBA
7  writes, "We recognize that some of the
8  foregoing requirements requiring the drawing
9  of lines between proper speech and speech
10  that is not protected."  I read that
11  correctly, even though that's not
12  grammatically correct; right?
13  A.  Correct.
14  Q.  "We would be happy to work
15  with you to establish standards for where
16  that line is.  Further, we would be happy to
17  work on procedures for dispute resolution in
18  the event of future disputes."  You see
19  that?
20  A.  I do.
21  Q.  So tell me, in filing the
22  lawsuit, who was the one that decided where
23  these lines exist?
24  MR. BROWN:  Objection.  You

221

1    can answer to the extent that it
2    doesn't involve discussions with
3    counsel.
4            THE WITNESS:  Yes.  All I can
5    say is that, again, it was our
6    expectation that that would be worked
7    out between the attorneys --
8    BY MR. COHN:
9        Q.    But --
10       A.    -- mutually agreeable.
11       Q.    But PSBA sued my clients
12   because they thought -- PSBA determined that
13   my clients had crossed the line with respect
14   to the -- the legal use of Right-to-Know Law
15   requests; right?
16       A.    That is correct, but that's
17   not the only reason for the suit.
18       Q.    Okay.  I understand, but
19   that's a reason; correct?
20       A.    Correct.
21       Q.    Okay.  Now I want to know, who
22   appointed PSBA as the arbiter of where the
23   line is for Right-to-Know Law requests?
24           MR. BROWN:  Objection.

222

1            THE WITNESS:  I don't think we
2    claimed that anybody appointed us to
3    that.  It's regarding this suit.
4    BY MR. COHN:
5        Q.    Okay.  But no Right-to-Know
6    Law requests were made directly of PSBA,
7    were they?
8        A.    No.
9        Q.    Okay.  So is it fair to say
10   then that PSBA was suing in a representative
11   capacity on behalf of its members in trying
12   to sue Mr. Campbell and PFUR for making
13   Right-to-Know Law requests to its members?
14           MR. BROWN:  Objection.
15   BY MR. COHN:
16       Q.    You can answer.
17       A.    I don't -- no.  I think we --
18   I don't think we're suing on behalf of the
19   members.  I think that, you know, that it
20   was based on the go forward idea that, you
21   know, what we would like to see happen going
22   forward.
23       Q.    So you want to control Mr.
24   Campbell's ability to make Right-to-Know Law

223

1    requests.  You want to impose restrictions
2    on those that don't appear in the statute;
3    correct?
4            MR. BROWN:  Objection.
5            THE WITNESS:  I don't think
6    that's what we had in mind.  We did
7    not have that in mind, no.
8    BY MR. COHN:
9        Q.    Well, where in the statute
10   does it say how many Right-to-Know Law
11   requests somebody can make?
12       A.    I don't think it's numbers
13   that were being referenced here.
14       Q.    Oh, it was asking for
15   information of the school districts so they
16   could get it from PSBA, is that what the
17   problem was?
18       A.    No.
19       Q.    It was broader than that?
20       A.    I -- I think that it -- it was
21   not -- it was not broader than that.  It was
22   just different than what you're saying.
23       Q.    Was the problem with -- with
24   the Right-to-Know Law request that Mr.

224

1    Campbell attached links to videos?
2            MR. BROWN:  I'm going to
3    object just to the extent that what
4    was intended appears in the Complaint
5    and the Amended Complaint.
6    BY MR. COHN:
7        Q.    I think we're done with that
8    one.
9            MR. COHN:  And I think we're
10   up to P-245.
11           (Discussion held off the
12   record.)
13              - - -
14           (Whereupon the document was
15   marked, for identification purposes,
16   as Exhibit Number P-245.)
17              - - -
18           (Discussion held off the
19   record.)
20              - - -
21   BY MR. COHN:
22       Q.    This is my e-mail back to Mr.
23   Levin with a copy to Mr. Heim, dated Sunday,
24   December 10th, 2017.

**225**

1    (Discussion held off the
2    record.)
3  BY MR. COHN:
4    Q.    Do you see this e-mail?
5    Not now.  Were you given a
6  copy of this e-mail at around the time that
7  it was sent?
8    A.    **I think -- give me one second**
9  **to just scan it.  I'm trying to trigger my**
10 **memory here.  There are a lot of e-mail.**
11   **Yes, I do remember receiving**
12 **this.**
13   Q.    Now, you say you've read the
14 briefs that have been filed in the federal
15 lawsuit, right?
16   A.    **That is correct.**
17   Q.    The fundamental arguments on
18 state actor are the second, the third and
19 fourth paragraph of this.  Do you see that?
20   A.    **I do.**
21   Q.    They're not fundamentally
22 different from the arguments that we now
23 have in front of Judge Dubois; right?
24   A.    **I --**

