**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| SIMON CAMPBELL, and PENNSYLVANIANS FOR UNION REFORM, | CIVIL ACTION |
| Plaintiffs, | |
| v. | NO. 18-892 |
| PENNSYLVANIA SCHOOL BOARDS ASSOCIATION, MICHAEL FACCINETTO, DAVID HUTCHINSON, OTTO W. VOIT, III, KATHY SWOPE, LAWRENCE FEINBERG, ERIC WOLFGANG, DANIEL O'KEEFE, DARRYL SCHAFER, THOMAS KEREK, and LYNN FOLTZ, in their individual capacities, | |
| Defendants. | |

**DuBois, J.**                                        **August 23, 2018**

## M E M O R A N D U M

### I.       INTRODUCTION

In this suit arising under 42 U.S.C. § 1983, plaintiffs allege that a tort suit filed by

defendant Pennsylvania School Boards Association ("PSBA") in the Court of Common Pleas of

Cumberland County, Pennsylvania ("state suit") retaliates against plaintiffs for the exercise of

their First Amendment rights of free expression and to petition the government.  The state suit

alleges that certain commentary and lobbying by plaintiffs constitute defamation, abuse of

process, and tortious interference with contract.  Presently before the Court is defendants'

Motion for Summary Judgment.  Because defendants have shown that they are entitled to judgment as a matter of law, defendants' Motion is granted.

## II.    BACKGROUND

The undisputed material facts in the record before the Court, taken in the light most favorable to plaintiffs, may be summarized as follows:

### A.  The Parties

Plaintiff Simon Campbell is a resident of Bucks County, Pennsylvania, and a naturalized citizen of the United States, originally from the United Kingdom.  Plts.' Resp. Statement Undisp. Facts ¶ 1, Doc. No. 49 [hereinafter Undisp. Facts].  In "approximately" 2013, Campbell founded plaintiff Pennsylvanians for Union Reform ("PFUR"), a non-profit advocacy group that "seeks to eliminate compulsory unionism in Pennsylvania while promoting transparency and efficiency in government for taxpayers."  *Id.* ¶¶ 2, 4.  Campbell and PFUR conduct their advocacy work through a number of channels, including the filing of requests under Pennsylvania's Right to Know Law ("RTKL requests"), 65 Penn. Stat. §§ 67.101 *et seq.*, lobbying government officials directly, and the maintenance of an official PFUR website at the URL www.paunionreform.org. *E.g.*, *id.* ¶¶ 3, 41, 94-95, 133, 164.  At the times relevant to this case, Campbell also maintained a website at www.psbahorror.com, paid for with his personal funds.  Jt. Stip. ¶ 140.

Defendant Pennsylvania School Boards Association ("PSBA") is a non-profit association of public school boards, incorporated under the laws of Pennsylvania.  Undisp. Facts ¶ 4; Joint Stipulation Facts & Evidence ¶ 66, Doc. No. 50 [hereinafter Jt. Stip.].  The individual defendants in this case were the ten voting members of the Governing Board of PSBA ("Board") at all relevant times, including the time when the Board unanimously voted to authorize the state suit against plaintiffs.  Undisp. Facts ¶ 125.  Seven of the individual defendants remain on the Board

and collectively constitute a quorum of the Board, capable of discontinuing the state suit. Jt. Stip. ¶¶ 16-19.

### B.  Structure of PSBA

The structure and mission of PSBA and its relationship to the state are central to this case.  As noted above, PSBA is an association of public school districts in Pennsylvania that "exists to further the interests of public education and to provide assistance to public school entities that are members of PSBA."  Jt. Stip. ¶ 84.  PSBA's membership consists entirely of "public school districts, Intermediate Units, career and technical schools, state-supported colleges and universities, and such other statutorily-created public education entities" ("Public School Entities").  Jt. Stip. ¶ 69.  The "overwhelming majority" of Pennsylvania public school districts are members of PSBA.  Jt. Stip. ¶¶ 69.  Membership in PSBA is expressly authorized by statute, 24 Penn. Conn. Stat. § 5-516, and Public School Entities may elect to join PSBA only "pursuant to a vote of the entity's governing board" at a public meeting.  Jt. Stip. ¶¶ 70, 86, 90.

Once the governing board of a Public School Entity elects to join PSBA, the entity itself becomes a member of PSBA.  *See* Jt. Stip. ¶¶ 66, 86.  "Derivative membership" is, in turn, "bestowed" on "the elected or appointed directors of such entity and upon certain other officials of that entity."  Jt. Stip. ¶ 86.  Votes for members of the Governing Board of PSBA are cast by each Public School Entity, as determined by "a majority vote of each member entity taken at an official public meeting of such member entity."  Jt. Stip. ¶ 87.  Other matters before PSBA's membership, including approval of its legislative platform, are voted on by an annual Delegate Assembly, comprised of delegates appointed by each member's respective governing board. Bylaws of the Pennsylvania School Boards Association, Inc. art. VIII, §§ 1-2, 4 (Oct. 20, 2017),

Exs. P-99, D-36.  Delegates must be derivative members of PSBA—that is, school board officials or the non-voting secretary of a school board.  *Id.* art. VIII, § 2; art. I, § 2.

PSBA's Board consists of ten voting directors, who "must be elected, currently-serving members of the board of a member government entity that itself is a member in good standing of PSBA," along with one non-voting member.  Jt. Stip. ¶ 87.  As noted above, the members of PSBA's Board are elected by votes cast by PSBA's Public School Entity members.  *Id.*  With the exception of the President Elect, President, and Immediate Past President of the Board, the eligibility of a derivate member to serve on the PSBA Board is "contingent" on the derivative member's continued service on the board of a Public School entity.  *Id.*  Without exception, all Board members' respective Public School Entities must continue to be members of PSBA in good standing.  *Id.*¶ 89.  If a Board member or his or her respective Public School Entity fails to meet these requirements, he or she is automatically removed from the PSBA Board.  *Id.* ¶¶ 88-89.

### C.  Membership in PSBA

An entity's PSBA membership is contingent on payment of a membership fee—and approval of that payment by the entity's governing board—every year.  Undisp. Facts. ¶ 104; Jt. Stip. ¶¶ 90, 136.  Membership in PSBA is voluntary and Public School Entities may withdraw at any time.  Undisp. Facts ¶ 19.  The "majority of PSBA's revenues" derive from membership dues and fees "paid for optional services and goods."  Jt. Stip. ¶¶ 71, 105.

