## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| SIMON CAMPBELL, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| | : | NO. 18-CV-892-JD |
| v. | : | |
| | : | JURY TRIAL DEMANDED |
| | : | |
| PENNSYLVANIA SCHOOL BOARDS | : | |
| ASSOCIATION, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## DECLARATION OF JACOB C. COHN IN OPPOSITION
## TO DEFENDANTS' MOTION TO SANCTION COUNSEL FOR PLAINTIFFS

Jacob C. Cohn declares as follows:

1.      I am co-lead counsel for Plaintiffs Simon Campbell and Pennsylvanians for Union Reform ("PFUR") in this action.  Together with Eric Rosenberg, I am also counsel for PFUR in the underlying state court action pending in Cumberland County, Pennsylvania (the "SLAPP Suit"), in which Mr. Campbell is separately represented by Craig Staudenmaier, Joshua Bonn, and Tyler Eshelman of Nauman, Smith, Shissler & Hall, LLP.  I make this declaration in opposition to Defendants' Motion to Disqualify.

2.      This Declaration has been reviewed by my clients who have consented to the disclosure of the matters discussed herein solely to the extent necessary to permit me to defend myself against Defendants' allegations.

Underline My Professional Background

3.      Since February 2013, I have been a partner of the Philadelphia office of San Francisco-based Gordon & Rees Scully Mansukhani.  I co-founded that office with a number of

other attorneys.   From September 2003 through January 2013, I was a member of Cozen

O'Connor.  From 1987 through September 2003, I was a summer associate, an associate, and

from February 1996 until my departure, an equity partner of Wolf, Block, Schorr and Solis-

Cohen.

       4.      I have been a member in good standing of this Court and of the Supreme Court of

the Commonwealth of Pennsylvania for approximately 30 years.  I am also a member in good

standing of the bars of New Jersey, New York, the United States Supreme Court, the United

States Courts of Appeal for the First, Second, Third, Fourth, Sixth, Ninth, Tenth, Eleventh, and

Federal Circuits, as well as the United States District Courts for the Middle and Western Districts

of Pennsylvania, the Eastern, Southern and Western Districts of New York, the District of New

Jersey, the Northern District of Illinois, the Eastern District of Wisconsin, the District of the

District of Columbia, and the District of Colorado.  I have also been admitted *pro hac vice* in

numerous other state and federal courts around the country, and currently am admitted *pro hac

vice* before several courts.

       5.      I have never been disciplined or sanctioned by any court or bar authority.

       6.      Since 1998, I have been rated AV by Martindale Hubble.  Since 2016, I have been

listed in The Best Lawyers in America© with a distinction in Insurance Law (2016-2019).  Since

2011, I have been listed in Pennsylvania Super Lawyers in the area of appellate law, and since

2016, I have been listed in Who's Who Legal: Insurance & Reinsurance.  I am also a founding

member of the Third Circuit Bar Association.  A copy of my current biography from my firm's

website is attached hereto as Ex. A.

       7.      Over the course of my career, I have devoted thousands of hours to providing *pro

bono* representation, mostly in litigation matters, but occasionally also in transactional matters.

2

8.      In 2006, I received the Pennsylvania Bar Association's Pro Bono Award, and was honored at the AIDS Law Project of Pennsylvania's Annual Event for my *pro bono* efforts on behalf of a woman living with AIDS who had sold her life insurance policy to a Texas-based viatical settlement company in exchange for a promise to pay her health insurance premiums for the rest of her life.  When the company determined it was no longer willing to support the costs, I spent hundreds of hours litigating injunctive and appellate proceedings on her behalf, eventually obtaining a monetary settlement sufficient to ensure that her future medical needs would be met.

9.      I have always believed that litigation not only is acrimonious, but is generally an exceedingly inefficient means of resolving disputes.  I therefore strive to efficiently end, not prolong, legal disputes.  Towards this end, whenever I am brought into a dispute, I try to "triage" the situation to understand the nature of the dispute, the parties, and their counsel with a view towards coming up with an efficient strategy to resolve the dispute in a manner consistent with my client's goals.

<u>My Background in Litigation Similar to This Lawsuit</u>

10.     Since 2008, I have been involved with two other SLAPP suits.  As a result, I have had the opportunity to observe first-hand the severe damage that such baseless lawsuits can wreak on the livelihoods, professions and careers of their victims.

11.     The first SLAPP suit was brought in 2008 by Correctional Care, Inc. ("CCI"), the medical contractor of the Lackawanna County prison against Pax Christi, an international Catholic peace and justice organization.  Pax Christi started investigating the state of medical care in the Lackawanna County Jail after a highly publicized incident in the summer of 2007, when an inmate gave birth alone in her cell, without medical attention or even a guard to help her.  After requests for an independent investigation were ignored, Pax Christi did its own

evaluation, interviewing a number of current and former inmates. They reported what they learned to the Lackawanna County Commissioners and suggested a fuller investigation. When they received no response to their concerns, they sent their report to the press.

12.     Although Pax Christi's activities, speech, and petitioning activities involved matters of public importance and were obviously protected by the First Amendment, CCI individually sued Joseph Rogan, a retired special education teacher and member of the Northeastern PA chapter of Pax Christi, for defamation and tortious interference with contract seeking compensatory and punitive damages as well as attorneys' fees.  Rogan, who genuinely feared the lawsuit could cost him his home and his retirement savings, turned to the ACLU, who turned to Cozen O'Connor.

13.     Working as co-counsel with Ms. Roper of the ACLU, I was personally able to convince CCI's counsel, attorney from Rosenn Jenkins & Greenwald, LLP, a highly respected Scranton firm founded by the late Third Circuit Judge Max Rosenn, to drop the lawsuit voluntarily.  I did so by writing them a strong letter explaining that the lawsuit was frivolous and that Pax Christi's activities and speech were clearly protected by the First Amendment.  I then followed up that letter with a telephone call to the filing attorney in which I reiterated the numerous defects in CCI's legal claims, and explained that if CCI's SLAPP suit were not dropped, CCI itself could face a subsequent action for wrongful use of civil proceedings.  I invited counsel to give my client a 60-day extension to answer, move or otherwise plead, while he researched the legal issues that I had identified, and consulted with his client.  I asked that he let me know within 30 days whether his client intended to proceed with the lawsuit.  Several weeks later, CCI voluntarily withdrew the SLAPP suit.

14.     In August 2015, I received a telephone call from a respected criminal defense and civil rights attorney in State College, Pennsylvania who has been a close personal friend of mine since we studied abroad together at Tel Aviv University in 1984 when we both were college juniors.  My friend was calling because he and his law partner had just been sued in a SLAPP suit by the then-sitting Centre County District Attorney, Stacy Parks Miller, and he wanted me to defend them, which I agreed to do.

15.     Parks Miller had sued these attorneys along with two other local criminal defense attorneys, her former paralegal, all three county commissioners, the county solicitor, the county records officer, a sitting common pleas court judge, and Centre County itself, alleging that they were all part of a vast conspiracy to drive her from office.

16.     Of particular relevance here, Parks Miller sued my clients for "abuse of process" for making Right to Know Law ("RTKL") requests of Centre County.  Specifically, Parks Miller was suing them for making RTKL requests for records documenting extensive text-messaging activity between Parks Miller and other lawyers in the DA's office, on the one hand, and certain sitting Centre County Common Pleas Court judges during pending criminal proceedings, and then "abusing" the information provided by the County by using that information in motions for relief filed on behalf of one of their criminal defense clients.

17.     Eventually, the claims against my clients were dismissed with prejudice on a Rule 12(b)(6) challenge to Parks Miller's amended complaint by Judge Brann of the Middle District, with that court rejecting as unsupported the notion that RTKL requests are or should be considered to constitute "legal process" upon which a claim for the tort of abuse of process can be founded.

18.     Even though they had prevailed, Parks Miller's SLAPP suit had succeeded in severely damaging my clients' criminal defense practice.  I witnessed first-hand the severe economic damage that a SLAPP suit can do, as my clients' ability to attract criminal defense clients dried up in the face of the SLAPP suit, and remained severely damaged as Parks Miller pursued an unsuccessful appeal of the dismissal of her claims against them that was not resolved until August 2017.  This was on top of the substantial legal fees that my clients and the other defendants were forced to incur in defending Parks Millers' SLAPP suit.

My Introduction to Simon Campbell's Legal Issues and the SLAPP Suit Against Him

19.     It was also through my representation of these attorneys in the Parks Miller SLAPP suit that I first became acquainted with Simon Campbell.  Mr. Campbell had heard about the scandals at the Centre County Courthouse, and PFUR began making RTKL requests of the District Attorneys' office and Centre County.  In addition, Mr. Campbell and PFUR started advocating for the investigation and prosecution of Parks Miller, including creating a website www.corruptparksmiller.com, as well as directly petitioning Centre County government officials.  These activities led to threats of a SLAPP suit against Mr. Campbell and PFUR from Parks Miller's SLAPP suit counsel, Bruce Castor, that never materialized, as well as the service of threatening "spoliation" letters by Castor upon counsel for each of the defendants demanding that they preserve communications with a number of Parks Miller's public detractors, including Mr. Campbell and PFUR.

20.     As he frequently does to get his message out, Mr. Campbell cc'd or bcc'd his emails concerning Parks Miller to people he thought might be interested in what he had to say and/or to people whom he wanted hear what he was saying, including the parties and their counsel in the Parks Miller SLAPP suit.  In the midst of this activity, Mr. Campbell and I

6

decided to meet for lunch in April 2016.  Mr. Campbell explained to me that he had become a political activist when he moved to Pennsylvania and was unable to send his three daughters to school because of a local teacher1 strike.  He started campaigning to outlaw teacher strikes, and eventually started lobbying to abolish public unions.  He also told me that he was very active in using the RTKL to forward his and PFUR's political agendas.  He told me that he got interested and involved in the Centre County scandals both because Parks Miller was a government official who was attacking people for using the RTKL, and because of Parks Miller's alleged abuses of her power and authority as District Attorney.  While I found that I had very little in common with Mr. Campbell politically, and that he was provocative and even bombastic in his First Amendment lobbying and petitioning activities, he certainly had none of the qualities of the unhinged "extremist" depicted in PSBA's SLAPP Suit complaint, and I shared his umbrage about those people and entities, especially government actors, who abuse the legal system in an effort to silence the constitutionally-privileged speech and petitioning of their adversaries.

21.    Mr. Campbell first contacted me concerning the SLAPP Suit underlying this case on July 19, 2017 after someone had provided him with PSBA's July 17, 2017 blast email announcing the filing of the SLAPP Suit against PFUR and him personally.  Mr. Campbell had already begun formulating his legal strategy and had reached out to the ACLU for potential legal assistance.  He also had contacted his homeowners' insurer, but thought that PFUR, which did not have any liability insurance, might need its own counsel.

22.    Shortly thereafter, I began my due diligence and triage of the situation with a view towards potentially representing Mr. Campbell and/or PFUR, possibly with the ACLU, against the SLAPP Suit and/or in the prosecution of a civil rights action in federal court.  I obtained and reviewed the Complaint.  I immediately took note that PSBA's counsel was

7

Bochetto & Lentz, a firm that, for decades, has affirmatively cultivated a highly public reputation as ruthless, no-holds-barred, "Rambo"-style litigators.  They are well known in the Philadelphia legal community and beyond as lawyers that one might hire when one wishes to maximize the pain and expense of the litigation process itself upon one's adversaries.  As someone once said to me years ago, they are the kind of lawyers that you would only wish upon the very worst of your enemies.