**226**

1    MR. BROWN:  Objection.
2    THE WITNESS:  -- disagree.
3  BY MR. COHN:
4    Q.    Anyway, so on the 10th this
5  offer of the 8th was -- was rejected;
6  correct?
7    A.    **I -- On the 10th, this is your**
8  **letter -- you are rejecting it.**
9    Q.    Yes, on behalf of my clients.
10   A.    **Okay.  I just want to make**
11 **sure that --**
12   Q.    Yes, yes, yes.
13   A.    **-- we were speaking the same**
14 **language.  Yes.**
15   Q.    Yes, yes, yes.  I know, we got
16 the Brit here.
17   So I wrote at the end, "If
18 PSBA really wants to die on this hill,
19 that's fine with my clients and I will now
20 sleep soundly at night, having twice given
21 PSBA opportunities to get down off its high
22 horse for far less than the federal
23 defendants and/or their insurers are going
24 to have to pay to resolve this situation

**227**

1  after the federal suit gets underway."  Do
2  you see that?
3    A.    **I do.**
4    Q.    I wrote, "The old saw that
5  when you find yourself in a hole, stop
6  digging is fully applicable to PSBA's
7  predicament.  And the filing of anything
8  other than a with prejudice discontinuance
9  of the state court SLAPP suit tomorrow will
10 only serve to deepen PSBA's hole."  Do you
11 see that?
12   A.    **I do.**
13   Q.    And after inviting somebody
14 else to come talk to me about compensating
15 my clients and paying their attorneys' fees,
16 I said, "Until then, to coin a phrase, see
17 you in court."  That's how I ended this
18 letter; right?
19   A.    **That is correct.**
20   Q.    And you received this letter
21 around the time I sent it; right?
22   A.    **That's correct.**
23   Q.    Did you have any doubt in your
24 mind that I was going to follow through with

**228**

1  my clients in filing a federal lawsuit --
2    A.    **No.**
3    Q.    -- if this case was not
4  dismissed?
5    A.    **No, I had no doubt.**
6    Q.    Okay.  So going back to your
7  straw poll that you referenced, was that
8  taken before or after my letter was sent on
9  the 10th?  My e-mail?
10   A.    **I don't recall.**
11   Q.    Do you remember whether or not
12 it was taken before or after the governing
13 board meeting?
14   A.    **I believe it was taken after**
15 **the governing board meeting.**
16   Q.    Do you remember whether it was
17 taken before or after Mr. Levin sent me the
18 settlement demand letter, which is Exhibit
19 P-114, on Friday, December 8th?
20   A.    **I don't recall.**
21   Q.    Let me see if there's anything
22 in here --
23   MR. COHN:  Are you going to
24 get me the -- the corrected privilege

1  log?
2        MR. BROWN:  I will.
3        MR. COHN:  I'm going to have
4  to reopen these depositions if this
5  is not done quickly.
6        MR. COHN:  All right.  So why
7  don't we do it this way.
8        Have I already marked the
9  privilege log?
10       Exhibit 105.  Here it is.
11  Let's make sure you get a clean one.
12       Did I already mark this?
13       MR. BROWN:  Yes, you did.
14  BY MR. COHN:
15       Q.    P-105, this is the privilege
16  log, such as it is.
17             And why don't you to turn to
18  page 47?  Actually, 48.  And you will see on
19  the 5th there is an e-mail that says, "PSBA
20  guidance to districts."  And I don't know --
21  As far as I know, that's not the accurate re
22  of the e-mail, but there is a December 5
23  e-mail that is showing that it went from Mr.
24  Mains to the governing board, with copies to

1  Mr. Levin and Mr. Heim.  And then there's an
2  e-mail of the 6th that says, re:  Settlement
3  offer, that goes again to the governing
4  board with the same ccs.
5        A.    Uh-huh.
6        Q.    And there's an e-mail that
7  comes in from you on the 6th that says,
8  e-mail re settlement offer.
9             There's an e-mail that comes
10  in from Mr. Faccinetto.  There's an e-mail
11  that comes in from Mr. Voit.  There's an
12  e-mail that comes in from Mr. Hutchinson.
13  There's an e-mail that comes in from Mr.
14  Wolfgang and Ms. Foltz.
15       A.    Uh-huh.
16       Q.    And Mr. O'Keefe on the 7th and
17  Mr. Levin -- I'm sorry.  With this in your
18  view, would I be correct in surmising that a
19  straw poll -- e-mail straw poll was
20  initiated on the 6th by Mr. Mains and
21  responded to by the governing board
22  directors on the 6th and 7th?
23       MR. BROWN:  I'm -- I'm going
24  to instruct her not to answer.  These

1  are covered by attorney/client
2  privilege, whether there was a straw
3  poll or not.
4        MR. COHN:  Well, we know there
5  was a straw poll.  And the fact of it
6  is one thing.  And attorney/client
7  communications and attorney/client
8  things are another thing.  This is a
9  vote on whether to do something.  To
10  vote -- and frankly, we are going to
11  have a big privilege fight at some
12  point, especially if you're going to
13  take this because all of this is at
14  issue.
15       Do you think that that kind of
16  vote is privileged?  Well, Mr. Mains
17  on October 16th said everybody voted
18  in favor unanimously to start this
19  lawsuit.  If that was privileged,
20  this is all at issue now.
21       MR. BROWN:  Well, that was a
22  different vote.
23       MR. COHN:  That doesn't
24  matter.  If you're saying votes are