In exchange for membership fees, PSBA provides certain services to its members, including "[l]egal advocacy in the name of PSBA on issues of statewide importance to public schools" and "[l]egislative advocacy for all public schools, other than charter schools."  Undisp. Facts ¶¶ 102, 105; *see also* Jt. Stip. ¶¶ 84-85.  "An essential component of PSBA's purpose is advocating the interests of public education in helping to shape law and education policy in front

of the legislature, administrative agencies and the courts.  PSBA's judicial advocacy is one of the benefits that PSBA provides to its government entity members for the price of such entities' membership."  Jt. Stip. ¶ 85

In addition to its judicial and legislative advocacy, PSBA provides its members with a number of publications, a searchable grant database, "legal links and resources," webinars, access to online training, and access to a "Career Gateway job posting site."  Undisp. Facts ¶ 105.  PSBA also provides its members with "assistance in the development of school policies," "personnel recruiting assistance," and assistance in employee relations.  Jt. Stip. ¶ 77.  Additional services are available to members for additional fees, including executive search services, "[b]oard policy services," and a "School Law and arbitration newsletter."  Undisp. Facts ¶ 106.

### D.  Plaintiffs' Underlying Activities

PSBA's mission and relationship with Pennsylvania public schools were the focus of plaintiffs' activity beginning in March 2017, when plaintiffs sent an RTKL request to "most, if not all, public school agencies" in the state.  Undisp. Facts ¶ 136.  In the request, plaintiffs sought, *inter alia*, the contact information for certain school district employees and for the representatives of public employee unions.  Verif. Compl. ex. 1.  On March 28, 2017, PSBA staff attorney Emily Leader sent an email to the Public School Entity members of PSBA regarding plaintiffs' RTKL request.  Undisp. Facts ¶ 138; Verif. Compl. ex. 1.  In the email, Leader advised the PSBA members to provide certain information such as publicly available contact information for receiving RTKL requests, the names of union presidents, and copies of collective bargaining agreements.  Verif. Compl. ex. 1.  Leader concluded, however, that employee email addresses that were not publicly published were not public records subject to the Right to Know Law.  *Id.*

On April 14, 2017, another PSBA staff attorney, Stuart Knade, sent a follow-up email to the members of PSBA, providing further "guidance" in responding to the request. Undisp. Facts ¶ 141; Jt. Stip. ¶ 3; Verif. Compl. ex. 2. In the email, Knade advised PSBA's members, *inter alia*, that the Right to Know Law required them to do no more than make the requested documents "available for pick up at the district offices." Verif. Compl. ex. 2 at 5. Knade noted, however, that his assessment was contrary to "early decisions" by Pennsylvania's Office of Open Records and that "anyone choosing to take [this] position . . . must be prepared to litigate this through at least the Commonwealth Court and possibly the Pennsylvania Supreme Court." *Id.* Knade also noted that the production of certain information was subject to a balancing test articulated by the Pennsylvania Supreme Court to protect the privacy interests of public employees. *Id.*

On April 25, 2017, Michael Levin, outside general counsel for PSBA, provided plaintiffs with a copy of PSBA's 2014 federal tax return via email, pursuant to a separate federal records request filed by plaintiffs. Defs.' Resp. to Pls.' St. Suppl. Mat. Facts ¶ 49, Doc. No. 56-1 [hereinafter Defs.' Resp.]. Campbell responded to Levin in a series of email on April 28, 2017, with other individuals copied, stating, in part, that Levin was serving in a "conflict-riddled role" because he served as counsel for both PSBA and some of its entity members. *Id.* ¶¶ 50, 82; Ex. P-476, exs. A-B. Campbell also stated that PSBA "has caused a disgraceful abuse of government resources by advising school solicitors that they may withhold their work email addresses under the RTKL," referring to Leader and Knade's earlier emails. Defs.' Resp. ¶ 50; Ex. P-476, exs. A-B. Plaintiffs eventually posted copies of Leader and Knade's emails to PFUR's website on a page titled "PSBA Horror." *See* Undisp. Facts ¶ 165; Exs. P-103-A, P-504.

On May 8, 2017, Campbell sent a second RTKL request "to approximately 600 members statewide." Undisp. Facts ¶ 142. Each of the 600 RTKL requests contained twenty-seven separate "items." Verif. Compl. ex. 5. A number of those items sought documents related to PSBA and its activities, including "[e]xtracted computerized information" detailing specific expenditures by PSBA. Verif. Compl. ex. 5, items 15-21. In addition to the requests regarding PSBA, the May 8, 2017, RTKL request stated, "I call upon elected school officials to terminate the taxpayers forced relationship with PSBA. Revoke PSBA membership. . . . Stop making taxpayers fund the salaries and . . . pensions of a private corporation's employees." Undisp. Facts ¶ 144. The request also included a link to a thirty-three minute video of Campbell, "ostensibly to aid school districts and their solicitors in responding to his requests." Undisp. Facts ¶ 147. After receiving plaintiffs' May 8, 2017, RTKL request, "more than 240 school districts" contacted PSBA for documents sought in the request. Undisp. Facts ¶ 149; Jt. Stip. ¶ 79.

On May 16, 2017, Levin provided PSBA's members with guidance regarding plaintiffs' May 8, 2017, RTKL request. Doc. No. 71 at 24. Levin advised the Public School Entities to produce some of the requested information such as evidence that the entity "is not a member" of PSBA, while other information was subject to a balancing test to protect the privacy interests of public employees. Ex. P-44 at 6-7. Levin further advised its members that it would not respond to plaintiffs' requests for "[e]xtracted computerized information" because its services were not "nonancillary core governmental functions" as required by the RTKL. *Id.* at 12. PSBA ultimately declined to provide those documents. Undisp. Facts. ¶ 151.

Plaintiffs eventually obtained a copy of Knade's April 14, 2017, email in which he advised PSBA's members that they needed only to make the requested documents available at

the "district offices" for "pickup." Defs.' Resp. ¶ 67. In response, plaintiffs posted a photo of PSBA Executive Director Nathan Mains to the paunionreform.org website on a page titled "PSBA Horror" with a word bubble stating, "Taxpayers, thanks for the $226,000 and the public pension! Now **** off, and drive to the school district if you want public records. And don't forget your check book." Jt. Stip. ¶ 120; Exs. P-103-A, P-519 (alterations in original). Mains does, in fact, receive a salary of at least $226,000 and participates in Pennsylvania's Public School Employees Retirement System ("PSERS"), a government pension program. Defs.' Resp. ¶ 84; Jt. Stip. ¶ 72.

In response, Levin sent Campbell a letter dated May 12, 2017, demanding that Campbell remove the image of Mains. Jt. Stip. ¶ 44; Verif. Compl. ex. 7. Campbell complied, but replaced the image with an image of the letters "PSBA" and a word bubble stating, "Taxpayers, thanks for the $226,000 for our Executive Director Nathan Mains. And thanks for the public pensions too. Now *%$&@ off, and drive to the school district if you want public records under the Right to Know Law!" Jt. Stip. ¶ 45; Ex. P-504 (alterations in original). Beneath the letters "PSBA," the image stated, "Public salaries, intimidation tactics, and much more." Ex. P-504.