23.     My review of the SLAPP Suit Complaint confirmed my expectations.  It was full of vitriol, and scandalous, defamatory, and impertinent matter.  Most seriously, it accused Mr. Campbell of criminally stalking and harassing a PSBA staff member (allegations that had nothing to do with any of the causes of action the Complaint attempted to allege).  The Complaint also was, as this Court subsequently has determined, patently frivolous as a matter of law on all counts – which was particularly obvious to me because I had spent the past two years briefing and arguing before the Middle District and the Third Circuit many of the same issues (such as that RTKL requests are not legal "process" and that government petitioning and political speech are entitled to the highest levels of First Amendment protection) in my defense of my attorney clients in the Parks Miller SLAPP suit.

24.     I further noted with interest that part of PSBA's "defamation" claim was Campbell's and PFUR's supposed defamation of PSBA's "Outside General Counsel" Michael Levin, and that part of its supposed "abuse of process" claim was the May 2017 RTKL's request for contracts between PSBA and Mr. Levin.  This, as well as the attachment of Mr. Levin's vitriolic emails to Mr. Campbell as exhibits to the SLAPP Suit complaint, suggested that the SLAPP Suit was motivated at least in part by Mr. Levin's declared personal antipathy towards

Mr. Campbell.  This surmise also offered a logical explanation for how a Central Pennsylvania-based organization came to hire Bochetto & Lentz to file a SLAPP Suit in Cumberland County.

25.     In addition to being defamatory and gratuitous, I saw the allegations that Mr. Campbell was a stalking and harassing "creep" as an attempt to dissuade anyone, especially the ACLU, from becoming interested in defending Mr. Campbell and PFUR.  I promptly questioned Mr. Campbell about these allegations, and he responded that he had never done and would never do any such thing and that he had no idea what PSBA was talking about.

26.     The same day, Mr. Campbell received and forwarded to me an overbroad "LITIGATION HOLD NOTICE" Bochetto & Lentz's David Heim, PSBA's counsel of record in the SLAPP Suit, threatening "**extreme penalties against you**" if Mr. Campbell did not undertake to undertake a litigation hold of all ESI "relating in any way to the above-referenced matter" dating all the way back to January 1, 2010 (even though the supposed tortious conduct all occurred in the Spring of 2017).  Notably, Mr. Heim emailed this letter to Mr. Campbell's PFUR email, but did not include a courtesy copy of the Complaint to enable Mr. Campbell even to begin to assess what might "relate in any way" to the SLAPP Suit.  Mr. Campbell and I interpreted this letter not as a *bona fide* preservation letter, but as a tool for attempting to further intimidate Mr. Campbell.

27.     The announcement of the SLAPP Suit, and the service of the threatening spoliation letter, succeeded in silencing PFUR.  Mr. Campbell decided that, as PFUR's president, he could not allow uninsured PFUR to incur any further risk, so he removed all PSBA-related content from the PFUR website.

28.     Mr. Campbell, however, was personally determined to continue his First Amendment speech and activities, and on July 22, 2017, established the www.psbahorror.com

9

website in his own name with his personal funds, reposted the PSBA content from the PFUR website, and continued his First Amendment activities from the new website. He also continued serving RTKL requests upon PSBA's members, as well as publicly condemning the SLAPP Suit and lobbying PSBA's government-entity members to repudiate the SLAPP Suit and to call for its withdrawal. Mr. Campbell's lobbying resulted in the passage of 40 school board resolutions condemning the SLAPP Suit, the first of which was passed on July 24, 2017. Mr. Campbell and PFUR also started vocally advocating for the passage of strong anti-SLAPP legislation, Senate Bill 95, which remains pending before the Pennsylvania House of Representatives, having passed the Pennsylvania Senate on a 42-8 vote.

<u>PSBA's Improper Conduct in the SLAPP Suit Relating to Service</u>

29.     Mr. Campbell publicly posted on his website, and PSBA's lawyers were aware, that he was on vacation in Europe with his family between July 26 and August 12, 2017.

30.     I monitored the Cumberland County docket and noted that a "return of no service" had been filed on August 24, 2017 noting that the Bucks County Sheriff had made three service attempts while Mr. Campbell and his family were abroad on vacation. The return of no service noted that Mrs. Campbell's car was in the driveway on all three attempts and contained no suggestion that service was being evaded. Instead, the return of service suggested "posting."

31.     PSBA, through Bochetto & Lentz, continued their misuses of the litigation process for the purpose of silencing and intimidating Mr. Campbell. Although PSBA and its counsel were aware that Campbell had been on vacation in early August, PSBA did not send the Sheriff back out, nor did their counsel seek leave make service by sending a copy of the complaint to the email address Mr. Heim previously had used to transmit his threatening litigation hold demand to Mr. Campbell and PFUR. Instead, on September 12, 2017, PSBA filed

10

a motion for leave to make service solely by newspaper publication – among the least likely ways of giving actual notice to a known party with a known residence and known email addresses.  The motion was accompanied by an affidavit by Mr. Heim falsely asserting that the Bucks County Sheriff had concluded that Mr. Campbell was affirmatively avoiding service, and asserted that he was "evading" service.  Although the Cumberland County court granted the motion on September 22, 2017, it also required PSBA to make service by posting, certified mail, and regular mail, i.e., means of service that, unlike the newspaper publication requested by PSBA, were intended to actually provide notice to Mr. Campbell and PFUR.

<u>My Retention</u>

32.     Although I invested numerous hours assisting Mr. Campbell, whether I would be formally retained as counsel, and the scope of such retention, was not settled until the latter part of September.  At that time, Mr. Campbell's personal insurer appointed Nauman Smith to defend him in the SLAPP Suit, and I was retained to defend PFUR in that litigation.

33.     Relatedly, I confirmed that the ACLU would serve as co-counsel with my firm in pursuing a potential First Amendment retaliation action in federal court on behalf of both Mr. Campbell and PFUR if we could not first get PSBA to back down and withdraw its frivolous and as-yet-unserved SLAPP Suit.

34.     Mr. Campbell's political goals are not mine.  I agreed to represent him because it was a First Amendment matter, and it is important to me to protect the rights of people who disagree with me.

35.     In September, we began strategizing in earnest Plaintiffs' contemplated civil rights lawsuit.  *Brentwood Academy* appeared to be directly controlling precedent sufficient to establish that PSBA itself was a pervasively-entwined state actor based on the information we

had already gathered.  To confirm our evaluation, I consulted informally with a nationally-respected constitutional scholar, Erwin Chemerinsky, who told me that based on the facts I had presented him, it was a "no-brainer" that PSBA was a state actor under *Brentwood Academy*.

36.     We also began considering additional/alternative state action theories and began actively considering asserting civil rights claims against the individual governing board members and their home school districts.  To clear the way for such claims, I updated the firm-wide conflict check that I had initially run in July only with respect to PSBA to include as potential defendants each of the 2017 governing board members and their home school districts.

37.     Based on our research, we concluded that we could make out a case that each of the individual PSBA voting governing board members was acting under color of state law, and that they could be sued for First Amendment retaliation as well.  We further concluded that a cause of action might be made out against the home districts of the Governing Board members based upon their failure to repudiate their individual director's participation in authorizing and maintaining the unconstitutional SLAPP Suit against Plaintiffs, and that the case for ratification would strengthen the longer each home school district knowingly stood by without taking any action to repudiate the SLAPP Suit and their directors' role in continuing it while the violation of our clients' constitutional rights continued.

38.     As we continued monitoring the Cumberland County docket, we noticed that PSBA had filed a praecipe to reinstate the SLAPP Suit complaint on October 3, 2017, and began to strategize preliminary objections with Mr. Campbell's defense counsel in anticipation of service.

<u>Efforts to Avoid the Need to Commence this Action</u>

39.     Although we had assembled our litigation teams, both for the defense of the SLAPP Suit and for the prosecution of the civil rights action, I was determined to attempt to resolve the situation by convincing the other side to drop their lawsuit, as I had been able to do in the Pax Christi situation.   The situation here, though, was significantly different given the selection of PSBA's litigation counsel, and was further compounded PSBA's "Outside General Counsel" who had openly declared his deep-seated animosity toward Mr. Campbell (e.g., writing to Mr. Campbell, "My opinion of you cannot be any lower") and apparently was litigating by proxy his own supposed defamation claims through the SLAPP Suit.

40.     Toward this end, we worked with Ms. Roper of the ACLU to prepare a "cease and desist" letter from the ACLU to PSBA's counsel explaining in detail that PSBA was a state actor, that its SLAPP Suit was frivolous on all grounds, and demanding that PSBA dismiss the SLAPP Suit with prejudice and confirm that it would not attempt to file another such action against our clients.  That letter (Ex. B) was sent on October 20, 2017, the day that PSBA finally effected service on our clients.

41.     Had PSBA dismissed its lawsuit at this juncture, and given the requested assurance, Plaintiffs would have considered the SLAPP Suit matter resolved, and I likely would have written off my own time, which I did not even start recording until late September, as pro bono.

42.     Defendants have falsely asserted (Reply Brief, ECF No. 59 at 7-8) that there was no time when this situation could have been resolved without the payment of money to Plaintiffs. This simply is untrue.  In addition to the ACLU's letter, Mr. Campbell, beginning in the latter half of July 2017, had repeatedly called upon PSBA, the members of its governing board, and the

13

PSBA's government entity members, through emails and publicly posted communications and videos to drop the suit before it was ever served, and PSBA's own president, Mr. Faccinetto, testified at his deposition that he understood that the lawsuit could have been withdrawn during the three months before it was served without facing a lawsuit from Mr. Campbell.  Faccinetto Dep. at 166 l. 15 – 167 l.4.

43.      Even prior to October 20, 2017, although the Complaint had not been served, to demonstrate that our clients were not hiding from anything, to make it clear that the defendants were prepared to defend themselves vigorously, and to let PSBA and its counsel know that a federal civil rights suit against PSBA and others was seriously being contemplated and that lawyers, including the ACLU, agreed with Mr. Campbell that PSBA was a state actor (a position that Mr. Campbell had been asserting in his First Amendment efforts to get PSBA's members to denounce the SLAPP Suit), on October 12, 2017, I responded to Mr. Heim's July 19 letter.  In that letter, I advised of Plaintiffs' position that PSBA is a state actor under *Brentwood Academy*, and that the demands and threats contained in his letter would be used as evidence to support my clients' First Amendment retaliation claims.  I further advised that my clients were contemplating suing the individual governing board directors, but would reconsider if they would disavow and condemn PSBA's actions in filing the SLAPP Suit.  (Ex. C).  That same day, Mr. Campbell's defense counsel, Mr. Bonn, sent a separate litigation hold demand to PSBA's counsel.

44.      Four days later, on October 16, 2017, PSBA acted to publicize the defamatory contents of the SLAPP Suit Complaint by sending a "blast" email to over 4,500 recipients containing a link to a copy of the complaint and inviting the members to read it.  The email also

went out of its way to announce that the filing of the SLAPP Suit had been approved by a unanimous vote of the Governing Board members.  (Ex. D).

45.     The next day, I wrote to Mr. Heim.  In addition to demanding that the link be disabled and a retraction issued, I advised him that the stalking and harassment allegations were false, reiterated that PSBA is a state actor, and further advised that the blast-emailing of the defamatory SLAPP Suit complaint constituted further retaliation against Mr. Campbell and PFUR for their exercise of their First Amendment rights.  (Ex. E).