1  privileged, then you've got a subject
2  matter privilege over here -- problem
3  here.  If you want to say, we're not
4  going to -- I'm not asking for
5  advice.  I'm not asking for if advice
6  was asked.  I have an e-mail that was
7  sent to a governing board, say yay or
8  nay.  Do we make, do we continue a
9  lawsuit?  Do we continue a lawsuit?
10       MR. BROWN:  I see no basis for
11  that.  I don't have this e-mail in
12  front of me.  I don't know if that
13  straw poll that she was mentioning --
14       MR. COHN:  I'm not asking
15  about what's in an e-mail.  I am
16  asking -- she already told me there's
17  a straw poll.  I'm trying to get the
18  date.  Was the straw poll taken on
19  the 6th or the 5th?
20       MR. BROWN:  If you know the
21  date.  I am instructing you not to
22  answer as far as --
23       THE WITNESS:  To be honest
24  with you --

233

1      MR. BROWN:  -- what the e-mail
2  said.
3      THE WITNESS:  -- I do not
4  remember what the date was.  And I
5  don't know for sure.
6  BY MR. COHN:
7      Q.      Did anybody ever communicate
8  the results of the straw poll to you?
9      A.      **I don't recall.**
10      Q.      So the next day the Amended
11  Complaint was filed, on the 11th.
12      A.      **Okay.**
13      Q.      Okay?  We'll go look at the
14  Amended Complaint.  Did you look at the --
15  Were you provided with a draft of the
16  Amended Complaint before it was filed?
17      A.      **No.**
18      Q.      Have you ever seen the Amended
19  Complaint?
20      A.      **I don't know.**
21      Q.      Was the straw poll -- Was
22  there -- was there any dissent to the straw
23  poll?
24      A.      **I wouldn't -- I did not**

234

1  **receive the other -- all of the responses.**
2      Q.      Okay.  So we're looking at
3  P-107, which already is marked.  Here you
4  go.  Here is the Amended Complaint that Mr.
5  Heim caused to be filed in Cumberland County
6  on December 11th.  My question is, whether
7  or not you've ever seen that before.
8      A.      **I read a Complaint.  I don't**
9  **know which one I read, whether I read the**
10  **original or the amended.**
11          **No, actually this one has --**
12  **let me look at this a minute.  Hold on.**
13          **Yes, I do.  I did see this.  I**
14  **did not read it word for word.**
15      Q.      How can you, in your mind,
16  distinguish this one from the original
17  Complaint?
18          That is -- and -- and -- Let
19  me back this up.
20          Now that you see -- that
21  you've seen this one, does that mean you
22  didn't see the other one, or you didn't see
23  that one, or you've seen both of them?
24      A.      **I have seen both of them.**

235

1      Q.      Okay.  The first one you read
2  carefully and this one you scanned?
3      A.      **The first -- yes.  That is**
4  **accurate.**
5      Q.      Did you look at the -- did you
6  happen to notice the last attachment?  The
7  Exhibit I --
8      A.      **Uh-huh.**
9      Q.      -- to this?
10      A.      **I saw it when I was paging**
11  **through here.**
12      Q.      Did you see it at the time?
13      A.      **I don't recall.**
14      Q.      Do you know who these redacted
15  e-mails came from?
16      A.      **No, I do not.**
17      Q.      Did you understand that, in
18  addition to suing for Mr. Campbell and
19  PFUR's communications in the original
20  Complaint, the Amended Complaint is -- was
21  now suing Mr. Campbell for subsequent
22  communications with school districts?
23      A.      **Yes.**
24      Q.      Did you have a discussion

236

1  about that before those allegations were
2  added with anyone?
3      A.      **That would have involved our**
4  **attorney.  So I don't think I can share that**
5  **with you.**
6      Q.      Did you -- did you personally
7  approve of suing Mr. Campbell for his
8  efforts to get school districts to pass
9  objector resolutions?
10      A.      **Could you repeat the question,**
11  **please?**
12      Q.      Did you approve of the
13  decision to sue Mr. Campbell for his efforts
14  to get the school districts to pass objector
15  resolutions?
16          MR. BROWN:  Objection to the
17      form.
18          MR. COHN:  Basis?
19          MR. BROWN:  As far as approve,
20      what do you mean by that?
21          MR. COHN:  You approve.
22          THE WITNESS:  Personally?
23  BY MR. COHN:
24      Q.      Yes.

237

1    A.    Yes.

2    Q.    Yes.  Okay.  Now was it --

3  This wasn't a Right-to-Know-Law request

4  attached here, was it?

5    A.    It says, new Right-to-Know Law

6  request attached.

7    Q.    Okay.  So you're suing him,

8  Mr. Campbell, at this point, for making a

9  Right-to-Know Law request subsequent to July

10  of 2017, PSBA is suing?

11    A.    I don't think -- I guess I

12  would say, the way you phrase the question,

13  I can't say yes because it sounds like we're

14  objecting to that he's making a request.  It

15  was deeper than that, is what I'm saying.