PFUR's website included other statements regarding PSBA. In one video posted to the website, Campbell described the RTKL requests sent to Public School Entities as "pertain[ing] to whether or not the school boards association is in fact a school boards association versus an association of individual people that show up, drink some wine at the cocktail party, and vote on things in their individual capacities." Jt. Stip. ¶ 52.

Campbell also posted images regarding PSBA on his personal website at www.psbahorror.com. For example, Campbell posted a second photo of Mains with a word bubble stating, "Hey school children, **** the Constitution! **** the bill of rights." Defs.'

Resp. ¶ 70 (alterations in original); Ex. P-505.  Likewise, in response to a separate RTKL request, Campbell received a letter dated November 13, 2017, from the Pennsylvania Department of Transportation ("PennDOT") stating that it had records responsive to plaintiffs' request for documents "as to whether employees of PSBA, or members of PSERS, are entitled to be exempt from fees" for registering vehicles.  Defs.' Resp. ¶ 87; Ex. P-458.  In its letter, however, PennDOT denied plaintiffs' request on the ground that PennDOT had its own "statutory and regulatory scheme for" obtaining "motor vehicles records."  Ex. P-458 at 2.  The record does not reveal whether PSBA employees were exempted from payment of registration fees.  Undisp. Facts ¶¶ 120-21.  Campbell subsequently posted a stock image of vehicles with the caption "Freebie State Government Auto Tags for PSBA!"  Defs.' Resp. ¶ 82.

### E.  The State Suit

Based on plaintiffs' conduct, the PSBA Board—comprised of the individual defendants—voted unanimously on June 12, 2017, to authorize a suit against plaintiffs.  Undisp. Facts ¶ 162; Jt. Stip. ¶¶ 9, 11; Defs.' Resp. ¶ 74.  Pursuant to that vote, PSBA filed suit on June 17, 2017, in the Court of Common Pleas of Cumberland County, Pennsylvania, setting forth counts against plaintiffs for defamation, tortious interference with contractual relations, and abuse of process.  Jt. Stip. ¶¶ 7-8; Ex. P-106, P-473.  That same day, Mains sent an email to the Public School Entity members of PSBA, announcing the filing of the state suit.  Jt. Stip. ¶¶ 54, 95; Verif. Compl. ex. 10.  In the email, Mains stated that Campbell's "perver[sion] of the intent of the Right to Know Law" and "his continued defamation of PSBA . . . has caused substantial damages to the association's reputation."  Verif Compl. ex. 10.  Michael Faccinetto, the President of PSBA at the time the state suit was filed, testified that the state suit was meant to "stop" Campbell from "harassing districts with . . . unreasonable request[s] [and] to stop

defaming members of the organization." Dep. Michael Faccinetto 79:1-9, Ex. P-511. Following the filing of the state suit, counsel for defendants sent plaintiffs a "Litigation Hold Notice" dated July 19, 2017. Jt. Stip. ¶ 55; Verif. Compl. ex. 11.

On October 16, 2017, Mains sent an email to "over 4,500 'school directors, chief school administrators, school solicitors and board secretaries'" linking to an "unsigned, unfiled copy" of the complaint in the state suit. Jt. Stip. ¶ 57; Verif. Compl. ex. 12. PSBA filed an Amended Complaint in the state suit on December 11, 2017. Jt. Stip. ¶ 14; Ex. P-476.

### F. Proceedings in this Court

Plaintiffs filed suit in this Court on February 28, 2018, alleging that PSBA's state suit, the announcement of that suit, the issuance of the litigation hold notice, and the filing of the Amended Complaint were in retaliation for plaintiffs' exercise of their First Amendment rights of free expression and to petition the government for redress. *Id.* ¶¶ 53-59. Plaintiff's Verified Complaint filed in this Court contains two counts of First Amendment retaliation under 42 U.S.C. § 1983, the first for injunctive relief and the second for compensatory and punitive damages. Pursuant to the Court's Order dated April 13, 2018, plaintiffs filed a Motion for Entry of a Permanent Injunction on April 20, 2018, and a Hearing on that Motion was scheduled for July 23, 2018 ("Hearing on Injunctive Relief"). In that same Order, the Court directed the parties to conduct discovery in two phases; phase one was to "cover all discovery related to injunctive relief" and was to be complete by June 1, 2018. Because entry of a permanent injunction requires plaintiffs to succeed on the merits of their claims, *Coffelt v. Fawkes*, 765 F.3d 197, 201 (3d Cir. 2014), phase one of discovery included all discovery on liability.

By Order dated June 19, 2018, the Court denied defendants' Motion[s] to Dismiss Complaint and/or Strike Impertinent and Scandalous Language. Defendants filed their Motion

for Summary Judgment on June 29, 2018.  Due to issues unrelated to defendants' Motion for Summary Judgment, the Hearing on Injunctive Relief was continued to August 6, 2018, by Order dated July 9, 2018.

After receiving plaintiffs' Brief in Opposition to Defendants' Motion for Summary Judgment and defendants' Reply Brief in Support of Defendants' Motion for Summary Judgment, the Court conducted a Final Pre-Trial Conference with the parties on July 26, 2018. During the Conference, the Court discussed, *inter alia*, defendants' Motion for Summary Judgment.  The parties agreed that the record before the Court was complete with respect to issues of liability and that any ruling by the Court in favor of plaintiffs that the state suit was objectively (or subjectively) baseless under the *Noerr-Pennington* doctrine, *infra*, did not require further proceedings under Federal Rule of Civil Procedure 56(f).[1]  Doc. No. 69 at 59:12-60:23. The Court also asked the parties if they required further notice under Rule 56(f).  *Id.* at 56:20-57:13, 59:23-60:12.  In response, the parties did not object to proceeding on the record before the Court.  *Id.*  By agreement of the parties, for reasons unrelated to this Memorandum and Order, the Hearing on Injunctive Relief was continued until further order of the Court.

On July 31 and August 7, 2018, the parties filed additional briefs on the issue of subjective baselessness under the *Noerr-Pennington* doctrine.  On August 16, 2018, plaintiffs filed a Motion for Leave to Amend the Complaint to Add a Count for Declaratory Relief. Defendants' Motion for Summary Judgment and Plaintiffs' Motion for Entry of a Permanent Injunction are ripe for decision.

---

[1] Subjective baselessness was not addressed in this context at the Final Pretrial Conference but the issues under Rule 56(f) are the same.

### III.    LEGAL STANDARD

#### A.    Motion for Summary Judgment

The Court will grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The Court's role at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether . . . there is sufficient evidence favoring the nonmoving party for a jury [or the court in a non-jury trial] to return a verdict for that party." *Id.* at 249. However, the existence of a "mere scintilla" of evidence in support of the nonmoving party is insufficient. *Id.* In making this determination, "the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). However, the party opposing summary judgment must identify evidence that supports each element on which it has the burden of proof. *Celotex Corp.*, 477 U.S. at 322.