46.     Although PSBA's counsel never responded to the ACLU's letter, Mr. Heim did respond to my letters of October 12 and 17 and Mr. Bonn's October 12 litigation hold letter by letter of November 2, 2017.  (Ex. F).  As is pertinent here, PSBA refused to retract the Mr. Mains' "blast" email of the draft SLAPP Suit complaint or disable the link to it.  Further, Mr. Heim wrote (without any legal citation or attempt to address *Brentwood Academy*):

> Finally, threats of "civil rights" claims based on "state action" accomplish nothing and have no plausible basis in law or fact. Neither the nature of voluntary membership in PSBA, a private corporation, nor the nature of the services PSBA members have the option of purchasing can possibly support the assertion that PSBA is a "state actor" legally capable of violating federal constitutional rights.

47.     Once the SLAPP Suit complaint had been served, defense counsel entered our appearances and, on November 9, 2017, filed Mr. Campbell's and PFUR's preliminary objections and supporting brief that again demonstrated the frivolous nature of all of PSBA's claims.  On November 15, 2017, Mr. Heim requested a 10-day extension to respond to the preliminary objections.  While I consented, I again took the opportunity to warn PSBA: "Speaking personally, you are welcome to the additional time as a professional courtesy.  To be clear, however, everything that you and your client are doing is state action, and PFUR and Mr. Campbell reserve the right to use *anything* that PSBA does to prolong or continue to press its SLAPP suit as evidence of First-Amendment retaliation in the forthcoming EDPA counter-

SLAPP suit, which likely will also seek injunctive relief.  (If PSBA would like a taste of what's coming, it can check out the filings in the ACLU/Reed Smith case against the Borough of Greensburg: https://www.aclupa.org/our-work/legal/legaldocket/owsiany-v-city-greensburg/)." (Ex. G).

48.     After the preliminary objections were filed in the SLAPP Suit, we began work on the civil rights complaint in what became this action.

49.     Throughout this time period, Mr. Campbell continued his lobbying and petitioning activities against the SLAPP Suit, including creating and posting on-line videos and sending emails in which he demanded that the SLAPP Suit be dropped, his legal fees reimbursed, and that PSBA apologize for SLAPPing him and PFUR.  In addition to repeatedly lobbying each of the approximately 600 entity members of PSBA to repudiate the SLAPP Suit, on several occasions, Mr. Campbell wrote to the 10 voting PSBA Governing Board members at their home school district email addresses and in their capacities as directors of their home school boards to demand that they repudiate the SLAPP Suit.

50.     Around Thanksgiving, my client authorized me to make one more appeal to PSBA to drop the SLAPP Suit.  On November 28, 2017, I wrote to Mr. Heim, forwarding him the draft state action portions of our complaint along with the October 31, 2005 PSERS opinion along with the following message:

> David,
>
> I am writing this email lawyer-to-lawyer and off-the-record – and I'm not copying Simon [Campbell], who has a penchant for posting my missives on his web site.
>
> We are working on Simon's and PFUR's federal First Amendment retaliation complaint and related preliminary injunction petition with a view towards filing and sending them out for service by Friday, December 22.  As I have written previously, our instructions are to sue PSBA as well as each of the ten members of its Governing Board who are elected school board members, but only in their

personal, not their official, capacities.  It is also likely that Mr. Mains will be sued
personally for his mass email republication of the defamatory SLAPP Suit
complaint.

It has occurred to me that PSBA likely has been advised they could file the
SLAPP Suit without facing liability under Dragonetti and without getting
sanctioned under Rule 1023.1.  It also has occurred to me that, in all likelihood,
no one considered whether PSBA is a state actor, and therefore no one ever
considered the liability that PSBA (and its government-elected Governing Board
members) could face under Section 1983 for First Amendment retaliation – and
for Section 1988 attorneys' fee awards – both of which are far easier to establish
as a legal matter than a Dragonetti claim.

We have researched the issue pretty thoroughly, including consulting a nationally-
renowned constitutional law scholar, whose opinion was that it is a "no-brainer"
that PSBA is a state actor under *Brentwood Academy*.  Since someone on PSBA's
side apparently is still advising PSBA that it is not a state actor, I thought it would
be useful for whoever that is (my guess is that it's Mr. Levin, not you) to have an
opportunity to evaluate the basis for Simon/PFUR's position that PSBA is a state
actor.  Accordingly, reserving all rights, I am attaching paragraphs from our draft
complaint detailing how and why PSBA is a state actor for constitutional
purposes, and always has been, as well as a copy of the referenced PSERS Chief
Counsel's report.

If you think that we are missing something, feel free to let me know.  If you don't,
and if PSBA would like to take this opportunity to defuse the situation, Simon has
been pretty public about what it would take – with-prejudice dismissal of the
SLAPP Suit, payment of all of Simon/PFUR's legal fees and expenses, and a
public apology and retraction from PSBA.  If not, this firm and the ACLU will
file the counter-SLAPP suit.  At that point, all bets will be off, and Simon/PFUR
will pursue recovery of compensatory and punitive damages, as well as our
attorneys' fees at full commercial rates.

I am writing this to give PSBA one last chance to climb down off of its high
horse, not because I have any doubts regarding my clients' position, but because I
will sleep better at night knowing that I personally went the extra mile.  Feel free
to give me a call if you would like to discuss any of this (off the record, of
course).  (Ex. H).

51.     Thereafter, on November 29, 2017, I had the one and only telephone conversation

that I have had to date with Mr. Heim.  In that conversation, I tried to get Mr. Heim to

understand the entwinement theory, although it was apparent that he was not the attorney

advising PSBA on this issue.  I further discussed with him the elements of a First Amendment

17

retaliation claim – especially the requirement that the retaliation chill a person of ordinary firmness from exercising their First Amendment rights.  In this context, I discussed at length with him the fact that Bochetto & Lentz intentionally cultivated a public reputation as ruthless litigators who go out of their way to be nasty to their litigation opponents – as the firm was already doing in the SLAPP Suit – something that Mr. Heim at no point disputed.  I also reiterated to him that my clients would seek to use everything that Bochetto & Lentz had done, or would do, in the SLAPP Suit to be "nasty" to my clients as evidence against the defendants in the First Amendment retaliation lawsuit.

52.     Shortly after that conversation ended, I followed up with an email attaching the *Brentwood Academy* decision, further explaining why PSBA's view of its government-actor status was flawed, and inviting a dialogue with whoever it was that was advising PSBA on that issue.  Ex. I.

53.     On December 6, 2017, I wrote again to Mr. Heim.  (Ex. J).  This time, Mr. Campbell and PFUR withdrew their demand for a public apology.  Instead, they demanded that PSBA dismiss the SLAPP Suit complaint with prejudice, and pay $100,000.  I advised that the offer would be deemed rejected if anything other than a with-prejudice dismissal of the SLAPP Suit were filed on December 11, 2017, the extended deadline for PSBA to respond to the preliminary objections.

54.     On December 8, 2017, I heard from Mr. Levin for the first time with a letter containing a settlement proposal that would constrain my clients' First Amendment rights.  (Ex. K).  His letter also contained PSBA's arguments for why it was not a state actor and its individual directors could not be sued for civil rights violations "with a straight face."

18

55.     I responded to Mr. Levin's letter on December 10, 2017 (Ex. L), trying one last time to disabuse him of the notion that PSBA is not a state actor, but accepting that "[i]t is now obvious that a federal court declaration of PSBA's state-actor status is needed before there will be any serious conversation to be had concerning an extra-judicial resolution of this dispute."

56.     I personally would have preferred to limit the defendants in this action to PSBA alone, and was prepared to advocate that position to my clients if PSBA would stop disputing its obvious status as a state actor.  But Mr. Levin's continued insistence that PSBA is not a government actor cemented my clients' need to individually name each voting member of PSBA's Governing Board as a defendant on the alternative theory that they were state actors acting under color of state law in collusion with PSBA in authorizing the filing and maintenance of the SLAPP Suit.

### PSBA Responds by Amending the SLAPP Suit Complaint and My Clients File Their Civil Rights Action

57.     On December 11, 2017, PSBA responded to the Preliminary Objections by amending its SLAPP Suit Complaint.  The amended complaint did nothing to cure the fatal defects of the original.  It did, however, serve to punish my clients through the litigation process, both by putting PFUR and Mr. Campbell to the expense and burden of preparing and filing a second set of preliminary objection papers, by repeating the scandalous, impertinent, and false allegations that Mr. Campbell was a criminal stalker and harasser, and, even more importantly, by suing them for Mr. Campbell's post-SLAPP Suit continuing First Amendment activities, including especially his efforts to lobby PSBA's members to repudiate the SLAPP Suit.  (Ex. M, at ¶¶ 24-32 Ex. I thereto).

58.     Following the filing of the Amended SLAPP Suit Complaint, Mr. Campbell, personally, was intimidated into silence.  He had the legitimate fear that every time he made a

RTKL request of a PSBA member or lobbied its members to repudiate the SLAPP Suit he would face additional retaliation from PSBA.

59.     We worked closely with our state court co-counsel to respond as quickly as feasible to the amended SLAPP Suit complaint, filing preliminary objections on December 22, 2017, well before they were due.

60.     We then turned our focus to working with the ACLU to finalize the civil rights complaint.  Although Mr. Campbell wanted to name the Governing Board's home school boards as defendants under a ratification theory, and Mr. Mains for his blast email republishing the highly-defamatory SLAPP Suit complaint, I prevailed upon him to initially name only the absolutely necessary defendants, PSBA and its governing board members that had voted to authorize, maintain, and amend the SLAPP Suit.  I likewise prevailed upon Mr. Campbell not to name as a defendant the eleventh member of the PSBA Governing Board, Carl Moore, who participated in the decision to file the SLAPP Suit against Plaintiffs, but was not permitted to vote under PSBA's by-laws.  We agreed, however, that we might revisit these decisions in the future.

61.     Briefing of the preliminary objections to the amended SLAPP Suit complaint was also completed on February 28, 2018, the same date that this action was filed and served.

62.     On March 22, 2018, we had a telephonic Rule 26(f) conference with Defendants' counsel, David Brown, who was to be our main point of contact throughout the case.  At the conference, Mr. Brown made it clear that Defendants had no intention of voluntarily dismissing the SLAPP Suit without a federal court injunction compelling them to do so, and that PSBA had no intention of conceding that it was a state actor such that we could risk dismissing the

individual defendants, or at least those who continued to serve on and who controlled PSBA's

Governing Board.

63.     Nevertheless, Plaintiffs remained interested in finding ways to limit the scope of

the dispute, and Mr. Campbell and I discussed the prospect of offering to negotiate separately

with individual defendants who no longer sat on the PSBA Governing Board, and who therefore

would not be necessary to keep as defendants for purposes of seeking injunctive relief since they

were no longer in a position to be compelled to act to discontinue the SLAPP Suit.  Mr.

Campbell directed me to approach Defendants' counsel about potentially settling with former

directors Foltz and Schafer, which I did in a March 26, 2018 email to Mr. Brown (Ex. N), along

with my clients' insistence that that "all substantive settlement communications with each

individual defendant be conducted in strict confidence, and that nothing of these discussions be

shared with any other defendant or their counsel."

64.     Mr. Levin responded the following day, March 27, 2018, with a blanket assertion

that his clients had no interest in paying any money:  "***Let me be clear—my clients have no

interest in paying your clients anything.  Please don't waste our time asking.  Thank you.***"

(Ex. O, Emphasis added).

65.     Thereafter, in a series of emails with Mr. Levin between March 27 and April 2

(Ex. P), I clarified that Plaintiffs would be willing to discuss settlement with Mr. Schafer, Ms.