16    Q.    Okay.  So was the content of

17  the e-mail -- we -- we just went through

18  substantially all of the e-mails that were

19  --

20    A.    Uh-huh.

21    Q.    -- sent to you and to your

22  school district subsequent to July 17th, up

23  to December.

24    A.    Yes.

238

1    Q.    And something about the

2  content of those e-mails gave PSBA the basis

3  to assert further claims against Mr.

4  Campbell --

5    A.    Yes.

6    Q.    -- is that what you're telling

7  me?

8    A.    That is what I'm telling you,

9  yes.

10    Q.    Okay.  Can you tell me what?

11    A.    I don't recall.

12    Q.    Was it the secret wanker

13  video?

14    A.    That offended me personally,

15  so that would be one of them.

16    Q.    Okay, so that's one of the

17  bases on which PSBA was suing, was for the

18  secret wanker video?

19    A.    Yes.

20    MR. BROWN:  Objection to the

21    form.  I don't know that that's what

22    she said.

23  BY MR. COHN:

24    Q.    You can answer.

239

1    A.    No, no.  But that would be the

2  type of thing that would be representative

3  of the statement I am making.

4    Q.    .All right, so Mr.Campell

5  doesn't have a First Amendment right to send

6  a parody to the government; correct?

7    MR. BROWN:  Objection to the

8    form.

9    THE WITNESS:  I didn't say

10    that.  I said that I didn't view it

11    as parody.

12  BY MR. COHN:

13    Q.    Are you aware of Mr. Mains

14  reaching out to Mr. Poirier in May of 2017?

15    A.    Who?

16    Q.    Mr. Poirier?

17    A.    I don't know Mr. Faryay.

18  Who's --

19    Q.    Poirier.

20    A.    Oh, Poirier.  Oh, oh --

21    Q.    Do you know who he is?

22    A.    Yes.  I'm sorry.

23    Q.    Yes.

24    A.    I misunderstood what you're

240

1  saying.

2    Q.    Who's he?

3    A.    He is the President of C.M.

4  Regent Insurance Company.

5    Q.    He's the Chairman of the Board

6  -- the President and the Chairman of the

7  Board of C.M. Regent; correct?

8    A.    That is correct.

9    Q.    He's, in fact, the president

10  and CEO of Church Mutual, the parent.

11    A.    That is correct.

12    Q.    Correct?

13    A.    Uh-huh.

14    Q.    So are you aware of his e-mail

15  to Mr. Poirier in -- in May of last year?

16    A.    Concerning what?

17    Q.    Let me get it.  Give me a

18  moment.  Hold on.

19    Yes, P-55.  Did we already

20  mark that?

21    COURT REPORTER:  Yes.

22  BY MR. COHN:

23    Q.    Here we go, P-55.

24    Have you ever seen that e-mail

241

1 before?
2     **A.**    **No.**
3     Q.    Did you ever have any
4 conversation with Mr. Mains about that
5 e-mail?
6     **A.**    **No.**
7     Q.    Have you ever considered the
8 potential impact of PSBA's actions upon C.M.
9 Regent?
10     **A.**    **I am sorry, I don't understand**
11 **the question.**
12     Q.    Have you ever considered the
13 potential impact of PSBA's lawsuit against
14 my clients upon C.M. Regent?
15     **A.**    **No.**
16     Q.    Do you know who insures your
17 home school district for E&O -- errors and
18 omission liability?
19     **A.**    **Yes.**
20     Q.    Who's that?
21     **A.**    **C.M. Regent.**
22     Q.    Do you know how many of the
23 current and former governing board
24 directors' home districts are insured by

242

1 C.M. Regent?
2     **A.**    **I think about a third of them.**
3     Q.    Would it surprise you that a
4 majority of them are represented -- I'm
5 sorry -- insured by C.M. Regent?
6     **A.**    **No, I didn't know that.**
7     (Discussion held off the
8     record.)
9 BY MR. COHN:
10     Q.    Have you spoke with -- spoken
11 with Mr. Poirier about this lawsuit?
12     **A.**    **No.**
13     Q.    Are you aware that a
14 litigation hold demand has been sent to C.M.
15 Regent forwarding a copy of that e-mail?
16     **A.**    **No.**
17     Q.    Do you see the response of Mr.
18 Poirier to the e-mail?
19     **A.**    **No, I did not, nor was -- oh,**
20 **yes, on the top.**
21     Q.    What did he write?
22     **A.**    **Nathan, let us know what we**
23 **need to assist. Thanks for the heads up.**
24     Q.    Are you aware of what

243

1 assistance, if any, C.M. Regent has given to
2 PSBA with respect to the lawsuit against my
3 clients?
4     **A.**    **None that I'm aware of.**
5     Q.    Do you have any idea why Mr.
6 Poirier would be offering to assist PSBA in
7 the lawsuit against my clients?
8     **A.**    **I do not know.**
9     Q.    Looking at Mr. Mains' e-mail,
10 he writes that Mr. Campbell is very angry
11 that PSBA continues to provide our members
12 with advice on how best to approach these
13 requests to stay within the law while
14 granting nothing additional.  Do you see
15 that?
16     **A.**    **I do.**
17     Q.    Is that consistent with your
18 understanding of the advice that PSBA was
19 providing to its school district members?
20     **A.**    **I think that the advice that**
21 **was being provided was to help our districts**
22 **best decide what possible options they have.**
23     Q.    Do you have any reason to
24 disagree with the way that Mr. Mains