#### B.    First Amendment Retaliation Claims Under § 1983

Plaintiffs' Verified Complaint sets forth two claims for First Amendment retaliation under 42 U.S.C. § 1983. Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." 42 U.S.C. § 1983; *accord Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999). By the terms of § 1983, "two—and only two—allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

Plaintiffs allege they were deprived of a federal right when defendants retaliated against them for exercising their First Amendment rights. "In order to plead a retaliation claim under the First Amendment, a plaintiff must allege: (1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Indep. Twp.*, 463 F.3d 285, 296 (3d Cir. 2006). In addition to the above elements, a First Amendment claim requires the conduct complained of to constitute "state action," which satisfies the requirement under § 1983 that the defendant act under color of state law. *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295 n.2 (2001). It is under this law that the Court considers defendants' Motion for Summary Judgment.

## IV.    DISCUSSION

In their Motion for Summary Judgment, defendants raise five arguments: (1) the conduct of PSBA and the individual defendants does not constitute state action; (2) plaintiffs' activity is not protected by the First Amendment; (3) the state suit is immunized under the First Amendment by the *Noerr-Pennington* doctrine; (4) the individual defendants are shielded by

qualified immunity; and (5) plaintiffs have not adduced evidence to support the imposition of punitive damages.

Defendants' arguments present several interrelated constitutional issues under the First Amendment. In particular, defendants argue that the filing of the state suit is protected by the First Amendment right to petition under the *Noerr-Pennington* doctrine. Significantly, however, that suit seeks to impose liability on plaintiffs for petitioning and exercise of free expression. The Court concludes that although plaintiffs' activities are protected by the First Amendment, they have not carried their burden to show that defendants' filing of the state suit is not. Consequently, the Court cannot grant plaintiffs the relief they seek. Because those two issues are dispositive of the case, the Court does not reach the parties' contentions with respect to state action, qualified immunity, or punitive damages.

## A. Plaintiffs' Activities Are Protected by the First Amendment

Defendants argue that plaintiffs have not proven that their petitioning and commentary were protected by the First Amendment, as required for their First Amendment retaliation claim. The Court addresses plaintiffs' petitioning and commentary in turn.

### 1. *Plaintiffs' Petitioning Is Protected by the First Amendment*

The First Amendment immunizes plaintiffs' petitioning from liability, pursuant to the *Noerr-Pennington* doctrine,[2] the same doctrine that defendants contend is applicable to the filing of the state suit. "Those who petition government for redress are generally immune from . . . liability" under the *Noerr-Pennington* doctrine. *Prof'l Real Estate Inv'rs, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 56 (1993) [hereinafter *PREI*]; *Herr v. Pequea Twp.*, 274 F.3d 109,

---

[2] The doctrine is named for the cases in which it was first promulgated, *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

116 (3d Cir. 2001). The constitutional protection of "peaceable" petitioning is not determined by either the speaker's motivation or the economic impact of the petitioning on others, "at least insofar as the . . . campaign [is] directed toward obtaining governmental action." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 914 (1982) (quoting *E. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961)). As one court stated:

> Under the *Noerr-Pennington* doctrine, it does not matter what factors fuel the citizen's desire to petition government. . . . The only restriction placed on *Noerr-Pennington* immunity is that the petitioners must make a genuine effort to influence legislation or procure favorable government action, rather than simply using the petitioning process as a means of interference or harassment (known as "sham exception").

*Barnes Found. v. Twp. of Lower Merion*, 927 F. Supp. 874, 877 (E.D. Pa. 1996). Petitioning is a "sham" only if it is both objectively and subjectively baseless—that is, the petitioner "could not reasonably expect success on the merits" and subjectively intended to use the "governmental process—as opposed to the outcome of that process—as a[] . . . weapon." *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 123 (3d Cir. 1999) (quoting *PREI*, 508 U.S. at 60-61). The Court addresses the objective and subjective baselessness of plaintiffs' petitioning in turn.

The record before the Court shows that plaintiffs' lobbying was not objectively baseless and therefore not a sham. Plaintiffs could "reasonably expect" to succeed on the merits of at least some portion of plaintiffs' requests, as demonstrated by the "guidance" provided by PSBA to its members. *Cheminor*, 168 F.3d at 123; *cf. Dentsply Int'l v. New Tech. Co.*, No. 96-cv-272 MMS, 1996 U.S. Dist. LEXIS 19846, at *9 (D. Del. Dec. 19, 1996) ("[L]itigation will not be considered a 'sham' so long as at least one claim in the lawsuit has objective merit."). In that guidance, PSBA attorneys advised the members of PSBA to provide, *inter alia*, the contact information used to receive RTKL requests, the names of union presidents, and collective bargaining agreements. Verif. Compl. ex. 1. The guidance also noted that several of plaintiffs'

requests were subject to fact-intensive balancing tests.  *Id.* ex. 2.  Levin reached similar

conclusions in his May 16, 2017, guidance provided to the members of PSBA.  Ex. P-44.

Further, plaintiffs' lobbying was not subjectively baseless, as the record establishes that it

was genuinely directed toward obtaining the relief sought—governmental action.  Plaintiffs'

lobbying for school districts to sever their ties with PSBA was directed at those institutions in

emails and RTKL requests.  That lobbying fit closely with Campbell and PFUR's known policy

goals and history of advocacy.  *See* Jt. Stip. ¶ 78; Faccinetto Dep. 19:21-21:24, Ex. P-505.  The

legal analysis and videos that plaintiffs included with their RTKL requests is evidence that

plaintiffs subjectively believed that they were entitled to the documents requested, including

those in PSBA's possession.  Verif. Compl. ex. 5 at 12; Exh. D-192 at 2.  Although PSBA and its

members may have found plaintiffs' conduct harassing, the record establishes that plaintiffs'

lobbying was not subjectively baseless, as it was a genuine effort to procure governmental

action.  Thus, plaintiffs' petitioning and lobbying are protected by the First Amendment,

whatever the motive or purpose of the activities.[3]

Despite this authority, defendants argue that plaintiffs' lobbying is not constitutionally

protected for three reasons:  (1) RTKL requests are a statutory right, and consequently, not

protected by the First Amendment, Doc. No. 32-1 at 46; (2) RTKL requests are limited public

fora and plaintiffs violated the reasonable limitations placed on RTKL requests, *id.* at 50; and,

---

[3] The parties do not address the applicability of the "more easily" established exception to *Noerr-Pennington* immunity for "a pattern of petitioning."  *In re Wellbutrin XL Antitrust Litig.*, 868 F.3d 132, 157 (3d Cir. 2017) (quoting *Hanover 3201 Realty, LLC v. Village Supermarkets, Inc.*, 806 F.3d 162 (3d Cir. 2015)).  Under that "more flexible standard" a court "should perform a holistic review" to determine whether "a series of petitions were filed with or without regard to merit and for the purpose of using the governmental process (as opposed to the outcome of that process) to harm" another.  *Id.*  As described above, the record as a whole shows that plaintiffs intended their petitioning for the purpose of procuring government action.  Thus, assuming *arguendo* the standard for a pattern of petitioning is applicable to this case, the Court concludes that plaintiffs' petitioning is still entitled to First Amendment protection.