Foltz, and any other individual defendant who wanted to discuss settlement through independent

counsel other than PSBA's counsel, and that Plaintiffs were not foreclosing the possibility that

they might settle with one or more of the individual defendants for consideration other than

monetary consideration.  Given the tone and substance of Mr. Levin's responses, I did not

believe that Defendants had any serious intention of discussing individual settlements, and, based

on this email exchange as well as Mr. Brown's statements at during the Rule 26(f) conference, I considered the settlement channel closed until after what we then anticipated would be the preliminary injunction phase of the case had concluded.

66.    In the meantime, PSBA, which had refused to commit during the Rule 26(f) conference to maintaining the status quo in the SLAPP Suit, filed a praecipe in Cumberland County on April 3, 2018 to list Plaintiffs preliminary objections in that action for oral argument pursuant to the local rules.  PSBA did so despite my telling Mr. Brown during our Rule 26(f) conference that pressing the state court action would lead Plaintiffs here to contact the Court about the need for a temporary restraining order.  PSBA's refusal to retract that praecipe, or to commit that it would do nothing further to disturb the status quo in the SLAPP Suit, led me to write to the Court, which ultimately led to PSBA's backing down and agreeing to maintain the status quo while the Court adjudicated the issue of preliminary injunctive relief (which, at the suggestion of the Court at the April 13, 2018 Rule 16 conference, was consolidated with an anticipated final injunction hearing pursuant to Fed. R. Civ. P. 65(a)(2)).

67.    Plaintiffs also pressed Defendants to complete their initial disclosures.  In particular, Defendants were delinquent in their obligation to identify and produce policies of insurance that might potentially respond to Plaintiffs claims against the various defendants. Based on my substantial experience in insurance law and familiarity with liability insurance policies, I expected that that, in addition to PSBA's own general and errors and omissions liability policies, the individual defendants' personal liability policies and the errors and omissions and general liability policies of their home school districts might be implicated by Plaintiffs' claims.

22

68.    On April 10, 2018, Defendants made a partial production of insurance policies that included PSBA's errors and omissions liability policy issued by AIG affiliate National Union Fire Insurance Company of Pittsburgh, Pa. (the "PSBA E&O Policy"), homeowners insurance policies for defendants Foltz, Faccinetto, Wolfgang, and Kerek, and a personal umbrella policy for defendant Foltz.

69.    I undertook to analyze the nature and extent of coverage provided by the Defendants' policies, starting with the PSBA E&O Policy.

70.    The PSBA E&O Policy, which provided coverage for Non-Profit Directors & Officers Liability, had several significant features.  First, it expressly disclaimed any duty to investigate claims or to provide a defense.  Defense costs, instead, were reimbursed and eroded the indemnity limits of the policy.

71.    Second, the "Other Insurance And Indemnification" clause expressly provided:

> This Coverage Section shall specifically be excess of any other valid and collectible insurance pursuant to which any other insurer has a duty to defend a Claim for which this Coverage Section may be obligated to pay Loss.  Such insurance as is provided by this Coverage Section shall apply as primary to any personal "umbrella" excess liability insurance purchased by an Insured Person.

I interpreted this to mean that the PSBA E&O Policy's coverage is excess over any other insurance policy (other than a personal umbrella policy) that imposed a duty to defend any of the Defendants against Plaintiffs' claims in this action, including any primary personal liability policy or school district policy under which an individual defendant was insured that had a duty to defend such a person.

72.    Third, the PSBA E&O Policy contains a "consent to settlement" provision that gives an insured the right to refuse to consent to a settlement by the insurer with a claimant.  This

means that each insured can prevent the insurer from paying to settle the claims against him by refusing to consent to a settlement.

73.     I also undertook to analyze the personal insurance policies of the individual directors.  The majority of these policies were substantially similar to one another in several material respects.  First, unlike the PSBA E&O Policy, these policies contained defense provisions giving the insurer the right, and imposing on the insurer the duty, to defend its insured against potentially covered claims.  Second, unlike the PSBA E&O Policy, these policies gave the insurer the right to settle claims against its insured without the insured's consent.  Third, these policies did not exclude from coverage liability arising from an insured's unpaid volunteer activities (such as serving on PSBA's Governing Board).  Fourth, these policies provided coverage for "Personal injury" that included liability for "malicious prosecution."  Fifth, these policies contained Supplementary Payments provisions providing that certain amounts, including defense costs and court-awarded "costs" of suit were covered outside of the policies' indemnity limits of liability for any case defended by the insurer, regardless of whether or not indemnity coverage ultimately existed.

74.     I interpreted the personal liability policies as potentially providing coverage for the individual directors because this action can be viewed as constituting an action for malicious prosecution for insurance coverage purposes.  Further, if such an insurer undertakes to provide a defense, I interpret these policies as potentially providing unlimited coverage for any award of attorneys' fees to Plaintiffs because 42 U.S.C. § 1988 expressly defines such an award as part of the "costs" of suit, and therefore constitute Supplementary Payments under these policies. Moreover, if a duty to defend were triggered, I interpret any such policy as primary to the coverage provided by the PSBA E&O Policy because of that policy's excess insurance clause.

75.     Because of these and other considerations, I considered it important and in my clients' interests that the Complaint in this action as well all related claims be tendered to all insurers who had potential coverage responsibilities to one or more defendants.  As a result, I pressed Defendants' counsel to provide full copies of all of the individual defendants' personal liability policies as part of their initial disclosure obligations, and to tender the complaint to them, and told them that we would tender the complaint directly if they did not – which we did in several instances.

76.     In addition, because we believed the PSBA's general liability policy might be implicated; we pressed Defendants' counsel to provide a copy of that policy as part of the initial disclosures, and tendered the complaint to that insurer after the policy was provided.

77.     Further, because we believed that the home districts' insurance policies might also be triggered, I pushed Defendants' counsel for the production of those policies as part of the initial disclosures, but they resisted producing them.

78.     Rather than fight about it, I informed Mr. Levin that we would obtain the policies through RTKL requests to the Defendants' home school districts, which we did after Mr. Levin informed me that he had no objection.  I also explained to him that we would be tendering the complaint to all of the district's insurers if they did not, to which Mr. Levin raised no objection. Thereafter, I sought and obtained the school district's general liability and errors and omissions policies from those districts and tendered the complaint to each of them.

79.     I analyzed the home district's general liability and errors and omissions policies upon receipt.  The general liability policies were largely based on standard Insurance Services Office (ISO) forms.  They provided coverage for "personal injury" including malicious prosecution for offenses "arising out of your business."  They provided that the insurer had a

25

right to settle and a right and duty to defend suits that triggered the policies, and provided supplementary payment coverage outside of indemnity limits for court-awarded "costs."  The "who is an insured" section provided that directors are insureds with regard to their duties as directors, and additionally provided that volunteer workers are insureds "while performing duties related to the conduct of your business."

80.     While I generally represent insurers in insurance coverage litigation, a creative policyholder attorney would argue that the SLAPP Suit constitutes malicious prosecution, that the individual PSBA directors are insured under the district's general liability policies because they fit the definition of "volunteer worker", and their activities as a PSBA member are, definitionally, "related" to the business of the school district since that is the fundamental reason why school boards join PSBA, such that, construed liberally in favor of the insured, this lawsuit triggers potential coverage under the school districts' general liability policies.

81.     The school districts' errors and omissions policies generally provided that the insurer had the right and duty to defend a potentially-covered claim.  Some of them gave the insurer the right to settle without the insured's consent.  Others, while containing a consent-to-settlement provision, required only the consent of the school district, and would not have required the consent of an individual insured director.  Individual school directors are insured under these policies while acting within the scope of their duties for the school district.  Some of the policies excluded indemnity insurance for claims arising out of service on boards of entities that were not under the exclusive control of the school district, but nevertheless provided that the insurer would defend the insured against any suit that arose out of such participation.  Again, I concluded that there were potentially-meritorious policyholder arguments to be made that

coverage, at least for defense, was triggered under some or all of the home districts' errors and omissions policies.

82.     Based on my analyses of the policies, I undertook to tender this action to the general and errors and omissions insurers of each of the individual defendants' home school districts.

<u>Defendants Embark on a Scorched Earth Litigation Strategy in this Action</u>

83.     Defendants in the meantime made it clear that they intended to continue using the litigation process to punish my clients.

84.     On April 26, 2018, Defendants served a patently abusive set of 208 requests for admission the great bulk of which asked Plaintiffs to admit matters about which they could not possibly be expected to have knowledge.

85.     On April 28, 2018, Defendants served sets of largely inappropriate interrogatories and document requests having little to do with issues relevant to the injunction phase of the case. Instead, the requests largely sought to invade Plaintiffs' First Amendment rights to free association, and Plaintiffs' subsequent objections on these grounds were not challenged by Defendants.

86.     I repeatedly emailed Mr. Brown asking for a telephone conference to discuss what facts really were disputed and required discovery as well as to discuss PSBA's abusive paper discovery.

87.     On May 4, 2018, I, along with Ilan Rosenberg, had a lengthy telephone conference with Mr. Brown to discuss, among other things, the possibility of limiting the scope of disputed factual issues so as to limit or eliminate the need for fact depositions and/or their scope, Defendants' abusive discovery requests to Plaintiffs, and Defendants' failures to comply with their discovery obligations.

88.     With respect to Defendants' discovery requests, Mr. Brown conceded that the bulk of the requests for admission were inappropriate.  He said that they were not drafted by him, that he would never have drafted such a set of requests for admission, but that he had no authority to pull them back and serve appropriately-tailored discovery requests.  He likewise said that he had not prepared the interrogatories or document requests, and that they would have been different if he had done so.

89.     We further discussed the possibility of agreeing that certain matters were not disputed.  I specifically asked Mr. Brown if the parties could agree that being sued for making RTKL requests and engaging in protected speech and petitioning activities would be sufficient to chill a person of ordinary constitutional firmness from exercising his First Amendment rights so that we would not need to pursue further discovery on this issue, such as seeking to build a record of Bochetto & Lentz's intentionally-cultivated reputation for thuggishly intimidating litigation conduct and PSBA's knowledge of that reputation.  Mr. Brown said that Defendants were not willing to concede anything, and that Plaintiffs should proceed with the discovery they felt that they needed.

90.     We also discussed the possibility of entering into tolling agreements with the three new 2018 PSBA Governing Board members for their potential liability for failing to act to cause the dismissal of the SLAPP Suit, and against Mr. Mains for his October 16, 2017 blast email of the defamatory SLAPP Suit complaint.  A copy of my confirmatory May 4, 2018 email is attached as Ex. Q.

91.     At the same time, Defendants made clear that they intended to continue using their court filings, as they had in the SLAPP Suit, as a public platform for their efforts to smear Mr. Campbell and PFUR through inappropriate and nasty personal attacks. On the evening of

May 4, the same day that we spoke with Mr. Brown, Defendants filed their brief in opposition to Plaintiffs motion for entry of a permanent injunction (ECF No. 18).

92.     Defendants repeated the defamatory "stalking" and "harassment" allegations from their SLAPP Suit complaints, again falsely alleging that "Campbell also went so far as to send Leader a link to a video of her granddaughter, causing Leader emotional distress."  (*Id*. at 8). This allegation was utterly irrelevant to any issue in either the SLAPP Suit or this action, and by this time, Defendants had been on notice for many months that this allegation was false, still had done nothing to verify it, and apparently were "slow-walking" the production of the email from Mr. Campbell containing the alleged link to Ms. Leader's personal video – perhaps because the most rudimentary investigation into this claim would have confirmed that it was false, as I and Mr. Campbell confirmed within minutes of finally receiving production of the alleged "stalking" and "harassing" email four days later.