244

1 characterizes this to Mr. Poirier?
2     **A.**    **I will finish reading it.**
3 **Sorry, I didn't get through it all.**
4     **(Reading document.)**
5     **Well, having read the rest of**
6 **that e-mail from Nathan to Mr. Poirier, I**
7 **would assume that his reason for -- to your**
8 **previous question, was to make him aware**
9 **that C.M. Regent was being mentioned in**
10 **these e-mails by Mr. Campbell, or in the Web**
11 **site by Mr. Campbell, it looks like.  And so**
12 **that would be, I guess, the reason for the**
13 **e-mail.  And I would suspect that that would**
14 **be the reason.  So -- and Your follow-up**
15 **question was?**
16     Q.    I don't remember if I had a
17 follow-up question.
18     **A.**    **Okay.**
19     Q.    But I'm sorry if I'm asking
20 you two in a row.  That's not fair to me or
21 to you.
22     **A.**    **It's okay.**
23     Q.    Now, the guidances for
24 responding to Right-to-Know Law requests,

1    they come in from time to time from PSBA to
2    the school districts; right?
3        A.    **Correct.  Guidance of all**
4    **kinds.**
5        Q.    And does your home school
6    district rely on those guidances for how
7    they respond to Right-to-Know Law requests?
8        A.    **Not usually.**
9        Q.    Do they rely upon the
10   guidances -- strike that.
11       The -- To be clear, when your
12   -- when your district is responding to
13   Right-to-Know Law requests, if you want
14   legal advice you go to Mr. Fanelli. Correct?
15       A.    **That's correct.**
16       Q.    He's your solicitor; correct?
17       A.    **Correct.**
18       Q.    Ms. Leader is not your
19   attorney; right?
20       A.    **That is correct.**
21       Q.    Mr. Knade is not your
22   attorney, right?
23       A.    **That is correct.**
24       Q.    Has your school board ever

1    taken advantage of the PSBA's offer to hire
2    out Mr. Leader -- I'm sorry, Mr. Knade or
3    Ms. Leader on an hourly basis --
4        A.    **No.**
5        Q.    -- to do legal work?
6        A.    **I'm sorry.  No.**
7        Q.    Are you aware that that
8    occurs?
9        A.    **I know that that is something**
10   **that is available to our membership.**
11       Q.    Did you know that the money
12   that is paid by the hour gets billed by
13   PSBA, paid to be PSBA and retained by PSBA?
14       A.    **I -- Like I said, I don't know**
15   **that personally, but I would assume that**
16   **would occur.**
17       (Discussion held off the
18       record.)
19       - - -
20       (Whereupon the document was
21       marked, for identification purposes,
22       as Exhibit Number 246.)
23       - - -
24   BY MR. COHN

1        Q.    P-246 is an e-mail from me to
2    a number of school solicitors, dated Sunday,
3    May 13th, 2018.  Take your time and review
4    that, please.
5        My first question will be
6    whether or not you've seen that before.
7        A.    **(Reviewing document.)**
8        (Discussion held off the
9        record.)
10       THE WITNESS:  I've never seen
11       this before, to answer your first
12       question.
13   BY MR. COHN:
14       Q.    Okay.  Are you aware of its
15   having been sent to Mr. Fanelli?
16       A.    **No.**
17       Q.    Would you have expected, as
18   the president of the Lewisburg School Board
19   to have been made aware of this e-mail?
20       A.    **No.**
21       Q.    Would you expect that your
22   superintendent would have been made aware of
23   this e-mail?
24       A.    **No, probably not.**

1        Q.    How does your school district
2    handle notices of claim?
3        A.    **Could you specify what you**
4    **mean by that?**
5        Q.    A notice of claim for money
6    damages that might potentially be covered
7    under your general liability or errors or
8    omission liability insurance policy.  Is
9    there a policy for handling such notices of
10   claim?
11       A.    **Not that I'm aware of.**
12       Q.    Are you aware that your errors
13   and -- do you understand what a claims made
14   policy is?
15       A.    **Yes.**
16       Q.    Do you understand what a
17   claims made and reported policy is?
18       A.    **Yes.**
19       Q.    You're on the board of an
20   insurance company; right?
21       A.    **Yes.**
22       Q.    It's important that you know
23   those things; right?
24       A.    **I do.**