(3) plaintiffs' lobbying is not protected by the First Amendment because they "threaten[ed] taxpayer-funded school districts into complying with [their] wishes," in violation of state law, *id.* at 48. The Court rejects each of defendants' three arguments.

First, courts have regularly recognized that statutorily authorized petitions are protected by the First Amendment. *E.g.*, *Herr v. Pequea Twp.*, 274 F.3d 109, 119 n.9 (3d Cir. 2001) (applications to county planning commission); *Brownsville Golden Age Nursing Home, Inc. v. Wells*, 839 F.2d 155, 160 (3d Cir. 1988) (reports to state and federal agencies). There is no reason why petitions pursuant to statutory authority should be given less protection than petitions independent of that authority.

Further, the cases cited by defendants on this issue are inapposite. Despite defendants' contentions, in *Harper v. EEOC*, No. 15-cv-2629, 2015 U.S. Dist. LEXIS 154916, at *9 (W.D. Tenn. Nov. 17, 2015), the court concluded that the First Amendment did not guarantee a petitioner that he would receive the documents he sought under the federal Freedom of Information Act ("FOIA"), 5 U.S.C. 552. The *Harper* court did *not* conclude that FOIA requests are not protected under the First Amendment right to petition. Similarly, in *In re Gaydos*, 519 U.S. 59, 59 (1996), the Supreme Court concluded that a *pro se* petitioner could be denied leave to proceed *in forma pauperis* after a series of "frivolous, repetitive filings" under FOIA. The *Gaydos* Court did not mention, much less discuss, the First Amendment.

Second, assuming *arguendo* that defendants are correct that RTKL requests may be properly analyzed as limited public fora, defendants' argument is nonetheless misplaced. A forum analysis serves to determine what burden the government bears in justifying restrictions on speech. *Make the Rd. by Walking, Inc. v. Turner*, 378 F.3d 133, 142 (2d Cir. 2004). Speech in a limited forum, however, is not automatically removed from the other protections of the First

Amendment merely because the speaker violated the restrictions placed on that forum. Plaintiffs' alleged violations of those restrictions do not, in themselves, strip plaintiffs' speech or petitioning of its First Amendment protection and open the door for suits by third parties such as PSBA. Even if plaintiffs' speech were in a limited public forum, defendants would still need to show that plaintiffs' speech was actionable defamation or sham petitioning to remove it from the protections of the First Amendment.

Third, defendants fail to show that any threats made by plaintiffs are outside the protection of the First Amendment. Mere threats, without more, are still speech and still protected by the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 359 (2003) ("'[P]olitical hyberbole' is not a true threat."). Plaintiffs' statements that they would appeal the denial of their RTKL requests—the only "threat" identified in defendants' Motion, Doc. No. 32-1 at 48—do not rise to the level of a "true threat" outside the scope of the First Amendment.

Defendants nonetheless argue that plaintiffs' purported threats are actionable because plaintiffs "abandoned [their] First Amendment protections by violating state law on defamation and abuse of process." Doc. No. 32-1 at 49 (citing *Rouse Phila. Inc. v. Ad Hoc '78*, 417 A.2d 1248 (Pa. Super. 1979)). This argument is unavailing because the decision it relies on, *Rouse Philadelphia, Inc. v. Ad Hoc '78*, addresses "the right to picket," which "involves actions as opposed to pure speech." *Rouse*, 417 A.2d at 1256. In *Rouse*, the Superior Court of Pennsylvania affirmed a contempt of court order entered against appellant for his continued picketing of private businesses despite an earlier order enjoining such conduct.[4] The *Rouse*

---

[4] A second case cited by defendants with respect to this issue, *Al Hamilton Contracting Co. v. Cowder*, 644 A.2d 188, 191 (1994), discusses whether a claim for abuse of process or tortious interference with contract may arise from lobbying a state agency for certain action, but does not mention or apply the First Amendment in its analysis. *Al Hamilton* is thus inapplicable to this issue.

court, however, did not conclude that threatening speech and lobbying fall outside the protection of the First Amendment simply because the speech itself violates state law. To the contrary, that court decided that certain *conduct*—including, in that case, the blocking of business entrances, "physical intimidation of patrons and store owners, and the setting afire of trash receptacles in a densely populated, downtown, commercial area"—was not entitled to constitutional protection. 417 A.2d at 1254 ("[A]s a person's activities move away from pure speech and into the area of expressive conduct they require less constitutional protection."). Plaintiffs' lobbying in this case contained no such conduct and remains within the protections of the First Amendment.

 2. *Plaintiffs' Commentary Is Protected by the First Amendment*

Defendants argue next that plaintiffs' commentary is actionable defamation outside the scope of First Amendment protection because defendants are not public officials or public figures and plaintiff therefore is not entitled to the "actual malice" standard under *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). Doc. No. 32-1 at 53. The Court rejects this argument.

In *Sullivan*, the Supreme Court concluded that a "public official" may not recover "damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279 (1964). In its decisions following *Sullivan*, the Supreme Court extended application of the actual malice standard to suits by "public figures," who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes," and "limited public figures," who "have thrust themselves to the forefront of particular public controversies in order to

19

influence the resolution of the issues involved." *Gertz v. Robert Welch*, 418 U.S. 323, 345 (1974).

PSBA, which filed the state suit, is, at the very least, a limited public figure. Limited public figures include "lobbyist[s]" as well as "the head of any pressure group, or any significant leader" who "possess[es] a capacity for influencing public policy." *Pauling v. Globe-Democrat Publ'g Co.*, 362 F.2d 188, 196 (8th Cir. 1966). PSBA serves to "further the interests of public education . . ., to advocate on behalf of public education, and in turn, the ability of public school systems to do their job and do their job well." Jt. Stip. ¶ 84. To carry out its mission, PSBA represents "the interests of public education" by filing suits in court and lobbying the legislature. *Id.* ¶ 85; Defs.' Resp. ¶ 28. Consequently, PSBA is at "the forefront of particular public controversies in order to influence the resolution of the issues involved" and is a limited public figure subject to the *Sullivan* actual malice standard.