93.     Mr. Levin's personal grudge against Plaintiffs was also on full display in this brief, which made a point of emphasizing that one segment of Plaintiffs' May 21, 2017 petitioning video, for which he had been sued in the SLAPP Suit, mocked a cease-and-desist letter from Mr. Levin – "after receiving a letter from PSBA's outside general counsel, Michael Levin, … Campbell posted a second, half-hour-long video on his web site including one segment mocking PSBA's counsel's letter."  (*Id*. at 8-9).

94.     Defendants brief also contained unseemly anti-immigrant remarks aimed against Mr. Campbell, a naturalized American citizen of British birth, such as accusing him of using the RTKL "soapbox in Hyde Park" and a "megaphone for his invective" (p. 7 n.6), a "soapbox that Campbell is using to express his venom" (p. 15), and "Campbell is using the RTKL as if he were back in London standing atop his soapbox in Hyde Park."  (*Id.*).

29

95.     Notably, Defendants' brief emphasized PSBA's retention of Bochetto & Lentz to prosecute the SLAPP Suit, as well as that firm's allegedly "excellent" reputation.  (*Id.* at 24).

96.     Further, Defendants contested that the filing of the SLAPP Suit alone was sufficient to deter a person of ordinary firmness from continuing to exercise his First Amendment rights.  (*Id*. at 43-44).  Had they instead agreed not to contest this point, I would not felt the need to make a record in discovery concerning Bochetto & Lentz's intimidating reputation and Defendants' knowledge of it.

97.     Thereafter, Plaintiffs served a Rule 30(b)(6) deposition notice on PSBA.  (Ex. R). "The decision to hire the law firm Bochetto & Lentz to prosecute the lawsuit against Plaintiffs" was topic 25, as to which PSBA CEO Nathan Mains was designated, without objection, to testify for PSBA.

98.     Defendants' anti-immigrant invective was particularly offensive and upsetting to one member of our team, Ilan Rosenberg, who himself was born, raised and lived until the age of 27 in Mexico, and is very active in immigration causes, including serving as a board member and immediate past-president of the Hebrew Immigrant Aid Society (HIAS).  When Mr. Rosenberg shared with Mr. Brown that he was genuinely upset and offended in a subsequent telephone call, Mr. Brown emphasized that those were not his words, and that those passages, as well as the repetition of the false and defamatory stalking allegations against Mr. Campbell, had not been written by him.

99.     By this point, Defendants had communicated a flat refusal to consent to any monetary settlement with Plaintiffs.  In addition, they had made it clear that they were intent on litigating in a scorched earth manner, resisting their discovery obligations, serving abusive discovery, contesting every factual issue, and continuing their improper efforts to blacken

Plaintiffs in their public court filings.  Mr. Campbell, who had always wanted to consider suing the home school districts of the Governing Board members, again started pushing to amend the Complaint to sue the school districts on a ratification theory (which Plaintiffs could have done as of right in the face of Defendants Rule 12(b)(6) motion).  I did not want to delay the injunction proceedings by amending the complaint at that stage to start adding new parties, but I was open to considering amending the Complaint at the damages stage.  Further, I was amenable to writing to the solicitors of the school districts to place them on notice that Plaintiffs in fact were asserting claims directly against the districts and to demand, as Mr. Campbell had done repeatedly in the Fall of 2017, that the home school districts take action to repudiate the SLAPP Suit and to cause it to be dismissed.

100.    On May 7, 2018, Defendants finally produced the supposed "stalking" email with the alleged link to Ms. Leader's private family videos.  The email turned out to be a March 27, 2017 email from Mr. Campbell to a union representative at a Western Pennsylvania community college that Mr. Campbell had blind-copied to numerous other recipients, including Ms. Leader (and Mr. Mains).  It took almost no time and a modicum of inquiry to determine that the link in the email was nothing more than an inoperative link that Mr. Campbell had mistakenly included in the email that was a YouTube "edit" link and not a "watch" link.  When clicked upon by someone other than the owner of the YouTube channel, an "edit" link redirects the browser to the Google sign-in page, or if the person were already logged into Google, to that person's own home YouTube Channel.  If anyone other than Ms. Leader who was sitting at her home computer where she was already logged into Google, had clicked on the link, it would have taken them to a Google log-in page, and then to their own home YouTube channel, or if that person did not have a YouTube channel, to a page with a message "Video Not Found".

31

101.    Consistent with my May 4 conversation with Mr. Brown that Plaintiffs were contemplating amending their complaint to add the three new 2018 Governing Board members as defendants, on May 8, 2018, I wrote to the insurance carrier for the home school districts of two of the three new governing board members (I had not yet received policy information for the third new director's home school district), advising that Plaintiffs were contemplating adding these directors as additional defendants, and asking that the consider my correspondence to constitute, as appropriate, a tender of a claim, notice of a claim, notice of a potential claim and/or notice of occurrence.

102.    I had further email correspondence with Messrs. Brown  and Levin on May 12, 2018 (Ex. S) regarding Defendants' continuing discovery defaults as well as to communicate the retraction of Plaintiffs' offer to enter into a tolling agreement with the three new PSBA Governing Board Directors.  My email asserted Plaintiffs' position that both the new directors and their home school districts faced liability for ratifying the continuation of the SLAPP Suit: "At this point, in Plaintiffs' view, the new directors, who have not sought dismissal of this action and/or tendered their resignations, and the school districts that cloak them with their mantle of state authority and permit them to remain in their positions as PSBA Governing Board directors, are just as culpable for the continuation (if not the procurement) of the SLAPP Suit as are the other remaining directors (and their home districts who also permit them to remain as PSBA directors)."

103.    On May 13, I sent an email to school solicitors for the home districts of the members of PSBA's 2018 Governing Board, including seven of the individual Defendants to this action.

104.    On May 14, I exchanged correspondence with Mr. Brown regarding Plaintiffs
intention to add the three new 2018 Governing Board members under a theory of ratification and
reasons why we believed that such claims were legally viable.  (Ex. DD).  That email also
articulated to Mr. Brown the numerous conflicts that we believed existed between the interests of
the PSBA and the individual defendants, and among the individual defendants, as well as the
three new Governing Board Directors that Plaintiffs wanted to add as defendants following the
injunction phase of the case.

105.    That same day, I wrote to the school solicitors for the home districts of the three
Individual Defendants who were formerly members of the 2017 PSBA Governing Board
communicating a similar message as my May 13 email regarding the districts' potential liability
for ratifying the acts of their directors, but without any suggestion that these districts take any
affirmative action to cause PSBA to discontinue the SLAPP Suit.  (Group Ex. T).

106.    The following day, I sent another group email to the school district solicitors for
12 of the school districts, omitting Keystone School District, home district of resigned 2018
PSBA Governing Board Director Stacey Thompson, forwarding Plaintiffs' reply brief and
reiterating the that Plaintiffs were asserting claims against the Districts.  Again, I was inviting a
settlement dialogue with the district's insurers, whose policies I believed were triggered, were
likely primary to the PSBA E&O Policy, would pay Section 1988 attorney's fees outside of
policy limits, and had the right to settle claims notwithstanding any refusal by any individual
director to consent to such payments to settle claims against them.

107.    I did not further communicate with the solicitor for Keystone School District, the
home school district of 2018 Governing Board Director Stacey Thompson.  Mr. Brown informed
us that she had resigned "for personal reasons" from the PSBA Governing Board in early May,

and we subsequently learned that she recently had lost her husband. In light of her personal circumstances, a decision was made in consultation with Mr. Campbell not to further pursue any potential claims against her or her home school district.

108.    My May 13, 14, and 15 emails went to the solicitors of the home school districts of the 2017 and 2018 PSBA Governing Board and had several purposes. First, they were intended to make clear that Plaintiffs in fact were asserting monetary claims against the districts for their ratification of the SLAPP Suit. This was in part due to a reservation of rights letter that had been produced in discovery from an insurer of one of the school districts asserting that no coverage had been triggered because there was no claim against the district. Plaintiffs wanted the districts and their insurers to understand that claims in fact were being asserted against the districts, even if the districts had not yet been sued. Second, Plaintiffs in fact wanted the home districts of the 2018 PSBA Governing Board Members, as governmental entities, to repudiate the SLAPP Suit and to take steps to get PSBA to withdraw it. Third, Plaintiffs wanted to strengthen the factual basis for eventually adding the districts as defendants, and documenting a demand directly to the school solicitors was seen as step towards building the ratification case.

109.    In communicating with the solicitors (as well as the insurers), I was communicating with counsel for government entities against which my clients were asserting a claim and hoping to join as defendants at the damages phase of this lawsuit. The ratification theory was one that we had explored, believed to be viable, but had decided at that time not to pursue. I was neither communicating nor intending to communicate directly with any of the individual defendants. Instead, it was my intention to induce the districts to act as entities through a majority vote of a quorum of their own boards to take action to repudiate the SLAPP Suit.

110.     Contrary to Mr. Freund's June 13, 2018 declaration (Ex. D-70 at ¶ 21), I had no way of knowing with whom Mr. Freund, as the entity's solicitor, would share my correspondence.  Given that Mr. Faccinetto was the conflicted director, it would have been appropriate for Mr. Freund and/or the district to wall Mr. Faccinetto off from such communications as well as from consideration of what, if anything, the district should do.  As for Mr. Schafer, I would not have expected Mr. Freund to share district business with him because Mr. Schafer had ceased serving as a director of Northwestern Lehigh School district in November 2017, and had been off the board for over six months prior to my initial May 13, 2018 correspondence.

111.     Each school district is a distinct government entity, and each has an official lawyer, its solicitor, to whom I directed communications.  Official action is taken by a quorum of all nine directors of a school board.  Given that the each of the individual defendants would have a conflict of interest in voting on whether and how to repudiate or otherwise take board action concerning their own participation in authorizing the filing and continued maintenance of the SLAPP Suit, as PSBA itself trains school directors, https://www.psba.org/wp-content/uploads/2016/08/5Intro_School_Law.pdf, "[a] school director must abstain from voting if vote would constitute a conflict of interest," my intention was not in any way to influence the individual defendants, but rather to influence each government entity to take action through a majority of the other eight unconflicted district directors.

112.     In any event, I did nothing to circumvent, and had no intention of making an "end-run" around, Levin Legal Group's representation of the individual defendants and improperly communicating with them by writing to the school district solicitors, and no one suggested that that was what I was attempting to do.  Had Mr. Levin (or any of the school district

solicitors to whom I wrote) made such an assertion, I would immediately have ceased further communications until the situation were sorted out, or appropriate guidance was sought from the Court.

113.    Likewise, if at any time, Mr. Brown or Mr. Levin had contacted me to assert that my contacts with the school district solicitors were impermissible in any sense, I would have suspended such communications, at least until we could address the situation and, if needed, obtain guidance from the Court.

114.    Further, it was never my intention to interfere in any way with anyone's ability to adduce evidence in this case, and to my knowledge nothing I did or said had that effect.  In fact, neither side served any subpoenas on any non-parties to this action.

115.    Later in the day of May 14, I spoke and corresponded with Ms. Roper.  She told me that she had received a call from Mr. Levin who had broached the notion of a non-monetary settlement.  Ms. Roper said that Mr. Levin had been provided copies of my emails to the school solicitors and that he thought that the tone of the email was not conducive to settlement discussions.  Nothing was communicated to me that Mr. Levin believed that my correspondence to the school district solicitors was unethical or otherwise out of bounds, and neither Mr. Levin nor Mr. Brown ever made any such claim, until Defendants filed this motion over two months later.