1    **Q.**    You're on the board of the
2    Insurance Trust, right?
3    **A.    That's correct.**
4    **Q.**    It's important that you know
5    what those things are; right?
6    **A.    That is correct.**
7    **Q.**    You see the e-mail here for --
8    for Mr. Fanelli?
9    **A.    I do.**
10    **Q.**    Is that the correct e-mail?
11    **A.    Actually, I don't see it.**
12    **Hold on.  Yes, it is.  Yes, it is.  I did**
13    **say that.  I thought I did.  Yes, that**
14    **appears to be correct.**
15    **Q.**    All right.  Do you see the
16    third paragraph from the bottom?  It says,
17    "Thus, to the extent that anyone needs
18    clarification that a claim for monetary
19    damages is being asserted."  Do you see that
20    paragraph?
21    **A.    No, I don't, I'm sorry.**
22    **Q.**    All right.  If you go to the
23    very end of the second page --
24         MR. BROWN:  It's the second

1         page.
2    BY MR. COHN:
3    **Q.**    -- of the second page.
4    **A.    Oh, I'm on the wrong page.**
5    **Q.**    Sorry, I should have been more
6    -- more specific.
7    **A.    The one that begins,**
8    **"Thus"?**
9    **Q.**    Yes.  Do you see that?
10    **A.    Okay.  Yes, I do see it.  Just**
11    **let me know when you turn the page because I**
12    **was still on the other one.**
13    **Q.**    Yes, my bad.
14         Is this the sort of
15    communication that you would expect
16    Lewisburg to forward to its insurance
17    carriers to avoid losing the possibility of
18    coverage?
19    **A.    Well, to be honest with you,**
20    **the way I'm looking at this, I don't see**
21    **anywhere that it mentions a particular --**
22    **school districts.  So -- It looks like a**
23    **general notice out to solicitors.  So I**
24    **would not have expected --**

1    **Q.**    Okay.
2    **A.    -- that we would act on that.**
3    **Q.**    Okay.  "I am writing to you
4    because I understand that each of you is the
5    solicitor for one of the home school
6    districts of the 10 current voting members
7    of PSBA governing board, seven of whom are
8    currently named as individual defendants."
9    Do you see that on the first page?
10    **A.    Yes.**
11    **Q.**    And you see the link to the
12    governing board?
13    **A.    Uh-huh.**
14    **Q.**    If somebody clicked on that
15    they would see who -- who their governing
16    board member would be; right?
17    **A.    I would suspect that would be**
18    **accurate.**
19    **Q.**    You would expect your
20    solicitor to be careful enough to ascertain
21    that; wouldn't you?
22    **A.    I -- I would -- I can't**
23    **presume to know what my solicitor would**
24    **think.**

1    **Q.**    Okay.  But now you're aware of
2    it; right?
3    **A.    Now I am.**
4    **Q.**    And you're aware that you're a
5    defendant.
6    **A.    I am aware.**
7    **Q.**    And you are aware that this is
8    the -- your home district is Lewisburg;
9    correct?
10    **A.    That is correct.**
11    **Q.**    And you're aware that this is
12    the assertion of a claim; correct?
13    **A.    Yes.**
14    **Q.**    And if you know anything, you
15    know that we're not kidding and we don't
16    make false promises, do we?
17         MR. BROWN:  Objection to form.
18         THE WITNESS:  I can't know
19         your mind.
20    BY MR. COHN:
21    **Q.**    Okay.  Has Mr. Campbell said
22    that he was going to do anything that he
23    hasn't done in this case?
24    **A.    I would have to review, but**

253

1 I've no reason to doubt that this would
2 occur, if that's where you're getting at.
3     Q.    Okay.  That's what I'm getting
4 at.
5     And nobody has made you aware
6 of this; correct?
7     A.    **Of what?**
8     Q.    Of this e-mail.
9     A.    **I have not seen this e-mail,**
10 **no.**
11     Q.    You know this e-mail was
12 forwarded by one of these recipients to Mr.
13 Levin's firm; don't you?
14     A.    **No, I did not know that.**
15     Q.    You would have liked to have
16 known that, wouldn't you?
17     MR. BROWN:  Objection to form.
18     THE WITNESS:  No.
19     MR. COHN:  All right.  Why
20 don't we take a break.  It might be a
21 little longer, but I want to get
22 myself together and see what else I
23 need to cover.  And it will go faster
24 If I take a little more time.  And

254

1 right now it's about -- It's about 10
2 past two.  I'd like to have you out
3 the door certainly well in advance of
4 three o'clock, if we can, so you
5 could --
6     THE WITNESS:  I appreciate
7 that, so I can get to the
8 baccalaureate.  That would be
9 excellent.  Thank you.
10     VIDEO TECHNICIAN:  The time is
11 2:10 p.m. We're now off the video
12 record.  This ends media unit number
13 three.
14     (Whereupon there was a recess
15 in the proceeding.)
16     VIDEO TECHNICIAN:  The time is
17 now 2:27 p.m.  We're back on the
18 video record.  This begins media unit
19 number four.
20     - - -
21     (Whereupon the document was
22 marked, for identification purposes,
23 as Exhibit Number P-214.)
24     - - -