The record before the Court does not establish that plaintiffs acted with actual malice. The actual malice standard is not satisfied by proof of even "highly unreasonable conduct constituting an extreme departure from the standards of investigation and reporting ordinarily adhered to by responsible publishers." *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). Instead, "actual malice" requires that "the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

There is no evidence that plaintiffs had such "serious doubts" as to the truth of their statements. As the record shows, plaintiffs undertook efforts to support most, if not all, of those statements. For example, plaintiffs' statement that Levin was serving in a "conflict-riddled role" arose from the fact that Campbell had discovered that Levin represented both PSBA and two

school districts that had received PSBA's advice.  P-476, ex. B.  Further, plaintiffs stated that PSBA had "caused a disgraceful abuse of government resources by advising school solicitors that they may withhold their work email addresses under the RTKL," only after learning that PSBA had, in fact, advised its members to withhold that information.  Defs.' Resp. ¶ 86. Likewise, the statements in the images "lampoon[ing]" Mains and PSBA were based on documents plaintiffs had obtained and the facts set forth in those statements are correct—PSBA advised its members that they could require plaintiffs to drive to the district offices to collect documents, and Mains earns $226,000 per year.  *Id.* ¶ 66-67, 84.  Finally, plaintiffs published the image with the caption "Freebie State Government Auto Tags for PSBA!" after they received a letter from the Pennsylvania Department of Transportation that it had records responsive to a request for documents on that issue.  The record of plaintiffs' efforts to support their statements negates defendants' claim that plaintiffs acted with actual malice.

Defendants argue that plaintiffs' *conclusions* that Levin had a conflict of interest and that PSBA's advice to its members was a "disgraceful abuse of government resources" and the *implication* that Mains and PSBA actually said those words contained in the images posted online are defamatory.  The Court rejects defendants' contentions.  Although plaintiffs' conclusions may not be correct—and the Court takes no position on that issue—the record shows that plaintiffs reached those conclusions based on their factual investigation.  When allegedly defamatory statements concern public figures, it is not enough that the statements may be deemed rude, harassing, or even untrue.  *Hustler Magazine v. Falwell*, 485 U.S. 46, 53 (1988) ("[I]n the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First Amendment.")  The statements must be made with actual

malice to be actionable. Based on the record before the Court, plaintiffs' commentary is within the protection of the First Amendment.

## B. Defendants' State Suit Is Protected by the *Noerr-Pennington* Doctrine

### 1. *Applicable Law*

Defendants next argue that their filing of the state suit is protected First Amendment petitioning under the *Noerr-Pennington* doctrine. As noted above, the *Noerr-Pennington* doctrine "immunizes petitioning directed at any branch of government, including the executive, legislative, judicial, and administrative agencies." *Mariana v. Fisher*, 338 F.3d 189, 199 (3d Cir. 2003) (citing *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972)). That protection extends to citizens' petitioning activities in general, *WE, Inc. v. City of Philadelphia*, 174 F.3d 322, 326-27 (3d Cir. 1999), including the filing of a suit in court, *PREI*, 508 U.S. at 57 (quoting *Cal. Motor Transp. Co.*, 404 U.S. at 510).

Under the doctrine, litigation is protected unless it can be shown to be a "sham" under the two-prong test described above: first, the activity must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits"; second, the petitioning must be subjectively baseless in that it "conceals" the "use [of] the governmental process—as opposed to the outcome of that process—as a[] . . . weapon." *PREI*, 508 U.S. at 60-61 (1993)). "Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation." *Id.* at 60. Once defendants show that their activity is protected by the First Amendment, plaintiffs bear the burden of proving that defendants' state suit was a sham. *Id.* at 61.

## 2.     *Objective Baselessness*

Defendants' argument in their Motion for Summary Judgment is nearly identical to the one they raised in their Motion to Dismiss, Doc. No. 16, and Reply Brief in Support of Defendants' Motion to Dismiss, Doc. No. 24.  In both Motions, defendants focus primarily on whether the state suit has an objective basis.  In particular, defendants argue in those Motions that (1) RTKL requests are "process" that may be subject to an abuse of process claim; (2) plaintiffs' commentary would not be perceived by "the average reader" as satire; and, (3) plaintiffs' petitioning of school districts to sever their ties with PSBA was a sham.

In its Memorandum and Order dated June 19, 2018, denying defendants' Motion to Dismiss, the Court did not reach those arguments, concluding the state suit has an objective basis only if plaintiffs' underlying commentary and petitioning are outside the protection of the First Amendment.  Doc. No. 30 at 10.  In that decision, the Court stated that "whether the state suit has an objective basis hinges on defendants' ability to establish in that suit that plaintiffs' petitioning was a sham or that their free expression was actionable defamation."  *Id.*  In their Motion for Summary Judgment, defendants nonetheless contend in a footnote that "such a test would be the Defendants' burden against a *Noerr-Pennington* challenge by Plaintiffs in the underlying case," not in this case.  Continuing, defendants argue that "to establish an objective basis, Defendants in this case must merely show that their claims in the underlying case are not a sham."  Doc. No. 32-1 at 36 n.8.  In sum, defendants argue the Court should analyze the state claims irrespective of the First Amendment protection of plaintiffs' activities.

Defendants' argument is rejected.  Defendants cite no authority whatsoever to support their argument that that they need only establish the elements of the causes of action asserted in the state suit, irrespective of the First Amendment protections for plaintiffs' petitioning and

23

commentary, to show the state suit had an objective basis. To the contrary, the Supreme Court has instructed that a suit is objectively baseless if "no reasonable litigant could realistically expect success on the merits." *PREI*, 508 U.S. at 60. To succeed on the merits in the state suit, defendants must meet a higher burden of proof in challenging plaintiffs' protected First Amendment activity—namely, that plaintiffs' RTKL requests and lobbying were shams or that their commentary was undertaken with actual malice. *PREI*, 508 U.S. at 60-61; *Hustler Magazine*, 485 U.S. at 57. In assessing the objective baselessness of the state suit, this Court must consider that additional burden.

Other courts have also considered the First Amendment protection accorded to activity challenged in a state suit when assessing the objective basis of that suit. In *Bartley v. Taylor*, 25 F. Supp. 3d 521, 535 (M.D. Pa. 2014), cited by defendants, the district court granted summary judgment for the defendant on the ground that the state libel suit at issue in that case was immunized by the *Noerr-Pennington* doctrine. Plaintiff in that case alleged that the state libel suit, filed by defendant, constituted First Amendment retaliation. The *Bartley* court concluded that the state libel suit had an objective basis because "it was not unreasonable" for the federal defendant, plaintiff in the state suit, to "believe" that an article written by plaintiff was libelous, as "it insinuated her liability in a lawsuit to which she was not a party." *Id.* at 537. Continuing, the court ruled that defendant's state suit was a "non-sham" because the challenged speech was reasonably considered "actionable defamation." *Id.* at 538.

In this case, however, the record does not establish that plaintiffs' underlying activities constitute actionable defamation or are otherwise outside the protection of the First Amendment. As described above, defendants are public figures who advocate for certain policies related to public schools. Plaintiffs' commentary criticized defendants for their advocacy and their

relationship to Pennsylvania's public schools.  Consequently, the state suit has an objective basis only if their petitioning was a sham or if plaintiffs undertook their commentary with actual malice, neither of which is supported by the record.  Thus, the Court concludes that the state suit is objectively baseless.