116.    After I was told by Ms. Roper that my email to the school district solicitors had been forwarded to Mr. Levin, I again wrote to them to make clear that Plaintiffs expected the solicitors and/or the districts' insurers to maintain confidentiality if they wanted to engage in any settlement dialogue with Plaintiffs.  My statements were not intended as a "threat" to anyone. My observation that Plaintiffs considered communications between the districts and/or their

insurers and PSBA or the individual defendants to be responsive to Plaintiffs' document requests

was an assertion of fact, as such communications are responsive to Plaintiffs document requests,

and Defendants in fact produced certain correspondence between the school district insurers and

individual defendants.  And my statement that sharing what was intended to be a confidential

settlement communication was a breach of "etiquette" that would not be favorably viewed in

settlement discussions was in fact an accurate representation of my clients' reaction that he

wished me to communicate to the solicitors, and I did not believe that it was inappropriate to do

so.

117.    Because correspondence between the school districts and PSBA is responsive to

Plaintiffs' discovery requests, I followed up with Mr. Brown on the subject on May 16, writing:

> Finally, a reminder that Plaintiffs' discovery requests are ongoing and the
> Defendants remain under an obligation to promptly supplement their
> production.  Thus, for example, Request No. 10 seeks "All documents
> constituting or pertaining to communications between PSBA and any school
> district and/or individual member of PSBA pertaining to any communication
> between Simon Campbell and/or PFUR and any school district and/or individual
> member of PSBA."  Request No. 51 seeks "All documents reflecting or pertaining
> to correspondence between any individual defendant and the school district of
> which they are or were elected officials pertaining to Simon Campbell, PFUR, the
> SLAPP Suit and/or this action."  We have reason to believe Defendants have in
> their possession documents responsive to these requests, including documents
> created or transmitted this month, that have neither been produced nor
> logged.  Please supplement your production and/or your log with these
> communications.

118.    I reiterated this request in a May 17 email to Mr. Brown.  Neither Mr. Brown nor

Mr. Levin ever disputed that such communications in fact were responsive to document requests

Nos. 10 and/or 51, to which the Defendants previously had responded that they would produce

responsive documents (subject to any claims of attorney-client privilege as to request no. 51).

119.    On the evening of May 16, in an effort to engage Defendants in a settlement

dialogue, I wrote to Mr. Levin to emphasize that there could be no meaningful discussions so

long as all Defendants maintained their blanket refusal to consent to any monetary settlement.  I advised him that Mr. Kristofco had confirmed that this remained the position of the three former director Defendants and encouraged Defendants to reconsider their refusal.

120.    On May 17, Mr. Brown responded to Plaintiffs' offer of a tolling agreement with regard to Plaintiffs' defamation claims against Mr. Mains by threatening a defamation lawsuit by Mr. Mains against Mr. Campbell on unspecified grounds.  We gave notice of this threat to Mr. Campbell's personal insurance carrier.

121.    On May 18, I sent individual emails to the solicitors for the home school districts. Those emails forwarded my May 16 email to Mr. Levin regarding Defendants' refusal to consent to any settlement, which I wanted the districts, and their insurers, to appreciate.  I also reiterated my clients' position that by failing to repudiate the SLAPP Suit, the home districts were ratifying the actions of their sponsored director in violating Plaintiffs' First Amendment rights.

122.    One of the school solicitors, Michael Cassidy, responded to my May 18 email. Far from expressing offense or outrage at my prior correspondence, Mr. Cassidy wrote that he "[found my] emails to be rather witty and amusing."  This led to an email exchange in which he questioned the legal basis of Plaintiffs' contemplated ratification-based civil rights claim against the home school districts, which led me to sketch out in some detail our working theory, and to invite a further dialogue.  Specifically, I wrote the following to Mr. Cassidy:

> There is a clear basis for imposition of liability on the district on an acquiescence/ratification theory stemming from the plurality opinion in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).  It is not a common theory, but it is well-recognized, and in fact is mentioned in the commentary to the Third Circuit's model civil rights jury instructions.  It is most frequently seen in the polic[e] misconduct and public employment contexts that, involve a "one and done" constitutional violation that is subsequently ratified by the government body.  Here, by contrast, PSBA's filing and maintenance of the SLAPP Suit constitutes an ongoing chilling of Plaintiffs' First Amendment rights.

Simon thinks that your response on Friday reflected a mistaken focus on state court municipal liability law.  So, here, in a nutshell, is the federal constitutional theory (which remains subject to further refinement):

1.     The School Board joins PSBA as an entity.

2.     As a result of that entity membership, each board member is given derivative membership, a "badge" of government authority, so to speak.

3.     When it comes to PSBA activities, by definition, the board member is never doing anything without his "badge".   There is no such thing as an "off duty cop" here.

4.     At all times, the school board has absolute control over whether its school district official  continues to have his PSBA "badge".

5.     While the "badge"-toting board member may control the decision over whether he chooses to run for PSBA Governing Board, definitionally, he is wearing his badge when he does so.

6.     And, while the school board may not have the ability in advance to control what its badge-wearing director does on the Governing Board, the home school district retains absolute authority at any time to immediately end its director's further membership and participation in the PSBA Governing Board's unconstitutional violations of Plaintiffs' rights (and further to publicly repudiate what the director has done while on the Governing Board).

7.     Unlike the bad cop who uses excessive force on an arrestee in a discrete instance, and then the constitutional violation is over, PSBA's First Amendment retaliation against Plaintiffs is ongoing.  By authorizing its continuation and/or acquiescing in it your client's badge-wearing director qua PSBA Governing Board member is participating in the continuing violation of Plaintiffs' First Amendment rights.

8.     Your client, Cumberland Valley SD, the school board that gave PSBA Governing Board member Gossert the "badge" that permits him to be on the PSBA Governing Board is well aware of PSBA's unconstitutional SLAPPing conduct of Plaintiffs (and, we posit, privately applauds it). If it leaves Mr. Gossert on the Governing Board to keep chilling Plaintiffs' speech, the District acquiesces in its own director's unconstitutional conduct as a PSBA Governing Board member, thereby ratifying it and owning it as the District's own action.

The foregoing, at a minimum, is a colorable theory of Section 1983 liability against the PSBA Governing Board Members' home school districts.

(Ex. U).  I did not hear further from Mr. Cassidy.

123.     For better or worse, I am given to making cultural references, frequently in my correspondence, sometimes in my briefs.  "Crazy train" is a cultural reference to a1980 Ozzy Osbourne song and a line from its refrain, "I'm goin' off the rails on a crazy train."  I intended it as a facetious, short-hand reference to the facts, as also expressed in my correspondence, that PSBA had rejected numerous opportunities to drop the SLAPP Suit and end the dispute, either for nothing, or for far less than Plaintiffs were demanding now that they had been forced to institute a civil rights lawsuit to vindicate their constitutional rights, and that PSBA and the individual defendants remained intent on continuing to SLAPP Plaintiffs, and refusing to consent to any monetary settlement with the Plaintiffs.  I intended this reference to be taken in the context of the facts that I disclosed, as Mr. Cassidy apparently did.

124.     Obviously, this cultural reference was misguided in that many of the people who have seen it did not understand it as such.  Were I to have been able to do it over again, and had I understood that it would be misunderstood, I would not have made it.

125.     Defendants have asserted that I misrepresented the amounts of fees that had been incurred as "several hundred thousand dollars" and increasing rapidly as of May 15, 2018.  This representation was accurate.  By that point in time, the fees incurred by this firm and the ACLU in this action were around $250,000.  They exceeded $300,000 by the end of May, and this did not count the substantial amount that already had been incurred by two sets of counsel in connection with defense of the underlying SLAPP Suit and would be part of Plaintiffs' compensatory damages claims.  Perhaps I should have been more respectful of Mr. Levin in my phrasing, but a lot of this was due to the Defendants' scorched-earth litigation tactics, as well as their insistence on pressing patently non-meritorious arguments such as urging *Younger*

abstention while failing to cite two controlling appellate precedents, one from the Supreme Court and one from the Third Circuit, that completely foreclosed any such argument.

126.    While it had proven impossible to have principled discussions with Mr. Levin, I did keep a channel of communications open with Mr. Brown, who did not appear to share Mr. Levin's personal animosity towards Mr. Campbell, and repeatedly told me and my partner Ilan Rosenberg that he would be handling things much differently if he were in charge of the situation.

127.    Late in the afternoon of May 18, I had a lengthy conversation with Mr. Brown. Among other things, we discussed the Defendants' blanket refusal to consent to settlement – which he confirmed remained the position of all Defendants, and why Defendants were insistent on continuing to try to press the transparently-frivolous SLAPP Suit.  Mr. Brown told me that the main people behind the decision to start the suit, Messrs. Levin and Mains, were like Nixon and Johnson were in Vietnam, i.e., they were already "too deep" into the situation to get out.  He also said that as long as the SLAPP Suit was silencing Mr. Campbell, it suited their goals and that they were greatly afraid of what Mr. Campbell would say if he were freed to resume his speech and petitioning activities.   He further told me that he personally hoped that the decision-makers on his side might see things differently after their Rule 12(b)(6) motion was denied, which he candidly conceded was a virtual certainty in his own mind, a sentiment he repeated in several subsequent in-person discussions that we had while he was in my offices for depositions.

My Communications with Mr. Kristofco

128.    Shortly after we received the first batch of insurance policies, on April 12, 2018, I received an email from Michael Kristofco stating that he had been retained by Defendants Voit, Foltz and Schafer, the three defendants who no longer were serving as members of PSBA's Governing Board, to represent them in connection with settlement discussions.  Because it

seemed that Mr. Kristofco had not read my email exchanges with Mr. Levin regarding potential individual settlements and Defendants' blanket refusal to consent to any monetary settlement, I sent him the email chain of that correspondence to review.

129.    I first spoke with Mr. Kristofco on April 13.  In that conversation, we discussed my clients' "ground rules" for any substantive settlement discussions, including my client's strong insistence on full confidentiality.  I further told Mr. Kristofco that, unless his clients were willing and able to offer material assistance in helping Plaintiffs to make their case against the remaining Defendants, any settlement would have to involve the payment of money.  I also discussed with Mr. Kristofco the adamant "no-pay" position that had been communicated to me by Mr. Levin on behalf of all defendants.  I also discussed with him material provisions of the PSBA E&O Policy, including the fact that as long as that was the only policy responding to the claim, and as long as the insureds refused to consent to settle, there could be no meaningful settlement discussions.

130.    I followed up my discussion the same day with an email (Ex. V) that reiterated the points I had made with him about the insurance issues.  I also shared with him my assessments of the situation, including the conflicts I perceived, and how PSBA's litigation decisions had led to Mr. Kristofco's clients being sued for compensatory and punitive damages in a federal lawsuit.

131.    I sent Mr. Kristofco Plaintiffs' injunction motion papers and invited me to review them and tell me if he thought our side was "full of it" or, if he didn't, to share his assessment with Mr. Levin.  When I hadn't heard anything further from him, I followed up with him by email on April 26.

132.    After hearing nothing further from Mr. Kristofco, I wrote to him again on May 1, expecting that it would be the last correspondence with him.  In that email, I shared with him my

interpretation of the potential import of the positions Defendants were taking regarding PSBA's status as a state actor, and how I thought that those positions could deepen the individual defendants' exposure to an award of punitive damages for which they would be directly liable for their own misconduct, which per well-settled Pennsylvania law, *Esmond v. Liscio*, 224 A.2d 793 (Pa. Super. 1966), would make them uninsurable as a matter of public policy.