255

1 BY MR. COHN:
2     Q.    P-214 is a letter I'd like you
3 to -- it's the e-mail we just looked at that
4 was forwarded to Mr. Poirier on the 23rd of
5 May.
6     A.    **Should I keep going or just**
7 **the first page right now?**
8     Q.    No, just the first page.
9 What's attached is what we just went over in
10 the prior exhibit.
11     A.    **Oh, okay.**
12     Q.    Have you ever seen this e-mail
13 before?
14     A.    **No, sir.**
15     Q.    How often does the C.M. Regent
16 board meet?
17     A.    **Four times a year.**
18     Q.    When's your next meeting?
19     A.    **We just had one last Thursday.**
20     Q.    Mr. Poirier did not bring this
21 situation to your attention?
22     A.    **No, sir.**
23     Q.    Do you understand -- You
24 understand that you have the ability, at

256

1 least the board collectively has the ability
2 to prevent the E&O carrier from PSBA from
3 settling this case, yes?
4     A.    **I'm not sure by what means we**
5 **have to prevent --**
6     Q.    Are you familiar with consent
7 to settle provisions?
8     A.    **No.**
9     Q.    Okay.  Well, we'll represent
10 to you that the E&O policy for PSBA has a
11 consent to settle provision pursuant to
12 which the board can refuse to consent to a
13 settlement to be funded by its insurance
14 company, by AIG.  The E&O insurer.
15     A.    **Uh-huh.**
16     Q.    And my understanding -- you
17 were not aware of that?
18     A.    **No.**
19     Q.    Okay.  Well, so, Is it then
20 that you did not appreciate that when Mr.
21 Levin told me there's no -- there's going to
22 be no consent to any monetary settlement,
23 that he was, in effect, telling AIG it can't
24 pay to settle the monetary claims against

257

1 PSBA?  You didn't understand --
2 **A.      I have no --**
3         MR. BROWN:  Objection to form.
4         THE WITNESS:  I have no
5     understanding of the legal aspects of
6     what you're discussing.
7 BY MR. COHN:
8 **Q.      Okay.  Do you understand that**
9 your refusal to consent to settlement
10 handcuffs PSBA's errors and omissions
11 insurer from paying money to my clients to
12 get you out of this lawsuit?
13 **A.      Yes.**
14 **Q.      Okay.  It's the same for the**
15 others.  Do you understand the nature of the
16 E&O policy that covers your home school
17 district?
18 **A.      To what extent?**
19 **Q.      Do you know that it does not**
20 contain a consent to settlement clause?
21 **A.      No, I did not.**
22 **Q.      Do you understand that it has**
23 a $25,000 self-insured retention?
24 **A.      I do know that.**

258

1 **Q.      And do you understand that**
2 PSBA's policy has a $25,000 self-insured
3 retention?
4 **A.      I did not know that.**
5 **Q.      Do you understand that it's my**
6 client's intention, if this goes through to
7 the injunction phase, and we get an
8 injunction, and then proceeds to the damages
9 phase, to amend the Complaint to add your
10 home school district as a defendant to seek
11 to recover money from your home school
12 district?
13         MR. BROWN:  Objection to the
14     form, but you can answer.
15         THE WITNESS:  You've made me
16     aware of that today.
17 BY MR. COHN:
18 **Q.      Do you perceive the conflict**
19 of interest inherent in your position?
20 **A.      No.**
21         MR. BROWN:  Objection to the
22     form.
23 BY MR. COHN:
24 **Q.      So we previously marked as**

259

1 P-239, the brief that was filed by my
2 clients on December 22, 2017 in support of
3 their preliminary injunction -- objections
4 to the Amended Complaint of PSBA.  And
5 you've started to look at that.  Now I hand
6 that to you again.
7 **A.      Okay.**
8 **Q.      And my first question is**
9 whether or not you've ever seen this?
10 **A.      Yes.**
11 **Q.      Was it provided to you at**
12 around the time it was filed?
13 **A.      Which was?**
14 **Q.      December 22nd.  We wasted no**
15 time.
16 **A.      I believe so.**
17 **Q.      Did you review it at the time?**
18 **A.      I don't recall.  I have seen**
19 **it and I have reviewed it, but I don't**
20 **recall the timeline as to how close to that**
21 **moment that I did.**
22 **Q.      Was there any further**
23 discussion between you and anybody at PSBA
24 about whether or not to continue the lawsuit

260

1 in light of the newly filled preliminary
2 objections in December?
3         MR. BROWN:  I'll instruct you
4     not to answer it if there were
5     discussions with counsel on that
6     topic.
7         THE WITNESS:  Any discussion
8     regarding that would have been with
9     counsel, so I'll decline.
10 BY MR. COHN:
11 **Q.      Following this, was there any**
12 consideration of directing Mr. Heim not to
13 file an opposition to the preliminary
14 objections to the Amended Complaint?
15 **A.      By -- by who?**
16         MR. BROWN:  Objection.
17 BY MR. COHN:
18 **Q.      By PSBA.**
19 **A.      I can't speak for PSBA, but I**
20 **can say that I'm not aware of a discussion.**
21 **Q.      Are you aware of any**
22 discussion -- Sorry.
23         No discussions at all, that
24 you're aware of, other than --

261

1        A.     **Not that I can recall.**

2        Q.     Okay.  After the straw vote

3   you referenced, has there been any other --

4   from that point forward, any other straw

5   vote or any other poll of the governing

6   board to ascertain whether or not they

7   wanted to continue to proceed with the

8   underlying action?