### 3.    *Subjective Baselessness—Plaintiffs' Burden of Proof*

Because the Court concludes that the state suit is objectively baseless, it next considers whether the state suit has a subjective basis.  *See PREI*, 508 U.S. at 60 ("Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation.").  A suit is subjectively baseless if it "conceals 'an attempt to interfere directly with the [interests of another],' through the 'use [of] the governmental process—as opposed to the outcome of that process—as a[] . . . weapon.'"  *Id.* at 60-61 (quoting *E. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)) (second alteration in original).  The Supreme Court stated that subjective baselessness may be established where (1) the litigant was "indifferent to the outcome on the merits" of the suit, (2) any recovery "would be too low to justify . . . investment in the suit," or (3) the litigant "decided to sue primarily for the benefit of collateral injuries inflicted through the use of legal process."  *Id.* at 65.

Plaintiffs argue that the state suit was subjectively baseless because it was brought, not to "obtain[] damages," but to "to stop Simon Campbell and PFUR from sending RTKL requests to PSBA's member districts and to chill [p]laintiffs' political criticisms of PSBA."  Doc. No. 68 at 4-5.  In response, defendants contend plaintiffs must meet a higher burden of proof to establish that the state suit was subjectively baseless.  *Id.* at 2-4.  Because it is a threshold issue in assessing a motion for summary judgment, the Court first considers the burden plaintiffs must

carry with respect to subjective baselessness to prevail at trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The Court agrees with defendants that plaintiffs must carry a higher burden to establish subjective baselessness. In their argument, defendants rely primarily on the decision in *FTC v. AbbVie Inc.*, No. 14-cv-5151, 2018 U.S. Dist. LEXIS 109628, *54-55 (June 29, 2018). In *AbbVie*, the court concluded that defendants had pursued subjectively baseless patent litigation. In reaching that decision, the *AbbVie* court determined that plaintiffs were required to meet a higher burden of proof in establishing subjective baselessness—showing "by clear and convincing evidence that defendants had actual knowledge" that their challenged petitioning was "baseless." *Id.* at *36, 41. The court required a showing of actual knowledge "so as not to infringe on a party's constitutional right to petition the government for redress of grievances." *Id.* at *39.

Further, in determining that actual knowledge had to be established by "clear and convincing evidence," the *AbbVie* court analogized to the imposition of liability for enforcing a fraudulently obtained patent, a type of suit known as a *Walker Process* claim. In those claims, there must be "no less than clear, convincing proof of intentional fraud involving affirmative dishonesty." *Id.* at *40 (citing *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1364 (Fed. Cir. 1998)). Based on that standard, the *AbbVie* court concluded that subjective baselessness requires establishing actual knowledge of the underlying petitioning's baselessness by clear and convincing evidence.

This Court agrees with the conclusion in *AbbVie* that establishing exceptions to First Amendment protection demands that plaintiffs carry a higher burden of proof, that is, proof by clear and convincing evidence. For example, the *Walker Process* claims discussed in *AbbVie*

require proof of fraud by clear and convincing evidence. Those claims are considered a "distinct avenue[] by which a party can lose *Noerr-Pennington* immunity" under the First Amendment. Similarly, the "actual malice standard" for defamation claims "is satisfied only on clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1088 (3d Cir. 1985) (internal quotation marks omitted). The Court concludes that the First Amendment requires that subjective baselessness in this case be established by that same standard. Consequently, plaintiffs must show the state suit was subjectively baseless by clear and convincing evidence.

> ### 4. *Subjective Baselessness—No Reasonable Factfinder Would Conclude that Plaintiffs Have Met Their Burden of Proof*

The Court next considers whether a reasonable factfinder could conclude that plaintiffs have met that burden. As noted above, a suit may be subjectively baseless where the litigant was "indifferent to the outcome on the merits" of the suit, any recovery "would be too low to justify . . . investment in the suit," or the litigant "decided to sue primarily for the benefit of collateral injuries inflicted through the use of legal process." *PREI*, 508 U.S. at 65.

Plaintiffs argue that record before the Court supports an inference that the state suit was subjectively baseless based on (1) statements by defendants and the members of PSBA, (2) PSBA's conduct in pursing the state suit, (3) the filing of an objectively baseless suit by attorneys "well known for bringing defamation claims."

First, plaintiffs point to statements by PSBA, its Board members, and its Public Entity members that that suit was filed "as a way of vindicating or protecting PSBA's member school districts, rather than a suit to redress PSBA's alleged injuries." Doc. No. 68 at 5-6. For example, Michael Faccinetto, President of the PSBA Board, testified that PSBA brought the state suit "to

make the harassment of school districts stop." Doc. No. 68 at 6 (quoting Faccinetto Dep. 78:1-9, Ex. P-511). Likewise, in the Complaint filed in the state suit, defendants alleged that plaintiffs' lobbying and commentary constituted "unrelenting harassment of PSBA [and] its members" and were intended to "cause PSBA's 600 plus member entities considerable cost and inconvenience." *Id.* (quoting Ex. P-473 ¶¶ 3, 48). Plaintiffs further support their argument by pointing to several email "blasts" sent by PSBA to its members, statements by defendants in settlement negotiations, and statements by PSBA in this suit. *Id.* at 7-9, 12-14.

Second, plaintiffs argue that defendants' manner of pursuing the state suit is evidence that they "used the state court litigation process to punish Plaintiffs, and not to protect PSBA's reputation." Doc. No. 68 at 10. In particular, plaintiffs contend that allegations in the state Complaint that Campbell sent PSBA attorney Emily Leader a link to private videos of her family members in order to threaten her were inaccurate. Doc. No. 68 at 11 (citing P-473 ¶¶ 26-28). According to plaintiffs, the link erroneously directed Leader to her private videos—a result Campbell did not intend—and defendants did not correct the inaccuracies despite having have opportunity to do so in the Amended Complaint. Further, plaintiffs contend that the Amended Complaint sought to punish plaintiffs for their conduct following the filing of the state Complaint, "including Campbell's petitioning to PSBA's membership to repudiate the State Tort Action itself." Doc. No. 68 at 15.

Plaintiffs also argue with respect to defendants' pursuit of the state suit that defendants' issuance of a litigation hold notice in the state for documents "dating back to 2010—7 years before [the] alleged abuse and defamation" and efforts to serve Campbell by publication are "consistent with the objective of using the [state suit] as a weapon." Doc. No. 68 at 12-13.

According to plaintiffs, this conduct in pursuing the state suit shows that suit was filed solely as a weapon to chill plaintiffs' speech.

Finally, plaintiffs contend in their third argument that, because defendants "hired a firm well known for bringing defamation claims" and pursued the state suit "despite every red flag and opportunity to stop," the Court should infer that the state suit was subjectively baseless. Doc. No. 68 at 16.