133.    As the email trail shows, Mr. Kristofco then wrote soliciting a settlement demand. Mr. Campbell and PFUR, however, were unwilling to communicate a demand without knowing that an insurer with a right to settle was involved, given the blanket "no pay" position Mr. Levin had communicated on March 27.  After Mr. Kristofco confirmed that only the PSBA E&O Policy's issuer, AIG, was involved, I wrote to advise that Mr. Campbell and PFUR would not communicate a settlement demand so long as Mr. Kristofco's clients were maintaining the position communicated by Mr. Levin on March 27 – that they would not consent to any payment of a monetary settlement.

134.    I also called Mr. Kristofco on May 3, 2018 to explain that his clients needed to advise that they would not object to an insurance-funded settlement of the claims against them before my clients would make a demand in light of the Mr. Levin's prior "no pay" email, and the consent to settlement provision of the AIG policy.  I heard nothing further from Mr. Kristofco on the subject.

135.    After we demonstrated that the "stalker" allegations against Mr. Campbell were false, I made a final effort to reach out to Mr. Kristofco on May 11, 2018 (Ex. W), writing: "To the extent that the reason that your three clients are refusing to consent to any monetary settlement whatsoever to take them out of harm's way is because they have been convinced that Simon Campbell is a 'creep' who 'hacked a private, secure drive and stole family videos to

43

intimidate Emily,' please feel free to share the below and attached emails with them.  Dave
Brown has confirmed that the attached email is the sole basis for that accusation, and, as you can
see below, this all appears to be one big misunderstanding at PSBA's end."

136.    On May 14, 2018, Mr. Kristofco emailed me: "Based on your prior email, my
clients advised me that they are done with discussions."  (Ex. X).  I understood this statement to
mean that Mr. Kristofco had consulted with the three former directors and that they had refused
to change their "no pay" position that Mr. Levin had communicated on March 27, and continued
to refuse to consent to any payment by AIG to resolve Plaintiffs claims against them.

<u>My Questioning of Mr. Schafer</u>

137.    On May 23, 2018, we conducted the deposition of defendant Darryl Schafer, who
was one of the former directors with whom we had attempted to have settlement discussions that
had failed because of their refusal to communicate a retraction of Mr. Levin's March 27 blanket
declaration that the Defendants would refuse any settlement that involved payment of money to
Plaintiffs.

138.    From the outset, Mr. Schafer was extremely stressed and angry, declining to
shake anyone's hand from Plaintiffs' side, and making clear that he was upset that he was a
defendant and that was being made to appear for a deposition.  He also made it clear that he
blamed the Plaintiffs for all of this.  This did not make sense for a party who had been asked to
permit an insurer to pay for a settlement of the claims against him and had refused.

139.    Toward the end of the deposition, I decided to explore whether Mr. Schafer
understood that settlement discussions with him had not progressed because he had not agreed to
permit PSBA's insurer to pay a monetary settlement on his behalf.  This came after Mr. Schafer
testified that he had not been made aware that he was going to be named as a defendant in this
lawsuit and first learned that he had been sued when PSBA's counsel advised him to put his

44

insurance carrier on notice in response to my request (a request that was not made until April 2018).  Mr. Schafer testified that he had no knowledge of Mr. Levin's March 27, 2018 "no-pay" position email, that he had no objection to an insurance company paying money to settle on his behalf, and that he did not believe that he had ever seen any of my correspondence asking Mr. Kristofco whether his clients would consent to allow insurers to pay money to settle Plaintiffs claims against them.

140.    Although Mr. Brown, who was defending the deposition, raised a few form and privilege objections, he made no suggestion that the subject matter of my inquiry was out of bounds or inappropriate.  At the end of the deposition, I told Mr. Schafer, in Mr. Brown's presence, that if counsel for the three former directors were to communicate to us that they would permit insurance companies to pay money to settle Plaintiffs' claims against them, Plaintiffs were prepared to move forward with separate settlement negotiations with a view towards getting the former directors out of the case.

141.    Immediately after the deposition ended and Mr. Schafer had departed, Mr. Rosenberg and I sat down with Mr. Brown to discuss what had just happened.  Mr. Brown said that he was as shocked as we were to learn that Mr. Schafer apparently had not been asked whether he objected to an insurer paying a monetary settlement on his behalf, especially in light of the emails that both he and Mr. Schafer read that I had sent to Mr. Kristofco repeatedly asking whether his clients would withdraw Mr. Levin's previously-communicated blanket refusal to consider any monetary settlement with Plaintiffs.

142.    The next day, I sent further documentation of my email communications with Mr. Kristofco to Mr. Brown (Ex. Y), further elaborating on my consternation and concerns over how, per Mr. Schafer's own testimony, he was not kept apprised of material issues that led to

45

settlement discussions never getting off the ground, discussions that might have spared him having to sit through what was for him a highly-stressful and upsetting deposition.  I wrote to him lawyer-to-lawyer, and had no intention of further disseminating this email to anyone "unless it ever becomes necessary for me to demonstrate that you in fact were provided with this information and with my interpretation of recent events and their impact on the matters as discussed above."

143.    Given that Defendants now have falsely claimed that Mr. Levin's firm was unaware of my communications with Mr. Kristofco prior to late July, I feel that it is necessary to submit this email and its attachments to demonstrate that Defendants' counsel in fact was affirmatively made aware of the material substance of my communications with Mr. Kristofco by May 24.

144.    On May 25, I wrote to Mr. Freund in his capacity as Northwestern Lehigh School District, Mr. Schafer's former school district (he had left his director position there in December 2017) (Ex. Z).  I wrote that Mr. Schafer had testified that the district's assistant superintendent had read and retained all of Mr. Campbell's communications to school officials calling for PSBA's members to repudiate PSBA's SLAPP Suit, which we viewed as providing evidence supporting our contemplated ratification claims against the home school districts.  I further asked that Mr. Freund confirm that the litigation hold demanded by Mr. Campbell's state court defense counsel in October 2017 had been implemented.

145.    On May 29, I had a further email exchange with Mr. Freund in which he asserted that I had no basis for asserting a claim against Northwestern Lehigh School District.  In response, I sent him the email chain that I had sent to Mr. Cassidy outlining our ratification theory and some of the legal support for it.  I invited him to review it and to do his own research

and then have a conversation with me.  When he wrote back that he didn't like my tone, I invited him to have one of his partners talk with one of my partners to avoid having personality conflicts get in the way.  Neither Mr. Freund nor anyone else from his firm ever wrote back to me to assert that Plaintiffs' ratification theory as articulated in my email to Mr. Cassidy was frivolous or otherwise to challenge its viability, nor did anyone contact either of my partners on the case to have such a conversation.

146.    Other than Messrs. Cassidy and Freund, none of the other thirteen solicitors contacted me to discuss or challenge the legal viability of Plaintiffs' ratification theory of civil rights liability against the home school districts of the PSBA Governing Board members who had authorized and/or were permitting the continued prosecution of the SLAPP Suit against Mr. Campbell and PFUR.

147.    I also had cause to discuss the merits of the theory several times with Mr. Brown, first in the context of my client's stated intention to add the new 2018 PSBA Governing Board Directors as defendants due to their participation in the ongoing chilling of Plaintiffs First Amendment rights.  While Mr. Brown told me he didn't think that the theory was viable, he was unable to provide me with anything other than his from-the-hip reaction.

148.    I also discussed the basis of a ratification claim against the school districts with Mr. Brown in the context of my communications with the school district solicitors.  While Mr. Brown again said he did not think that such a theory was viable, he admitted that he had not done any research.  Moreover, when I asked him if that was the advice he would give his own school district clients if they received similar correspondence he said that in that situation he would take a much more cautious approach in giving advice to such a district.

149.    I asked Mr. Brown hypothetically whether a home district might face a ratification claim if it stood by while one of its directors, serving as a PSBA governing board director, voted with the rest of the PSBA Governing Board to declare that the PSBA would henceforth be solely a whites-only organization, and that delegates would be required to wear white sheets and burn crosses at the PSBA annual meeting in Hershey.  Mr. Brown thought that in those circumstances, perhaps such a claim could be viable.  When I asked Mr. Brown what the analytical difference was between the situation where the home school district stood by and refused to repudiate the continuing violation of a person's First Amendment rights and the situation where the home school district instead refused to repudiate the ongoing violation of a person's Fourteenth Amendment equal protection rights, Mr. Brown was unable to articulate any principled legal distinction.

150.    During the depositions in late May 2018, I, along with Ilan Rosenberg, had several informal, previously off-the-record discussions with Mr. Brown about many topics, including my communications with the school district solicitors.  Mr. Brown never suggested that my communications with the school district solicitors were inappropriate, much less unethical.  To the contrary, he stated that he understood why, given Defendants' emphatic no-pay position on settlement, I would start putting pressure on the home school districts, and said that if he were in my position he might do exactly the same thing.  Moreover, Mr. Brown intimated to us that our demands that the home school districts take action repudiate the SLAPP Suit were in fact causing the school districts to put pressure on PSBA to resolve its disputes with Plaintiffs.

151.    The first time I became aware that anyone viewed my communications to be ethically improper was when Defendants filed this motion on July 20.

152.     Prior to the beginning of Ms. Swope's deposition, I again asked Mr. Brown, as I had done in the past, if Defendants were prepared to stipulate that the filing of the SLAPP Suit was sufficient to chill a person of reasonable firmness from exercising his First Amendment rights so that I could dispense with the need to inquire further into the Bochetto & Lentz issues. Mr. Brown refused.  I believe that I also asked, and he also refused the same proposal prior to the start of Mr. Faccinetto's deposition.

153.     On May 29, 2018, following Ms. Swope's deposition, I wrote to Mr. Fanelli, forwarding again my May 13, 2018 solicitor email, and reiterating that Plaintiffs in fact were asserting monetary claims against Lewisburg Area School District.  My intention was to ensure that notices were being provided to Lewisburg's insurance carriers, which had a right to settle claims without their insured's consent.

154.     On May 29, the day before Mr. Faccinetto's deposition, staff counsel from his personal insurance carrier, Susan J. Wiener, entered her appearance as co-counsel for Mr. Faccinetto at 3:32 p.m.  (ECF No. 21).

155.     This led to a chain of email correspondence as to how we were going to accommodate her attendance that day since only the smallest of my office's conference rooms was available for that deposition.  In that correspondence, Ms. Wiener wrote:  "My office only received the assignment today and I was not even aware that other depositions have already taken place."  This was the basis of my assertion in my May 31 email to Mr. Spry that Mr. Faccinetto's insurance counsel at his deposition had been "literally clueless" which was not meant as any sort of a dig at Ms. Wiener's professionalism or competence, but as an accurate assessment of the fact that she had been retained the day before and knew nothing about the

dispute, all of which was placed in context in my email to Mr. Spry.  Nevertheless, I recognize in hindsight that I should have used more temperate language in making my point.

156.    On May 31, I wrote to Mr. Spry, who I had learned was Bethlehem Area School District's solicitor, not his partner Mr. Freund as I originally had believed.  Again, the purpose of my letter was to ensure that notice was being provided to the district's insurer who had the right to settle claims without the consent of its insureds.  In addition, I wanted to advise that Plaintiffs viewed Mr. Faccinetto's testimony as providing strong evidence for Plaintiffs' contemplated ratification claims against the district, and to reiterate Plaintiffs' demand that the district act immediately to repudiate PSBA's SLAPP Suit.

157.    Because Defendants had made an issue of Bochetto & Lentz's reputation, and refused to concede that the SLAPP Suit alone was sufficient to chill a person of ordinary firmness, I questioned witnesses about that reputation and whether that was why PSBA selected Bochetto & Lentz rather than using their usual litigation counsel.