9              MR. BROWN:  Again, to the

10             extent that there were discussions

11             with the counsel --

12             THE WITNESS:  I was going to

13             say, I'm trying -- yeah.

14             MR. BROWN:  -- I instruct you

15             not to answer.

16             THE WITNESS:  Yeah, any -- any

17             discussion would have been with

18             counsel.  I'm trying to think if

19             there was anything without.  And I

20             can't recall any.

21   BY MR. COHN:

22       Q.     Were there discussions with

23   counsel?

24       A.     **I am -- I'm trying to recall.**

262

1   **There would have been if we discussed that**

2   **matter, but I don't recall specifically if**

3   **we did.**

4        Q.     Well, there are responses to

5   Requests for Admission that claim that at

6   least as of April the matter of continuing

7   the lawsuit had not been brought up for

8   consideration by the board.  Is that -- Are

9   those responses accurate?

10       A.     **Yes.**

11       Q.     When's your next board

12   meeting?

13       A.     **It's in -- well, we have a --**

14   **a phone conference in June.**

15       Q.     Do you have an understanding

16   of how punitive damages work?

17       A.     **Not in depth understanding.**

18       Q.     Do you have an understanding

19   that they're not indemnifiable by insurance

20   companies under Pennsylvania law?

21       A.     **No.**

22       Q.     Do you have an understanding

23   of -- that they are not indemnifiable by a

24   not for profit corporation under

263

1   Pennsylvania law?

2        A.     **I don't even know what that**

3   **means, what you're saying.**

4        Q.     I'm suggesting to you that if

5   punitive damages are awarded against you,

6   you're going to have to pay them from your

7   own family's assets, and nobody can pay you

8   back, as a matter of Pennsylvania public

9   policy.  Has anybody ever suggested to you

10   that that might be the case?

11             MR. BROWN:  Again, I'll

12             instruct you not to answer to the

13             extent it was discussed with you with

14             counsel.

15             THE WITNESS:  Yes it was.

16   BY MR. COHN:

17       Q.     Have you ever considered that

18   by taking the legal position that PSBA is

19   not a government actor, not a state actor?

20   That you may be forfeiting an argument for

21   qualified immunity personally?

22             MR. BROWN:  Objection.

23             THE WITNESS:  I have not

24             considered that.

264

1              MR. COHN:  I think I have no

2   further questions.  Unless you have a

3   cross-examination, I think we should

4   set Ms. Swope free to be on her way

5   back to Lewisburg.

6              MR. BROWN:  I have no

7   questions for Ms. Swope at this time.

8              VIDEO TECHNICIAN:  The time is

9   now 2:36 p.m.  We are off the video

10   record.  This ends media unit number

11   four in today's deposition.  Thank

12   you.

13             -  -  -

14             (Witness excused.)

15             -  -  -

16             (Deposition concluded at

17   2:36 p.m.)

18

19

20

21

22

23

24

C E R T I F I C A T E

      I do hereby certify that I am a
Notary Public in good standing, that the
aforesaid testimony was taken before me,
pursuant to notice, at the time and place
indicated; that said deponent was by me duly
sworn to tell the truth, the whole truth,
and nothing but the truth; that the
testimony of said deponent was correctly
recorded in machine shorthand by me and
thereafter transcribed under my supervision
with computer-aided transcription; that the
deposition is a true and correct record of
the testimony given by the witness; and that
I am neither of counsel nor kin to any party
in said action, nor interested in the
outcome thereof.

      WITNESS my hand and official seal
this 14th day of June, 2018.




            <%signature%>
            _____
            Notary Public

---

- - - - -

E R R A T A

- - - - -

PAGE   LINE    CHANGE

___ ___ ___ _____

Reason for Change:

_____

___ ___ ___ _____

Reason for Change:

_____

___ ___ ___ _____

Reason for Change:

_____

___ ___ ___ _____

Reason for Change:

_____

___ ___ ___ _____

Reason for Change:

_____

___ ___ ___ _____

Reason for Change:

_____

---

INSTRUCTIONS TO WITNESS


      Please read your deposition over

carefully and make any necessary

corrections.  You should state the reason in

the appropriate space on the errata sheet

for any corrections that are made.

      After doing so, please sign the

errata sheet and date it.

      You are signing same subject to the

changes you have noted on the errata sheet,

which will be attached to your deposition.

      It is imperative that you return the

original errata sheet to the deposing

attorney within thirty (30) days of receipt

of the deposition transcript by you.  If you

fail to do so, the deposition transcript may

be deemed to be accurate and may be used in

court.

---

ACKNOWLEDGMENT OF DEPONENT

      I, _____, do

hereby certify that I have read the

foregoing pages ___ to ___ and that the same

is a correct transcription of the answers

given by me to the questions therein

propounded, except for the corrections or

changes in form or substance, if any, noted

in the attached Errata Sheet.


_____       _____

DATE             SIGNATURE


      Subscribed and sworn to before

me this

_____ day of _____, 2018.


      My commission expires:

      _____


      _____

      Notary Public