The Court rejects each of plaintiffs' arguments on this issue for the following reasons:

First, as defendants point out, defendants' statements regarding the purpose of the state suit "have nothing to do with PSBA's intent in filing" that suit, but simply state "what a defamation suit is all about." Doc. No. 71 at 17, 20-21. "Under the *Noerr-Pennington* doctrine, it does not matter what factors fuel [a] citizen's desire to petition government," as long as the citizen subjectively intended to prevail on the merits of his or her petition. *Barnes Found. v. Twp. of Lower Merion*, 927 F. Supp. 874, 877 (E.D. Pa. 1996). The statements cited by plaintiffs do not address whether defendants subjectively intended to prevail on the merits in the state suit, but only defendants' stated reason for filing that suit—that is, "vindicating" the interests of the members of PSBA. That is irrelevant for purposes of *Noerr-Pennington* and does not establish that defendants intended to use the "governmental process[,] as opposed to the outcome of that process," as a "weapon."

Second, the Court rejects plaintiffs' argument that defendants' manner of pursuing the state suit is evidence of that suit's subjective baselessness. The purported inaccuracies in the state suit regarding the link sent to Leader are insufficient to establish that the state suit was subjectively baseless. Doc. No. 71 at 24; *see* Complaint, Ex. D-473 ¶¶ 26-28; Amended Complaint, Ex. 476 ¶¶ 38-40. Leader herself subjectively believed that plaintiffs had sent the

video in order to "creep [her] out and upset [her] daughter and [her]."  Ex. P-518 70:5-10.

Further, those allegations are directly related to and add context to plaintiffs' alleged harassment

of PSBA and its employees.  Consequently, the inclusion of those allegations—accurate or not—

is evidence that defendants sought to bolster their claims and does not establish that they were

"indifferent to the outcome on the merits."

Furthermore, plaintiffs' argument that the "only 'new' allegations in the Amended

Complaint pertained to Plaintiffs' RTKL requests and complaints about PSBA made after PSBA

filed the State Tort Action—including Campbell's petitioning to PSBA's membership to

repudiate the State Tort Action itself," Doc. No. 68 at 15-16, is unavailing.  As an initial matter,

it is entirely appropriate for a plaintiff to amend its complaint to add allegations of conduct that

occurred after the filing of the initial complaint.  *Cf.* Fed. R. Civ. P. 15(a), (d).  Further, the

allegations added in the Amended Complaint do not pertain to plaintiffs' RTKL requests or the

lobbying of school districts to "repudiate" the state suit.  Instead, the new allegations address the

parodies posted to Campbell's personal website and plaintiffs' statements that Levin was serving

in a "conflict-riddled role."  Amended State Complaint, Ex. 476, ¶¶ 24-30, 46-49.  Those

allegations are directly related to defendants' claims and their addition is evidence that

defendants sought to prevail on the merits in the state suit.

The Court also rejects plaintiffs' arguments regarding the litigation hold notice and

service by publication—those facts are simply irrelevant to the ultimate issue of whether

defendants subjectively intended to prevail on the merits of the state suit.  Without more, the

Court declines to infer that defendants' use of the tools of litigation is evidence of their

indifference to the merits of that litigation.

Further, the record shows that plaintiffs' lobbying campaign continued well after the filing of the Complaint in the state suit. *See* Doc. No. 71 at 58-64. Defendants excluded much of this conduct from the Amended Complaint. Had the state suit been filed solely to harass or embarrass plaintiffs, defendants could have included this conduct in the Amended Complaint. Defendants' decision to exclude that conduct from the Amended Complaint is evidence that the suit was tailored to focus on conduct defendants subjectively believed to be actionable.

Finally, the Court rejects plaintiffs' third argument, that defendants' selection of "a firm well known for bringing defamation claims" and pursuit of the state suit "despite every red flag and opportunity to stop" is evidence that the state suit was subjectively baseless. Doc. No. 68 at 16. In their argument, plaintiffs rely on the decision in *FTC v. AbbVie Inc.*, No. 14-5151, 2018 U.S. Dist. LEXIS 109628, at *54. In *AbbVie*, the court concluded that because "all of the decision-makers" who decided to file "objectively baseless [patent] infringement lawsuits" were "very experienced patent attorneys," it was reasonable to conclude that they acted with the subjective intent to "file sham lawsuits."

The *AbbVie* court emphasized that the individuals "who made the decision on behalf of AbbVie on whether to file the objectively baseless lawsuits . . . were four experienced patent attorneys . . . . The record reflects that no business executives were in any way involved—not even with a perfunctory sign-off." *Id.* at *48. In this case, the record shows that the key—if not exclusive—decisionmakers were school board officials and the attorneys of PSBA; the record contains no evidence that any of those individuals were well versed in the First Amendment. Thus, on this issue, *AbbVie* is distinguishable. Further, the fact that defendants hired a firm well-known for its defamation work is evidence that defendants subjectively intended to prevail in the state suit.

Taking the record as a whole, no reasonable factfinder could conclude that plaintiffs have shown by clear and convincing evidence that the state suit was subjectively baseless. Consequently, defendants' Motion for Summary Judgment is granted.

### C. Plaintiffs' Motion for Leave to Amend the Complaint Is Moot

Plaintiffs filed a Motion for Leave to Amend the Complaint to Add a Count for Declaratory Relief on August 16, 2018. Declaratory judgment is a remedy and not a cause of action. A plaintiff is "required to prevail on the merits to obtain declaratory relief." *Skold v. Galderma Labs., L.P.*, No. 14-5280, 2017 U.S. Dist. LEXIS 139217, at *47 (E.D. Pa. Aug. 29, 2017); *see also USX Corp. v. Barnhart*, 395 F.3d 161, 166 (3d Cir. 2004) (holding that a "court cannot provide a remedy, even if one is demanded, when plaintiff has failed to set out a claim for relief"). Plaintiffs have not prevailed on the merits of their First Amendment retaliation claims. Thus, their Motion for Leave to Amend the Complaint to Add a Count for Declaratory Relief is denied as moot.

### D. Plaintiffs' Motion for Entry of a Permanent Injunction Is Denied

Plaintiffs filed their Motion for Entry of a Permanent Injunction on April 20, 2018. To obtain a permanent injunction, the moving party must establish, *inter alia*, "actual success on the merits." *Coffelt v. Fawkes*, 765 F.3d 197, 201 (3d Cir. 2014). Plaintiffs have not succeeded on the merits of their First Amendment retaliation claims because they have not established that defendants' state suit is subjectively baseless. Consequently, plaintiffs' Motion for Entry of a Permanent Injunction is denied.

### V. CONCLUSION

For the foregoing reasons, defendants' Motion for Summary Judgment is granted, plaintiffs' Motion for Leave to Amend the Complaint to Add a Count for Declaratory Relief is

denied as moot, and plaintiffs' Motion for Entry of a Permanent Injunction is denied. Judgment

is entered in favor of defendants and against plaintiffs. An appropriate order follows.