158.    My partner, Ilan Rosenberg, also questioned Mr. Mains as PSBA's Rule 30(b)(6) designee regarding PSBA's retention of Bochetto & Lentz and knowledge of their reputation.

159.    While there were objections to form, and invocation of privilege, at no point was any suggestion made by Defendants' counsel that questioning on the subject matter of the reasons for the retention of Bochetto & Lentz to file the SLAPP Suit against Plaintiffs, or their public reputation, was improper or out of bounds.

160.    I regret repeating Judge Dubois's remarks concerning the Bochetto & Lentz Christmas card, which was made in the course of his remarks to counsel at the Rule 16 conference on April 13 about that firm's reputation for being "pugnacious.  On reflection, it was an ill-considered question that I wish that I had not asked.  But it was never my intention, as

Defendants assert, to imply that the Court was biased in Plaintiffs' favor.  My point was that

Bochetto & Lentz affirmatively and broadly cultivates their ruthless reputation, including

through broadly disseminating their famously aggressive holiday cards, even to the judiciary.

161.    When Judge DuBois shared his observations and anecdote about receiving

Bochetto & Lentz's holiday card, although the Rule 16 conference was not recorded, he never

told counsel that his remarks were "off the record" or otherwise not to be repeated or shared.

Further, it was my impression that the card had been mailed by the law firm as part of their

mailing list distribution.

162.    On May 30, we conducted the deposition of Defendant Otto Voit.  Because of Mr.

Schafer's testimony, I was concerned that Mr. Voit similarly may not have been informed by Mr.

Kristofco that the reason that settlement discussions with the three former directors had gone

nowhere was because an unequivocal "no-pay" position had been communicated to Plaintiffs

that had effectively been reiterated by Mr. Kristofco on their behalves.  I see in the transcript that

I did suggest that Mr. Voit consider getting his own, unconflicted independent counsel.  I admit

that it was inappropriate for me to have said that directly to Mr. Brown's and Mr. Levin's client,

even with counsel present, and I apologize for making that remark.

163.    On May 30, following Mr. Voit's deposition, I wrote to Mr. Boland (Ex. AA) as I

had to Mr. Freund, again forwarding my May 13, 2018 solicitor email, and reiterating that

Plaintiffs in fact were asserting monetary claims against Muhlenberg School District.  My

intention was to ensure that notices were being provided to Muhlenberg's insurance carriers,

which had a right to settle claims without their insured's consent.

164.    On May 31, 2018, following Mr. Levin's deposition of Mr. Campbell, which I

viewed as exceedingly abusive of my client, I wrote to Mr. Brown (Ex. BB).  At the end of the

deposition, as Mr. Levin left the room, he said something about filing a "motion", which I took

to be a discovery motion.  I wrote:

> In any event, Mike left the deposition (with 3 hours left on the 7-hour clock)
> grumbling something about filing a discovery motion.  Please remind Mike that
> Judge DuBois's practice (which he reinforced at the Rule 16 conference) is to
> address discovery disputes through a teleconference, or in person conference, with
> formal motion practice only as a last resort.  So, if Mike still wants to proceed
> tomorrow after he has calmed down a bit, let's please discuss the other discovery
> issues that Plaintiffs would want to place before the Court at the same time, such
> as the still-unfixed, defective privilege log, and our right to production of those
> documents listed on the privilege log that Mr. Faccinetto identified yesterday as
> communications that he affirmatively had reviewed over the weekend for the
> purpose of refreshing his recollection for his deposition testimony, and confirmed
> that his review of such documentation had in fact refreshed his recollection (i.e.,
> providing the full foundational evidentiary basis for seeking their production
> under FRE 612(a)(2)).  While we could agree to let this sleeping dog lie until July
> (when we would need that information for trial), if Mike wants to attempt to start
> a diversionary *faux* discovery fight, we have real ones we are ready to tee up right
> now.

165.    Mr. Brown never responded, and never informed me that Mr. Levin instead had

started shopping for ethics experts for a motion against me for communications that they were

well aware of, and had never told me that the viewed as unethical or impermissible.

166.    Mr. Levin now asserts that his March 27 statement that "my clients have no

interest in paying your clients anything" referred only to Mr. Schafer and Ms. Foltz, and was not

made on behalf of all defendants.  (Reply Brief, ECF No. 59 at 13).  I view this as a recent

fabrication that simply cannot be squared with the extensive history of my correspondence and

discussions with defense counsel.  Other than exposing that this was not Mr. Schafer's position

though his deposition testimony (and that he had never been asked either to take this position or

to tell us that he had not taken this position), both Mr. Levin and Mr. Brown were clear that this

was the position of the defendants.  Indeed, I wrote to Mr. Levin on May 16, 2017 (Ex. CC) to

emphasize that, until Defendants changed their blanket refusal-to-consent to any monetary

settlement, there could be no meaningful settlement discussions – a position that I continued to

confirm in email correspondence into June.  Moreover, Mr. Brown, at our meetings and discussions that occurred around the depositions in the last two weeks in May, repeatedly confirmed that his clients, all of them, refused to discuss any monetary settlement, and thought that maybe a denial of the Defendants motion to dismiss (which he again candidly admitted he, personally, fully expected) might cause them to change their views.

167.     On June 3, 2018, after the close of Phase I discovery, I wrote to Messrs. Levin, Brown, Kristofco, AIG's Myra Cataldo concerning the parties' obligation to report to the court about settlement prospects.  In particular, I wrote to see if there had been any change in the global "no-pay" position that the Defendants had maintained since March 27:

> Our operating understanding is that Defendants' settlement position remains where it was on March 27, when Mike Levin wrote to me: "Let me be clear—my clients have no interest in paying your clients anything.  Please don't waste our time asking."  If any individual defendant might have changed his or her mind about wanting to continue as a defendant in this case, that individual's independent counsel should reach out to me forthwith for confidential settlement discussions.  Likewise, if PSBA has had a change of heart, please let me know.

> If all 11 defendants remain firm in their positions that none will consent to the payment of money to my clients, even from an insurance company, please let me know by COB Wednesday, June 6.  We will then prepare a draft report to Judge Dubois for Mike Levin's and Dave Brown's consideration reporting that the parties are not even in the same national park, let alone the same ballpark, regarding settlement.  No point in keeping the Court in suspense if it is clear that it will take judicial declarations that the state court action is a SLAPP Suit and that PSBA is a pervasively-entwined state actor for constitutional purposes, coupled with the entry of a final injunction enjoining that SLAPP Suit, before there will be any meaningful discussion of resolving the monetary aspects of this lawsuit.

168.     On June 6, having received no response, I wrote again to confirm Plaintiffs' "understanding that Defendants remain wedded to a settlement position that includes refusing to permit its insurers to pay money to my clients, as well as to conditioning the dismissal of the SLAPP Suit upon imposing limitations upon my clients' speech."

169.     On June 8, in response an email from Mr. Brown suggesting that Defendants would be interested in a settlement conference, I wrote to offer to settle with individual defendants who would consent to insurance-funded settlements, as well as other potential defendants, including school districts.

170.     On June 5, I sent an excerpt of Mr. Schafer's deposition to Mr. Kristofco and expressed to him my consternation concerning the obvious disconnect between his testimony that had no objection to an insurance company paying money to settle Plaintiffs' claims against him and Mr. Kristofco's communications with me declining to advise that Mr. Schafer did not wish to stick by Mr. Levin's March 27 "no-pay" position.  I had no intention of writing to him again or of pursuing the matter any further, but I wanted him to know, in case Mr. Brown had not told him already, that he his actions had caused real detriment to Mr. Schafer.

171.     On June 12, I sent Mr. Spry an excerpt of the deposition transcript for Mr. Faccinetto that I had just received, noted that Bethlehem Area School District had done nothing to repudiate the SLAPP Suit, and repeated Plaintiffs' stated intention to seek to add the district as a defendant in the damages phase on a ratification theory.  Mr. Spry responded that he had received it.  I followed up with an email stating that I had not meant to send it as a settlement communication, but rather with the purpose of building an evidentiary trail documenting "Bethlehem Area School District's continued conscious ratification of PSBA's ongoing violations of my  clients' constitutional rights under color of state law."

172.     None of my communications with district solicitors was intended to intimidate anyone from providing evidence relevant to this dispute, and no one ever asserted that anyone perceived that this was the case.  Again, had anyone asserted that I was attempting to intimidate witnesses, or that my correspondence was being perceived as any such attempt, I would have

immediately ceased all communications with the district solicitors, at least until I had obtained appropriate guidance.

173.    The fact of the matter is that neither side served deposition or document subpoenas on any non-party, and while, out of an abundance of caution, Plaintiffs generally listed representatives of PSBA member organizations as possibly having discoverable information that Plaintiffs might use to support their claims, there was no particular person nor any particular documents that Plaintiffs had in mind in making that generalized disclosure. As for the Defendants, their initial disclosures listed only Mr. Campbell, the individual defendants, and PSBA CEO Mains, and in-house attorneys Knade and Leader. Until Defendants filed their summary judgment papers, I had no idea that Defendants would be submitting declarations from other witnesses, nor who those witnesses might be. I had neither knowledge of any non-party witnesses, nor any motive to interfere with anyone's provision of evidence in these proceedings.

174.    The assertion that nothing short of the imposition of sanctions would have stopped me from engaging in the allegedly improper conduct is simply incorrect – and completely speculative, as no one ever communicated to me that they took issue with permissibility of those communications prior to the filing of PSBA's motion. As for the correspondence with school district solicitors, other than Mr. Levin telling Ms. Roper that he thought that the tone of my first email was unhelpful to settlement prospects, no one suggested to me that they somehow improper attempts to communicate with represented parties, were an effort to intimidate witnesses or were otherwise unethical. To the contrary, Mr. Brown said to me that if he were in my shoes, he might have done the same thing. And when Mr. Levin said something about filing a motion, I promptly wrote to Mr. Brown and asked him what the grounds for such a motion might be. But I received no response.

175.     Further, while there are a couple of things that I said or asked at depositions, several of which were fairly contentious, that I wish that I had not said, there was no suggestion that anything rose to the level of sanctionable conduct, there were no follow-up emails or discussions, no motions were filed, and Mr. Brown repeatedly advised the Court during telephonic pretrial conferences that were no further motions or other matters outstanding or contemplated.

176.     By the same token, Plaintiffs could have filed a motion over the highly abusive deposition that Mr. Levin took of Mr. Campbell.  Indeed, I wrote to Mr. Brown about it, when asking what "motion" Mr. Levin had said he would file as he exited the deposition room.  But I chalked it all up to the rough-and-tumble of a highly contentious litigation, and in the absence of a motion from Defendants, resolved to let it be and move forward with the merits.

177.     I sent one final email to the solicitors of the home districts of the 9 remaining 2018 PSBA Governing Board directors attaching a copy of the Court's decision in order to apprise them of the fact that Defendants' Motion to dismiss had been denied in all respects, and to reiterate Plaintiffs position that by failing to take action to repudiate the SLAPP Suit, the home districts were continuing to ratify the ongoing violation of Plaintiffs' civil rights.  This email, which was not labeled as a settlement communication was also intended, in part, to add to the evidentiary record of the home districts' continued inaction in the face of their knowledge that their directors who served on PSBA's Governing Board by virtue of the home districts' membership in PSBA were continuing to participate in the violation of Plaintiffs' First Amendment rights.  Finally, Plaintiffs hoped, but by this point had low expectations, that seeing the Court's *seriatim* rejection of almost all of Defendants' arguments, especially on the "state

action" issues, might actually move one or more of the districts to take action to repudiate the

SLAPP Suit.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on: October 29, 2018          _____
                                                            Jacob C. Cohn

57